No. 04-0034C
(Judge Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DELMARVA POWER & LIGHT COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF DELMARVA POWER & LIGHT COMPANY'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
Tel: (202) 785-9700
Fax: (202) 887-0689

*Counsel of Record for*
*Delmarva Power & Light Company*

Of Counsel:
David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037

Todd Goodman, Esq.
Assistant General Counsel
Conectiv
P. O. Box 231
Wilmington, DE 19899
(302) 429-3786

August 6, 2004

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ISSUE PRESENTED ..... 3

STANDARD OF REVIEW ..... 3

FACTUAL BACKGROUND ..... 5

ARGUMENT ..... 7

DELMARVA HAS A COGNIZABLE TAKINGS CLAIM UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION ..... 7

A. Delmarva's Takings Claim Arises Out Of Legal And Property Rights That Existed Prior To The Standard Contract ..... 8

B. Delmarva's Real Property Rights Were Taken Without Just Compensation ..... 12

C. Privity Of Contract Is Not A Prerequisite To A Takings Claim ..... 20

D. Delmarva Is An Express Intended Beneficiary Of The Standard Contracts ..... 22

E. Delmarva Is Not Suing As A Minority Shareholder But Rather As A Direct Owner Of An Interest In The Nuclear Stations ..... 26

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

Page

Cases:

*Ala. Power Co. v. Dep't of Energy*, 307 F.3d 1300 (11th Cir. 2002) .......... 13

*Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973) .......... 21

*Benenson v. United States*, 548 F.2d 939 (Ct. Cl. 1977) .......... 12, 21

*Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995) .......... 19

*Busby School of Northern Cheyenne Tribe v. United States*, 8 Cl. Ct. 596 (1985) .......... 24

*Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part, vacated, and remanded in part*, 301 F.3d 1328 (Fed. Cir. 2002) .......... 15, 16, 17, 25

*Cavin v. United States*, 956 F.2d 1131 (Fed. Cir. 1992) .......... 20

*Chancellor Manor v. United States*, 146 F.3d 1358 (fed. Cir. 1998) .......... 21, 22

*Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29 (2000), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001) .......... 3

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) .......... 15, 16, 17

*D&H Distrib. Co. v. United States*, 102 F.3d 542 (Fed. Cir. 1996) .......... 23

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990), *aff'd*, 526 U.S. 687 (1999) .......... 4

*Del Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998) .......... 22

*Devon Energy Corp. v. United States*, 45 Fed. Cl. 519 (1999) .......... 27

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999) .......... 21

*Glass v. United States*, 258 F.3d 1349 (Fed. Cir. 2001) .......... 23, 24, 25

*Hamlet v. United States*, 873 F.2d 1414 (Fed. Cir. 1989) .......... 22

*Houck v. Little River Drainage Dist.*, 239 U.S. 254 (1915) .......... 19

*Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) .......... 10, 11, 14, 18

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .......... 13, 21

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .......... 13, 21

*Knight v. United States*, 65 Fed. Appx. 286 (Fed. Cir. 2003) .......... 23, 24

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) .......... 22

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......... 12, 21

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) .......... 27

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 11, 12, 17

Page

*N. States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997) ............ 10

*Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978) ..................................... 2, 14, 21

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922) ..................................................................... 14

*Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir. 2002) ........................................................ 21

*Roedler v. Dep't of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) ............................ 18, 19, 20, 24, 25

*Scheuer v. Rhodes*, 416 U.S. 232 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................................ 3, 22

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001) ..................................... 3, 22

*Suess v. United States*, 33 Fed. Cl. 89 (1995) ..................................................................... 25

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) ........................................................ 13, 21

*Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985) .................................. 4

*Yancey v. United States*, 915 F.2d 1534 (1990) ..................................................................... 21

*Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ........................................................................ 11, 12, 22

*Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983) ..................................... 17

Statutes:

Atomic Energy Act of 1954 ........................................................................................ 5, 8

Mineral Leasing Act, 30 U.S.C. § 226 *et seq.* ............................................................... 27

Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* ........................................ *passim*

U.S. Constitution:

Fifth Amendment ........................................................................................ 7, 12, 18, 27

Rules:

Rules of the U.S. Court of Federal Claims:

Rule 7.2(c) ........................................................................................................ 1

Rule 12(b) ........................................................................................................ 1

Regulations:

*Standard Contract for Disposal of Spent Nuclear Fuel and/or High level Radioactive Waste*, 48 Fed. Reg. 5458 (Feb. 4, 1983) .................................................................... 23

Page

*Standard Contract for Disposal of Spent Nuclear Fuel and/or High level Radioactive Waste*, 48 Fed. Reg. 16590 (Apr. 18, 1983) .......... 23

*Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities*, 10 C.F.R. pt. 50, App. F .......... 9

Other Authorities:

*Financing Nuclear Waste Disposal: Joint Hearing on S. 637 and S. 1662 Before the Comm. on Energy and Natural Resources and the Subcomm. on Nuclear Regulation of the Comm. on Environment and Public Works*, 97th Cong. 307 (1981) (Congressional Budget Office Staff Working Paper) .......... 8

H.R. Rep. No. 97-491, pt. 1, *reprinted in* 1982 U.S.C.C.A.N. 3792 .......... 5, 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DELMARVA POWER & LIGHT COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 04-0034 (J. Miller)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF DELMARVA POWER & LIGHT COMPANY'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION

Pursuant to Rules 7.2(c) and 12(b) of the Rules of the U.S. Court of Federal Claims, Plaintiff Delmarva Power & Light Company ("Delmarva"), through its undersigned counsel, hereby submits its brief in opposition to the Motion to Dismiss Delmarva's Complaint ("Motion") filed by Defendant, the United States of America ("Government"), acting through and on behalf of the Department of Energy ("DOE").

As discussed below, both the law and the facts preclude a judgment in favor of the Government on its Motion. Delmarva was a part owner of the Salem Nuclear Generation Station Units 1 and 2 ("Salem 1 and 2") and Peach Bottom Atomic Power Station Units 2 and 3 ("Peach Bottom 2 and 3") (collectively, the "Nuclear Stations") at the time of the Government's taking and thus has asserted a cognizable takings claim for which it is entitled to just compensation. Accordingly, Delmarva respectfully requests that the Court deny the Government's Motion.

The Government's Motion is based upon mischaracterizations of Delmarva's Complaint and misapplications of the law. First, the Government argues that Delmarva's takings claim must be dismissed because there is no privity of contract between Delmarva and the Government. Privity of contract, however, has never been a necessary element of a takings claim, which requires a showing that: (1) the Government failed to act upon a preexisting duty to Delmarva; (2) the Government's actions had an economic impact on Delmarva's property interests; and (3) the Government's actions have interfered with Delmarva's distinct investment-backed expectations. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978). However, even if the Government's original intention to relieve Delmarva of its spent nuclear fuel ("SNF") contractually was presumed to be a relevant consideration, it is beyond dispute that Delmarva was expressly designated as an intended beneficiary of the Standard Contract for disposal of SNF.[1] The Standard Contracts relating to the SNF generated by the Nuclear Stations state on their face that they were being executed "for the benefit" of Delmarva. Accordingly, a scrutiny of the Government's privity and intended beneficiary arguments supports a finding adverse to the Government's Motion.

Second, the Government erroneously asserts that Delmarva was a *shareholder* in the Nuclear Stations, and that the Complaint should therefore be dismissed because it fails to meet the requirements of a shareholder derivative action. Delmarva did not own "shares" of a company or of the Nuclear Stations, but rather, owned a direct

[1] The obligation to permanently dispose of SNF generated by the nation's nuclear plants in one or more repositories beginning no later than January 31, 1998 was imposed on DOE upon enactment of the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* (the "NWPA"). As set forth more fully below and in Delmarva's Complaint, passage of the NWPA was essentially the codification and particularization of a binding commitment made by the Government to the nation's electric utilities beginning in the 1950s as an inducement to build and construct nuclear power plants.

interest in the Nuclear Stations, as well as the SNF that was the object of the Government's failed statutory commitment. Delmarva was a direct owner of the Nuclear Stations and, as such, has as much a right to just compensation for the Government's taking of its property as any other nuclear power plant owner. The Government's shareholder arguments, therefore, must be rejected.

**ISSUE PRESENTED**

Whether Delmarva can pursue an uncompensated takings claim that arises directly from the Government's actions in failing to adhere to (and comply with) a decades-long statutory framework requiring timely disposal of Delmarva's SNF by DOE pursuant to carefully delineated DOE arrangements, thereby resulting in substantial damage to Delmarva's ownership interests in the Nuclear Stations.

**STANDARD OF REVIEW**

"When a federal court reviews the sufficiency of the complaint pursuant to a motion to dismiss, 'its task is necessarily a limited one.'" *Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 35 (2000) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support [its] claims.'" *Id*. To this end, the court must presume that the "factual allegations included in the complaint by a plaintiff are true." *Id*. Given this standard, the court should not dismiss a complaint for failure to state a claim "unless it is 'beyond doubt that the plaintiff can prove no set of facts which would entitle [it] to relief.'" *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citation omitted). As discussed below, the Government's Motion

fails to demonstrate that Delmarva can prove no set of facts which would entitle it to relief.

As an additional matter, takings claims are extremely fact-intensive, and thus it is typically inappropriate for the court to decide a takings claim on a dispositive motion. As the Ninth Circuit observed in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990), *aff'd*, 526 U.S. 687 (1999), where a plaintiff claims that governmental action effects a taking, dispositive motions "must be viewed with particular skepticism. . . . The importance of the specific facts . . . and circumstances relating to the governmental action militate against summary resolution in most cases. . . . This issue must await determination after a trial on the merits." *Id*. at 1508 (citations omitted). Applying the same principle, the Federal Circuit in *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985), reversed the dismissal of a takings claim because it was "not a legal impossibility" that the claimant "might establish facts constituting a taking" given the allegations of the complaint. *Id.* at 1555. The court emphasized that "whether or not there has been a taking . . . is normally a fact issue that cannot be resolved except on a 'complete record,' or a trial." *Id*. at 1558-60. Among the issues that will benefit from factual development in this case are the sufficiency of the Government's actions from 1982 until 1998 to avoid an uncompensated taking of Delmarva's property by complying with its unconditional obligations under the NWPA, the extent of the Government's taking, the nature of Delmarva's expectations regarding the use of its property (given the long history of federal responsibility for SNF disposal), the nature of the Government's efforts to comply with successive rulings of the D.C. Circuit, and the lawfulness of DOE's fee assessment practices. As such, Delmarva respectfully requests that the Court deny the Government's Motion.

## FACTUAL BACKGROUND

For over a half-century, beginning with the enactment of the Atomic Energy Act ("AEA") in 1954, the Government has recognized its sovereign obligation to dispose of SNF. Compl. ¶¶ 11-21. This obligation culminated in the passage of the NWPA and the litigation that has transpired from the mid-1990s until today. *Id.* ¶¶ 11-42. Congress enacted the NWPA "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." H.R. Rep. No. 97-491, pt. 1, at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792. At the time of the enactment, Congress also made clear that time was of the essence and that disposal of SNF was a matter of immediate federal priority:

> The failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated. . . . Failures in the Federal repository development program, the collapse of the domestic spent fuel reprocessing industry and quickly deteriorating public confidence in our ability to deal safely with nuclear waste, together with other critical safety and economic issues, were seriously undermining the strength of the domestic nuclear industry.

*Id.* at 28, 1982 U.S.C.C.A.N. at 3794. As such, the NWPA established a schedule for the location, construction, and operation of repositories for the disposal of SNF, and initiated ownership and custody of SNF by the federal government at a permanent disposal facility beginning in January 1998. Compl. ¶ 19.

Delmarva is a public utility company incorporated under the laws of the State of Delaware and the Commonwealth of Virginia, and is subject to the regulatory jurisdictions and oversight of the Federal Energy Regulatory Commission ("FERC") and the states of Delaware and Maryland and the Commonwealth of Virginia with respect to its regulated assets and the rates it can charge with respect to the use of those assets. Compl. ¶ 8. Along with other utilities, Delmarva was a direct owner of the Nuclear

Stations, not a shareholder as the Government now argues. Motion at 8-9. Delmarva was issued licenses by the Nuclear Regulatory Commission ("NRC") for Salem 1 and 2 in August 1976 and April 1980, respectively; and Peach Bottom 2 and 3, in August 1973 and July 1974, respectively, approving Delmarva's financial creditworthiness to maintain an ownership interest in the Nuclear Stations. Compl. ¶ 43. Delmarva's ownership interests in Salem 1 and 2 and Peach Bottom 2 and 3 amounted to 328 MWs. *Id*. As such, Delmarva owned an undivided (i) 7.41% interest as tenant in common without the right to partition in Salem 1 and 2, and (ii) 3.755% interest as tenant in common without the right to partition in Peach Bottom 2 and 3. *Id.* ¶ 2. The remainder of the Nuclear Stations was owned by PSEG Power LLC ("PSEG") and PECO Energy Company ("PECO"). *Id.* Delmarva did not own "shares" in PSEG or PECO, nor did it own "shares" in the Nuclear Stations.

As a part owner of the Nuclear Stations, Delmarva was subject to the NWPA, including payment in excess of $7.6 million in fees to the Nuclear Waste Fund, but was not a signatory to the Standard Contracts. Compl. ¶¶ 22, 24. Rather, as discussed in greater detail below, the Standard Contracts covering the Nuclear Stations were executed by PSEG and PECO as operating entities and state that they were executed by each of them "acting on its own behalf as managing utility for [the Nuclear Stations] and on behalf of the joint owner(s) . . . Delmarva Power and Light Company," thereby making Delmarva an express intended beneficiary of the Standard Contracts. *Id.* Delmarva sold its interests in the Nuclear Stations on September 27, 1999. *Id.* ¶ 49.

DOE did not begin to take custody or dispose of Delmarva's SNF by January 31, 1998, or by the closing date of Delmarva's sale of the Nuclear Stations. Compl. ¶ 3. By the closing date of Delmarva's sale of the Nuclear Stations, there was no prospect

that DOE would take custody or dispose of SNF from Delmarva or any other generator in the foreseeable future because DOE had not then (and has not to this day) sited, licensed, constructed, or placed in operation an SNF disposal facility. *Id.*

## ARGUMENT

### DELMARVA HAS A COGNIZABLE TAKINGS CLAIM UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

Delmarva asserts a valid claim against the Government for a taking of Delmarva's property without just compensation by alleging that the Government deprived Delmarva of the full use, benefit, and value of its nuclear facility and interfered with Delmarva's investment-backed expectations. Compl. ¶¶ 56-63. Contrary to the Government's assertion, Delmarva's takings claim arises from property rights and interests that emanate from a long-standing Government undertaking that culminated in the NWPA, rights and interests that exist independently from the Standard Contract. *Id.* ¶¶ 11-21. As described below, Government action taken and inducements made decades prior to the drafting of the Standard Contract obligated the Government to assume responsibility for the permanent disposal of SNF produced by Delmarva and other nuclear utilities, a property right of Delmarva's that was taken while Delmarva was a part owner of the Nuclear Stations. *Id.* ¶ 11-17. As a part owner of the Nuclear Stations, a generator and owner of SNF, and a contributor to the Nuclear Waste Fund, Delmarva was clearly within the class of interested parties whose property interests were intended to be covered by the duties undertaken by the Government. Accordingly, Delmarva respectfully requests the Court to deny the Government's Motion.

### A. Delmarva's Takings Claim Arises Out Of Legal And Property Rights That Existed Prior To The Standard Contract

In its Motion, the Government asserts that Delmarva's takings claim is invalid because Delmarva was not a party to the Standard Contract, or otherwise in privity with the Government. Motion at 7. Delmarva's takings claim is not predicated on rights emanating from the Standard Contract, but rather is based upon legal and property rights recognized by Congress and affirmed by numerous courts long before the drafting of the Standard Contract.

Since the enactment of the AEA in 1954, the federal government has recognized its sovereign obligation to provide for the lawful and permanent disposal of the wastes of nuclear power generation. Compl. ¶¶ 11-21. As Congress found in the legislative history of the NWPA:

> Responsibility for the final disposition of nuclear waste has been lodged solely with the federal government because of the waste's hazardous nature. Various types of nuclear waste remain radioactive for periods of time ranging from several hundred years to several hundred thousand. Since it cannot be "disposed of" in the sense that a biodegradable product can, disposal must consist of permanent and isolated storage, generally in deep geologic formations. Therefore, when the Atomic Energy Act of 1954 (Public Law 83-703) authorized commercial development of nuclear energy, the federal government indicated it would control such potentially dangerous materials by *mandating that disposal occur on federal land.* In 1970, with Regulation 10 C.F.R. 50, the federal government formally accepted full responsibility for providing a final repository.

*Financing Nuclear Waste Disposal: Joint Hearing on S. 637 and S. 1662 Before the Comm. on Energy and Natural Resources and the Subcomm. on Nuclear Regulation of the Comm. on Environment and Public Works*, 97th Cong. 307 (1981) (Congressional Budget Office Staff Working Paper). As this legislative history shows, an official Government policy statement that long-predates the NWPA, and remains current to this day, provides that "[d]isposal of high-level radioactive fission product waste material will not be

permitted on any land other than that owned and controlled by the Federal Government." *Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities*, 10 C.F.R. pt. 50, App. F, ¶ 3.

Throughout the late 1950s and early 1960s, the federal government continued to represent that it would provide mechanisms for SNF storage and disposal, among which would be the continued utilization of nuclear fuel reprocessing. Compl. ¶ 15. Consequently, electric utilities, including Delmarva, designed, and the Atomic Energy Commission (and subsequently the NRC) licensed and approved for operation, nuclear power facilities with SNF pools intended only for temporary storage and for only a fraction of a nuclear plant's forty-year license life. *Id*.

In 1976, consistent with new arms control initiatives, a moratorium on reprocessing SNF was put in place. Compl. ¶ 16. This moratorium coincided with a surge in the number of commercial operating reactors entering service. *Id*. Whereas reprocessing had previously been expected to limit the growth of SNF inventories at commercial nuclear power reactor sites, in the absence of reprocessing, the inventory of SNF at reactor sites began to rapidly increase until the limited, temporary storage capacity of the SNF pools at these plants was consumed. *Id*. As such, the reprocessing moratorium had a major impact on the entire nuclear industry, including Delmarva.

In 1977, President Jimmy Carter announced that SNF would be transferred to a federally approved "away from reactor" facility for storage until a federal government repository became available. Compl. ¶ 17. Under this regime, the federal government would charge a one-time fee for storage. *Id*. The President also established the Interagency Review Group on Nuclear Waste Management ("IRG"). *Id*. The IRG issued

its findings in 1979 which proposed, among other things, that the federal government construct and operate a repository for permanent SNF disposal by the early 1990s. *Id*.

The NWPA represents the Government's further acceptance of responsibility for the disposal of SNF. Compl. ¶ 18. Congress passed the NWPA to address and ameliorate the accumulation of SNF from nuclear reactors, and to fulfill the federal government's long-standing policy of assuming responsibility for the disposal of SNF. *Id*. Recognizing that reprocessing of SNF was not a viable alternative to disposal of SNF, Congress created the NWPA "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." H.R. Rep. No. 97-491, pt. 1, at 26, 1982 U.S.C.C.A.N. at 3792. Congress also made clear that time was of the essence and made the disposal of SNF an immediate federal priority:

> The failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated. . . . Failures in the Federal repository development program, the collapse of the domestic spent fuel reprocessing industry and quickly deteriorating public confidence in our ability to deal safely with nuclear waste, together with other critical safety and economic issues, were seriously undermining the strength of the domestic nuclear industry.

*Id.* at 28, 1982 U.S.C.C.A.N. at 3794.

One of the purposes of the NWPA was to establish a schedule for the location, construction, and operation of repositories for the disposal of SNF, and to initiate ownership and custody of SNF by the federal government at a permanent disposal facility beginning in January 1998. Compl. ¶ 19. The Government's obligation to the utilities, including Delmarva, was "'without qualification or condition,'" *N. States Power Co. v. United States Dep't of Energy*, 128 F.3d 754, 757 (D.C. Cir. 1997) (quoting *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1273 (D.C. Cir. 1996)), and, thus, essential to Delmarva's obligation to pay the fees into the Nuclear Waste Fund, *see Indiana Michigan*,

88 F.3d 1276-77.[2] Thus, the NWPA established the federal government's exclusive responsibility for the disposal of SNF beginning in January 1998. *Id*.

This Court has affirmed the legislative history discussed above and recognized that a nuclear utility's legal and property rights existed prior to and, thus, independent from, the execution of the Standard Contract. *See Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 225-29 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000). Indeed, this Court has denied similar dispositive motions by the Government and recognized that DOE obligated itself to remove SNF prior to the execution of the Standard Contract. For example, in *Yankee Atomic*, the court noted that "Yankee asserts that DOE's failure to dispose of its SNF amounts to a taking of the real property on which its inoperative facility is located." *Id.* at 236. Assessing the basis for Yankee's takings claim, the court rejected the Government's motion to dismiss, concluding that "no contract clause purports to cover or redress an alleged taking of real property. Therefore, plaintiff's takings claim is not converted into a claim arising under the contract . . . ." *Id*.

Thereafter, the Federal Circuit affirmed the *Yankee Atomic* decision in *Maine Yankee. Atomic Power Co. v. United States*, 225 F.3d 1336, 1340, 1342-43 (Fed. Cir. 2000) (affirming lower court's denial of Government's motion to dismiss plaintiff's takings claim as one not arising under the Standard Contract). In short, this Court already has

[2] Moreover, DOE continued (and continues to this date) to disregard limitations imposed by the NWPA on its authority to assess Nuclear Waste Fund fees, which has resulted in the collection of at least $15 billion more than DOE spent on activities to fulfill its disposal obligations prior to the January 31, 1998 deadline. This fund surplus is significant, particularly when one considers that the NWPA requires the Secretary of Energy to annually submit to Congress a report on the status of the Nuclear Waste Fund balance and recommendations on whether to raise or lower the fee to ensure that the fund is neither under- nor over-collected. Despite the fund's massive surplus, the Secretary of Energy has never proposed an adjustment to the fee.

recognized, and the Federal Circuit has affirmed, that a nuclear utility has a cognizable takings claim distinct from any rights granted by the Standard Contract. It is this independent basis, as more fully described below, that supports Delmarva's takings claim and respectfully requires that the Court deny the Government's Motion.

### B. Delmarva's Real Property Rights Were Taken Without Just Compensation

Delmarva has asserted two independent incidents of unjustified taking: (i) DOE's failure to dispose of Delmarva's SNF by January 31, 1998 deprived Delmarva of the use and value of its facility, and (ii) DOE's systematic collection of unauthorized fees after January 31, 1998 constituted a taking of Delmarva's property. Compl. ¶¶ 58-59. These takings theories are entirely consistent with the decisions in *Yankee Atomic* and *Maine Yankee* and, therefore, represent cognizable takings claims, which are not susceptible to dismissal at the very outset of a proceeding.

The Government's actions and inactions, as detailed in the Complaint, have deprived Delmarva of the use of its real property in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution. A Government-caused occupation of real property for public use constitutes a *per se* Fifth Amendment taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) (law allowing cable companies to attach equipment to apartment buildings requires just compensation). Government action that requires use of private property for a public purpose also is a taking. *See, e.g.*, *Benenson v. United States*, 548 F.2d 939, 949 (Ct. Cl. 1977) (Government's actions barring owners from demolishing Willard Hotel and enjoining them from removing building's facade to determine whether structure could be used for profitable purposes other than operation of a hotel constituted a taking of owners' fee interest). Delmarva is no less of a party whose property has been taken, inasmuch as it was

compelled to set aside and dedicate its property to activities and purposes that were specifically assigned to the Government by the NWPA.

A taking occurs when the Government forces a business to dedicate its own resources for the benefit of the public, or to perform activities and provide services that should be undertaken by the Government. *See, e.g.*, *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) ("*Pewee*") (taking occurred where Government federalized a coal mine); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949) (taking occurred where Government federalized laundry service and retained management and employees to operate the plant); *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979) (taking occurred where Government imposed a navigational servitude on the landowner's "private pond").

The Government's actions in this case are functionally indistinguishable from those in the cases cited above. The Government prohibited Delmarva from reprocessing its SNF, charged Delmarva millions of dollars for removal of the SNF, and then failed to provide for the permanent removal of SNF from the Nuclear Stations when it was congressionally mandated to do so, thereby forcing Delmarva to store the SNF at its own cost, compromising the economic viability of Delmarva's nuclear assets, increasing mandated future plant retirement costs, and encumbering the future ability to utilize the property for other uses. Indeed, the Government failed to act even though Delmarva, along with other nuclear utilities, had paid billions of dollars into the Nuclear Waste Fund, the express purpose of which was to ensure timely execution of the Government's responsibilities. *Ala. Power Co. v. United States Dep't of Energy*, 307 F.3d 1300, 1303 (11th Cir. 2002). A further taking occurred when the majority of these monies were diverted for uses unrelated to the intended purpose of SNF disposal.

The Government's failure to comply with its statutory duty to remove Delmarva's SNF and its fee collection practices forced Delmarva to suffer direct and substantial economic consequences, and therefore, constitute a taking of Delmarva's property without just compensation. The NWPA imposed an unconditional obligation on the Government to begin to remove and dispose of Delmarva's SNF by January 31, 1998. *Indiana Michigan Power Co.*, 88 F.3d at 1276. Moreover, the Government's failure to remove and dispose of SNF and the Government's reliance on Delmarva to substitute its resources and provide its own property and facilities to store and maintain SNF beyond the date when the Government was required to assume such responsibilities and obligations, while the Government continued to collect fees without authorization, also constitute a taking of Delmarva's property without just compensation.

A taking also occurs if "regulation goes too far," *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922), and the character of the governmental action economically impacts a property owner and "interfere[s] with distinct investment-backed expectations of the owner," *Penn Central*, 438 U.S. at 124. Delmarva invested in its real property with the understanding that the Government was responsible for the permanent disposal of Delmarva's SNF. Compl. ¶ 44. The Nuclear Stations were designed and licensed by the Government in a configuration that did not anticipate nor allow for the on-site storage of any significant amount of SNF over a protracted period of time. *Id.* ¶ 15. DOE's prohibition of reprocessing, followed by its failure to take custody of SNF as required, accompanied by the continuous and unauthorized collection of fees, significantly deprived Delmarva of its investment-backed expectations in the Nuclear Stations. *Id.* ¶¶ 59, 61.

Although the Government does not dispute the substantial encumbrance of Delmarva's property, it alternatively contends that Delmarva's takings claim is prohibited because it is allegedly founded on a breach of the Standard Contract. Motion at 11. The Government then extends this argument by maintaining that a contract holder may only receive performance or damages for breach and not just compensation under a takings theory. *Id*. The Government cites *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003), and *Castle v United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part, vacated, and remanded in part*, 301 F.3d 1328 (Fed. Cir. 2002), in support of its contention that the Court has rejected takings claims that are raised when contract claims are also pled. *Id.* at 12-14. Neither of those cases, however, supports the Government's argument that Delmarva's takings claim must be dismissed as a matter of law, nor do those cases suggest in any way that Delmarva should not be justly compensated for its takings claim.

This court addressed Commonwealth Edison's takings claim in the context of a Government motion to dismiss. Denying the Government's motion regarding Commonwealth Edison's breach of contract claims, the court ruled that "DOE had breached the Standard Contract by not beginning to accept, transport, and dispose of SNF by the deadline of January 31, 1998." *Commonwealth Edison*, 56 Fed. Cl. at 655. The court also concluded that, as pled in the complaint, Commonwealth Edison's takings claim relied and was dependent upon the existence of the Standard Contract. Accordingly, the court determined that the plaintiff's rights were enforceable through a contract remedy, and that dismissal of a takings claim found to be redundant could therefore not diminish the plaintiff's recovery. *Id.* at 656. Likewise, in *Castle*,[3] the

---

[3] *Castle* was a *Winstar* case brought by shareholders of an investment banking firm against the Government contending that they had a contract with the Government to

Federal Circuit ruled that because the plaintiff had successfully pursued a breach of contract claim, its property interests were protected, and thus the takings claim was dismissed. 48 Fed. Cl. at 220.

As discussed *supra*, Delmarva's takings claim is quite different from *Commonwealth Edison* and *Castle.* Delmarva's claim relates to the Government's unconstitutional taking of Delmarva's property interests which emanate from a decades-long statutory framework. Delmarva's claim is not derivative of a breach of contract claim as the Government now suggests. The Government's assertion that Delmarva's takings claim is even related to, much less arises exclusively from (or is wholly dependent upon) the existence of the Standard Contract, is simply incorrect and completely misstates Delmarva's Complaint. Motion at 15-16. Delmarva's takings claim is premised upon duties imposed on the Government and the nuclear industry *by statute*; duties that are independent from obligations imposed by the Standard Contract.

Among other arguments, Delmarva alleges a taking of its property accomplished through over-collection of the 1 mil per kWh fee well in excess of that authorized by the NWPA. Compl. ¶¶ 59. This Delmarva claim is, by its very nature, non-contractual. Delmarva had no choice but to pay DOE's unauthorized fees, since satisfaction of DOE's fee demands was essential to maintaining Delmarva's NRC license and preserving Delmarva's property interest in the Nuclear Stations (which, if anything, would serve to mitigate the consequences of the Government's taking). Commonwealth Edison, on the other hand, did not allege the taking of its property through the imposition of excessive and unauthorized fees under color of the NWPA.

acquire and recapitalize a failing savings and loan association in exchange for certain regulatory treatment. Castle agreed that the Government's subsequent seizure of the savings and loan was an illegal regulatory taking.

Moreover, Commonwealth Edison was a Standard Contract holder at the time of suit, whereas Delmarva sold its ownership interests in the Nuclear Stations prior to filing its claim (but after the Government's taking). Because of these and other critical differences, *Commonwealth Edison* supplies no support for dismissal of Delmarva's takings claim.

The Government's suggestion that *Commonwealth Edison* precludes SNF-related takings claims and limits a plaintiff to breach of contract damages is erroneous. This interpretation is squarely at odds with the Federal Circuit's decision in *Maine Yankee.* As discussed *supra*, in *Maine Yankee,* the Federal Circuit expressly affirmed an SNF plaintiff's right to pursue a takings claim concurrently with and independent from a contract action. *See* 225 F.3d at 1342. The present takings claim is no exception. An interpretation of *Commonwealth Edison* or *Castle* precluding Delmarva's takings claim at this early stage would be a misapplication of the decisions of this Court and the Federal Circuit.

The Government also seeks to evade responsibility for its uncompensated taking of Delmarva's property by drawing an artificial distinction between Government actions in a sovereign capacity, as opposed to a proprietary capacity. The Government argues that Delmarva's takings claim cannot be brought against the Government because the Government was acting in its proprietary capacity. Motion at 15-16. The Government's sovereign/proprietary capacity distinction, however, is meritless.

The Federal Circuit has expressed doubt about the usefulness of analyzing a takings claim based on a sovereign/proprietary dichotomy. In *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed. Cir. 1983), the court concluded that "[i]n whatever other context it may be useful, . . . determination of whether the United States has acted

in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis." Accordingly, regardless of whether the Government is acting in its sovereign or proprietary capacity, the Government is liable to provide just compensation for an unlawful taking of property.

Even if the sovereign/proprietary distinction were to bear some relevance to this case (which it does not), this would not aid the Government's argument since Delmarva alleges conduct by the Government that can only be viewed as sovereign acts. Among these allegations are: (1) the Government's disregard of successive rulings of the D.C. Circuit, beginning in 1996, that DOE had an unconditional obligation, "commensurate" with the entitlement to continue to collect fees, to begin disposal activities by January 31, 1998 (Compl. ¶¶ 37-39); *see also Indiana Michigan*, 88 F.3d at 1276; (2) systematic under-spending, at least relative to funds available through fee collections, between 1983 and 1998 (Compl. ¶¶ 25, 26, 29, 40); and (3) DOE's assertion of a twenty-two-year future fee liability despite a "lack of [Nuclear Waste Policy Act] authorization," while utilizing the NRC license linkage to compel payment (*id.* ¶¶ 25, 54, 59). The fact that some of these topics were also addressed in the Standard Contract does not detract from the fact that they are sovereign acts taken in utter disregard of the Government's *statutory* obligations. The impetus for these action is based on the statute. Delmarva thus relies on actions taken by the Government in its sovereign capacity, and its takings claim is therefore cognizable even under the Government's reading of the law.

Finally, the Government contends that the Federal Circuit's ruling in *Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001), precludes Delmarva's takings claim as a matter of law. Once again, the Government mischaracterizes and misapplies the

law. In *Roedler*, customers of a utility that had executed a Standard Contract with DOE sought disgorgement of 1 mil per kWh fee payments, alleging breach and takings theories. These customers claimed that amounts paid into the DOE's Nuclear Waste Fund derived from monies paid from customer electric bills, and analogized themselves to third-party beneficiaries of the Standard Contract. *Id.* at 1352-53.

Unlike Delmarva's takings claim, discussed *supra*, the *Roedler* plaintiffs neither contested the reasonableness of the fee assessments, nor contended that the fees were diverted for unrelated and unauthorized purposes. *Id.* at 1355. This critical distinction by itself fully distinguishes *Roedler*. So too does the Federal Circuit's rationale, in which it limited its analysis to the legal interests of *customers* of utilities, not owners of utility property and SNF owners like Delmarva. *Id.* at 1353.

Consistent with the court's reasoning in *Roedler* and the allegations contained in Delmarva's Complaint, the Government's misuse of the 1 mil per kWh fee constitutes a confiscation of Delmarva's property. In *Houck v. Little River Drainage Dist.*, 239 U.S. 254 (1915), and *Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995), both of which are cited by the *Roedler* court, the Supreme Court and Federal Circuit held that the unreasonableness of an assessment gave rise to a valid takings claim. Similarly, the Government's failure to begin disposal of Delmarva's SNF on January 31, 1998, and the Government's continued diversion of the 1 mil per kWh fee, even though fee collections were "commensurate" with its obligation to timely dispose, is an unlawful taking.

The *Roedler* court clearly distinguished between waste generators that had a direct obligation to pay into the Nuclear Waste Fund (like Delmarva) and rate-payers that simply had an obligation to pay their utility bills. 255 F.3d at 1353. *Roedler* found that the latter group of individuals was not conferred a benefit by the NWPA by virtue

of its rate-payer status. *Id.* Moreover, the Federal Circuit accepted the Government's argument that the *Roedler* plaintiffs, as rate-payers, did not have an "ownership interest" in either the nuclear assets harmed by the Government's default or the money paid into the Nuclear Waste Fund, and that a takings plaintiff must be the owner of the property taken at the time of the taking. *Id.* at 1355 (citing *Cavin v. United States*, 956 F.2d 1131, 1134 (Fed. Cir. 1992)).

Thus, the principles cited by the Federal Circuit in *Roedler* actually support the claims of Delmarva, since Delmarva was simultaneously designated as a beneficiary, an owner, and a contributor to the Nuclear Waste Fund.[4] Unlike the rate-payers in *Roedler*, Delmarva had real and cognizable property interests that were taken by the Government without just compensation.[5] Accordingly, the Government's Motion is without merit and should be denied.

### C. <u>Privity Of Contract Is Not A Prerequisite To A Takings Claim</u>

The Government also argues that Delmarva's takings claim must be dismissed because there was no privity of contract between Delmarva and the Government. Motion at 7. Again, the Government improperly attempts to dress a takings claim in breach of contract clothing. Even if the Government's contentions were factually accurate, which they are not, privity of contract should never be and is not a

[4] The Government wrongly assumes that Delmarva's minority ownership interest is akin to that of a rate-payer and that Delmarva did not own a property interest at the time of the taking. As an owner of the Nuclear Stations, Delmarva was directly responsible for payment of fees, owned title to the SNF that was to be disposed by the Government, and was responsible for its share of all costs associated with its interim storage at the Nuclear Stations. As provided in its Joint Owners Agreements with PSEG and PECO, Delmarva also participated on the Nuclear Stations' owners' management committee, voting on budgets, capital expenditures, and could even vote with other owners to replace the operator if necessary.

[5] Further, unlike the rate-payers in *Roedler,* Delmarva was an express third-party beneficiary of the Standard Contract.

prerequisite to a takings claim. Unlike suits for breach of contract, a plaintiff alleging a taking can maintain that cause of action without having to demonstrate privity of contract. *See*, *e.g.*, *Phillip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir. 2002) (plaintiff recovers under a takings theory without having to demonstrate privity); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999) (ruling that the Court of Federal Claims had jurisdiction over takings claims, even though the plaintiffs were not in privity with the Federal Deposit Insurance Corporation, and therefore, could not maintain suit for breach); *see also, e.g., Loretto*, 458 U.S. at 433 (same); *Kaiser*, 444 U.S. at 180 (same); *Pewee*, 341 U.S. 114 (same); *Kimball*, 338 U.S. at 6 (same); *Benenson*, 548 F.2d at 949 (same).

Rather, to pursue a takings claim, a plaintiff must establish (1) the character of the governmental action or omission of a duty; (2) the economic impact on the plaintiff's property interests; and (3) the extent to which the regulation has interfered with distinct investment-backed expectations. *Penn Central*, 438 U.S. at 124. In fact, the very nature of a takings claim belies the jurisdictional requirement of proving privity of contract in a breach setting. A takings claim is designed to justly compensate a plaintiff for a Government-induced deprivation of rights and property, regardless of whether the plaintiff has entered into a contract with the Government. *See Yancey v. United States*, 915 F.2d 1534 (1990); *see also Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973).

The Government is incorrect to assume that a takings claim must be subject to contractual requirements, even when congressional mandates are accompanied by contractual arrangements. *See, e.g., Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003) (where takings claim arose separately from breach of contract action under

single statute). Rights to be vindicated through a takings claim can be separate and apart from those granted by contract, and the existence of a contract need not diminish a party's takings claim. *See, e.g., Del- Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998) (where takings and breach of contract claims were found to co-exist). The contractual relationships may even be viewed as supplementing and reinforcing the takings rights without supplanting them, and each right may be individually enforced through separate litigation relief paths. *Id*. at 1367-68; *Chancellor Manor*, 331 F.3d at 903 (where the court held that the lack of contractual privity did not inhibit the plaintiff's takings claim); *Yankee Atomic*, 42 Fed. Cl. at 236 (permitting takings and contract claims to be pursued concurrently).

As the movant, the Government bears the burden of proving that Delmarva has failed to state a claim for which relief can be granted. *Sommers Oil*, 241 F.3d at 1378 (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Scheuer*, 416 U.S. at 236; *Hamlet v. United States*, 873 F.2d 1414 (Fed. Cir. 1989)). Yet, the Government's Motion offers no legal support for its assertion that privity is a prerequisite to Delmarva's takings claim. Accordingly, Delmarva respectfully requests that the Court deny the Government's Motion.

### D. Delmarva Is An Express Intended Beneficiary Of The Standard Contracts

Even if privity were a requirement for a takings claim, which it is not, Delmarva would be found to have satisfied such a requirement by virtue of its status as an express intended beneficiary of the Standard Contracts for the Nuclear Stations. Compl. ¶¶ 22, 60. When the Standard Contract was initially promulgated in the Federal Register for public comment in February 1983, the proposed language made no reference or recognition to the possibility that the "Purchaser" could be more than one

entity, such as when a nuclear plant has a multiple number of co-owners. *See Standard Contract for Disposal of Spent Nuclear Fuel and/or High level Radioactive Waste*, 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983).

When the final version of the Standard Contract language was adopted and published in the Federal Register in April 1983, however, the Government had inserted a parenthetical immediately following the area designated to identify the "Purchaser" as follows: "[add as applicable: acting on behalf of itself and _______.]." *See Standard Contract for Disposal of Spent Nuclear Fuel and/or High level Radioactive Waste*, 48 Fed. Reg. 16590, 16600 (Apr. 18, 1983). The Government therefore expressly recognized at the time it promulgated the Standard Contract that there could be multiple owners of a nuclear facility covered by a single Standard Contract, each of which maintained undivided interests in both the plant and the SNF, and proceeded to explicity acknowledge its obligation to *all such owners.* Delmarva is specifically named in the Standard Contracts for the Nuclear Stations, as one of the owners intended to benefit from these contracts. Compl. ¶¶ 22, 60.

To demonstrate a plaintiff's status as a third-party beneficiary, a plaintiff must only prove that the underlying contract reflects either an express or implied intention to benefit the plaintiff directly. *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001). The Federal Circuit recognizes and enforces a contract as intending to benefit third parties when the contract evidences an intent that such non-signatories be benefited and/or where there are other indicia of such an intent. *See D&H Distrib. Co. v. United States*, 102 F.3d 542, 546-47 (Fed. Cir. 1996) (subcontractor for delivery of computer equipment to Government was an intended third-party beneficiary); *Knight v. United States*, 65 Fed. Appx. 286 (Fed. Cir. 2003) (unpublished) (discharged employees

were intended third-party beneficiaries of Government employment contract). The question of whether a party is a third-party beneficiary to a contract is a mixed question of law and fact, and thus not appropriate for resolution on a motion to dismiss. *Glass*, 258 F.3d at 1353; *see also Knight*, 65 Fed. Appx. at 289 ("whether a plaintiff is a third-party beneficiary to a contract with the United States is a mixed question of law and fact"). Since Delmarva has pled sufficient facts in the Complaint that demonstrate that it is an express intended beneficiary of the Standard Contract, the Government's Motion must be denied.[6]

The Complaint asserts that Delmarva was an intended beneficiary of the Standard Contracts entered into by the respective operators of the Nuclear Stations on Delmarva's behalf. Compl. ¶¶ 22, 60. Indeed, as detailed in the Standard Contract published in the Federal Register, the Standard Contracts state that they were executed by the operators "acting on its own behalf as managing utility for [the Nuclear Stations] and on behalf of the joint owner(s) . . . Delmarva Power and Light Company." The language of the actual Standard Contracts at issue in this case specifically provided that they were entered into "on behalf of the joint owner Delmarva Power and Light Company." Moreover, as part owner of the Nuclear Stations, as an SNF generator, and as a contributor to the Nuclear Waste Fund, there can be little doubt that the

[6] As a factual matter, to determine whether a litigant is a third-party beneficiary to a contract based on a federal statute, the court first examines whether the contract itself references the intent to benefit a third party. If a review of the contract does not demonstrate the parties' intention to benefit a third party, the Court must then examine pertinent statutes and regulations and their underlying policy. For example, in *Busby School of Northern Cheyenne Tribe v. United States*, 8 Cl. Ct. 596 (1985), the Claims Court denied the Government's motion to dismiss where "the plaintiffs in question may very well be able to show they were intended third-party beneficiaries of the contracts between the School Board and the [Bureau of Indian Affairs] given the pertinent statutes and regulations and the underlying policy behind the contracts and applicable statutes and regulations." *Id*. at 602; *see also Roedler*, 255 F.3d at 1353 (identifying nuclear waste generators as intended beneficiaries of the NWPA).

Government's performance under the Standard Contracts was intended to benefit Delmarva. *See Roedler*, 255 F.3d at 1353.

The Government's Motion fails to address why Delmarva should not be deemed a third-party beneficiary of the Standard Contracts as a matter of law. In fact, Delmarva's third-party beneficiary status is abundantly clear from even a cursory reading of the Standard Contract as well as the NWPA. The only cases cited by the Government on this issue, *Glass*, 258 F.3d 1349, and *Suess v. United States*, 33 Fed. Cl. 89 (1995) (Motion at 17-18), are not relevant for the purposes for which the Government cites them because they involved entirely different contractual and statutory regimes that manifest an entirely different congressional intent.[7] Both *Glass* and *Suess* were "*Winstar*" cases that turned on the construction of FIRREA, a statutory scheme decidedly distinct from the NWPA and the instant case. *Glass* and *Suess* both involved lawsuits by shareholders alleging that the passage of FIRREA breached contracts with the Government that allowed the plaintiffs to meet certain regulatory requirements. None of the authority relied on by the Government concerning third-party beneficiary contracts pertains to the NWPA or the Standard Contract. In both cases, the Federal Circuit examined the contracts at issue and concluded that there was no evidence of a direct benefit to the shareholders independent of their shareholder status.

Unlike the Plaintiffs in *Glass* and *Suess*, Delmarva was not a shareholder. Rather, it was a part owner of the nuclear facilities and was an express intended beneficiary of the Standard Contract. Both the Standard Contract and the legislative history of the NWPA, described *supra*, support Delmarva's status as an express intended beneficiary of the Standard Contracts for the Nuclear Stations. The

[7] Further, *Suess*, along with *Castle*, addresses only whether a shareholder is a third-party beneficiary of a contract, not a minority owner.

Government's contention that Delmarva is not entitled to bring its suit because Delmarva is not a third-party beneficiary of the Standard Contract (Motion at 17-19) ignores both the law and the facts of this case. Accordingly, the Government's arguments regarding Delmarva's third-party beneficiary status should be rejected.

### E. Delmarva Is Not Suing As A Minority Shareholder But Rather As A Direct Owner Of An Interest In The Nuclear Stations

The Government finally alleges that Delmarva lacks standing to bring a claim for diminution of value in its interest in the Nuclear Stations because Delmarva is a former *minority shareholder*. Motion at 8-9. The Government further contends that a diminution of value claim may only be brought as a derivative claim by an owner, and only after all inter-corporate remedies have been exhausted. *Id.* at 9-10. Delmarva's Complaint clearly states that Delmarva was an owner. Compl. ¶¶ 2, 22, 24, 31. The term "shareholder" does not appear in the Complaint. The Government's Motion mischaracterizes Delmarva's status, and the accompanying legal analysis is therefore inapplicable and inappropriate. The Government's characterization of Delmarva as a shareholder is factually inaccurate and provides no basis for construing Delmarva's takings claim.

At the time of the Government's taking, Delmarva owned minority interests, not shares, in the Nuclear Stations and in SNF. As clearly and repeatedly stated in its Complaint, Delmarva "was a minority interest owner of the Nuclear Stations." Compl. ¶¶ 2, 22, 24, 31. Specifically, Delmarva owned an undivided (i) 7.41% interest as tenant in common without the right to partition in Salem 1 and 2; and (ii) a 3.75% interest as tenant in common without the right to partition in Peach Bottom 2 and 3. *Id.* ¶ 2. As a direct owner of the Nuclear Stations, not a minority shareholder, Delmarva was licensed as an owner of the Nuclear Stations by the NRC. Delmarva performed all of

the functions and shouldered all of the responsibilities of any other owner. Delmarva made substantial capital investments in the construction of the Nuclear Stations in order to support their continued operation. Compl. ¶ 11. Delmarva was also subject to the fee payment obligations and other requirements of the NWPA, and paid in excess of $7.6 million into the Nuclear Waste Fund. *Id.* ¶ 24. As a public utility, Delmarva also was subject to the regulatory jurisdiction and oversight of the FERC and the states of Delaware and Maryland and the Commonwealth of Virginia with respect to its ownership of the Nuclear Stations. *Id*. ¶ 8. These are the acts, burdens, and responsibilities of an owner, not a shareholder.

This Court has previously recognized an interest owner's right to bring an action for illegal taking of its property under the Fifth Amendment. *See Devon Energy Corp. v. United States*, 45 Fed. Cl. 519 (1999); *see also Lucas v. S.C. Costal Council*, 505 U.S. 1003 (1992). In *Devon*, this Court determined that the owners of interests in federal oil and gas leases could bring regulatory takings claims against the Government on their own behalf. The plaintiffs all had ownership interests in federal oil and gas leases that were issued pursuant to the Mineral Leasing Act ("MLA"), 30 U.S.C. § 226 *et seq*. *Devon*, 45 Fed. Cl. at 521. The plaintiffs charged that the Government's denial of certain drilling permits on the leases constituted an illegal taking of the plaintiff's property contrary to the MLA. *Id.* at 524-25. The Government argued that some of the plaintiffs lacked the requisite property interests and privity of contract to bring their claims because the transfer through which they had obtained their land had not yet been approved by the Secretary of the Interior. *Id.* at 530. The court disagreed, finding that the lack of approval did not "diminish plaintiffs' right to protect those interests under the Takings Clause of the Fifth Amendment." *Id.* at 531. Similar to *Devon*, Delmarva is

a part owner in the property that has been subjected to an uncompensated taking brought about by the Government's failure to meet its statutory obligations.

The Government further argues that only the party that signed the Standard Contract was responsible for payment of the 1 mil per kWh fee, and thus Delmarva does not have standing to seek compensation for having made excess payments. Motion at 17. The Government bases its argument on the novel theory that only the "owner" – which it defines as the entity that signed the contract – can bring a claim. *Id*. This argument is simply incorrect. Delmarva was most certainly an owner of the Nuclear Stations, and an express intended beneficiary of the Standard Contracts as well. As such, Delmarva bore responsibility for and paid its share of the fees assessed to the Nuclear Stations, as well as all of the other rights and responsibilities of a party to the Standard Contract. Consequently, Delmarva, as a property owner, is fully entitled to seek compensation for DOE's unlawful actions that had an adverse impact on Delmarva's property interest, and is unimpeded from doing so by virtue of its status as a minority interest holder.

## CONCLUSION

For the foregoing reasons, Delmarva respectfully requests that the Court deny the Government's Motion to Dismiss in its entirety.

Date: August 6, 2004

Respectfully submitted,

s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Delmarva Power & Light Company*

Of Counsel:
David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Neven Rabadjija, Esq.
Associate General Counsel
NSTAR Electric & Gas Corporation
800 Boylston Street
36th Floor
Boston, MA 02199-0228

**CERTIFICATE OF FILING**

I hereby certify that on August 6, 2004, a copy of the foregoing "Plaintiff Delmarva Power & Light Company's Brief in Opposition to Defendant's Motion to Dismiss" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Delmarva Power & Light Company*