IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.04–0034C, into which |
| v. | ) | is consolidated No. 04-0036C |
| | ) | (Judge Christine Miller) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of this Court, and in accordance with this Court's orders dated April 7 and 22, 2005, permitting the Government to file a renewed motion for summary judgment, defendant, the United States, respectfully requests that the Court enter summary judgment in the Government's favor. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUES

1. Whether the plaintiffs, Delmarva Power & Light Company ("Delmarva") and Atlantic City Electric Company ("Atlantic City"), both of which purported to assign all of their claims relating to the contracts at issue and relating to their interests in their nuclear reactors to third parties, are entitled to maintain an action based upon their own assertion of the invalidity of their assignment agreement with the third party.

2. To the extent that plaintiffs may otherwise maintain a breach of contract action, (a) whether plaintiffs may maintain a breach of contract action seeking diminution in value for

the sale of their interests in nuclear reactors where the sale of those interests was not directly related to the Standard Contract, but, rather, was the result of an independent and collateral transaction, (b) whether plaintiffs may recover restitution damages for an alleged partial, rather than total, breach of contract, and (c) whether plaintiffs may recover restitution damages when they did not pay to the Government the monies that they seek to recover.

3. To the extent that plaintiffs may otherwise maintain a takings claim, whether plaintiffs' allegation that the Government's failure to dispose of the spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") covered by the contracts at issue has deprived plaintiffs of the full economic use of their nuclear electric generating facilities constitutes a viable claim under the Fifth Amendment of the United States Constitution, where any right that plaintiffs have to require the Government to accept SNF and/or HLW derives solely from the Standard Contract.

4. Whether this Court possesses jurisdiction to adjudicate plaintiffs' challenge to the Secretary of Energy's collection of fees under the Nuclear Waste Fund and, if it did, whether the plaintiffs have identified a cognizable takings theory.

## STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

## SUMMARY OF ARGUMENT

The two plaintiffs in these consolidated cases, Delmarva Power & Light Company ("Delmarva") and Atlantic City Electric Company ("Atlantic City"), allege that they are former minority interest owners of nuclear reactors the majority interests in which were owned by PSEG

Nuclear, L.L.C. ("PSEG") and PECO Energy Company ("PECO" or "Exelon"). The amended complaints that Delmarva and Atlantic City have filed identify two basic bases for damages: (1) claims for breach of the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," the terms of which are published at 10 C.F.R. § 961.11, arising from the delay by the Department of Energy ("DOE") in beginning spent nuclear fuel ("SNF") acceptance from the nuclear utility industry, and (2) a claim for a taking of property under the Fifth Amendment of the United States Constitution. Yet, in 1999, both Delmarva and Atlantic City purported to assign all of their claims arising from the Standard Contract, arising from DOE's failure to accept SNF, and arising out of the plaintiffs' rights, title, and interests in the nuclear reactors identified in the Standard Contracts at issue here to PSEG Nuclear, L.L.C. ("PSEG"), and PECO Energy Company ("PECO" or "Exelon"). Both PSEG and Exelon have filed their own lawsuits in this Court, seeking damages for DOE's delay in beginning SNF acceptance, and the <u>Exelon</u> case has been resolved amicably.

It is true that the Assignment of Contracts Act, 41 U.S.C. § 15, generally governs and limits the ability of Government contractors to assign their contracts without the Government's consent, while the Assignment of Claims Act, 31 U.S.C. § 3727, generally governs and limits the ability of Government contractors to assign their claims against the Government. The Nuclear Waste Policy Act, 42 U.S.C. § 10222(b)(3), creates an exception to the limitations of the Assignment of Contracts Act, providing that the "rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved," and the Standard Contract at issue in this case incorporates that provision. Although the Government is still entitled under these statutory provisions to

challenge any assignment of claims by a contract holder to another party, we have been unable to locate any authority for the proposition that the assignor itself is entitled to file a lawsuit against a third party, based upon its belief that its prior assignment is void or unenforceable. As discussed below, Delmarva and Atlantic City are barred from asserting the invalidity of their own purported assignments. To the extent that the Government challenges assignments in current or future lawsuits filed by PSEG and/or Exelon in which assigned claims are raised, RCFC 17(a) provides the appropriate mechanism for substituting the real party in interest in those cases. Although the Government has the right to challenge the purported assignments when appropriate, Delmarva and Atlantic City do not. Their damages claims should be dismissed as a matter of law, subject to the provisions of RCFC 17(a) if any Government challenge to assignments in the PSEG case is successful.

To the extent that Delmarva and Atlantic City are entitled to pursue their contract claims here, their claims for the diminished value of their ownership interests in the nuclear reactors at issue, as well as their claim for restitution damages, should be dismissed. The plaintiffs' sale of their minority ownership interests in the reactors is a transaction completely unrelated to the Standard Contract. The United States Court of Appeals for the Federal Circuit has consistently rejected consequential damages claims against the Government where those damages are not directly related to the contract that was allegedly breached. Here, the Standard Contract relates solely to the Government's obligation to accept and dispose of SNF, with the corresponding obligation that the contract holder pay for the cost of such acceptance and disposal. The plaintiffs' sale of its interests to third parties is not a transaction that arises directly from the Standard Contract, but, rather, constitutes an independent and collateral transaction. With regard

to their restitution damages claims, through which they seek refunds of payments into the Nuclear Waste Fund ("NWF"), the plaintiffs cannot recover restitution damages for a partial, rather than total, breach and, further, cannot seek restitution for monies that they did not pay to the Government.

To the extent that Delmarva and Atlantic City are entitled to pursue their takings claims, the plaintiffs' alleged damages arise solely as a result of the Standard Contract that PSEG and PECO executed with the Government. Absent the execution of the Standard Contract, PSEG and PECO were wholly responsible for the storage and disposal of the SNF and HLW that they generated. Accordingly, any remedy that a contract holder possesses lies in contract, not the Fifth Amendment. As a result, the plaintiffs' claim for damages for a taking of "property" under the Fifth Amendment should be denied.

Finally, this Court lacks jurisdiction to adjudicate the plaintiffs' challenge to the Secretary of Energy's fee assessments. Pursuant to the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270, the United States Courts of Appeals for the District of Columbia Circuit and the various regional circuits have original and exclusive jurisdiction to adjudicate, among other things, challenges to the Secretary of Energy's decisions related to the assessment and collection of fees for payment into the Nuclear Waste Fund. Therefore, this Court lacks jurisdiction to adjudicate the plaintiffs' challenge to the Secretary of Energy's alleged overcollection of fees. In any event, given that neither Delmarva nor Atlantic City was compelled or obligated to make NWF fee payments to the Government, no viable takings claim can exist.

## DISCUSSION

### I. HAVING PURPORTED TO ASSIGN THEIR CONTRACT AND TAKINGS CLAIMS TO THIRD PARTIES BY WRITTEN AGREEMENT, PLAINTIFFS ARE BARRED FROM ASSERTING THE INVALIDITY OF THEIR OWN ASSIGNMENT AGREEMENTS

It is undisputed that plaintiffs have purported to assign all of their interests in the Standard Contracts and in any claims relating to the nuclear reactors identified in those contracts to PSEG and PECO (now Exelon). Amend. Compl. ¶ 2.[1] In their Purchase Agreements with PSEG and PECO, Delmarva and Atlantic City expressly purported to assign all of their claims relating to or pertaining to DOE's delays under the Standard Contract and any other claims with respect to, arising out, of or in connection with their rights, title, and interests in and to the purchased assets, or any portion thereof, whether accruing prior to, on, or after the closing date of the sale:

> 2.1 Transfer of Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, (i) Seller shall sell, assign, convey, transfer and deliver to [the purchaser], and [the purchaser] shall purchase, assume and acquire from Seller, free and clear of all Encumbrances, except for Permitted Encumbrances, the Purchased Assets . . ., including the following Purchased Assets:
>
> * * *
>
> (l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the

[1] "Amend. Compl. ¶ ___" refers to the amended complaints that Delmarva and Atlantic City filed in these cases. "App. __" refers to the appendix to this motion.

> Purchased Assets, other than the claims described in Section 2.2(j); and
>
> (m) The rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date.

App. 45-46; see App. 51-52, 55, 58-59, 62. The only excluded claims identified in the Purchase Agreements are claims pertaining to a refund of fees paid related to DOE's special assessment of utilities for the Uranium Enrichment Decontamination and Decommissioning Fund – a matter unrelated to the Standard Contract. App. 43-44, 47, 53, 56, 60, 63 (Section 2.2(j)).[2] The Purchase Agreement also expressly provided that, "[f]rom and after the Closing Date, Buyers shall have all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the Department of Energy's failure to take Spent Nuclear Fuel." See, e.g., App. 48 (Section 2.6).[3]

---

[2] Even with regard to claims for refunds of fees from the Uranium Enrichment Decontamination and Decommissioning Fund, the Purchase Agreement purports to bar Delmarva and Atlantic City from maintaining any action to recoup those fees separately from PSEG and PECO, with "such action controlled by [the purchaser] in its sole discretion." App. 47.

[3] We have a complete copy of only one of the five Purchase Agreements that Delmarva and/or Atlantic City entered with PSEG and/or PECO. In that one complete copy, we identified the language in Section 2.6. The pages that we have obtained from the other four Purchase Agreements do not include the page containing Section 2.6. Because other language in those portions of the Purchase Agreements that we have appears to be virtually identical, we assume that the complete copies of the other Purchase Agreements contain the same language as that in Section 2.6.

Despite this purported assignment of all rights and claims, Delmarva and Atlantic City have filed this action, seeking to recover damages allegedly resulting from DOE's delay in beginning SNF acceptance under the Standard Contract. It is undisputed that the sole basis for plaintiffs' contract claims is their belief that the Government may at some time in the future challenge the assignment of their contract in the PSEG case and in some future case with Exelon and that the Government will be successful in its challenge.[4] At bottom, plaintiffs' contract claim necessarily assumes that the assignments of their contracts to PSEG and to Exelon are invalid. Yet, as against an assignee, an assignor is barred from maintaining the inequitable position that its prior assignment is invalid and that it is permitted to proceed as though no assignment was ever made. See 6 Am. Jur. 2d Assignments § 155 (2004); In re Kaufman, 37 P.3d 845, 855 (Okla. 2001). In Kaufman, the court explained that an assignor has no basis upon which to challenge the validity of its own assignment, particularly where its assignee is pursuing claims:

> An assignor is not permitted to raise [nonassignability] as against the assignee, and it is right and just that he should not be permitted to do so, for a more perfect illustration of the necessity for the

[4] As counsel for Atlantic City and Delmarva acknowledged at the hearing before Judge George Miller on the Government's motion to dismiss Atlantic City's complaint:

> And our anticipation is that they're going to argue in the Entergy that under Entergy, that there was no assignment. Only the assignor has the assignment and only the assignor can bring it. So, as a result, we have amended our complaint as of right to raise breach counts, in anticipating that argument is going to be raised in Entergy and here. So we're doing this as a protective matter, to protect our situation, Your Honor.

Dec. 3, 2004 Hearing Tr. at 31:9-16 (emphasis added).

> doctrine of estoppel could hardly be stated. The rule that an assignor cannot as against his assignee allege nonassignability is well settled.

Id. (citing Harris v. Tipton, 90 P.2d 932 (1939)). Although the Government is certainly entitled to challenge the enforceability of these assignments against the Government, we have been unable to locate a single decision in which the putative assignors were entitled to assert the invalidity of their assignments.

By raising what plaintiffs refers to as a "protective" contract claim and by directly pursuing their takings claims, all of which are based upon DOE's failure to begin SNF acceptance by January 31, 1998 pursuant to the Standard Contract, plaintiffs improperly attempt to circumvent this prohibition against challenging the assignability of their contracts with respect to PSEG and PECO. Both PSEG and PECO are pursuing or have pursued their own claims arising from the Standard Contract. Because plaintiffs have no basis upon which to challenge their own assignments of their damages claims, their damages claims should be denied. To the extent that the Government challenges assignments of any claims that the purported assignees, PSEG and PECO, raise in litigation, RCFC 17(a) provides the appropriate mechanism for substituting the real party in interest in the actions that those contract holders bring if the assignment is found invalid. However, until such claims are submitted and such challenges are raised, Delmarva and Atlantic City have identified no basis upon which they, at the same time that litigation by their purported assignees is pending, have a right to ignore their own purported assignments and maintain an action based upon the purportedly assigned claims separate and apart from the purported assignees. The Government should not be placed in the position of having to defend

duplicative claims from different plaintiffs in different suits. The plaintiffs' claims here should be denied as a matter of law, subject to the rights identified in RCFC 17(a).

## II. TO THE EXTENT THAT PLAINTIFFS ARE OTHERWISE PERMITTED TO PURSUE THEIR CONTRACT CLAIMS, THEIR REQUEST FOR DIMINISHED VALUE AND RESTITUTION DAMAGES SHOULD BE DENIED

### A. The Plaintiff's Contract Claim For The Diminished Sales Price Of Their Minority Interests In The Reactors At Issue Is A Claim For Unrecoverable Consequential Damages

#### 1. A Plaintiff May Not Obtain Consequential Damages For An Alleged Breach Of Contract

The United States Court of Appeals for the Federal Circuit has repeatedly held that "remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common-law damages, such as the instant case." Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 886, 524 F.2d 707, 720 (1975)); see LaVan v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004); San Carlos Irrig. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). As the United States Court of Claims has explained:

> "The true concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement." Where such damages are the proximate result of a defendant's breach of contract, they are recoverable. However, while damages resulting from "the natural and probable consequences of the breach complained of [are recoverable], damages remotely or consequently resulting from the breach are not allowed."

Olin Jones Sand Co. v. United States, 225 Ct. Cl. 751, 742-43 (1980) (quoting Gardner Displays Co. v. United States, 171 Ct. Cl. 497, 504-05, 346 F.2d 585, 589 (1965), and Ramsey v. United States, 121 Ct. Cl. 426, 433, 101 F. Supp. 357 (1951)). Indeed, not "every injury resulting from a breach of contract is remediable in damages." San Carlos Irrig., 111 F.3d at 1563 (quoting Wells Fargo, 88 F.3d at 1022).

The Federal Circuit routinely looks to the purpose of the breached contract to determine whether the claimed damages were "consequential" to the breach rather than a direct damage. In Wells Fargo, a bank brought a breach of contract action when the Government failed to honor its commitment to provide a guarantee for a particular construction loan that the bank extended pursuant to a Federal program. Wells Fargo, 88 F.3d at 1017. The Court of Federal Claims ruled that the Government had breached its contract with the bank and awarded profits that the bank allegedly lost because it was unable to make additional loans following a capital restructuring required as a result of the Government's refusal to issue the guarantee. Id. at 1018. The Federal Circuit reversed the award of lost profit damages, explaining that the "purpose of the guarantee was to enable Wells Fargo to make profits from the interest on its loan to High Plains, not on some other loans it might make." Id. In reaching this conclusion, the Federal Circuit explained that lost profits that would have been realized from "independent and collateral undertakings," rather than those that would have "grown out of the contract itself," are, as a matter of law, unrecoverable:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by

> the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

Id. at 1022-23 (emphasis added) (quoting Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353 (1951)).

Similarly, in Scott Timber Co. v. United States, 33 F.3d 1358 (Fed. Cir. 2003), a timber contractor claimed that the Government breached various timber sales contracts when the Government suspended performance on the contracts to protect an endangered bird species that was indigenous to the area covered by the contracts. In addition to claiming damages equal to the cost of obtaining replacement timber in the open market, the contractor also sought costs related to its sawmill operations, including labor, taxes and insurance. Id. at 1372. The Court of Federal Claims granted the Government's motion for summary judgment with respect to the costs related to the plaintiff's sawmill operations, concluding that they were "remote and speculative damages and therefore not recoverable." Id. The Federal Circuit affirmed, explaining that the plaintiff's "sawmill expenses are not directly related to the timber sales contracts. Any sawmill costs were not a direct result of the suspensions in this case." Id.; see also First Height Banks v. United States, 57 Fed. Cl. 162, 174 (2003) ("We hold, as a matter of law, that the subject of the bargain was confined to the opportunity to take advantage of the tax laws; that it would not have been foreseeable to federal negotiators that plaintiffs were entering into the arrangement to secure future funds for homebuilding projects. Absent some specific reference, those projects, and the potential profits on them, were simply too remote to be within the parties' contemplation as a potential collateral damage from a breach.").

In fact, in Olin Jones, this Court's predecessor, the Court of Claims, recognized that the type of diminished business value damages that the plaintiffs seek in this case are too remote and consequential, as a matter of law, to constitute a recoverable damage. In Olin Jones, the plaintiff claimed that, based upon the Government's delay in making contract payments on a particular contract, the plaintiff could not obtain bonding on other contracts, thereby crippling its ability to obtain new contracts or work. Olin Jones, 225 Ct. Cl. at 742. The Court of Claims recognized that, to decide whether a damage is too remote or consequential for recovery, "it is necessary to examine the kinds of damages sought, and to decide which resulted directly and proximately from the asserted breach, and which, even if proven at trial, would be too remote or speculative to qualify as compensable damages." Id. at 743. Although the Court of Claims found that those damages relating to "completion of this particular contract" could be sufficiently direct to warrant a trial, as a matter of law, there could "be no recovery for general loss of business, the claimed loss of the entire [company's] net worth, and losses [on] the non-federal work – all are all deemed too remote and consequential." Id. at 744 (emphasis added) (quoting William Green Constr. Co. v. United States, 201 Ct. Cl. 616, 626, 477 F.2d 930, 936 (1973)). Finding that the claimed "speculative alleged loss of future contracts and work . . . comes within the losses of outside business, outside contracts, and general company worth referred to in Green," the Court of Claims barred the trial commissioner from further considering these damages "since we hold as a matter of law that, even assuming such damages could be proven, they are too remote and indirect to be recoverable in this breach action." Id.

Conversely, the Federal Circuit affirmed a ruling of the Court of Federal Claims that certain lost profits were not overly remote and uncertain as a matter of law because the plaintiff's

anticipated profits flowed directly from the alleged breached contract. Energy Capital Corp. v. United States, 302 F.3d 1314, 1328-29 (Fed. Cir. 2002). In that case, a lender had entered into a contract with the Department of Housing and Urban Development ("HUD") to originate loans to owners of HUD properties in exchange for HUD's treatment of the lender's loans in a way that gave the lender security for its loans. Id. at 1317. Before the lender originated any loans, HUD terminated the contract. Id. at 1319. The lender sued the Government for breach of contract, asserting that it was entitled to lost profits. Id. The Federal Circuit held that the lender's damages were not overly remote or speculative because the lost transactions flowed directly from and were the intended purpose of the breached contract:

> In the present case, Energy Capital's anticipated profits flowed directly from the AHELP agreement and not from "other independent and collateral undertakings." As the Court of Federal Claims found, the express purpose of the AHELP agreement was to permit Energy Capital to make up to $200 million worth of loans to HUD-assisted property owners. When the government breached the AHELP agreement, Energy Capital was no longer able to issue those loans, and its resulting loss of profits flowed directly from the government's breach.

Id. at 1328-29 (citations omitted; emphasis added).

2. The Plaintiffs' Sales Of Their Interests In The Nuclear Reactors At Issue Is Not Directly Related To The Standard Contract, But, Rather, Constitute Independent And Collateral Undertakings

The gravaman of Delmarva's and Atlantic City's claims for breach of contract damages is that "[a]s a direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF, the value of [plaintiffs'] generating assets was substantially reduced, such that [plaintiffs] realized significantly less value upon the sale of [their interests] than would have been the case had DOE properly fulfilled its contractual and statutory obligations." Amend.

Compl. ¶ 6. However, it is beyond dispute that the sales of the plaintiffs' interests in the reactors at issue to PSEG and PECO do not flow directly from the Standard Contract, but, instead, constitute independent and collateral undertakings.

Pursuant to the NWPA, the Secretary is authorized to enter into contracts "for the acceptance of title, subsequent transportation, and disposal" of SNF. 42 U.S.C. § 10222(a)(1) (2004). Section 10131 of Title 42 of the United States Code expressly identifies the purposes behind the NWPA:

> (1) to establish a schedule for siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;
>
> (2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel;
>
> (3) to define the relationship between the Federal Government and the State governments with respect to the disposal of such waste and spent fuel; and
>
> (4) to establish a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

42 U.S.C. § 10131(b)(1)-(4) (2004).

Similarly, the purposes of the Standard Contract are set forth in its preamble and mirror those of the NWPA:

> Whereas, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and

> Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and
>
> Whereas, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and
>
> Whereas, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high-level radioactive waste; and
>
> Whereas, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and
>
> Whereas the Purchaser desires to obtain disposal services from DOE; and
>
> Whereas, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth . . . .

10 C.F.R. § 961.11.

As the NWPA establishes, the sole purpose of the Standard Contract is to create a commitment on the part of the Federal Government to accept and dispose of commercial utilities' SNF, with a corresponding obligation on the part of commercial utilities to pay for the cost of such acceptance and disposal. Although the Standard Contract permits assignment of the contract upon sale of the nuclear reactor to which the contract relates, 10 C.F.R. § 961.11, Art. XIV, it is not concerned with assisting in sales transactions or with the value or price of any sale.[5] To the contrary, the potential sale of a nuclear utility from one private entity to another is a

---

[5] To the extent that the Court in Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005), found to the contrary, we respectfully disagree with that decision.

transaction wholly separate and distinct from the Standard Contract. The loss of sales value claimed here is no different in nature than the loss of profits on other transactions claimed in Wells Fargo and Scott Timber or the loss of general net worth discussed in Olin Jones and William Green. Like in those cases, the damages that Delmarva and Atlantic City seek for the alleged devaluation of its plants and its reduced 1999 sales price are not recoverable because they do not directly flow from the breach, but, instead, arise from "independent and collateral undertakings."

### B. The Plaintiffs' Request For Restitution Damages Should Be Dismissed

#### 1. The Alleged Third-Party Beneficiary Plaintiffs' Contract Claims For Restitution Damages Fail Because The Actual Contract Holders Elected To View DOE's Delay As A Partial Breach Of Contract

In their amended complaints, both Delmarva and Atlantic City assert a restitution claim under a partial breach of contract theory, seeking recovery of monies that they assert they paid into the Nuclear Waste Fund. Amend. Compl. ¶ 87. Claiming that DOE overcollected funds that it was statutorily authorized to collect, Delmarva and Atlantic City assert that they are entitled to a refund of those monies. Id.

As a matter of law, a party is not entitled to bring a claim for restitution for a partial breach of contract. See Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1309 (Fed. Cir. 2004) (relief in restitution is only available if breach gives rise to a claim for total breach rather than partial breach). In this case, PSEG and PECO, the actual entities identified as the contract holders in the Standard Contracts under which Delmarva and Atlantic City claim third-party beneficiary status, have elected to view DOE's delay in beginning SNF acceptance as a partial,

rather than total, breach of the Standard Contract. Given that neither PSEG nor PECO (the majority interest owners and named contract holders in the Standard Contracts at issue) have never declared the Standard Contract to be in total breach, but, instead, have elected to declare DOE's delay a partial breach, Delmarva and Atlantic City, as purported third-party beneficiaries, cannot assert claims based upon a total breach of contract.

"The terms total breach and partial breach are frequently used by the courts in determining the remedies available to the injured party." 9 A. Corbin, Corbin on Contracts § 946, at 717-18 (interim ed. 1979). "A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." 9 A. Corbin, supra, § 946, at 718; see Restatement (Second) of Contracts § 236(1), at 214 (1981) ("[a] claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance"). "[I]t is clear that, wherever the court will hold that A's breach is a total breach, B can regard A's performance as at an end and at once maintain action for damages for all of his injury, past, present, and future." 9 A. Corbin, supra, § 946, at 718.

"While in the case of a total breach the injured party can at once get judgment for his entire injury, it is not always necessary for him to elect this remedy." 9 A. Corbin, supra, § 946, at 720. "In some cases he may elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." Id.; see Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the

contract").[6] "If the injured party elects to or is required to await the balance of the other party's performance under the contract, his claim is said instead to be one for damages for partial breach. For example, an injured party who claims damages in addition to specific performance claims damages for partial breach." Restatement (Second) of Contracts § 236 cmt. b, at 214 (1981). If the non-breaching party elects to view the breach as partial, the breaching party is required to continue its contract performance. Id.

Both PSEG and PECO, the named contract holders in the contracts under which Delmarva and Atlantic City claim third-party beneficiary status, elected to view DOE's delay in beginning SNF acceptance as a partial, rather than total, breach. Neither Delmarva nor Atlantic City have identified any basis upon which they, as alleged third-party beneficiaries, can modify that election and sue for total breach. Given that the contract holders elected to view DOE's delay as a partial breach, Delmarva and Atlantic City are bound by that election. Accordingly, they cannot individually seek restitution damages that are not available under a partial breach of contract theory.

2. Plaintiffs Did Not Pay And Had No Obligation To Pay Any Money Into The Nuclear Waste Fund, Precluding Their Claims For Restitution Of Those Payments As A Matter Of Law

Even if the plaintiffs could overcome the fatal legal deficiency to their restitution claim, they are not entitled to claim restitution for the amounts that they voluntarily paid to PSEG and PECO for ultimate payment into the Nuclear Waste Fund, given that only PECO and PSEG had a contractual obligation to pay monies into the NWF. The United States Court of Appeals for the

[6] "A partial breach of contract is a breach where remedial rights provided by law can be substituted by the injured party for only part of the existing contractual rights." Restatement (First) of Contracts § 313(2) (1932).

Federal Circuit has held that, where a party voluntarily makes payments to a third party absent a contractual obligation, that party is not entitled to damages in the form of restitution. Castle v. United States, 301 F.3d 1328, 1340 (Fed. Cir. 2002) (holding that plaintiff in Winstar case that made voluntary contributions absent contractual obligation could not recover contributions under restitution theory); see E. Allan Farnsworth, Farnsworth on Contracts § 10.7 ("beneficiary ordinarily has no right to restitution from the promisor since any benefit the promisor has received was conferred by the promisee, not by the beneficiary").

In this case, the Standard Contract unambiguously provides that the "Purchaser" has the sole responsibility for the payment of fees into the NWF. 10 C.F.R. § 961.11, Art. VIII.B.1 ("For electricity generated by the Purchaser's civilian nuclear power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by the Purchaser . . .") (emphasis added). Under the Standard Contracts at issue in this case, PSEG and PECO are unequivocally designated as the "Purchaser," App. 1, 15, 28, and the contracts provide that the "Purchaser" is "acting on its own behalf as managing utility for" the particular nuclear utilities "on behalf of the joint owner" or owners, Delmarva and/or Atlantic City. Id. The fact that PECO and PSEG may have acted upon behalf of the plaintiffs in no way transforms the plaintiffs into the "Purchaser," as that term is defined in the Standard Contract. Consequently, the plaintiffs have no contractual obligation to the Government to pay fees into the Nuclear Waste Fund, precluding their claims for restitution.

In fact, DOE's records unequivocally reflect neither Delmarva nor Atlantic City paid any money directly into the NWF. Instead, PECO and PSEG paid the fees arising under the Standard Contracts at issue directly into the NWF. See App. 64-69 (wire transfer of NWF payment for 1995 for Peach Bottom plant from PECO to DOE and for 1995 for Salem plant from PSEG to

DOE).[7] Therefore, any recovery of monies paid into the NWF that Delmarva and Atlantic City seek must come from PECO and PSEG, not the Government, and their restitution claim fails as a matter of law.

## III. TO THE EXTENT THAT PLAINTIFFS ARE OTHERWISE PERMITTED TO PURSUE THEIR TAKINGS CLAIMS, THOSE CLAIMS SHOULD BE DENIED ON THEIR MERITS

### A. Plaintiffs Have Not Identified A Cognizable Claim For A Taking Of Rights Created By A Contract With The Government

In analyzing a takings claim, "a court must first determine what was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). Here, the plaintiffs allege two bases for their takings claim. First, they assert that the "NWPA conferred upon [plaintiffs] a right to have DOE dispose of [plaintiffs'] SNF in a manner and at a cost consistent with the intent of Congress," Amend. Compl. ¶ 85, and that plaintiffs had "a protected property interest in the benefits of [the] NWPA." Id. ¶ 87. Alternatively, the plaintiffs allege that they were "intended beneficiar[ies] of the Standard Contract" and that DOE's failure to begin SNF acceptance by the contractual deadline constitutes a "taking of [plaintiffs'] vested property rights." Id. ¶ 88.

[7] Indeed, when DOE agreed to credit nuclear utilities for certain overpayments made into the NWF after the decision of the United States Court of Appeals for the District of Columbia in Wisconsin Electric Power Co. v. Hodel, 778 F.2d 1 (D.C. Cir. 1985), which concluded that payments made into the NWF did not include electricity that a generating plant itself consumed, DOE credited PSEG and PECO for payments made on behalf of the Salem, Hope Creek and Peach Bottom plants. DOE did not provide any credits directly to Delmarva or ACE. See, e.g., App. 70-89.

DOE's breach of the Standard Contract does not constitute a compensable taking of plaintiffs' property rights. It is well-established that, where a party's rights are created by contract with the Government, a party cannot state a takings claim against the Government founded upon a breach of that contract. Tyler House Apartments, Ltd. v. United States, 38 Fed. Cl. 1, 10 (1997) (citing J.J. Henry Co. v. United States, 188 Ct. Cl. 39, 46, 411 F.2d 1246, 1249 (1969)); Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); Smith v. United States, 58 Fed. Cl. 374, 389 (2003). As Justice Scalia has recognized, "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance. The duty to keep a contract at common law means a predication that you must pay damages if you do not keep it – and nothing else." United States v. Winstar Corp., 518 U.S. 839, 919 (1996) (Scalia, J., concurring) (citations omitted). Likewise, this Court has held that, when a party enters into a contract, that party has either the right to receive performance or, if a breach occurs, the right to receive damages pursuant to contract law. Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9 (1997), aff'd, 133 F.3d 874 (Fed. Cir. 1998); see Northwest Airlines, Inc. v. United States Dep't of Transp., 15 F.3d 1112, 1121 n.5 (D.C. Cir. 1994). That is why "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)).

This Court has rejected takings claims that are, in reality, disguised contract claims. In Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), one of the 60 currently

pending cases concerning the Standard Contract, the Court was presented with a takings claims based upon the Government's breach of the Standard Contract. Id. at 656. In its complaint, Commonwealth Edison alleged that the Government's breach prevented it from the full commercial use of its property because it was forced to store SNF that otherwise would have been removed. Id. at 655. The Court rejected this claim, holding that Commonwealth Edison did "not have a takings claim absent the rights and obligations granted to the parties by the Standard Contract." Id. at 656. In so holding, the Court explained that, because the Government had no obligation to accept the plaintiff's SNF absent the contract, the contractor had no basis for seeking takings damages outside the context of the contract:

> [A]bsent the contract, plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim. The court finds that plaintiff's claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through contract remedy.

Id.; see Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished opinion) (dismissing Standard Contract holders' takings claim because it "is grounded on the SNF contracts that [two of the plaintiffs] executed with the United States").

Similarly, in Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002), this Court rejected a takings claim based upon rights created by contract. In Castle, the plaintiffs alleged that the Government had effected a taking of "their contractual agreement with the government" because the Government had not performed in strict accordance with the terms of the contract. Id. at 217. This Court recognized that "the formation

of a contract does not entitle its signatories to absolute performance, but rather gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy." Id. at 218 (citing Winstar, 518 U.S. at 919 (Scalia, J., concurring)). "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, and nothing else." Id. (quoting Winstar, 518 U.S. at 919 (Scalia, J., concurring)). In its review of this Court's decision in Castle, the Federal Circuit reiterated that, because the Government did not deprive the plaintiff of its previously existing contract remedies, the Government had not effected a taking of the plaintiff's contract:

> The plaintiffs received no contractual guarantee that the government would refrain from regulating Western Empire. At most, the contract promised either to regulate Western Empire consistently with the contract's terms, or to pay damages for breach. *Cf. Winstar*, 518 U.S. at 919, 116 S. Ct. at 2432 (Scalia, J., concurring in judgment) ("Virtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance . . . ."). Thus, by enacting FIRREA, the government did not deprive the plaintiffs from a contractual remedy – injunctive relief – to which they otherwise might have been entitled against a private defendant. Nor did FIRREA remove the plaintiffs' cause of action for damages. We agree with the Court of Federal Claims that the plaintiffs retained the full range of remedies associated with any contractual property right they possessed. Consequently, we hold that even assuming the enactment and enforcement of FIRREA breached a contract the government had with Castle and Harlan, it did not constitute a taking of the contract.

Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002); see Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002) (no taking of contract rights exist unless Government "takes" range of remedies associated with vindication of contract), aff'd, 341 F.3d 1342 (Fed. Cir. 2003); Integrated Logistics Support Sys. Int'l, Inc. v. United States, 42 Fed. Cl. 30, 34 (1998) (plaintiff

"cannot exploit the Fifth Amendment to amend unilaterally a contract in an effort to rectify what hindsight reveals as an unappealing bargain").[8]

B. Plaintiffs' Takings Claim Based Upon Rights Allegedly Created By The Nuclear Waste Policy Act Does Not State A Viable Claim

To the extent that Delmarva and Atlantic City are claiming that their right to have DOE remove SNF by a date certain stems from the NWPA, that "right" cannot constitute a property right giving rise to a takings claim. The Supreme Court has been clear that a "mere unilateral expectation or an abstract need is not a property interest entitled to protection" under the Fifth Amendment, Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980), "even if they are entirely plausible expectations of economic benefit." National Educ. Ass'n-R.I. v. Retirement Bd., 172 F.3d 22, 29 (1st Cir. 1999).

To the extent that a statute or regulation provided that the Government would accept SNF from nuclear reactors absent a contract, no entity would have had a property right in that rule of law. "[T]he law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations." Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) (quoting Munn v. Illinois, 94 U.S. 113 (1876)); see Branch, 69 F.3d at 1577-78 ("[i]If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever'")

[8] In a few decisions in the SNF cases, the Court has deferred dismissal of the plaintiff's takings claim to await further development of the contract claims and as potential alternative claims to a contract action. See, e.g., Systems Fuels, Inc. v. United States, No. 03-2623C, 2005 WL 950497 (Fed. Cl. Apr. 20, 2005); Sacramento Municipal Utility Dist. v. United States, 61 Fed. Cl. 438 (2004); Detroit Edison Co. v. United States, 56 Fed. Cl. 299 (2003). With all due respect to the Court in those cases, the Federal Circuit's decisions in cases such as Castle and LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004), plainly establish that the plaintiffs' takings claims here are not viable, making resolution of this motion appropriate.

(quoting L. Fuller, The Morality of Law 60 (1964)); Pittman v. Chicago Bd. of Educ., 64 F.3d 1098, 1104-05 (7th Cir. 1995) ("A statute is not a commitment by the legislature never to repeal the statute. . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred"), cert. denied, 517 U.S. 1243 (1996). "Because Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment." Members of the Peanut Quota Holders Ass'n, Inc. v. United States, 60 Fed. Cl. 524, 529 (2004). To the extent that plaintiffs are relying upon a statute or regulation as creating a right to SNF acceptance, they cannot state a viable takings claim.

The Federal Circuit recently reaffirmed the principle that statutes may not form the basis for a property interest. In Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004), a group of Federal employees claimed entitlement to overtime compensation at the rate specified under the Fair Labor Standards Act ("FLSA"), which was greater than the overtime that they were then receiving under the Federal Employees Pay Act ("FEPA"). Plaintiffs raised a takings claim, asserting a property interest in the overtime payments under the FLSA. The Federal Circuit rejected this claim and affirmed the trial court's decision granting a motion to dismiss, explaining that "[w]e disagree that Appellants own any Fifth Amendment property interest pursuant to the FLSA statute." Id. at 1220. The Federal Circuit distinguished between property rights derived from statutes for purposes of the Due Process Clause, which may create cognizable "rights" that a court could enforce, and property rights derived from statutes for purposes of the Takings Clause, which does not create such "rights." Id. To the extent that the plaintiffs are relying upon the NWPA as creating a right to SNF acceptance, they cannot state a viable takings claim by

identifying the NWPA – or any other statute or regulation – as their "property right" to require that acceptance.

In any event, plaintiffs' attempt to bypass the requirement that an executed Standard Contract exist before the Government would be obligated to accept a particular nuclear utility's SNF directly conflicts with the language of the NWPA. Contrary to plaintiffs' assertions, the NWPA did not create any self-executing obligation upon DOE to accept a particular utility's SNF. Instead, section 302(a) of the NWPA, 42 U.S.C. § 10222(a), authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (emphasis added). More significantly, the Secretary of Energy was – and is – expressly barred from disposing of any SNF under the NWPA, "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." Id. § 10222(b)(2) (emphasis added).

DOE's obligation to dispose of any particular generator's SNF is expressly conditioned upon the existence of a contract between the generator and DOE. Absent a contract between DOE and a particular utility, DOE is barred from accepting that utility's SNF. As a result, plaintiffs' contention that they somehow has a statutory right to DOE acceptance of their SNF, outside the context of the Standard Contract, is unsupported by precedent and contrary to the express language of the NWPA.[9] Accordingly, it is clear that the plaintiffs' takings claim in these

[9] Because the NWPA does not create a "property right" requiring DOE to accept and dispose of the plaintiffs' SNF, an alleged violation of the NWPA cannot constitute a taking of the plaintiffs' property right. See, e.g., Commonwealth Edison Co. v. United States, 271 F.3d 1327,

cases is based solely upon the Government's contractual obligation to accept SNF from the Peach Bottom, Hope Creek, and Salem nuclear reactors in which Delmarva and/or Atlantic City had minority ownership interests. A breach of that contract by the Government may give rise to a claim for breach of contract, but it does not give rise to a separate takings claim, absent a taking of any remedy that the contract provided for its breach.[10]

C. The Plaintiffs Cannot Assert A Physical Taking Of Their Property

To the extent that the plaintiffs are asserting a physical (as opposed to a regulatory) taking of their property, their claim fails. As the United States Court of Appeals for the District of Columbia Circuit has held, DOE does not hold, and has not taken, title to the utilities' SNF. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Accordingly, the SNF about which the plaintiffs are complaining that they had to continue to store was the plaintiffs' own SNF. The Federal Circuit has expressly rejected the argument that anything less than a physical invasion of property by the Government could constitute a physical taking. In The Stearns Co. Ltd. v. United States, 396 F.3d 1394 (Fed. Cir. 2005), the Federal Circuit was confronted with an allegation that a physical taking had occurred based upon the

---

1340 (Fed. Cir. 2001) (provision of Energy Policy Act requiring domestic utilities that had entered into contracts with the Government for processing uranium to pay for costs of cleanup of environmentally contaminated uranium processing facilities was not a Fifth Amendment taking).

[10] This Court in Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005), recently declined to dismiss a takings claim in a spent nuclear fuel case, finding, in part, that the plaintiff's allegations that some statute or regulation other than the NWPA obligated DOE to accept the plaintiff's SNF created a genuine issue of material fact about whether the plaintiff had a property right in SNF acceptance outside of the contract. Id. at 187. With all due respect, we disagree with that decision. The existence of a statute or regulation that creates rights to SNF acceptance is not a factual issue that warrants fact witness testimony. Instead, it is a matter of law. If the plaintif cannot identify a statute or regulation that creates property rights (which, as previously discussed, they do not), the plaintiff has failed to establish its case.

enactment of a regulation that affected the appellee's ability to engage in surface mining. Id. at 1346. The appellee argued that the denial of its "valid existing rights" application ("VER"), which would have allowed it to engage in mining, effected a physical taking because it unilaterally transferred the appellee's surface easement to the United States. Id. at 1357. In overturning the trial court's determination that the denial of the appellee's VER constituted a physical taking of the surface easement, the Federal Circuit reiterated long-standing precedent, noting that a physical taking occurs only "when the government itself occupies the property or 'requires the landowner to submit to physical occupation of its land.'" Id. (quoting Forest Props., Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999), and Yee v. City of Escondido, 503 U.S. 519, 527 (1992)); see Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1135 (Fed. Cir. 2004) (explaining that physical takings require physical possession). The Court then held that the Government had neither (1) occupied appellee's mineral property or the accompanying implied appurtenant easement nor (2) required appellee to accept the physical presence of a third party on any of the property. Stearns, 396 F.3d at 1357.

Here, there is no physical occupation by the Government of the reactor sites, and the Government did not required the plaintiffs to accept the presence of a third party upon their property. The plaintiffs cannot allege that the Government federalized their facilities or the generation of nuclear power at those facilities. They cannot allege that the Government owns the SNF that their reactors generated. See Indiana Michigan, 88 F.3d at 1276. They merely allege that they were required to continue storing their own SNF. Even assuming the truth of all of the plaintiffs' limited assertions, they simply do not constitute a physical taking of the plaintiffs' property.

D. The Plaintiffs Have Not Identified Any Viable Regulatory Taking Of Their Property

In their amended complaint, the plaintiffs seem to suggest that they are pursuing a regulatory takings claim, referring to the destruction of their "reasonable, investment-backed expectations." Amend. Compl. ¶ 89. However, before the Court analyzes whether Government action constituted a regulatory taking, the plaintiffs must identify whether a protected property interest exists or, in other words, whether "the use interest proscribed by the government action was part of the owner's title to begin with." M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995). This Court has recognized that an "investment-backed expectation is not property." Ambase Corp. v. United States, 58 Fed. Cl. 32, 51 (2003). The only "property right" to have DOE accept the plaintiffs' SNF and to do so by any particular date arising from the Standard Contract, the mere breach of which, as previously discussed, cannot constitute the basis for a takings action. In Ambase, the plaintiff had alleged that, "as the sole shareholder of [the contracting party], it had a reasonable investment-backed expectation that the government would honor the goodwill contracts with [the contracting party], and that the enforcement of FIRREA confiscated that expectation . . . ." Id. at 50. The Court rejected this argument, finding that, because the "right" at issue was created through a contract with the Government, the only remedy was a contract-based remedy by the contract holder:

> In light of these general concepts, the issue in this case is whether an action by the government against the corporation, that destroys the corporation's value, can be the legal cause of the shareholder's loss in value. The answer seems to the Court to depend on what the character of the government action was. If the government's action is legally compensable under some remedial system then the answer appears to be that there is no legal cause that would justify a takings claim. In this case that is clearly the situation. The

> government's breach of contract creates in the corporation, here Carteret, a cause of action against the government. If Carteret prevailed in the breach of contract action, the corporation would be restored to the position it would have been in and the shareholder would have lost nothing by the government's action. Therefore, the takings claim can only exist if there is no remedy other than a takings claim for the government's breach of contract. But clearly there is a contract remedy.

Id. at 52 (emphasis added; citations omitted). Because the Standard Contracts' "Purchasers," see 10 C.F.R. § 961.11, have contract remedies and have availed themselves of those contract remedies by filing suit (Docket Nos. 01-551C (Fed. Cl.) (now pending) and 04-102C (Fed. Cl.) (subsequently amicably resolved)), no valid regulatory takings claim exists.

Similarly, the plaintiffs have not identified any regulation by the Government that allegedly took their property. The plaintiffs' complaint is devoid of reference to any regulation that "took" their property, and we are not aware of any. Accordingly, the plaintiffs' regulatory takings claim should be dismissed. During the parties' conference with the Court on December 3, 2004, the Court indicated that the Federal Circuit's decision in United Nuclear Corp. v. United States, 912 F.2d 1432 (Fed. Cir. 1990), might provide a basis for finding that the plaintiffs could maintain a takings claim based upon a property interest in their plants, which they sold at an allegedly depreciated value. Transcript, at 20-21 (Dec. 3, 2004). The taking in United Nuclear was viewed as a regulatory taking. United Nuclear, 912 F.2d at 1437. In the United Nuclear case, the Federal Circuit found that the Government's refusal to approve a mining plan "seriously interfered with United's investment-backed expectations by destroying them" and that "the subject of the takings claim [was] United's leasehold interest in the minerals, which the government took by preventing United from mining under the leases." Id. Yet, as the Federal

Circuit explained in a subsequent decision, Golden Pacific Bancorp v. United States, 15 F.3d 1066 (Fed. Cir. 1994), United had possessed "reasonable investment-backed expectations, the reason being that, inherent in [its interests] – . . . United Nuclear's status as a lessee – was, in one sense or another, the right to exclude others." Id. at 1075 (emphasis added); see Hendler v. United States, 952 F.2d 1364, 1374 (Fed. Cir. 1991) (in "bundle of rights we call property, one of the most valued is the right to sole and exclusive possession – the right to *exclude* strangers, or for that matter friends, but especially the Government"). In the cases currently before the Court, Delmarva and Atlantic City are not complaining that they were unable to exclude the Government from their property. Instead, they are complaining that they – or, at least, the majority owners of the Salem, Hope Creek, and Peach Bottom reactors – had to continue storing their own property. That is, as the United States Court of Appeals for the District of Columbia Circuit has held, DOE does not hold, and has not taken, title to the utilities' SNF. See Indiana Michigan, 88 F.3d at 1276. Absent the Standard Contract, DOE would not have any obligation to accept that SNF. Accordingly, the United Nuclear decision does not support the existence of a regulatory taking where the plaintiffs complain that they have been required to store their own property.

Further, the Supreme Court has held that, in considering whether a regulatory taking has occurred, courts must look at the totality of the claimant's property rights, not specific segments of those rights:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature

> and extent of the interference with rights n the parcel as a whole – here, the city tax block designated as the "landmark site."

Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 327 (2002) (quoting Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 130-31 (1978)). "Where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." Id. (quoting Andrus v. Allard, 444 U.S. 51, 65-66 (1979)). Here, the plaintiffs do not allege that the Government has taken the most significant strand from the reactors' "bundle of property rights" – the ability to operate a nuclear power reactor and generate electricity. The plaintiffs do not even allege the "destruction of one 'strand' of the bundle." Instead, they allege that the Government's delay in accepting SNF resulted in the storage of certain SNF assemblies for longer than contractually mandated. Under the most basic analysis, the plaintiffs' regulatory takings claim fails.

## IV. PLAINTIFFS' ASSERTION THAT PAYMENT OF FEES INTO THE NUCLEAR WASTE FUND SOMEHOW CONSTITUTES A "TAKING" OF THEIR PROPERTY IS MERITLESS

### A. Because An Obligation To Pay Fees Into The Nuclear Waste Fund Is Created By Contract, That Obligation Cannot Form The Basis Of A Takings Claim

The plaintiffs also contend that their takings claim should proceed because they allege a taking of property accomplished through over-collection of the NWF fee in excess of that authorized by the NWPA. Amend. Compl. ¶ 87. It is unclear whether the plaintiffs believe that the collection of the fee itself constitutes a taking of its property or, instead, whether the payment of the fee somehow creates some right that has been taken. Regardless of the meaning of their allegation, it is meritless. First, absent the Standard Contract, no fees need be paid into the NWF.

See 10 C.F.R. § 961.11, Art. VIII. Although the amount of the fee is set by statute, based upon a "1.0 mil per kilowatt-hour" charge, 42 U.S.C. § 10222(a)(2), nothing in the NWPA itself requires any entity to pay this fee into the NWF. Instead, the NWPA provides that contracts into which the Secretary of Energy enters pursuant to the NWPA "shall provide for the payment to the Secretary of [these] fees . . . sufficient to offset expenditures . . ." and that, if an entity enters into a contract with the Secretary for disposal of its SNF, the contract will require the contract holder to pay the fees. 42 U.S.C. § 10222(a)(1). For the reasons previously explained, plaintiffs cannot take a fee payment required only by contract and somehow create a cognizable takings claim.

B. Because The Standard Contracts At Issue Did Not Require *Plaintiffs* To Pay Fees Into The Nuclear Waste Fund, Any Payment Of Fees By Plaintiffs Was Not "Compelled" By The Government

Plaintiffs have no basis upon which to raise an excess payments claim. Only the Purchaser, as identified in the Standard Contract, is responsible for paying the fees associated with the SNF generation at its facility. Specifically, the Standard Contract provides that only the "Purchaser" shall be charged a fee, see 10 C.F.R. § 961.11, Art. VIII.A.1, and that the "fee shall be paid quarterly by the Purchaser . . . ." Id., Art. VIII.B.1 (emphasis added). Fees are paid into the Nuclear Waste Fund only if required to be paid by contract. See 42 U.S.C. § 10222(a) (authorizing Secretary of Energy to enter into contracts for acceptance of SNF, and "[s]uch contracts shall provide for the payment to the Secretary of fees pursuant to paragraphs (2) and (3) sufficient to offset expenditures described in subsection (d)"); id. § 10222(c) (obligating Secretary to deposit fees collected under contract into Nuclear Waste Fund). PSEG and PECO, as the "Purchaser" under the Standard Contract, was responsible for paying the fees associated with the SNF generation at their facilities, pursuant to the terms of their contracts. Plaintiffs, as

non-signatory minority interest holders, were not. As a result, plaintiffs have no basis upon which to claim a taking of property based upon fee payment disputes.

"To hold the United States liable for a taking, plaintiffs must show that the federal government has done some affirmative act that deprives the plaintiffs of their property or that interfered with or disturbed their property rights." Custom Contemporary Homes, Inc. v. United States, 5 Cl. Ct. 88, 90 (1984) (citing D.R. Smalley & Sons, Inc. v. United States, 178 Ct. Cl. 593, 598-99, 372 F.2d 505, 508, cert. denied, 389 U.S. 835 (1967)). "A fundamental requirement for any taking is that the challenged governmental action create legal compulsion." Hinesburg Sand & Gravel Co. v. Chittendon Solid Waste District, 959 F. Supp. 652, 657 (D. Vt. 1997). Here, Delmarva and Atlantic City cannot establish any basis upon which they were "compelled" by the Government to pay fees into the NWF. The only entities with a legal liability for those fees under the Standard Contracts at issue are the Purchasers. Further, as previously discussed, it is clear from the evidence that Delmarva and Atlantic City did not pay fees to the Government. App. 64-69. To the extent that plaintiffs voluntarily reimbursed fees to PSEG and PECO or did so pursuant to a contract with PSEG and PECO, their voluntary actions cannot form the basis of a takings claim against the Government. To the extent that the plaintiffs had arrangements with the Purchasers to reimburse them for fees that those entities paid, the plaintiffs' amended complaints are with the Purchasers, not the Federal Government, and its internal agreements cannot create the type of "compulsion" by the Federal Government giving rise to a takings claim.[11]

[11] Even if this Court were to conclude that plaintiffs were obligated to pay the fee, that obligation to pay money could not constitute a taking. See Commonwealth Edison Co. v.United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (mere imposition of obligation to pay money does

C. This Court Lacks Jurisdiction To Entertain Claims Relating To The Amount Of The Nuclear Waste Fund Fees

Even if the plaintiffs had been compelled to pay fees into the NWF, this Court would lack jurisdiction to adjudicate their challenge to the legality of DOE's actions concerning the collection of those fees. Section 10139 of Title 42 of the United States Code provides that the United States Courts of Appeals shall have original and exclusive jurisdiction over, among other things, any of the following civil actions: (1) review of any final decision or action of the Secretary of Energy; (2) allegations concerning the failure of the Secretary of Energy in making any decisions or taking any actions under this section; and (3) challenges to the constitutionality of any decision made, or action taken under this section. 42 U.S.C. § 10139(a)(1)(A), (B), & (C). In this regard, section 10222(a)(4) provides that the Secretary shall annually review the amount of the fee and, if he views it as insufficient or excessive, and to report to Congress. 42 U.S.C. § 10222(a)(4). The United States Court of Appeals for the District of Columbia Circuit has held unequivocally that challenges relating to the collection of fees under the NWPA are under the original and exclusive jurisdiction of the United States Courts of Appeals. Wisconsin Elec. Power Co. v. Hodel, 778 F.2d 1, 2-3 (D.C. Cir. 1985); General Elec. Uranium Mgt. Corp. v. United States Dep't of Energy, 764 F.2d 896, 907 (D.C. Cir. 1985).

Recently, this Court in Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005), disagreed with the D.C. Circuit and suggested that no actions by the Secretary under Title III of the NWPA were covered by the jurisdictional provisions of Section 10139. If the Court's

not give rise to a takings claim); United States Shoe Corp. v. United States, 296 F.3d 1378, 1383 (Fed. Cir. 2002). "Unlike real or personal property, money is fungible." United States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989). Accordingly, "[r]equiring money to be spent is not a taking of property." Atlas Corp. v. United States, 895 F.2d 745, 756, cert. denied, 498 U.S. 811 (1990).

analysis in Boston were correct, it would mean that all of the decisions upon which the plaintiffs heavily rely in this litigation, including the D.C. Circuit's decisions in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1276 (D.C. Cir. 1996); Northern States Power Co. v. United States Department of Energy, 128 F.3d 754 (D.C. Cir. 1997); and Wisconsin Electric Power Co. v. Department of Energy, 211 F.3d 646 (D.C. Cir. 2000), and the Eleventh Circuit's decision in Alabama Power Co. v. Department of Energy, 307 F.3d 1300 (11th Cir. 2002), would have been issued by courts without jurisdiction to enter them. The Boston Edison Court's analysis of this issue, with all due respect, is incorrect to the extent that it finds that the United States courts of appeals do not have exclusive jurisdiction to entertain challenges to actions or inactions arising under Title III of the NWPA. Based upon the D.C. Circuit's correct analysis of this issue in General Electric, the Court should dismiss the plaintiffs' claims based upon challenges to the NWF fees.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant summary judgment in the Government's favor and dismiss the plaintiffs' amended complaints.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

April 28, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 28th day of April 2005, a copy of foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.