(DP&L-PEACH BOTTOM)
Conformed

# PURCHASE AGREEMENT

BY AND AMONG

DELMARVA POWER & LIGHT COMPANY,

PECO ENERGY COMPANY

and

PSEG POWER LLC

Dated as of September 27, 1999

179675.03-WilmingtonS1A

**PURCHASE AGREEMENT**
(DP&L-Peach Bottom)

PURCHASE AGREEMENT, dated as of September 27, 1999, by and between Delmarva Power & Light Company, a Delaware and Virginia corporation ("Seller"), PECO Energy Company (formerly Philadelphia Electric Company), a Pennsylvania corporation ("PECO") and PSEG Power LLC, a Delaware limited liability company ("PSEG" and, together with PECO, "Buyers"). Seller, PECO and PSEG may be referred to herein individually as a "Party," and collectively as the "Parties."

**WITNESSETH**

WHEREAS, Seller owns an undivided 7.51% interest as tenant in common without the right of partition in the Peach Bottom Station (as defined below) and certain properties and assets associated therewith and ancillary thereto;

WHEREAS, PECO desires to purchase and assume, and Seller desires to sell and assign, or cause to be sold and assigned, one-half of all of Seller's rights, title and interests in and to the Purchased Assets (as defined below) and certain associated liabilities, upon the terms and conditions hereinafter set forth in this Agreement;

WHEREAS, PSEG desires to purchase and assume, and Seller desires to sell and assign, or cause to be sold and assigned, one-half of all of Seller's rights, title and interests in and to the Purchased Assets (as defined below) and certain associated liabilities, upon the terms and conditions hereinafter set forth in this Agreement; and

WHEREAS, Public Service Enterprise Group Incorporated, a New Jersey corporation and sole member of Buyer, has contemporaneously delivered a Guaranty dated the date hereof to Seller, upon which Seller has relied in entering into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants, representations, warranties and agreements set forth herein, and intending to be legally bound hereby, the Parties hereby agree as follows:

# ARTICLE I

## DEFINITIONS

1.1 Definitions. As used in this Agreement, the following capitalized terms have the meanings specified in this Section 1.1.

(1) "ACE" means Atlantic City Electric Company, a New Jersey corporation.

(2) "Additional Agreements" means the Deeds, the Assignment and Assumption Agreements, the Bills of Sale and the Amendment to Owners Agreement.

(3) "Affiliate" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations promulgated under the Exchange Act.

(4) "Agreement" means this Purchase Agreement together with the Schedules and Exhibits hereto.

(5) "Allocation" has the meaning set forth in Section 3.6.

(6) "Amendment to Owners Agreement" means the amendment to the Owners Agreement among the signatories to the Owners Agreement, to be delivered at the Closing, substantially in the form of Exhibit A.

(7) "Antitrust Laws" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade, in each case, as amended from time to time.

(8) "Applicable Tax Law" has the meaning set forth in Section 3.6.

(9) "Assignment and Assumption Agreements" means the assignment and assumption agreements between Seller and PECO and Seller and PSEG, to be delivered at the Closing, substantially in the form of Exhibit B hereto, pursuant to which Seller shall assign to each of PECO and PSEG one-half of Seller's rights, title and interests in and to the Seller's Agreements, certain intangible assets and certain

Holdings, an Affiliate of PSEG, and (ii) the Confidentiality Agreement, dated July 9, 1999 between Conectiv and PECO.

(31) "Courts" has the meaning set forth in Section 11.10.

(32) "CSFB" has the meaning set forth in Section 11.3.

(33) "Decommissioning" means to remove the Peach Bottom Station from service and restore the Sites, in accordance with applicable Law, including (a) the dismantlement, decontamination, storage or entombment of the Peach Bottom Station, in whole or in part, and any reduction or removal, whether before or after termination of the NRC Licenses for the Peach Bottom Station, of radioactivity at the Sites relating to the Peach Bottom Station and (b) all activities necessary for the retirement, dismantlement and decontamination of the Peach Bottom Station to comply with all Laws, including Nuclear Laws and Environmental Laws, including the requirements of the Atomic Energy Act and the NRC's rules, regulations, orders and pronouncements thereunder, the NRC Licenses for the Peach Bottom Station and related decommissioning plans.

(34) "Decommissioning Costs" means the costs of Decommissioning the Peach Bottom Station in accordance with all applicable Laws, including Nuclear Laws and Environmental Laws.

(35) "Decommissioning Funds" means, collectively, the Seller's Qualified Decommissioning Funds and the Seller's Nonqualified Decommissioning Funds.

(36) "Deeds" means the special warranty deeds, as customarily used in the Commonwealth of Pennsylvania, substantially in the form of Exhibit D hereto, pursuant to which Seller will convey all of its rights, title and interests in the Real Property to PECO, to the extent of the PECO Interest, and to PSEG, to the extent of the PSEG Interest.

(37) "Defined Expenses" has the meaning set forth in Section 7.1(b).

(38) "Department of Energy" means the United States Department of Energy, and any successor agency thereto.

(39) "Department of Energy Decommissioning and Decontamination Fees" means all fees related to the Department of Energy's special assessment of utilities for the Uranium Enrichment Decontamination and Decommissioning Fund pursuant

to Sections 1801, 1802 and 1803 of the Atomic Energy Act (42 U.S.C. 2297g *et seq.*), and the Department of Energy's implementing regulations at 10 CFR Part 766, and any similar fees assessed under amended or superseding statutes or regulations applicable to separative work units purchased from the Department of Energy in order to decontaminate and decommission the Department of Energy's gaseous diffusion enrichment facilities.

(40) "Department of Energy Standard Contract" means the Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, No. DE-CR01-83NE 44405 with respect to the Peach Bottom Station, dated as of June 1, 1983, between the United States of America, represented by the United States Department of Energy, and PECO.

(41) "Direct Claim" has the meaning set forth in Section 9.2(d).

(42) "Encumbrances" means any and all mortgages, pledges, liens, claims, security interests, conditional and installment sale agreements, easements, activity and use limitations, exceptions, rights-of-way, deed restrictions, defects of title, encumbrances and charges of any kind.

(43) "Environmental Claims" has the meaning set forth in Section 9.1(d).

(44) "Environmental Condition" means the presence or Release to the environment, whether at the Sites or otherwise, of Hazardous Substances, including any migration of Hazardous Substances through air, soil or groundwater at, to or from the Sites or at, to or from any Off-Site Location, regardless of when such presence or Release occurred or is discovered.

(45) "Environmental Laws" means all (a) Laws, in each case, as amended from time to time, relating to pollution or protection of the environment, natural resources or human health and safety, including Laws relating to Releases or threatened Releases of Hazardous Substances or otherwise relating to the manufacture, formulation, generation, processing, distribution, use, treatment, storage, Release, transport, Remediation, abatement, cleanup or handling of Hazardous Substances, (b) Laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Substances and (c) Laws relating to the management or use of natural resources; but shall not include Nuclear Laws.

## ARTICLE II

## PURCHASE AND SALE

2.1 Transfer of Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, (i) Seller shall sell, assign, convey, transfer and deliver to PECO, and PECO shall purchase, assume and acquire from Seller, free and clear of all Encumbrances, except for Permitted Encumbrances, the Purchased Assets, but only to the extent of the PECO Interest, and (ii) Seller shall sell, assign, convey, transfer and deliver to PSEG, and PSEG shall purchase, assume and acquire from Seller, free and clear of all Encumbrances, except for Permitted Encumbrances, the Purchased Assets, but only to the extent of the PSEG Interest, in each case, as in existence on the Closing Date, including the following Purchased Assets:

(a) The Real Property;

(b) The Inventories;

(c) The Nuclear Materials held pursuant to the NRC Licenses;

(d) The Fuel Supplies;

(e) All machinery (mobile or otherwise), equipment (including computer hardware and software and communications equipment), vehicles, tools, spare parts, fixtures, furniture, furnishings and other personal property located at or in transit to the Peach Bottom Station or used and necessary for the operation of the Peach Bottom Station, in each case, on the Closing Date (collectively, the "Tangible Personal Property");

(f) Subject to the receipt of necessary consents and approvals, the Seller's Agreements;

(g) Subject to the receipt of necessary consents and approvals, the Transferable Permits and all of Seller's rights, title and interests in and to any other permits, registrations, franchises, certificates, licenses and other authorizations, consents and approvals of Governmental Authorities relating to the ownership, lease, maintenance or operation of the Peach Bottom Station or any portion thereof;

(h) Seller's Nonqualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(i) Seller's Qualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(j) All books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of Seller relating specifically to the Peach Bottom Station (subject to the right of Seller to retain copies of same for its use) other than such items which are proprietary to third parties and accounting records;

(k) All unexpired, transferable warranties and guarantees from third parties arising out of, in respect of, or in connection with, (i) any item of Real Property or personal property, or interest therein, included in the Purchased Assets or (ii) the Assumed Liabilities;

(l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(j); and

(m) The rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date.

2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall constitute or be construed as requiring Seller to sell, assign, convey, transfer or deliver, and neither PECO nor PSEG shall be entitled to purchase or acquire, any right, title or interest in, to or under the following assets and properties which are associated with the Purchased Assets, but

Buyers in connection with obtaining the portion of such Tax refund or credit owed to Seller);

(g) The minute books, stock transfer books, corporate seal and other corporate records of Seller;

(h) The right, title and interest of Seller in, to and under all contracts, agreements, arrangements, licenses and leases of any nature, other than the Seller's Agreements;

(i) All other assets and properties owned or leased by Seller which are not used and necessary for the operation of the Peach Bottom Station or any portion thereof;

(j) All claims of Seller relating to or pertaining to any refund or credit received on or after the Closing Date by PECO, as operator of the Peach Bottom Station, or its successors or permitted assigns, of all or any part of Department of Energy Decommissioning and Decontamination Fees for which Seller is or was liable; provided that Seller shall not have any right to pursue such claims separately, but shall be entitled to pursue such claims solely by joint action with PECO and any other interested parties approved by Buyers, such action to be controlled by PECO in its sole discretion; provided, also that if PECO shall receive any such refund or credit on or after the Closing Date of all or any part of such Department of Energy Decommissioning and Decontamination Fees, Seller's claim to a portion of such refund shall be limited to the amount of such refund or credit multiplied by a fraction, (i) the numerator of which is the amount of Decommissioning and Decontamination Fees with respect to the Peach Bottom Station paid by Seller or on Seller's behalf, and (ii) the denominator of which is the amount of Decommissioning and Decontamination Fees with respect to the Peach Bottom Station paid by all of the parties to the Owners Agreement or on their behalf; and provided, further, that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims (but not Department of Energy Decommissioning and Decontamination Fees), such proportionate share to be determined as if Seller had not transferred its rights, title and interests in and to the Purchased Assets to Buyers; and

(k) The right, title and interest of Seller in, to and under this Agreement, the Collateral Agreement and the Additional Agreements.

Act) occurring prior to the Closing Date, which assessment exceeds the aggregate amount of the policy limits under all applicable Buyers' Insurance Policies.

2.5 Control of Litigation.

(a) The Parties acknowledge and agree that, from and after the Closing Date, Seller shall be entitled exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Excluded Assets or Excluded Liabilities, so long as such control, defense or settlement does not unreasonably interfere with Buyers' operation of the Peach Bottom Station; and Buyers agree to cooperate fully in connection therewith provided, however, that Seller shall reimburse Buyers for all reasonable costs and expenses incurred in providing such cooperation.

(b) The Parties acknowledge and agree that, from and after the Closing Date, Buyers shall be entitled exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Purchased Assets or Assumed Liabilities, so long as such control, defense or settlement does not unreasonably interfere with Seller's ownership of the Excluded Assets or with the Excluded Liabilities; and Seller agrees to cooperate fully in connection herewith, provided, however, that PECO or PSEG, as the case may be, shall reimburse Seller for all reasonable costs and expenses incurred in providing such cooperation to PECO or to PSEG, as the case may be.

2.6 Spent Nuclear Fuel Fees. Seller, to the extent of the Peach Bottom Interest, shall be liable for and pay, pursuant to the Owners Agreement, all Spent Nuclear Fuel Fees in effect prior to the Closing Date with respect to its share of electricity generated at and sold from the Peach Bottom Station prior to the Closing Date, and Buyers shall have no liability or obligation in respect thereof. PECO, to the extent of the PECO Interest, and PSEG, to the extent of the PSEG Interest, shall be liable for and pay all Spent Nuclear Fuel Fees with respect to its share of electricity generated at and sold from the Peach Bottom Station from and after the Closing Date, together with all additional Spent Nuclear Fees that are assessed or become effective on or after the Closing Date, whether assessed with respect to electricity generated at and sold from the Peach Bottom Station prior to, on or after the Closing Date, and Seller shall have no further liability or obligation in respect thereof. Without limiting the liability of Buyers under Sections 2.3(e) and (f), from and after the Closing Date, PECO, to the extent of the PECO Interest, and PSEG, to the extent of the PSEG Interest, shall assume title to, and such liabilities and obligations as Seller may have for the storage and disposal of, Spent Nuclear Fuel presently stored

at the Peach Bottom Station (including any such fuel which may have been used in connection with generating Seller's share of electricity at the Peach Bottom Station). From and after the Closing Date, Buyers shall have all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the Department of Energy's failure to take Spent Nuclear Fuel.

2.7 Department of Energy Decommissioning and Decontamination Fees. Seller, to the extent of the Peach Bottom Interest, shall be liable for and pay, pursuant to the Owners Agreement, its pro rata share of Department of Energy Decommissioning and Decontamination Fees prior to the Closing Date, and, thereafter, PECO, to the extent of the PECO Interest, and PSEG, to the extent of the PSEG Interest, shall be liable for and pay, and Seller shall have no liability for, such Department of Energy Decommissioning and Decontamination Fees, together with all additional assessments for Department of Energy Decommissioning and Decontamination Fees that become effective on or after the Closing Date, whether assessed with respect to any period occurring prior to, on or after the Closing Date.

## ARTICLE III

## THE CLOSING

3.1 Closing. Upon the terms and subject to the satisfaction of the conditions contained in Article VIII, the sale, assignment, conveyance, transfer and delivery of Seller's rights, title and interests in and to the Purchased Assets by Seller to Buyers, and the purchase, assumption and acquisition by Buyers of the Purchased Assets and the Assumed Liabilities, and the consummation of the other transactions contemplated hereby, shall take place at a closing (the "Closing ") to be held at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, Wilmington, Delaware, at 10:00 a.m. local time, or at such other time and location as may be agreed upon in writing among Buyers and Seller, within five (5) Business Days following the date on which the last of the conditions precedent to the Closing set forth in Sections 8.1(a), 8.2(a), 8.3(a) and 8.4(a) of this Agreement, shall have been satisfied or, to the extent permitted by applicable Law, waived by the Party for whose benefit such conditions precedent exist. The date on which the Closing actually occurs is hereinafter called the "Closing Date." The Closing shall be effective for all purposes as of 12:01 a.m., New York City time, on the Closing Date.

(DP&L-SALEM)
**Conformed**

# PURCHASE AGREEMENT

**BY AND BETWEEN**

**DELMARVA POWER & LIGHT COMPANY**

**and**

**PSEG POWER LLC**

**Dated as of September 27, 1999**

179501.03-WilmingtonS1A

spare parts, fixtures, furniture, furnishings and other personal property located at or in transit to the Salem Station or used and necessary for the operation of the Salem Station, in each case, on the Closing Date (collectively, the "Tangible Personal Property"), including the electrical transmission assets (as opposed to generation assets) set forth in Schedule 2.1(e);

(f) Subject to the receipt of necessary consents and approvals, the Seller's Agreements;

(g) Subject to the receipt of necessary consents and approvals, the Transferable Permits and all of Seller's rights, title and interests in and to any other permits, registrations, franchises, certificates, licenses and other authorizations, consents and approvals of Governmental Authorities relating to the ownership, lease, maintenance or operation of the Salem Station or any portion thereof;

(h) Seller's Nonqualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(i) Seller's Qualified Decommissioning Funds as of the Closing Date, including all income, interest and other earnings accrued thereon, together with all required accounting and other records;

(j) All books, operating records, operating, safety and maintenance manuals, engineering design plans, blueprints and as-built plans, specifications, procedures and similar items of Seller relating specifically to the Salem Station (subject to the right of Seller to retain copies of same for its use) other than such items which are proprietary to third parties and accounting records;

(k) All unexpired, transferable warranties and guarantees from third parties arising out of, in respect of, or in connection with, (i) any item of Real Property or personal property, or interest therein, included in the Purchased Assets or (ii) the Assumed Liabilities;

(l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy

with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(l); and

(m) The rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date, other than the claims described in Section 2.2(m).

2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall constitute or be construed as requiring Seller to sell, assign, convey, transfer or deliver, and Buyer shall not be entitled to purchase or acquire, any right, title or interest in, to or under the following assets and properties which are associated with the Purchased Assets, but which are hereby specifically excluded from the definition of Purchased Assets (collectively, the "Excluded Assets"):

(a) The right, title and interest of Seller in, to and under all electrical transmission or distribution assets (as opposed to generation assets) located at or forming part of the Salem Station (whether or not regarded as a "transmission" or "generation" asset for regulatory or accounting purposes), including all switchyard facilities, substation facilities and support equipment, as well as all permits, contracts (including the LDV Agreement) and warranties, to the extent they relate to such transmission and distribution assets (other than the electrical transmission assets identified in Schedule 2.1(e) included as Purchased Assets) (collectively, the "Transmission Assets");

(b) The right, title and interest of Seller in, to and under certain switches and meters, gas facilities, revenue meters and remote testing units, drainage pipes and systems, pumping equipment and associated piping, in each case, located at or forming part of the Salem Station as identified in Schedule 2.2(b) attached hereto;

(c) All certificates of deposit, shares of stock, securities, bonds, debentures, evidences of indebtedness, and interests in joint ventures, partnerships, limited liability companies and other entities, including account balances under Seller's Insurance Policies and the right, title and interest of Seller in, to and under

(k) All other assets and properties owned or leased by Seller which are not used and necessary for the operation of the Salem Station or any portion thereof;

(l) All claims of Seller relating to or pertaining to any refund or credit received on or after the Closing Date by Buyer or its successors or permitted assigns of all or any part of Department of Energy Decommissioning and Decontamination Fees for which Seller is or was liable; provided that Seller shall not have any right to pursue such claims separately, but shall be entitled to pursue such claims solely by joint action with Buyer and any other interested parties approved by Buyer, such action to be controlled by Buyer in its sole discretion; provided, also, that if Buyer shall receive any such refund or credit on or after the Closing Date of all or any part of such Department of Energy Decommissioning and Decontamination Fees, Seller's claim to a portion of such refund shall be limited to the amount of such refund or credit multiplied by a fraction, (i) the numerator of which is the amount of Decommissioning and Decontamination Fees with respect to the Salem Station paid by Seller or on Seller's behalf, and (ii) the denominator of which is the amount of Decommissioning and Decontamination Fees with respect to the Salem Station paid by all of the parties to the Owners Agreement or on their behalf; and provided, further, that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims (but not Department of Energy Decommissioning and Decontamination Fees), such proportionate share to be determined as if Seller had not transferred its rights, title and interests in and to the Purchased Assets to Buyer;

(m) All rights of Seller in, to and under the action against Westinghouse Electric Corporation or its Affiliates, or their respective successors or assigns, captioned <u>Public Service Electric & Gas Company, et al. v. Westinghouse Electric Corporation</u>, C.A. No. 96-925 (MTB) in the United States District Court for the District of New Jersey, and all related actions currently pending in state courts; provided that the aforesaid claims shall constitute Excluded Assets (rather than Purchased Assets) after the Closing only if Seller shall continue to pay after the Closing its proportionate share of the costs and expenses (including reasonable legal fees) of pursuing any such claims, such proportionate share to be determined as if Seller had not transferred its rights, title and interests in and to the Purchased Assets to Buyer; and