IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04–0034C, into which has |
| v. | ) | been consolidated No. 04-0036C |
| | ) | (Judge Christine Miller) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

## I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

1. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the

> disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. at § 10131(b).

3. The NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that the contracts with the nuclear utilities provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5).

## II. PLAINTIFFS' EXECUTION OF THEIR STANDARD CONTRACTS

4. On June 1, 1983, Philadelphia Electric Company (now PECO Energy Company ("PECO")) executed its Standard Contract with DOE concerning Peach Bottom Atomic Power Station Units 2 and 3, in which it indicated that it acted "on behalf of itself and Public Service Electric and Gas Company ["PSEG"], Delmarva Power and Light Company and Atlantic Electric Company, joint owners of Peach Bottom Atomic Power Station, Units 2 & 3." A.15. PECO is identified as the "Purchaser" under this Standard Contract. Id.

5. On June 13, 1983, PSEG executed its Standard Contracts with DOE concerning Hope Creek Generating Station, in which it indicated that it acted "on its own behalf as managing utility for Hope Creek Generating Station, No. 1 Unit and on behalf of the joint owner Atlantic City Electric Company." A.1. PSEG is identified as the "Purchaser" in this Standard Contract. Id.

6. On June 13, 1983, PSEG executed its Standard Contracts with DOE concerning Salem Generating Station, Nos. 1 and 2, in which it indicated that it acted "on its own behalf as managing utility for Salem Generating Station, Nos. 1 and 2 Units and on behalf of the joint owners, ["PECO"], Atlantic City Electric Company, and Delmarva Power and Light Company." A.28. PSEG is identified as the "Purchaser" in this Standard Contract. Id.

7. Pursuant to the Standard Contract, only the "Purchaser" is responsible for the quarterly payment to DOE of fees into the Nuclear Waste Fund. 10 C.F.R. § 961.11, Art.VIII, B.1. ("For electricity generated and sold by the Purchaser's civilian nuclear power reactor(s) on or after 7, 1983, fees shall be paid quarterly by the Purchaser . . ."), see, e.g., A.6, A.20, A.33.

8. PSEG and PECO, as the designated "Purchasers" under the Standard Contracts, were responsible for, and in fact did, make payments into the Nuclear Waste Fund. See, e.g., A.64-69. At no time did Delmarva or Atlantic make quarterly payments directly to DOE pursuant to the Standard Contract.

9. Indeed, when DOE agreed to credit nuclear utilities for certain overpayments made into the Nuclear Waste Fund ("NWF") after the decision of the United States Court of Appeals for the District of Columbia in Wisconsin Electric Power Co. v. Hodel, 778 F.2d 1 (D.C. Cir. 1985), which concluded that payments made into the NWF did not include electricity that a

generating plant itself consumed, DOE credited PSEG and PECO for payments made on behalf of the Salem, Hope Creek, and Peach Bottom plants. DOE did not provide any credits directly to Delmarva or ACE. See, e.g., A.70-89.

III. PLAINTIFFS' COMPLAINTS AND ASSIGNMENTS OF CONTRACTS

10. DOE did not begin accepting SNF and/or HLW from the nuclear utilities under the Standard Contract by January 31, 1998.

11. In their complaints, Atlantic City and Delmarva allege that, on October 1, 2001, and December 29, 2000, respectively, Atlantic City sold its minority interests in the Hope Creek, Salem, and Peach Bottom nuclear generating facilities, and Delmarva sold its minority interests in the Salem and Peach Bottom, to PSEG and/or PECO. See Atlantic Amend. Compl. ¶ 2; Delmarva Amend. Compl. ¶ 2.

12. In their Purchase Agreements with PSEG and PECO, Delmarva and Atlantic City expressly purported to assign all of their claims relating to or pertaining to DOE's delays under the Standard Contract and any other claims with respect to, arising out of or in connection with Seller's rights, title and interests in and to the purchased assets, or any portion thereof, whether accruing prior to, on, or after the closing date of the sale:

> 2.1 Transfer of Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, (i) Seller shall sell, assign, convey, transfer and deliver to [the purchaser], and [the purchaser] shall purchase, assume and acquire from Seller, free and clear of all Encumbrances, except for Permitted Encumbrances, the Purchased Assets . . ., including the following Purchased Assets:
>
> * * *

> (l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(j); and
>
> (m) The rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date.

See, e.g., A.45-46.

13. The only excluded claims identified in the Purchase Agreements were claims pertaining to a refund of fees paid related to DOE's special assessment of utilities for the Uranium Enrichment Decontamination and Decommissioning Fund – a matter unrelated to the Standard Contract, A.47 (Section 2.2(j)).[1] The Purchase Agreement also expressly provided that, "[f]rom and after the Closing Date, Buyers shall have all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the Department of Energy's failure to take Spent Nuclear Fuel." A.48 (Section 2.6).

---

[1] Even with regard to claims for refunds of fees from the Uranium Enrichment Decontamination and Decommissioning Fund, the Purchase Agreement purports to bar Delmarva and Atlantic City from maintaining any action to recoup those fees separately from PSEG and Exelon, with "such action controlled by [the purchaser] in its sole discretion." See, e.g., A.47.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director
JOSHUA E. GARDNER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

April 28, 2005

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2005, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.