**No. 04-0034C, into which has been consolidated No. 04-0036C**
**(Judge C. Miller)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**DELMARVA ELECTRIC COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF DELMARVA ELECTRIC COMPANY'S BRIEF IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
Tel: (202) 785-9700
Fax: (202) 887-0689

*Counsel of Record for*
*Delmarva Power & Light Company &*
*Atlantic City Electric Company*

Of Counsel:
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037

Todd Goodman, Esq.
Assistant General Counsel
Conectiv
P. O. Box 231
Wilmington, DE 19899
(302) 429-3786

May 25, 2005

TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

STATEMENT OF THE ISSUE ..... 1

STATEMENT OF FACTS ..... 2

SUMMARY OF THE ARGUMENT ..... 5

STANDARD OF REVIEW ..... 7

ARGUMENT ..... 8

I. DELMARVA'S AND ATLANTIC'S AMENDED COMPLAINTS ALLEGING BREACH OF CONTRACT CLAIMS WERE BROUGHT IN DIRECT RESPONSE TO THE GOVERNMENT'S ARGUMENT THAT THE ASSIGNMENT OF PRE-PURCHASE CLAIMS WERE VOID AS A MATTER OF LAW ..... 8

II. DELMARVA AND ATLANTIC HAVE PROPERLY ALLEGED THAT THEY HAVE INCURRED DIRECT AND FORESEEABLE DAMAGES AS A RESULT OF THE GOVERNMENT'S BREACH OF THE STANDARD CONTRACT ..... 10

A. Delmarva's And Atlantic's Claims For Diminished Value Are "Classic Contract Damage(S)" And Thus Are Recoverable ..... 10

1. The Sales of Hope Creek, Peach Bottom, and Salem Were Reasonably Foreseeable by the Government at the Time the Standard Contracts Were Executed ..... 14

B. The Court May Also Award Damages For Breach Of Contract Based Upon A "Lost Asset" Analysis ..... 17

C. The Cases Relied Upon By The Government Do Not Adversely Affect Delmarva And Atlantic's Entitlement To A Recovery ..... 19

D. Delmarva And Atlantic Are Pursuing Expectancy, Not Restitution, Damages ..... 21

E. Delmarva And Atlantic Have Brought A Cognizable Claim For Breach Of Contract Separate And Apart From The Purchasers' Claims For Partial Breach Of Contract ..... 22

F. Determination Of Delmarva And Atlantic's Damages Is An Issue Of Fact To Be Made Upon The Evidence Submitted ..... 24

III. DELMARVA AND ATLANTIC HAVE COGNIZABLE TAKINGS CLAIMS UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION ..... 25

A. Delmarva's And Atlantic's Takings Claims Arise Out Of Legal And Property Rights Separate From The Standard Contract ..... 26

1. The Federal Circuit and the Court of Federal Claims Have Previously Affirmed That the Basis of the Nuclear Utilities' Property Rights Existed Independent of the Standard Contract ..... 27

B. Plaintiffs Have Suffered Both A Physical And Regulatory Taking ..... 29

1. The Physical Taking of Delmarva and Atlantic's Real Property..... 29

2. The Regulatory Taking of Delmarva's and Atlantic's Property...... 34

a. The Government's continued assessment of the 1 mil per kWh fee constituted a regulatory taking .......... 37

C. The Government Has Acquired The Use Of Plaintiffs Property Through Both A Regulatory And Physical Taking Of Atlantic's And Delmarva's Property Interests .......... 38

D. Determination Of Delmarva's And Atlantic's Takings Claim Is An Issue Of Fact .......... 40

E. Delmarva's And Atlantic's Claims Are Properly Before The Court Of Federal Claims .......... 41

CONCLUSION .......... 42

# TABLE OF AUTHORITIES

Page

Cases:

*Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996)................................ 3, 7
*Benenson v. United States*, 548 F.2d 939 (Ct. Cl. 1977) .................................................... 26, 31
*Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) ............................................ *passim*
*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) .................................. 26, 35
*Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954) ......................................................... 37
*Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338 (2004) .................................. 18
*Cooper v. Ford Motor Co.*, 748 F.2d 677 (Fed. Cir. 1984) ....................................................... 7
*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990), *aff'd*, 526 U.S. 687 (1999).......................................................................................... 32,39
*Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003) ............................................ 24, 25
*E. Enters. v. Apfel*, 524 U.S. 498 (1998) ............................................................................ 39
*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ............................ 11, 12
*Entergy Nuclear Indian Point 2, LLC v. United States*, No. 03-2622C (Fed. Cl. filed Nov. 4, 2004) ............................................................................................ 8
*First Heights Bank, FSB v. United States*, 57 Fed. Cl. 162 (2003)........................................... 19
*Goolsby v. United States*, 21 Cl. Ct. 88 (1990)...................................................................... 23
*Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440 (2005) ........................................ 26, 35
*Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996).......................... 32, 37
*Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995) .............................................. 17
*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)........................................................ 25, 32
*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) ................................................ 26, 32
*Koby v. United States*, 53 Fed. Cl. 493 (2002)....................................................................... 18
*Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001)....................................... 23
*Long Island Sav. Bank, FSB v. United States*, 60 Fed. Cl. 80 (2004)....................................... 18
*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)............................. 25, 30
*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 25, 27
*Neely v. United States*, 285 F.2d 438 (Ct. Cl. 1961)................................................................ 12
*Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741 (1980) ................................................. 20
*Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978) .............................................. 33

Page

*Petersen Mfg. Co. v. Cent. Purchasing, Inc.*, 740 F.2d 1541 (Fed. Cir. 1984), *abrogated on other grounds by Beatrice Foods Co. v. New England Printing & Lithography Co.*, 899 F.2d 1171 (Fed. Cir. 1990) .......... 7

*Protectors Ins. Serv., Inc. v. United States Fid. & Guar. Co.*, 132 F.3d 612 (10th Cir. 1998) .......... 18

*Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295 (Fed. Cir. 1986) .......... 23

*Ramsey v. United States*, 101 F. Supp. 353 (Ct. Cl. 1951) .......... 20

*Rochester Gas & Electric Corp. v. United States*, No. 04-118 (Fed. Cl. filed May 12, 2005) .......... 9

*Rochester Gas & Electric Corp. v. United States*, No. 04-118C (Fed. Cl. filed Sept. 22, 2004) .......... 8

*S. Nat'l Corp. v. United States*, 57 Fed. Cl. 294 (2003) .......... 11, 12

*Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438 (2004) .......... *passim*

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d. Cir. 2000) .......... 16, 17

*Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) .......... 19

*Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820 (2d Cir. 1990) .......... 17

*Suess v. United States*, 52 Fed. Cl. 221 (2002) .......... 10, 12

*Sys. Fuels v. United States*, No. 03-26236, 2005 WL 950497 (Fed. Cl. Apr. 20, 2005) .......... 28

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962) .......... 7

*United States v. Peewee Coal Co.*, 341 U.S. 114 (1951) .......... 26, 32

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) .......... 32

*Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996) .......... 18, 19, 20

*Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985) .......... 39

*Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990) .......... 26, 35

*Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 26, 27

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) .......... 13

Statutes:

31 U.S.C. § 3727 .......... 15

42 U.S.C. § 10122(b)(3) .......... 15

42 U.S.C. § 10131(a)(4) .......... 39

42 U.S.C. § 10222(a)(5) .......... 29, 32

62 Fed. Reg. 44,076-77 (Aug. 19, 1997) .......... 22

H.R. Rep. No. 97-491, pt. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792 .......... 2, 3

Page

Other Authorities:

Restatement (Second) of Contracts § 350 (1981) .................... 18
U.S. Court of Federal Claims Rule 56(c) .................... 1, 6
U.S. Court of Federal Claims Rule 7.29(c) .................... 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER AND LIGHT COMPANY<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) | **No. 04-0034C, into which has Been consolidated No. 04-0036C (Judge Christine Miller)** |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 7.2 (c) and 56 of the Rules of the U.S. Court of Federal Claims ("RCFC"), Plaintiffs Delmarva Power & Light Company ("Delmarva") and Atlantic City Electric Company ("Atlantic"), through their undersigned counsel, hereby submit their brief in response to the Motion for Summary Judgment ("Motion") filed by Defendant, the United States of America ("Government"), acting through and on behalf of the Department of Energy ("DOE").

## STATEMENT OF THE ISSUE

1. Whether Delmarva's and Atlantic's breach of contract and breach of good faith and fair dealing claims are proper in light of the Government's admitted failure to dispose of their spent nuclear fuel ("SNF") as required by the Nuclear Waste Policy Act ("NWPA") and the Standard Contract, when brought expressly as "protective" claims in response to the Government's argument (made in other SNF cases) that sellers were precluded from assigning pre-purchase claims as a matter of law.

2. Whether Delmarva and Atlantic may recover expectancy damages on their breach of contract and good faith and fair dealing claims as measured by the diminished value of the Nuclear Stations.

3. Whether the Government's unlawful demand for payments of fees in disregard of court rulings, and after the Government's authority to collect such fees had lapsed, in linking such demand of payments to the license status of Delmarva's and Atlantic's Nuclear Stations, and also effecting the constructive occupation of Delmarva's and Atlantic's property for storage of SNF in violation of federal law, constitutes an impermissible taking of their property for which they must be duly compensated.

## STATEMENT OF FACTS

For over a half-century, beginning with the enactment of the Atomic Energy Act ("AEA") in 1954, the Government has recognized its sovereign obligation to dispose of SNF. Response to Proposed Findings of Fact ("RPFF") No. 1.[1] This obligation culminated in the passage of the NWPA and the litigation that has transpired from the mid-1990s through today. *Id.* Congress enacted the NWPA "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." H.R. Rep. No. 97-491, pt. 1, at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792. At the time of the enactment, Congress also made clear that time was of the essence and that disposal of SNF was a matter of immediate federal priority:

> The failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated. . . .

[1] Plaintiffs' citations to the RPFF refers to Delmarva's and Atlantic's Responses to the Government's Proposed Findings of Fact pursuant to RCFC 56(h)(2).

> Failures in the Federal repository development program, the collapse of the domestic spent fuel reprocessing industry and quickly deteriorating public confidence in our ability to deal safely with nuclear waste, together with other critical safety and economic issues, were seriously undermining the strength of the domestic nuclear industry.

*Id.* at 28, 1982 U.S.C.C.A.N. at 3794. As such, the NWPA established a schedule for the location, construction, and operation of repositories for the disposal of SNF, and initiated ownership and custody of SNF by the federal government at a permanent disposal facility beginning no later than January 1998. *Id.*

Atlantic is a public utility company with former direct ownership interests in Hope Creek, Peach Bottom, and Salem (the "Nuclear Stations").[2] Appendix ("App.") 1, ¶ 2.[3] Along with other utilities, Atlantic was a direct owner of the Nuclear Stations, owning (i) an undivided 7.41% interest as tenant in common without the right to partition in Salem 1 and 2; (ii) a 5% interest as tenant in common without the right to partition in Hope Creek, and (iii) a 3.755% interest as tenant in common without the right to partition in Peach Bottom 2 and 3. *Id.* The remainder of the Nuclear Stations was owned by PSEG Power LLC ("PSEG") and PECO Energy Company ("PECO"). *Id.*

Delmarva is a also public utility company with a direct ownership interest in the Nuclear Stations. App. 1, ¶ 2. Delmarva had a 7.41% interest as a tenant in common without the right to partition in Salem, and a 7.41% interest as a tenant in common without the right to partition in Peach Bottom. *Id.* The remainder of the Nuclear Stations was owned by PSEG and PECO. *Id.*

---

[2] For ease of reference, Plaintiffs will refer to Peach Bottom, Hope Creek and Salem collectively as the "Nuclear Stations" throughout their joint response, recognizing that Atlantic had an ownership interest in all three Nuclear Stations, while Delmarva had ownership interest only in Peach Bottom and Salem.

[3] Plaintiffs' citations to the App. refers to Delmarva's and Atlantic's Appendix in support of its Response brief pursuant to RCFC 56.

As part owners of the Nuclear Stations, Delmarva and Atlantic were subject to the NWPA, including payment in excess of $7.6 million and $7.9 million in fees, respectively, to the Nuclear Waste Fund. RPFF No. 8; App 1, ¶ 5. As discussed in greater detail below, the Standard Contracts covering the Nuclear Stations were executed by PSEG and PECO as operating entities and state that they were executed by each of them "acting on its own behalf as managing utility for [the Nuclear Stations] and on behalf of the joint owner(s) . . . Atlantic City Electric Company/Delmarva Power and Light Company," thereby making Delmarva and Atlantic direct owners and also express intended beneficiaries of the Standard Contracts. RPFF Nos. 4-6. Atlantic sold its interests in the Nuclear Stations on October 18, 2001. RPFF No. 11. Delmarva sold its interests in the Nuclear Stations on December 29, 2000. *Id.*

DOE did not begin to take custody or dispose of Atlantic's or Delmarva's SNF by January 31, 1998, or by the closing date of Delmarva's or Atlantic's sale of the Nuclear Stations. RPFF No. 10. By the closing date of Delmarva's and Atlantic's sale of the Nuclear Stations, there was still no prospect that DOE would take custody or dispose of SNF from Delmarva, Atlantic, or any other generator in the foreseeable future because DOE had not then (and has not to this day) sited, licensed, constructed, or placed in operation an SNF disposal facility. App. 4, ¶ 11.

As a result of the Government's failure to begin removal of SNF by January 31, 1998, the market value of the Nuclear Stations was drastically reduced. RPFF No. 10; App. 5, ¶ 15. This is evidenced by, among other facts, the far below market price that was ultimately paid for the Plaintiffs' share in the Nuclear Stations. *Id.* In support of its Response to Defendant's Motion for Summary Judgment, Delmarva and Atlantic have submitted the affidavit of Thomas Shaw, Executive Vice President and Chief

Operating Officer for Pepco Holding, Inc., the parent company of Delmarva and Atlantic. App. 1, ¶ 1. At the time of the sale of Delmarva's and Atlantic's direct ownership interests in the Nuclear Stations, Mr. Shaw was the Executive Vice-President of Connectiv, which, at the time, was the parent company of both Delmarva and Atlantic. As Executive Vice President, Mr. Shaw was responsible for the divestitures of the Nuclear Stations, as well as each company's fossil fuel generating assets. *Id.* In this capacity, Mr. Shaw oversaw the public auctions for all of Delmarva's and Atlantic's generating assets, including the Nuclear Stations. *Id.*, ¶ 3. Through his oversight of the auction process, including his direct supervision of numerous employees and consultants, Mr. Shaw has personal knowledge of the damages suffered by both Delmarva and Atlantic as a direct and proximate result of the Government's breach of the Standard Contract. *Id.*

## SUMMARY OF THE ARGUMENT

Six months after this Court denied the Government's first Motions to Dismiss Delmarva's and Atlantic's takings claims, the Government has essentially filed the same motion, this time styled as one for summary judgment. In addition to its previously rejected takings arguments, the Government has also moved for summary judgment with respect to Delmarva's and Atlantic's breach claims, essentially making the same arguments that it has made (and which have been rejected) in virtually every other SNF matter. The present Motion is nothing more than another attempt by the Government to pour old wine into new bottles, and accordingly, Delmarva and Atlantic respectfully request that the Court, once again, deny the Government's Motion.

Beyond its standard motions arguments, the Government has taken the novel approach of arguing that assignments of SNF claims contained in Delmarva's and

Atlantic's asset purchase and sale agreements – assignments that the Government has gone on record as being *void as a matter of law* – preclude Delmarva and Atlantic from pursuing breach claims. Delmarva and Atlantic filed their breach claims only in direct response to the Government's assertion that the assignments to Delmarva's and Atlantic's buyers were invalid. As such, both Delmarva and Atlantic styled their amended complaints as "protective" in nature, specifically stating that they would only pursue breach claims to the extent that the Government succeeded in its efforts to void their assignments.

The circular nature of the Government's reasoning is apparent upon even the most cursory of reviews. On the one hand, the Government is arguing in parallel SNF proceedings that purchasers of utilities are barred, as a matter of law, from pursuing pre-purchase SNF claims that were assigned to them by the utilities' sellers. That argument is not specific to one or two purchasers, but rather, is a *per se* attack on all such assignments. On the other hand, the Government is arguing in this case that these same assignments should be given operative effect to preclude the sellers from asserting breach claims as well. Taken to its logical conclusion, the Government is arguing that *neither* a buyer *nor* a seller can assert pre-purchase breach claims where an assignment has been attempted. Such a result is illogical, unfair, and inequitable. Accordingly, Delmarva and Atlantic respectfully request that the Court deny the Government's present Motion and permit them to pursue their breach claims, at least until such time as the Government's assignment argument is rejected in its entirety.

Finally, it should be noted that the Government's Motion for Summary Judgment has been brought before any discovery has been conducted in this matter. As discussed in detail below, this Court has strongly disfavored motions for summary

judgment involving necessarily fact-intensive issues such as Delmarva's and Atlantic's breach and takings claims in the absence of discovery. Accordingly, Delmarva and Atlantic respectfully request that the Court deny the Government's Motion.

## STANDARD OF REVIEW

Under Rule 56(c) of the Rules of the Court of Federal Claims, judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The evidence presented must be viewed in a light most favorable to the nonmovant and all reasonable inferences must be drawn in the nonmovant's favor. *See, e.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Petersen Mfg. Co. v. Cent. Purchasing, Inc.*, 740 F.2d 1541, 1546 (Fed. Cir. 1984), *abrogated on other grounds by Beatrice Foods Co. v. New England Printing & Lithography Co.*, 899 F.2d 1171 (Fed. Cir. 1990). "The movant bears the burden of demonstrating the absence of all genuine issues of material fact." *E.g., Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).

## ARGUMENT

### I. DELMARVA'S AND ATLANTIC'S AMENDED COMPLAINTS ALLEGING BREACH OF CONTRACT CLAIMS WERE BROUGHT IN DIRECT RESPONSE TO THE GOVERNMENT'S ARGUMENT THAT THE ASSIGNMENT OF PRE-PURCHASE CLAIMS WERE VOID AS A MATTER OF LAW

More than six months ago, Delmarva and Atlantic filed amended complaints asserting breach of contract claims in direct response to the Government's argument that the assignment of pre-purchase SNF claims to the buyers of the Nuclear Stations was void as a matter of law. In particular, Delmarva's and Atlantic's First Amended Complaints state:

> The Government has asserted that while the NWPA provides for the assignment of the Standard Contract, it does not provide for assignment of pre-existing claims arising under the contract. . . . Further, DOE cites to the Federal Circuit's holding in *Ginsberg v. Austin*, 986 F.2d 1198 (Fed. Cir. 1992), for the proposition that pre-existing claims are not transferred automatically with an assignment of contract. . . . According to DOE's analysis of the relevant statutory and case law, any purported assignment of pre-existing claims attempted to be made in the [Delmarva and Atlantic Purchase and Sale Agreements] was invalid. To the extent that the Court concurs with DOE on this point, and does not agree with [Delmarva and Atlantic that their] transfer of claims [were] valid, [Delmarva and Atlantic] hereby assert[] claims for breach of contract and breach of the duty of good faith and fair dealing.

Delmarva First Amended Complaint ¶ 61; Atlantic First Amended Complaint ¶ 61. The Government has made this argument in both the *Entergy Nuclear Indian Point 2, LLC v. United States*, No. 03-2622C (Fed. Cl. filed Nov. 4, 2004) and *Rochester Gas & Electric Corp. v. United States*, No. 04-118C (Fed. Cl. filed Sept. 22, 2004 ). The Government's assignment argument is *not* specific to particular SNF cases. Rather, the Government has taken the position that an assignment (any assignment) that attempts to transfer pre-purchase claims is void as a matter of law.[4]

[4] The Government has *never* stated that it would refrain from raising the same challenges to the assignment provisions in the Asset Purchase and Sale Agreements for

Delmarva and Atlantic were compelled to file Amended Complaints alleging a breach of contract immediately upon becoming aware that the Government was asserting in other SNF proceedings that purchasers of Nuclear Stations were precluded as a matter of law from acquiring and asserting pre-purchase breach claims. Presumably, if the Government successfully challenges the assignment of Delmarva and Atlantic's breach claims to PECO/PSEG, any assignment of preexisting claims could be invalid and PECO/PSEG would be precluded from pursuing breach claims that matured prior to their acquisition of the Nuclear Stations and those claims would revert back to Delmarva and Atlantic. While Delmarva and Atlantic disagree with the Government regarding the legality of their assignment of pre-existing SNF claims to PECO/PSEG, Delmarva and Atlantic were compelled to file an amended complaint asserting breach claims in the event that the Government was successful in its efforts to void the assignments. To date, the Government's assignment arguments have not been finally resolved, although Judge Lettow recently issued a decision in *Rochester* rejecting the Government's assignment arguments. *Rochester Gas & Electric Corp. v. United States*, No. 04-118 (Fed. Cl. filed May 12, 2005) (Opinion and Order). It is unknown when a decision will be reached in *Entergy*.

In spite of the Government's earlier argument that the assignment of pre-existing SNF claims were legally deficient, and therefore *void ab initio*, the Government has now taken the fundamentally contradictory position here that virtually identical assignments should be given the effect of precluding Delmarva and Atlantic from asserting breach claims in this matter. Motion at 6-11. The Government's patently

---

the Nuclear Stations. To the extent that the Government is willing to make such a concession, Delmarva and Atlantic would be willing to dismiss the breach claims in the amended complaints.

inconsistent legal positions would in effect permit the Government to avoid *any* liability for breach damages arising from the date of breach to the date of sale of the Nuclear Stations. The amended complaints, when viewed as protective filings, preclude the Government from pursuing such an unfair and inequitable result. As such, Delmarva and Atlantic respectfully request that the Court deny the Government's Motion with respect to Counts I and II of the amended complaints.

## II. DELMARVA AND ATLANTIC HAVE PROPERLY ALLEGED THAT THEY HAVE INCURRED DIRECT AND FORESEEABLE DAMAGES AS A RESULT OF THE GOVERNMENT'S BREACH OF THE STANDARD CONTRACT

### A. Delmarva's And Atlantic's Claims For Diminished Value Are "Classic Contract Damage(S)" And Thus Are Recoverable

Delmarva's and Atlantic's claims for diminished value of the Standard Contract as well as their interests in the Nuclear Stations are, as a matter of law, entirely consistent with prior decisions of the Court that have found such damages to be recoverable.[5] Recognizing the propriety of damages that are measured by the diminished value of a nuclear facility, Judge Lettow recently affirmed in *Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005), that the Court may award "damages for diminished value as incidental or consequential damages, provided they are not unenforceable or too remote." *Id.* at 182. As will be discussed in greater detail below, the *Boston Edison* decision also concluded that such diminished value damages were foreseeable, completely rejecting the Government's argument that damages for diminished value were too remote and speculative. *Id.* at 183-84. The consequential

[5] Delmarva and Atlantic will also demonstrate that they sustained damages associated with re-racking as well as damages associated with Delmarva's and Atlantic's inability to buy, sell, and trade SNF disposal allotments, as the Government had earlier encouraged.

damages arguments raised by the Government and rejected by the Court in *Boston Edison* are identical to the ones raised in the present Motion. *See* Motion at 10-17.

The *Boston Edison* decision, drawing on an analogy to construction law, recognizes that diminished value is often the most equitable manner in which to compensate a plaintiff.

> Diminution in value is assessed in the construction context when the cost of repairing defective construction far exceeds the loss in value. Of the two alternatives, the more reasonable damage assessment is the diminution in value. *Restatement (Second) Contracts* § 348 cmt. c. In the present case, the government has not completed its repository, and it has failed in its disposal duties. As a result, the value of Boston Edison's property allegedly dropped. The option of getting another contractor to repair the damage is unavailable to Boston Edison because there is no other approved provider of disposal services in this highly regulated industry. Diminution in value is left as the appropriate damage assessment.

*Boston Edison*, 64 Fed. Cl. at 183; *see* App. 4-5, ¶¶ 12-15.

Recognition of diminished value as an appropriate measure of damages is not unique to the *Boston Edison* decision. For example, in *Suess v. United States*, 52 Fed. Cl. 221 (2002), the court awarded damages for the diminished value of the plaintiffs banking franchise. *Suess*, a *Winstar* case, was brought derivatively on behalf of Franklin Federal Savings and Loan Association ("Franklin"). As a direct result of the Government's breach of contractual promises regarding the treatment of "goodwill" due to the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Suess alleged that Franklin suffered damages, including the diminished value of the bank. The court found that the passage of FIRREA was the "substantial factor" leading to the demise of Franklin, and was sufficient to establish the causation element of damages based on the bank's diminished value. *Id.* at 231. In its

holding, the court described the plaintiff's diminished value theory in the following manner:

> These are *classic contract damages*, because it [is] *sic* was both foreseeable and actually foreseen that breach of the contractual promise regarding the regulatory treatment of goodwill would push the thrift into insolvency and subject it to seizure. Further, the breach was the substantial factor in the seizure of Franklin. In short, but for the breach, Franklin would have been a going concern with a market value of $35 million.[6]

*Id.* (emphasis added); *see also S. Nat'l Corp. v. United States*, 57 Fed. Cl. 294, 310 (2003) (court should determine at trial whether plaintiff could prove the diminished value of its business opportunity).

Like *Suess* and *Southern National*, the Federal Circuit's ruling in *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002), supports Delmarva's and Atlantic's damages theory as an appropriate measure of damages. In *Energy Capital*, the Federal Circuit held that lost profits are recoverable when they are benefits that were anticipated from the contract and are necessary for the plaintiff's ongoing operation. *Id.* at 1324-25. The Government's breach of the Affordable Housing Energy Loan Program ("AHELP") agreement precluded Energy Capital from issuing the loans AHELP was designed to permit. *Id.* at 1328-29. Just as there was no intervening cause in *Energy Capital*, there is no intervening cause in Delmarva's and Atlantic's present claims against the Government. As the AHELP agreement was intended to permit lenders to offer certain loans, the Standard Contract was designed to ensure Delmarva's and Atlantic's operational viability by shifting to the Government (for a fee) the burden posed by SNF. The Government's failure to perform its obligations pursuant to the Standard Contract here, much like its failure to abide by the AHELP agreement in

---

[6] In making its award, the court determined that the clearest indicator of Franklin's value prior to the breach was the market value of its stock on the day prior to the breach.

*Energy Capital*, directly and severely impacted Delmarva's and Atlantic's operation of their Nuclear Stations. Moreover, the diminished value that Delmarva and Atlantic suffered is equivalent to and consistent with the lost profit damages awarded in *Energy Capital*.

Finally, in *Neely v. United States*, 285 F.2d 438 (Ct. Cl. 1961), the Court of Claims awarded lost profits to appropriately compensate a plaintiff for the diminished value of a lease that had been breached by the Government. The plaintiff in *Neely*, a coal miner, had leased land from the Government with the intent of conducting mining upon the land. When the Government prohibited such mining, the plaintiff brought suit for breach of the lease. The predecessor to the Court of Federal Claims awarded the plaintiff damages in the amount of the value of the lease after the Government's breach. The Court of Claims rejected this award and permitted the plaintiff to seek lost profits. The court based its reasoning on the fact that the "plaintiff might have been able to secure a higher price for [the lease], if the prohibition against strip-mining had not been imposed." *Id.* at 443.

Much like the plaintiffs in *Energy Capital*, *Suess*, *Southern National*, and *Neely*, Delmarva and Atlantic seek to recover the diminished value of the Standard Contract as well as that of their Nuclear Stations as a direct consequence of the Government's breach. By executing the Standard Contract, the Government promised decades ago to remove SNF from the Nuclear Stations on or before January 31, 1998. RPFF Nos. 1-3. When it executed the Standard Contract, the Government knew that the failure to fulfill its contractual obligations would have a significant impact on the nuclear power industry, including Delmarva and Atlantic. *See Yankee Atomic Elec. Co. v. United States*, No. 98-126C (Fed. Cl. filed June 28, 2004) (Merrow, J.). Given the Government's

prohibition of nuclear fuel reprocessing, the Standard Contract and NWPA were implemented to ensure the viability of the nuclear industry. RPFF No. 1. The Government should not be permitted to shirk these obligations and avoid fully compensating Delmarva and Atlantic for their resultant injuries, merely because Delmarva and Atlantic sold their interest in the Nuclear Stations in the wake of the Government's breach.

It is noteworthy that the Government, acting through the Federal Energy Regulatory Commission in 1996, adopted Orders 888 and 889. The express intent of these Orders was to mandate the restructuring of the country's utility industry in order to provide an openly competitive market for electric generation. The essence of the restructuring was the separation of electric generation from traditional utility transmission and distribution functions. The Government essentially mandated these changes for interstate electric sales, and also encouraged states to follow suit. The Government should therefore not be heard to complain that it could not have foreseen that the physical and economic separation of nuclear electric generating plants was strongly encouraged at the same time the Government was severely compromising the economic viability of these nuclear plants by disavowing its obligations under NWPA.

### 1. The Sales of Hope Creek, Peach Bottom, and Salem Were Reasonably Foreseeable by the Government at the Time the Standard Contracts Were Executed

The sale of the Nuclear Stations were foreseeable, and thus damages for diminished value are thus recoverable. In *Boston Edison*, Judge Lettow rejected the Government's argument that damages for diminished value were too remote and speculative.

> That damages might arise from diminution in value was foreseeable. That sale of Nuclear Stations was contemplated by

> Congress and by DOE is shown by the existence of the assignment provision in the NWPA, 42 U.S.C. § 10222(b)(3), "and by Article XIV of the Standard Contract which provides that '[t]he rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer." . . . Such a diminution resulting from DOE's breach of its obligations under the Standard Contract was thus a foreseeable damage.

*Boston Edison*, 64 Fed. Cl. at 183-84.

Given the Government's knowledge of the limitations imposed upon nuclear utilities by NWPA and the Standard Contract, it is disingenuous for the Government to argue that the damages incurred by Delmarva and Atlantic were not foreseeable. For instance, the Government knew that nuclear plants had finite storage capacity on-site and would be required to cease operations when that capacity was exhausted. RPFF 1, 2. It knew that expanding that storage capacity was not as-of-right, but depended on uncertain regulatory approvals. RPFF Nos. 1, 3. The Government knew that it alone was practically and legally able to offer SNF disposal services, and that the purchasers of those services could not obtain "cover" from any other source when the Government failed to provide these critical services. RPFF Nos. 1, 3. It knew that the NWPA placed obligations on DOE as to the amount of fees it was to collect from 1982 until 1998, and that its fee collection authority was constrained both by NWPA and rulings of the D.C. Circuit. *Id.*

The Government was also aware that related statutes and agency orders further limited Delmarva and Atlantic, as Standard Contract holders. For instance, the Government also knew that the NRC's regulations directly linked the approved status of the nuclear plant's operating license with DOE's determination as to whether a Standard Contract holder was current in satisfying DOE's demands for the payment of fees. App 1, ¶ 11. It also was aware that the Federal Energy Regulatory Commission, in

the late 1990s, was strongly urging competitive markets in electric energy sales and the separation of ownership of electric generating facilities from traditional utilities. *Id.* ¶ 8.

Lastly, the Government knew that nuclear plants could and likely would be sold, and expressly included very detailed provisions as to how such sales would occur in the both NWPA and the Standard Contract. The assignment of a Standard Contract was authorized by a specific provision in NWPA. 42 U.S.C. § 10122(b)(3). In addition, Article XIV of the Standard Contract explicitly allowed Delmarva and Atlantic to assign their Standard Contract rights to a subsequent purchaser.[7] In order to effectuate an assignment, Delmarva and Atlantic were required to provide the Government with ninety days notice. *Id.* Further Government-imposed requirements on the sale included the fact that Standard Contract holder status and SNF ownership could not under any circumstances become separate from the nuclear generating facility with which they were inextricably linked. *Id.*

Delmarva and Atlantic provided the Government with the requisite notice of its intended sale and assignment of the Standard Contract to PECO/PSEG. The Government *never* objected to the assignment. At the time of contract formation, the Government therefore recognized that Nuclear Stations were bought and sold regularly, and that they would continue to be bought and sold after the execution of the Standard Contract. As such, it is disingenuous (at best) for the Government to now argue that a sale of Delmarva's and Atlantic's direct ownership interests in the Nuclear Stations was unforeseeable.

---

[7] This assignment clause within the Standard Contract is significant because it is an exception to the general rule that government contracts are non-assignable. *See* 31 U.S.C. § 3727.

Given the above-described circumstances, it is quite simply unfathomable that the Government could not have foreseen the consequences of its failure to commence SNF disposal to its trading partners, while continuing to exact millions of dollars in fees indefinitely.

### B. The Court May Also Award Damages For Breach Of Contract Based Upon A "Lost Asset" Analysis

Delmarva and Atlantic are also entitled to seek damages for diminished value on the basis of a "lost asset" model. When a defendant's breach of contract leads to the reduction of the price a willing buyer would otherwise pay a willing seller for the right to a particular income stream, that plaintiff is eligible to recover for the lost asset. An award for lost assets provides a plaintiff with damages for the market value of a lost income-producing asset.

Various circuit courts have affirmed lost asset damages as a valid method of recovery when the plaintiff seeks to reclaim the diminished value of its asset. For instance, in *Schonfeld v. Hilliard*, 218 F.3d 164 (2d. Cir. 2000), the Second Circuit awarded lost asset damages to a plaintiff on a breach of contract claim. The plaintiff, a former partner with the defendants, brought suit on behalf of himself, as well as derivatively on behalf of the former company run by the plaintiff and the defendants. In the complaint, the plaintiff alleged that the defendants' breach of an oral agreement with the plaintiff lead directly to the company's breach of an agreement with a third party as well as to the subsequent loss of a different agreement with that same third party. The plaintiff sought damages for the diminished value of the lost agreement. *Id*. at 170-71.

The court awarded "lost asset" damages to the plaintiff, based upon the value of the asset the plaintiff lost as a result of the defendants' breach. "When a defendant's breach of contract deprives a plaintiff of an asset, the courts look to compensate the

plaintiff for the 'market value' of the asset." *Id.* at 178. In determining the market value of the agreement, the court based its decision on "'future profits as estimated by potential buyers who form the "market"' and 'reflect the buyer's discount for the fact that the profits would be postponed and . . . uncertain.'" *Id.* at 176 (citation omitted). Further, the court found that it favored awarding lost asset damages over lost profits because "[t]he market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time." *Id.* at 177; *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495-96 (2d Cir. 1995) (holding that plaintiff's damages for market value of business were recoverable even though plaintiff's lost profits claim was too speculative); *see also Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (measuring contract damages by the value of the item at the time of breach is a valid measure and actually takes expected future lost profits into account).

The decisions described above provide further credence to Delmarva's and Atlantic's allegations that they are entitled to seek damages for the diminished value of the Standard Contract and their direct ownership interests in the Nuclear Stations which were incurred as a result of the Government's breach.[8] The value of both the direct ownership interests in the Nuclear Stations and the value of the Standard

---

[8] Far from being an unrelated, intervening event, the sale of the Nuclear Stations also had the effect of mitigating the precipitous drop in value of the Standard Contract and related nuclear assets after the Government's breach. Under generally accepted principles of contract law, Delmarva/Atlantic should be entitled to have contract liquidation recognized as the equivalent of taking reasonable steps to mitigate its losses. *See Boston Edison*, 64 Fed. Cl. at 182; *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002) (citing Restatement (Second) of Contracts § 350 (1981)); *see also Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 355 (2004). In the *Winstar* cases, this Court has recognized the sale, merger, or liquidation of banks that had been harmed by the Government's breach as sentinel events for purpose of damage measurement. *See, e.g., Long Island Sav. Bank, FSB v. United States*, 60 Fed. Cl. 80, 89-90 (2004).

Contract were severely diminished as a result of the Government's breach, specifically the failure to commence removal of SNF on January 31, 1998. App. 5, ¶ 15. Potential buyers discounted from their purchase price all of the additional costs that they would incur as a result of having to continue storing the SNF and continue making payments to the NWF. App. 3-5, ¶¶ 9-13. Under a lost asset theory, Delmarva and Atlantic would be entitled to recover the difference between the value of their direct ownership interests in the Nuclear Stations at the time of the breach and the price at which their interests were ultimately sold. *See Protectors Ins. Serv., Inc. v. United States Fid. & Guar. Co.*, 132 F.3d 612, 617 (10th Cir. 1998) (awarding lost asset damages based upon the difference between the going concern value and the price actually received by the plaintiff upon the sale of the business).

### C. The Cases Relied Upon By The Government Do Not Adversely Affect Delmarva And Atlantic's Entitlement To A Recovery

In its Motion, the Government misappropriates and/or mischaracterizes numerous cases for the principle that Delmarva and Atlantic may not recover the damages asserted by them for breach of contract. For instance, the Government relies upon the Federal Circuit's decision in *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996). Motion at 10-11. However, *Wells Fargo* actually supports Delmarva's and Atlantic's opposition. In *Wells Fargo*, the court only rejected Wells Fargo's claim for lost profits on loans that were *unrelated* to the subject of the contract, loans that Wells Fargo had hoped to make by leveraging additional capital it may have received had the Government honored its guarantee commitment. However, the court allowed Wells Fargo's other claim for lost profits where Wells Fargo was able to prove that the profits were directly related to the breached contract. As in *Wells Fargo*, Delmarva and Atlantic have demonstrated here that as a direct result of the

Government's breach of the Standard Contract, Delmarva and Atlantic suffered direct and immediate damages to the Nuclear Stations in the form of a severely diminished plant value. App. 4-5, ¶¶ 11-15.

Contrary to the Government's assertion, the diminished value alleged here is not a result of the sale of Delmarva's and Atlantic's direct ownership interests in the Nuclear Stations. Rather, the evidence confirms that the value of those assets was severely diminished by the Government's breach.[9] A situation comparable to *Wells Fargo* would be one under which Delmarva and Atlantic were seeking damages under a theory that the Government's breach thwarted its ability to build and operate, for example, a coal-fired power plant or some other distinct enterprise. To the contrary, all of Delmarva and Atlantic's claimed damages were the natural, and as best as can be determined prior to discovery, *actually foreseen* consequences of the Government's breach, stemming directly from DOE's failure to commence SNF disposal by the 1998 deadline.

Like the court in *Wells Fargo*, the court in *Ramsey v. United States*, 101 F. Supp. 353 (Ct. Cl. 1951), affirmed the validity generally of lost profit damage awards. As discussed above, when accompanied by appropriate showings as to amount, the award of lost profits associated with the breach of government contract is exceedingly well established in the Court of Federal Claims. While the *Ramsey* court denied an award of damages in the circumstances of that case, it also recognized that there are cases that

[9] The Government also cites *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003), and *First Heights Bank, FSB v. United States*, 57 Fed. Cl. 162 (2003). Both of these cases, like *Wells Fargo*, were decided much later in the litigation, and in fact *First Heights* was decided after a finding of liability and upon a motion for summary judgment on damages. Given this, the decisions are confined to their facts, and certainly cannot be extended to preclude Delmarva and Atlantic's opportunity to obtain discovery and offer proof for the damages it has properly alleged.

appropriately have awarded lost profit damages. *Id.* at 357 n.1. The *Ramsey* court denied lost profits because the breached contract did not affect the remainder of the plaintiff's business. *Id.* at 357. Unlike in *Ramsey*, however, the Government's breach in the instant case has affected all aspects of operations at the Nuclear Stations. RPFF No. 10; App. 3-5, ¶¶ 10-15.

*Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741 (1980), is also not applicable to the situation presented in Delmarva and Atlantic. The court in *Olin Jones* denied the damage request because its claim was predicated upon damages due to the plaintiff's lost reputation. The plaintiff claimed that the Government's breach hurt its reputation, and prevented it from obtaining further projects. *Id.* at 744. That is not the allegation here. Delmarva and Atlantic are not claiming that the Government's breach lead to a change in perception about Delmarva or Atlantic, as companies, and their ability to perform additional work. Rather, Delmarva and Atlantic allege (and demonstrate) that the Government's breach improperly burdened them with SNF, and that the costs associated with SNF storage for indefinite periods were accounted for in the diminished value of the Standard Contract and other interrelated assets, when asset valuations considered the costs to be incurred, the additional risks to be assumed, and the amount of the checks to be written, all as a direct consequence of DOE's conduct. App. 4-5, ¶¶ 11-15.

### D. Delmarva And Atlantic Are Pursuing Expectancy, Not Restitution, Damages

The Government's Motion improperly asserts that Delmarva and Atlantic are seeking restitution damages for the return of fees paid into the Nuclear Waste Fund. Motion at 17-21. Neither Delmarva nor Atlantic have sought the recoupment of such fees. As the basis of its argument, the Government cites paragraph 87 of Delmarva's

and Atlantic's Amended Complaint. Paragraph 87, however, is not a claim for restitution "under a partial breach of contract theory," but rather an explanation of which Government actions constituted an unlawful taking. Delmarva and Atlantic assert, as discussed in detail below, that the assessment of fees in excess of those authorized by the NWPA are a distinct and fundamental component of their takings claim. Paragraph 87 of the Amended Complaint does not request the Government to return the fees. In fact, Delmarva and Atlantic request only just compensation, as measured by the fair market value of their direct ownership interests in the Nuclear Stations prior to the Government's taking. The Government cites no other section of the Amended Complaint that requests restitution for a breach of contract because neither Delmarva nor Atlantic have sought such a remedy.

### E. Delmarva And Atlantic Have Brought A Cognizable Claim For Breach Of Contract Separate And Apart From The Purchasers' Claims For Partial Breach Of Contract

The Government asserts that Delmarva and Atlantic may not sue for total breach because PSEG and PECO have elected to sue for partial breach of the contract. First and foremost, Delmarva and Atlantic are not suing for total breach of contract, but rather for damages as a result of a partial breach. Second, Delmarva and Atlantic had distinct contractual and statutory obligations and entitlements as co-owners of the Nuclear Stations. The Government maintains that Delmarva and Atlantic may not bring a claim simultaneous with PSEG and PECO because PSEG and PECO, as the "Purchasers" of the Standard Contract, are the only parties with obligations under the contract, and thus the only parties with rights to determine claims brought under the Standard Contract. This could not be further from the truth. Delmarva and Atlantic were co-owners of the Nuclear Stations, and had rights and responsibilities akin to

PSEG and PECO. In fact, the Nuclear Regulatory Commission ("NRC") addressed the issue of co-owners in its "Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry." 62 Fed. Reg. 44, 076-77 (Aug. 19, 1997). In this document the NRC stated that:

> Many of the NRC's power reactor licensees own their plants jointly with other, unrelated organizations. Although some co-owners may only be authorized to have an ownership interest in the nuclear facility and its nuclear material, and not to operate it, the NRC views all co-owners as co-licensees who are responsible for complying with the terms of their licenses. *See Public Service Company of Indiana, Inc. (Marble Hill Nuclear Generating Station, Units 1 and 2)*, ALAB-459, 7 NRC 179, 200-201 (1978).

*Id.*

This policy statement makes clear that while a party may not have a license to operate a nuclear facility – there may by only *one* operator – the co-owners still have obligations to comply with the terms of the license. As such, just because Delmarva and Atlantic were not listed as the "Purchasers" does not mean that they had any less of a contractual obligation to pay monies to the Nuclear Waste Fund ("NWF"). While the Government maintains that the language of the Standard Contract, which states that the purchaser acts on its own behalf and on behalf of the joint owners, in no way obligates Delmarva and Atlantic in the same manner as PSEG and PECO, the policy statement above confirms that this is exactly what the Standard Contract language provides. As such, Delmarva and Atlantic have the same right to bring claims against the Government, as well as the same right to determine what type of claims (e.g., partial or complete breach) are brought under the Standard Contract.

### F. Determination Of Delmarva And Atlantic's Damages Is An Issue Of Fact To Be Made Upon The Evidence Submitted

Prior to a ruling upon damages, Delmarva and Atlantic should be afforded the opportunity to obtain discovery as well as to offer proof of the properly asserted allegations they have made in the Amended Complaint. The U.S. Court of Claims previously had held that a determination of damages is an issue of fact, and is to be made upon the evidence submitted. In *Goolsby v. United States*, 21 Cl. Ct. 88 (1990), the court was presented with a motion to dismiss alleging that the plaintiff's lost profit damages were too consequential, and hence, not recoverable. The court denied the motion, holding that "[a]llegations of profits loss foreseeability entail a factual, not a legal, inquiry, and a [motion to dismiss] mandates acceptance of the nonmovant's factual allegations, along with all reasonable inferences arising therefrom." *Id.* at 91 (citing *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 (Fed. Cir. 1986)). Although the defendant claimed that the plaintiff's damages were too large and too speculative, the court found that "however fortuitous . . ., plaintiff's averments must be accepted pending trial." *Id.* In that same vein, the court wrote: "These claims may be suspect, . . . but they cannot be rejected as a matter of law." *Id.; see also Landmark Land Co. v. United States*, 256 F.3d 1365, 1379 (Fed. Cir. 2001) (holding that whether damages are foreseeable is a question of fact to be determined upon the evidence).

Similarly, this Court should deny the Government's Motion, especially as it pertains to Delmarva's and Atlantic's breach of contract damages, because Delmarva and Atlantic have properly alleged breach of contract and have not yet had an opportunity to obtain discovery and offer proof of their damage allegations. While the Government has styled its Motion as one for summary judgment, it has offered not a single factual argument to suggest that Delmarva's and Atlantic's damages are not

recoverable. To the contrary, Delmarva and Atlantic have produced admissible evidence of substantial damages. App. 3-5, ¶¶ 9-13. Accordingly, the Government has failed to meet its burden and its Motion should therefore be denied.

## III. DELMARVA AND ATLANTIC HAVE COGNIZABLE TAKINGS CLAIMS UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION

The Government's Motion for Summary Judgment with respect to Delmarva's and Atlantic's takings claims is nothing more than a recycled version of the Motion to Dismiss which this Court previously rejected in December of last year. As it did six months ago, the Court should similarly deny the Government's present Motion. Delmarva and Atlantic assert two independent bases of unjustified taking of their property interests: (i) DOE's systematic collection of unauthorized fees after January 31, 1998 constituted a taking of Delmarva and Atlantic's property; and (ii) DOE's failure to dispose of Delmarva and Atlantic's SNF by January 31, 1998 deprived Delmarva and Atlantic of the use and value of their direct ownership interests in the Nuclear Stations. These takings theories are also entirely consistent with prior SNF decisions discussed below, and, therefore, represent cognizable takings claims which are not susceptible to summary judgment at the very outset of a proceeding.[10]

---

[10] Should Delmarva and Atlantic elect to pursue breach claims in the wake of a successful challenge to their assignments, they would do so concurrently with their takings claims. The Court of Federal Claims has affirmed a plaintiff's right to concurrently pursue both a breach of contract and a takings cause of action in SNF matters. In *Boston Edison*, Judge Lettow found that "Boston Edison may bring contract and taking claims concurrently, but, if both claims remain viable, recovery under the contract damages theory is appropriate." 64 Fed. Cl. at 187. This holding is consistent with the ruling of the Court of Federal Claims in *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003) (takings and breach claims can proceed to trial concurrently). As in *Boston Edison*, the *Detroit Edison* Court denied the Government's Motion, finding that even if the plaintiff could not recover damages under both theories, the plaintiff would be allowed to pursue both theories and create a more fully developed record. 56 Fed. Cl. at 302; *see also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) (breach and takings claims allowed to proceed concurrently); *Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438, 442 (2004). Delmarva and Atlantic should be

### A. Delmarva's And Atlantic's Takings Claims Arise Out Of Legal And Property Rights Separate From The Standard Contract

Three related property interests were taken from Delmarva and Atlantic by the Government's failure to remove SNF from the Nuclear Stations on or before January 31, 1998: (1) Delmarva and Atlantic's real property interests, namely, the property that must be employed to provide storage of the SNF for which the Government was otherwise responsible (*see, e.g.*, App. 3-5, ¶¶ 10-15); (2) Delmarva and Atlantic's assets associated with the Nuclear Stations, (*see id.*); and (3) the value of the Nuclear Stations as a going concern, i.e., the ability of Delmarva and Atlantic to use and enjoy the benefit from the Nuclear Stations unencumbered by the mounting liabilities associated with interim SNF storage, and the costs and uncertainties of permanent disposal. (*see id.*).

The property interests described above have been recognized by the Court of Federal Claims in parallel SNF proceedings and are consistent with well-settled takings case law. *See Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438, 442 (2004) ("*SMUD*") (nuclear utility has recognized property interest in both the Standard Contract and its ability to put its real property to "other valuable economic uses"); *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003) (analyzing nuclear utility's real property interests taken by the Government); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) (apartment building owners had property interest in the full use of their building that could not be taken without just compensation); *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979) (plaintiff had property interest in real property – a private pond – that was taken when the Government imposed a navigational servitude); *United States v. Peewee Coal Co.*, 341 U.S. 114 (1951) (property interest in coal mine and associated property); *Kimball Laundry Co. v. United States*, 338

---

afforded the same opportunity to pursue both of their claims in an effort to create a complete factual record for the Court.

U.S. 1, 14 (1949) (taking of laundry's premises as well as its "opportunity to profit from its trade routes," i.e., its going-concern value); *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) (real estate owners had vested property interests in the contractual right to prepay and exit low-income housing programs); *Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990) (turkey breeders had property interest in the "economically viable use of property" – i.e., turkeys for breeding stock as opposed to slaughter); *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440, 444 (2005) (security company had property interest in its business assets, "including its . . . contracts, goodwill, and going-concern value"); *Benenson v. United States*, 548 F.2d 939, 949 (Ct. Cl. 1977) (hotel owner's fee interest in the use of its hotel was cognizable property interest). Both Delmarva and Atlantic have properly identified the interests that were taken by the Government as a result of its failure to dispose of SNF as required by the NWPA.

### 1. The Federal Circuit and the Court of Federal Claims Have Previously Affirmed That the Basis of the Nuclear Utilities' Property Rights Existed Independent of the Standard Contract

Contrary to the Government's assertion, Delmarva and Atlantic claim a taking of rights granted independent from, not by, the Standard Contract. This Court has affirmed and recognized that a nuclear utility's legal and property rights existed prior to and, are thus, independent from the Standard Contract. *See Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 225-29 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000). Indeed, this Court has denied similar dispositive motions by the Government, and has instead recognized that DOE obligated itself to remove SNF prior to the execution of the Standard Contract. *See SMUD*, 61 Fed. Cl. 438.

For example, in *Yankee Atomic,* the Court noted that "Yankee asserts that DOE's failure to dispose of its SNF amounts to a taking of the real property on which its inoperative facility is located." 42 Fed. Cl. at 236. Assessing the basis for Yankee's takings claim, the Court rejected the Government's motion to dismiss, concluding that "no contract clause purports to cover or redress an alleged taking of real property. Therefore, plaintiff's taking claim is not converted into a claim arising under the contract." *Id.* The Federal Circuit affirmed the *Yankee Atomic* decision in *Maine Yankee,* 225 F.3d at 1340, 1342-43, when it affirmed the lower court's denial of the Government's motion to dismiss plaintiff's takings claim as one not arising under the Standard Contract and granted plaintiff's motion for partial summary judgment regarding the Government's liability for breach of contract. In so doing, the Federal Circuit found that while the Standard Contract provided details regarding SNF removal,

> [t]he Act effectively made entry into such contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses to any operator who has not "entered into a contract with the Secretary" or who "is [not] actively and in good faith negotiating with the Secretary for a contract."

*Id.* at 1337 (citation omitted) (alteration in original).

Likewise, in *SMUD,* the Court denied the Government's motion to dismiss a takings claim analogous to those asserted by Delmarva and Atlantic. SMUD had brought a takings claim alleging that the Government had invaded SMUD's private property through its failure to remove SNF. The court allowed SMUD to continue pursuing its takings claim. Recognizing SMUD's claim for taking of real property, the court held that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." *SMUD,* 61 Fed. Cl. at 442; *see also, Boston Edison,* 64 Fed. Cl. at 187-88 (denying the dismissal of plaintiff's takings

claim); *Sys. Fuels v. United States*, No. 03-26236, 2005 WL 950497, at *9 (Fed. Cl. Apr. 20, 2005) (same).

**B. Plaintiffs Have Suffered Both A Physical And Regulatory Taking**

Delmarva and Atlantic have asserted both physical and regulatory takings of the property interests in the Nuclear Stations described above. First, the Government's failure to begin removal of SNF on or before January 31, 1998 constituted a taking of Delmarva and Atlantic's land itself, forcing Delmarva and Atlantic to use identifiable portions of the Nuclear Stations as indefinite storage facilities for SNF. Since these portions of the Nuclear Stations cannot be used for any commercial purposes other than the interim storage of SNF in a manner dictated by the Government, Delmarva and Atlantic have been deprived of the fair use and enjoyment of their physical property.

The Government's actions also amounted to a regulatory taking of Delmarva and Atlantic's property interests as a direct result of the Government's failure to abide by its obligations under the NWPA. By obligating Delmarva and Atlantic to use the Nuclear Stations as an interim SNF storage facility, the Government deprived Delmarva and Atlantic of its investment-backed expectations in the Nuclear Stations, including the expectation that the owners of the facilities (including Delmarva and Atlantic) would not otherwise be required to store SNF at the Nuclear Stations. App. 4-5, ¶¶ 13-15. Since Delmarva and Atlantic were forced to sell their interest in the Nuclear Stations, the Government's taking was permanent.

**1. The Physical Taking of Delmarva and Atlantic's Real Property**

The Government's failure to remove SNF on or before January 31, 1998, as required by the NWPA, infringed upon Delmarva and Atlantic's fair use and enjoyment of the Nuclear Stations resulting in the physical taking of Delmarva and Atlantic's real

property. *See* 42 U.S.C. § 10222(a)(5)(B). The Government's failure to remove SNF, thereby requiring Delmarva and Atlantic to take steps necessary for the interim storage of SNF at the Nuclear Stations, amounted to a confiscation of Delmarva and Atlantic's physical property.

Contrary to the Government's assertion, an actual "invasion" is not the only factual predicate giving rise to a physical taking. Delmarva's and Atlantic's takings theory was previously adopted in parallel SNF proceedings by Judge Braden in the *SMUD* decision referenced above. In *SMUD*, Judge Braden found that the Government's failure to remove SNF amounted to a taking of the plaintiff's real property because the plaintiff was forced to utilize portions of its property to store SNF that the Government was otherwise obligated to take custody of no later than January 31, 1998 pursuant to the express obligations of the NWPA. 61 Fed. Cl. at 442-43; *see also* 42 U.S.C. § 10222(a)(5)(B). The Court agreed with the plaintiff's position that the Government's failure to begin removal of SNF on January 31, 1998 resulted in a physical taking and "forced SMUD to devote economically valuable real property to the storage of the SNF." *SMUD*, 61 Fed. Cl. at 442 (internal quotation marks and citation omitted). In denying the Government's Motion to Dismiss, the Court found that the plaintiff had properly alleged that "[t]he government has taken this real property by denying SMUD its rights as owner of this property to put it [the portion of the property SMUD was obligated to designate for interim SNF storage] to other valuable economic uses." *Id.* (internal quotations marks and citation omitted). As in *SMUD*, Delmarva and Atlantic's physical takings claim seeks just compensation for the Government's de facto physical invasion of the Nuclear Stations.

Delmarva and Atlantic's physical takings claims are *identical* to the claim explicitly recognized by the Court in *SMUD*. As in *SMUD*, the Government has denied Delmarva and Atlantic the opportunity to put identifiable portions of the Nuclear Stations to other viable economic uses by forcing Delmarva and Atlantic (and other current and future owners of the Nuclear Stations) to preserve such property in order to store ever-increasing amounts of SNF for an indefinite period of time at the Nuclear Stations. The Government's failure to take custody of the Nuclear Stations' SNF required Delmarva and Atlantic to take the requisite steps necessary to accommodate the storage of SNF at the Nuclear Stations, a function that the NWPA unambiguously imposed upon the Government. App. 4, ¶ 11. In particular, the owners of the Nuclear Stations – including Delmarva and Atlantic – were obligated to plan for, designate, and reserve certain identifiable portions of the Nuclear Stations for use as an interim storage facility. *Id.* No other options for the handling of SNF were afforded to Delmarva and Atlantic. As such, the Government's failure to accept the Nuclear Stations' SNF was akin to a confiscation of the portion of the Nuclear Stations that now must be used for interim SNF storage.

Judge Braden's *SMUD* decision is consistent with and supported by a fully developed body of takings jurisprudence. It is well settled that a Government-caused occupation of real property for public use constitutes a *per se* physical taking. *See Loretto*, 458 U.S. at 433 (law allowing cable companies to attach equipment to apartment buildings requires just compensation). Likewise, a Government action that results in the use of private property for a public purpose also constitutes a physical taking. *See, e.g., Benenson*, 548 F.2d at 947 (Ct. Cl. 1977) (Government's actions barring owners from demolishing Willard Hotel and enjoining them from removing building's facade to

determine whether structure could be used for profitable purposes other than operation of a hotel constituted a taking of owners' fee interest). The Government's failure to remove SNF from the Nuclear Stations, thereby requiring Delmarva and Atlantic to set aside commercially valuable property in order to store SNF on site, constitutes a similar physical occupation of Delmarva and Atlantic's real property by unlawfully depriving Delmarva and Atlantic of the fair use and enjoyment of the Nuclear Stations that must be used for the interim storage of SNF.

Delmarva and Atlantic were compelled to dedicate their property to activities and purposes that were specifically assigned by Congress to the Government in furtherance of the public interest for a safe and secure permanent repository for SNF. App. 4, ¶ 11. As the Court explained in finding a taking in *Benenson*, "[t]he net effect of the acts of the Government is that plaintiffs cannot use their property for any income-producing purpose . . . . Consequently, plaintiffs are forced to preserve the structure for the benefit of the Government, which bears no part of the financial responsibility." *Id.* at 947. Similar to *Benenson*, where the Government refused to allow landowners to remove a building from their property while simultaneously refusing to condemn the property, Delmarva and Atlantic were deprived of a federal repository for the storage of their SNF – a repository for which they paid millions of dollars in fees – and obligated by the Government to set aside otherwise commercially valuable property in order to store SNF at the Nuclear Stations in accordance with exacting federal standards.

A physical taking also occurs when the Government forces a business to dedicate its own property for the benefit of the public, or to perform activities and provide services that should be undertaken by the Government. *See, e.g., Kaiser Aetna,*

444 U.S. at 180 (taking occurred where Government imposed a navigational servitude on landowner's private pond); *Peewee Coal Co.*, 341 U.S. 114 (taking occurred where Government federalized coal mine); *Kimball Laundry*, 338 U.S. at 6 (taking occurred where Government federalized laundry service and conscripted the owner's management and employees to operate plant). Similarly, when the Government has forced storage on another's private property, an illegal physical taking has occurred and the property owner must be justly compensated for its loss. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980) (a state may not transform private property into public property without just compensation); *see also Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990) (Government's refusal to allow private party to develop its land for use benefiting the public is an unlawful taking). The Government's failure to comply with its statutory duty to remove Delmarva and Atlantic's SNF, thereby obligating Delmarva and Atlantic to continue custodial responsibilities on its own property indefinitely, had an immediate and direct impact on Delmarva and Atlantic's fair use and enjoyment of the Nuclear Stations.

Indeed, the Government does not quarrel with Delmarva's and Atlantic's assertion that the NWPA imposed an unconditional obligation on the Government to remove and dispose of nuclear utilities' SNF on or before January 31, 1998. *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) ("*Indiana Michigan*") (citing 42 U.S.C. § 10222(a)(5)(B)). The Government's failure to remove and dispose of SNF in express disregard of the NWPA, requiring instead that Delmarva and Atlantic provide its own property and facilities to store SNF beyond the date when the Government was required to assume such obligations, constitutes a taking of Delmarva

and Atlantic's physical property without just compensation. Accordingly, the Government's Motion for Summary Judgment should be denied.

**2. The Regulatory Taking of Delmarva's and Atlantic's Property**

The Government's failure to remove SNF from the Nuclear Stations on or before January 31, 1998 also amounted to a regulatory taking of Delmarva's and Atlantic's property. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) (holding that a determination of a regulatory taking of property is based upon: (1) the character of the Government's action; (2) the economic impact on the plaintiff; and (3) the extent to which the regulation interferes with distinct investment-backed expectations of the owner). As with Delmarva's and Atlantic's physical takings allegations, a regulatory taking of Delmarva's and Atlantic's property interests has been recognized in other SNF cases as arising exclusively from the NWPA and is consistent with well-settled takings jurisprudence.

In the *Boston Edison* decision referred to above, Judge Lettow recognized that Boston Edison's takings claim does not arise from the Standard Contract, denying the precise argument that the Government is making in this case, but rather, from the long line of Congressional involvement in SNF storage, culminating in the NWPA. 64 Fed. Cl. at 187 n. 22. In rejecting the Government's restrictive view of a nuclear utility's rights, the Court held, "[a]s a matter of logic, that [the] NWPA may have altered a pre-existing right of Boston Edison does not mean that the right taken was created solely by the Standard Contract." *Id.* Indeed, the Government has historically recognized its obligation to provide for the permanent storage of SNF. Government actions toward this end began in 1954 with the passage of the Atomic Energy Act, and have continued up to and have included the passage of the NWPA in 1983. Consequently, electric

utilities (including Delmarva and Atlantic) designed, and the Atomic Energy Commission licensed and approved for operation, nuclear power facilities with limited SNF wet storage pool capacity, which were designed only for temporary storage and for only a fraction of a nuclear plant's forty-year license life. In short, these utilities invested in their facilities with the expectation that the Government would fulfill its long-standing obligation to accommodate the storage of SNF. The Court's *Boston Edison* decision recognizes that nuclear utilities, such as Delmarva and Atlantic, had reasonable investment-backed expectations in their facilities that did not include the interim storage of SNF. *Id.*

As in *Boston Edison*, Delmarva's and Atlantic's property interests in their land, assets, and going-concern value – for which Delmarva and Atlantic had reasonable investment-backed expectations (as manifested in the design and construction of the Nuclear Stations) – were taken as a result of the Government's failure to remove SNF from the Nuclear Stations on or before January 31, 1998. In fact, Delmarva and Atlantic were original participants in the siting, development, design, and construction of the Nuclear Stations with the understanding that they would be able to adequately dispose of SNF through off-site disposal methods – first through reprocessing, and then later through the assumption of title to and removal of SNF to a permanent federal repository on or before January 31, 1998 by the Government pursuant to the NWPA. App. 2, ¶ 4. The Government's failure to begin removal of SNF constitutes interference with Delmarva's and Atlantic's investment-backed expectations in a facility unencumbered by SNF storage obligations.

Judge Lettow's decision in *Boston Edison* is supported by considerable regulatory takings case law. The Federal Circuit has long recognized regulatory takings

as a means for providing just compensation to takings plaintiffs similarly situated to Delmarva and Atlantic. For example, in *Yancey*, 915 F.2d 1534, the Federal Circuit affirmed the plaintiffs' taking claim, (brought after the Plaintiffs' turkey farm was quarantined) finding that "[w]hen adverse economic impact and unanticipated deprivation of an investment backed interest are suffered, as when the poultry quarantine forced the Yanceys to sell their turkey flock, compensation under the Fifth Amendment is appropriate." *Id.* at 1542. Similarly, in *Huntleigh*, 63 Fed. Cl. at 445, this Court denied the Government's Motion to Dismiss the plaintiff's regulatory taking claim. In *Huntleigh*, a private security company alleged that the passage of the Aviation and Transportation Security Act and the subsequent federalization of airport security was a regulatory taking. Although the Court ultimately found that the Government acted for a public purpose, Judge Margolis held that "the expense was placed disproportionately on a few private property owners." *Id.* at 448-49 (internal quotation marks and citation omitted). While the Government's purpose may have been legitimate, "the government has not shown that the *actions* Congress took . . . were within its powers to exercise without also granting compensation." *Id.* (internal quotation marks and citation omitted). In the SNF context, Congress recognized that SNF disposal should be the responsibility of the Federal Government. It therefore makes sense that the Government's abandonment of that responsibility (whether permanent or temporary), coupled with its decision to require utilities such as Delmarva and Atlantic to perform these otherwise governmental functions, requires Delmarva and Atlantic to be compensated.

Moreover, in *Cienega Gardens*, 331 F.3d 1319, the Federal Circuit found that the federal statutes altering an existing regulatory framework interfered with the

plaintiffs' investment-backed expectations and thus were deserving of just compensation. The plaintiffs were owners of low-income apartments who had signed contracts allowing for the prepayment of their mortgages. When the Government passed statutes that prevented the plaintiffs from prepaying their mortgages, the plaintiffs sought just compensation for an unlawful regulatory taking. The Federal Circuit agreed with the plaintiffs. In fact, the *Cienega Gardens* Court rejected many of the same arguments presented by the Government in the present case. For instance, similar to Delmarva's and Atlantic's allegation that the measure of compensation should be the diminished value of its property, the Court found that the Government's action need not dispossess the plaintiff of title to its property, but rather a taking could be found when the actions "denied them a future enhancement in the value of their property." 331 F.3d at 1339. Furthermore, just as Delmarva and Atlantic had come to expect that the Government would remove SNF on or before January 31, 1998, the *Cienega Gardens* Court found that the plaintiffs had investment-backed expectations upon demonstrating that "they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Id*. at 1345-46. (internal quotation marks and citation omitted).

**a. The Government's continued assessment of the 1 mil per kWh fee constituted a regulatory taking**

The Government was obligated to cease collecting fees from Delmarva and Atlantic for two independent but complementary reasons: (1) its statutory authority to collect fees for its SNF repository program expired under NWPA when the repository was obligated to be operational in 1998; and (2) the Court of Appeals ruled in *Indiana Michigan*, 88 F.3d at 1276, that its ability to collect fees was "reciprocal" to its obligation to commence disposal activities by the statutory deadline. Nonetheless, DOE continues



DOCSNY.149972.1

to collect fees, and in fact announced in the 1998 DOE Plan that it would do so for decades through 2020. This represents a classic unlawful takings claim under *Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996), and its progeny. *Aerolineas Argentinas* confirms that these types of allegations are properly lodged in the Court of Federal Claims under the Tucker Act when the confiscation is based on an asserted statutory power. *Id.* at 1573 (citations omitted). *Aerolineas Argentinas* cites with approval to *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954), for its characterization that an illegal confiscation has occurred when "the Government has the citizen's money in its pocket." *Id.* *Aerolineas Argentinas* also establishes that "[a contract] does not provide the authorization for requiring the airlines to incur the obligations imposed on [the Government] by the enactment of [a statute]." *Id.* at 1576. All of these principles are fully applicable here, and confirm the sufficiency of the 1 mil per kWh fee portion of Delmarva's and Atlantic's takings claim, which are not vitiated in any way by the Government's defenses based upon its interpretation of the Standard Contract.

### C. The Government Has Acquired The Use Of Plaintiffs Property Through Both A Regulatory And Physical Taking Of Atlantic's And Delmarva's Property Interests

By failing to abide by the NWPA's mandates, the Government has acquired the use of the Nuclear Stations as interim storage facilities for an indefinite period of time in lieu of siting, constructing and operating a federal SNF repository. Additionally, the Government received millions of dollars in fee payments from Delmarva and Atlantic, for which Delmarva and Atlantic received no benefit. RPFF No. 8. On February 7, 2005, Margaret Chu, director of DOE's Office of Civilian Radioactive Waste, told reporters that DOE would not file a license application for such a federal repository until the end of 2005. App. 50. Ms. Chu further reported that "we're [DOE] hoping

2012" will be the year that a permanent repository begins accepting nuclear waste. *Id.* Despite the Government's recalcitrance, the owners of the Nuclear Stations were forced to make immediate accommodations for the interim storage of such waste in the absence of a permanent federal repository capable of accepting SNF on or before January 31, 1998. The extent of the Government's failure to provide such a facility means that future owners' interests in the Nuclear Stations (including the utility that purchased Delmarva and Atlantic's interest in the Nuclear Stations) will be encumbered by this easement.

When the Government failed to provide a permanent SNF repository on or before January 31, 1998, it also forced nuclear utilities, including Delmarva and Atlantic, to expend their own resources to plan for the disposal of SNF. Since Delmarva and Atlantic were unable to have their SNF reprocessed, it was left with two options: (1) to spend additional money to store the Nuclear Stations' SNF at an off-site storage facility, and/or (2) to provide for the storage of SNF at the Nuclear Stations. Transporting the waste off-site was not, nor is it now, a viable option because there are currently no private fuel storage facilities available to accept the waste.[11] Moreover, the NWPA charges the Government with the sole responsibility for permanent SNF storage. 42 U.S.C. § 10131(a)(4). Thus, Delmarva and Atlantic were (and the subsequent purchaser

---

[11] As Judge Lettow held in *Boston Edison*:

> In the present case, the government has not completed its repository, and it has failed in its disposal duties. As a result, the value of Boston Edison's property allegedly dropped. The option of getting another contractor to repair the damage is unavailable to Boston Edison because there is no other approved provider of disposal services in this highly regulated industry. Diminution in value is left as the appropriate damage assessment.

64 Fed. Cl. at 183.

still is) left to store the SNF at the Nuclear Stations. This condition severely restricted Delmarva's and Atlantic's fair use and enjoyment of the Nuclear Stations.

### D. Determination Of Delmarva's And Atlantic's Takings Claim Is An Issue Of Fact

Takings claims are extremely fact-intensive, and thus it is inappropriate for the Court to decide a takings claim on a dispositive motion. As the Ninth Circuit observed in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990), *aff'd*, 526 U.S. 687 (1999), where a plaintiff claims that governmental action effects a taking, dispositive motions "must be viewed with particular skepticism. The importance of the specific facts and circumstances relating to the . . . governmental action militate against summary resolution in most cases. . . . This issue must await determination after trial on the merits." *Id.* at 1508 (citations omitted); *see also E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998) (analysis of a takings claim "is essentially ad hoc and fact intensive"). Applying the same principle, the Federal Circuit in *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985), reversed the dismissal of a takings claim because it was "not a legal impossibility" that the claimant "might establish facts constituting a taking" given the allegations of the complaint; the court emphasized that "whether or not there has been a taking . . . is normally a fact issue that cannot be resolved except on a 'complete record,' or a trial." *Id.* at 1555, 1558-60. Among the takings claim issues that would benefit from factual development here as discussed below is the extent of the Government's taking and the nature of Delmarva's and Atlantic's expectations regarding the use of their property, particularly given the long history of federal responsibility for SNF disposal.

### E. Delmarva's And Atlantic's Claims Are Properly Before The Court Of Federal Claims

Having successfully argued in the Court of Appeals for the D.C. Circuit that claims for the unlawful collection of Nuclear Waste Fund fees are to be raised in the Court of Federal Claims, the Government now attempts to argue the exact opposite before this Court. Motion at 35-37. In a hearing on the Government's previously filed Motion to Dismiss in this case, the Government sought to highlight the same jurisdiction argument (as made initially in its papers). *See* Dec. 3, 2004 hearing tr. at 31-32, *Delmarva,* No. 04-034C. As this Court observed, Delmarva's (and now Atlantic's) claim did not pose a challenge to the authority of the Secretary of Energy to assess or alter fees. As the Court noted at the December 3, 2004 hearing,

> I interpret Plaintiff's claim as saying not that there is a challenge to the amount of the fee, but that is a challenge to the fact that it has continued to be assess after there essentially is no quid pro quo, and I think that is a different case than challenging the fee structure or imposition of the fee when it originated because those decisions had to be challenged years ago.

*Id.* at 32. The Court's comments still accurately describe their 1 mil per kWh fee argument and evidence why the Government's jurisdiction argument should be rejected.

## CONCLUSION

For the foregoing reasons, Delmarva and Atlantic respectfully request that the Court deny the Defendant's Motion for Summary Judgment.

Date: May 25, 2005

Respectfully submitted,

s/ Richard J. Conway

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Delmarva Power & Light Company &*
*Atlantic City Electric Company*

Of Counsel:
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Todd Goodman, Esq.
Assistant General Counsel
Conectiv
P. O. Box 231
Wilmington, DE 19899
(302) 429-3786

**CERTIFICATE OF FILING**

I hereby certify that on May 25, 2005, a copy of the foregoing "Plaintiffs Delmarva Power and Light Company's and Atlantic City Electric Company's Brief in Response to Defendant's Motion for Summary Judgment" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Richard J. Conway

Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Delmarva Power & Light Company &*
*Atlantic City Electric Company*