IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DELMARVA POWER AND LIGHT COMPANY<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendants. | No. 04-0034C, into which has been consolidated No. 04-0036C (Judge Christine Miller) |

PLAINTIFF DELMARVA POWER & LIGHT COMPANY'S AND ATLANTIC ELECTRIC COMPANY'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

## I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

**1. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).**

**Delmarva's and Atlantic's Response to No. 1.**[1] Plaintiffs, Delmarva Power & Light Company ("Delmarva") and Atlantic Electric Company ("Atlantic") dispute Defendant's, the United States of America (the "Government"), first proposed finding of uncontroverted fact. The Government's characterization of the Department of Energy's ("DOE") responsibility for the disposal of SNF and HLW, and the generator's cost responsibility for interim storage and disposal is incomplete. First, the

[1] Delmarva's and Atlantic's Responses to the Government's Proposed Findings of Fact (hereinafter referred to as "RPFF") is filed pursuant to RCFC 56(h)(2).

Government's solution to the nuclear waste problem was first addressed, not by the NWPA, but by the enactment of the Atomic Energy Act ("AEA") in 1954, where the federal Government recognized its sovereign obligation to provide for the lawful and permanent disposal of the wastes of nuclear power generation. *See* Pub. L. No. 83-703, 1954 U.S.C.C.A.N. 1076. As Congress found in the legislative history of the NWPA:

> Responsibility for the final disposition of the nuclear waste has been lodged solely with the federal government because of the waste's hazardous nature. Various types of nuclear waste remain radioactive for periods of time ranging from several hundred years to several hundred thousand. Since it cannot be "disposed of" in the sense that a biodegradable product can, disposal must consist of permanent and isolated storage, generally in deep geologic formations. Therefore, when the Atomic Energy Act of 1954 (Public Law 83-703) authorized commercial development of nuclear energy, the federal government indicated it would control such potentially dangerous materials by mandating that disposal occur on federal land. In 1970, with Regulation 10CFR50, the federal government formally accepted full responsibility for providing a final repository.

*Financing Nuclear Waste Disposal: Joint Hearing on S. 637 and S. 1662 Before the Comm. on Energy and Natural Resources and the Subcomm. On Nuclear Regulation of the Comm. on Environment and Public Works*, 97th Cong. 307 (1981) (Congressional Budget Office Staff Working Paper). As this legislative history shows, an official Government policy statement that long predates the NWPA, and remains current to this day, provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." *Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities*, 10 C.F.R. pt. 50, App. F, ¶ 3. Further, through previously enacted legislation, the Government prohibited nuclear utilities from further reprocessing of their nuclear waste.

Government experts who have testified previously in parallel SNF proceedings have corroborated this legislative history. For example, Michael Lawrence, DOE's Acting Assistant Secretary for Defense Programs in 1983, testified that "through the Atomic Energy Act, . . . the Department . . . had a responsibility to provide for the permanent disposal of nuclear waste. The Nuclear Waste Policy Act provided a congressionally approved process to do so." Appendix ("App.") 7-13. Similarly, Benard C. Rusche, Director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM") in 1984, testified that "[f]rom the beginning of the Atomic Age, it has been a given that the Federal Government has the responsibility for eventual disposal of high level radioactive wastes and spent fuel." App. 14-20; 21-25. Robert Morgan, Acting Director of OCRWM in October 1983, also testified that the federal Government has had responsibility for the disposition of SNF since the AEA was enacted in 1954. App. 26-34.

Congress's stated concern in passing the NWPA was protecting the nation against specific health and safety issues arising from (a) SNF generated by commercial nuclear reactors; and (b) radioactive waste from SNF reprocessing, medical applications involving nuclear material, as well as other sources of nuclear waste. 42 U.S.C. § 10131(a)(2). The NWPA was a "pay as you go" statute, whereby the NWPA provided that the generators' cost responsibility was for a specific timeframe within which DOE was obligated to perform disposal functions. As such, virtually all of the monies would be required prior to January 31, 1998. Annual fee adequacy responsibilities were imposed upon the Secretary of Energy. The NWPA specifies that "the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel *until such waste and spent fuel is accepted by the*

*Secretary of Energy in accordance with the provisions of this chapter."* *Id.* § 10131(a)(5) (emphasis added). The referenced provisions required that such acceptance was to occur *"not later than* January, 31,1998." *Id.* § 10222(a)(5)(B) (emphasis added). The provisions of the NWPA pertaining to cost responsibility for interim storage and disposal occurring in accordance with the requirements of the NWPA. This includes the requirements of the NWPA that permanent disposal occur no later than January 31, 1998, and that the facilities necessary to accomplish such statutorily-mandated activity be in existence and operational by the specified deadline. Cost responsibility for activities occurring after the deadline – and thus not conducted in accordance with explicit and integral requirements of the NWPA – were expressly not assigned to generators.

**2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing:**

> **. . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.**

**Id. at§ 10131(b).**

**Delmarva's and Atlantic's Response to No. 2.** Delmarva and Atlantic dispute the Government's second proposed finding of uncontroverted fact. The references relied upon and cited by the Government do not accurately reflect the intent of Congress as mandated by the NWPA. Specifically, the NWPA provides that

> the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for,

> and the responsibility to pay the costs of, the interim storage of such waste and spent fuel *until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter.*

42 U.S.C. § 10131(a)(5) (emphasis added). Congress also found that, "in return for the payment of fees [into the waste fund] established by this section, the Secretary, *beginning not later than* January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel." *Id.* § 10222(a)(5)(B) (emphasis added).

Over time, DOE altered the timetable as well as the utilities' obligations established under the NWPA. For example, in 1987, just four years after the execution of the Standard Contract, DOE took the position that 1998 was no longer a viable date for the opening of a permanent SNF repository and that the new date would be 2003. App. 35-36. Subsequently, in 1990, DOE advised that it would no longer be able to have a permanent repository functioning by 2003. By then, DOE's revised deadline for a permanent repository had slipped to 2010. App. 37-48. In spite of these announcements, DOE continued to require utilities, including Delmarva and Atlantic, to participate in the delivery commitment schedule ("DCS") process even though that process assumed that DOE would begin acceptance of SNF by January 31, 1998.

DOE also continued (and continues to this date) to assess Nuclear Waste Fund fees which (as of September 2003) has resulted in the collection of nearly $15 billion more than DOE had spent on the development and construction of an SNF repository. *Id.* The NWPA only authorizes the collection of funds from generators as necessary for pursuit of a waste program that achieves disposal of SNF and HLW in a repository beginning no later than January 31, 1998. 42 U.S.C. § 10222(a)(5)(B). The NWPA also requires the Secretary of Energy to submit annually to Congress a report on the status of the Nuclear Waste Fund balance and recommendations on whether to raise or lower the fee in order to ensure that the fund is neither over- nor under-collected. *Id.*

§ 10222(a)(4). The Secretary of Energy has never proposed an adjustment to the fee prior to the deadline by which permanent disposal of SNF and HLW at a repository was to begin, or at any other time. From 1983 through 1998 DOE had a positive Nuclear Waste Fund balance of $8 billion dollars, and under the NWPA was therefore obligated to spend no more than $8 billion dollars from January 31, 1998 until the Yucca Mountain facility was open.

**3. The NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(l) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that the contracts with the nuclear utilities provide that:**

> **(a) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and (b) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31,1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.**

**42 U.S.C. § 10222(a)(5).**

**Delmarva's and Atlantic's Response to No. 3.** Delmarva and Atlantic dispute the Government's third proposed finding of uncontroverted fact. The Standard Contract was to provide for the payment of fees by utilities sufficient to offset the costs associated with DOE's authorized statutorily compliant SNF-related disposal expenditures, chief among these being the achievements of permanent disposal in a repository no later than January 31, 1998. Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, § 302(a), 96 Stat. 2201, 2257 (1982). Further, the NWPA required that Delmarva and Atlantic (and the other nuclear utilities) enter into a contract committing to use DOE as the singular entity for the disposal of its SNF. If a utility did not execute the

Standard Contract, the NRC was prohibited from granting license renewal or extension of the license period. *See* 42 U.S.C. § 10222(b). The site could not be put to any other commercial use, thus depriving the utility of the full use and enjoyment of the property. Simply stated, the utility's nuclear operating site would be turned into a long-term, and perhaps permanent, nuclear waste disposal facility, in contravention of clear governmental and public policy.

## II. PLAINTIFFS' EXECUTION OF THEIR STANDARD CONTRACTS

**4. On June 1, 1983, Philadelphia Electric Company (now PECO Energy Company ("PECO")) executed its Standard Contract with DOE concerning Peach Bottom Atomic Power Station Units 2 and 3, in which it indicated that it acted "on behalf of itself and Public Service Electric and Gas Company ["PESG"], Delmarva Power and Light Company and Atlantic Electric Company, joint owners of Peach Bottom Atomic Power Station, Units 2 & #." A.15. PECO is identified as the "Purchaser" under this Standard Contract. Id.**

**Delmarva's and Atlantic's Response to No. 4.** Delmarva and Atlantic dispute the Government's fourth proposed finding of uncontroverted fact. Delmarva and Atlantic were express intended beneficiaries of their respective standard contracts. Delmarva and Atlantic were co-owners of Peach Bottom, and had the same NWPA rights and responsibilities as PECO. *See,* the Nuclear Regulatory Commission's ("NRC") "Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry." 62 FR 44077 (Aug. 19, 1997). As an NRC approved co-licensee of Peach Bottom, Atlantic and Delmarva were required to be bound by the terms and conditions of a Standard Contract with DOE, which was entered into on Delmarva and Atlantic's behalf by PECO. App. 2 at ¶ 5. Pursuant to NRC policy, in the case where there are multiple co-owners of a nuclear power facility, all co-owners are deemed to be co-operating licensees; one entity shall be designated to be the operator pursuant to 10 CFR 55. *Id.* The operator is empowered to act on behalf of the co-

owners with respect to all matters affecting the plant and its operation, including the execution of all necessary contracts, subject to the oversight of the co-owners. *Id.* Atlantic and Delmarva are named co-owners in the Standard Contracts affecting Peach Bottom. *Id.* As such, they each remained obligated pursuant to the Standard Contract until the closing date for Peach Bottom, at which time the contract was assigned to the PECO. *Id.*

**5. On June 13, 1983, PSEG executed its Standard Contracts with DOE concerning Hope Creek Generating Station, in which it indicated that it acted "on its own behalf as managing utility for Hope Creek Generating Station, No. 1 Unit and on behalf of the joint owner Atlantic City Electric Company." A.1. PSEG is identified as the "Purchaser" in this Standard Contract. Id.**

**Delmarva's and Atlantic's Response to No. 5.** Atlantic disputes the Government's fifth proposed finding of uncontroverted fact. Atlantic was an express intended beneficiary of the standard contract. Atlantic was co-owner of Hope Creek, and had the same NWPA rights and responsibilities as PSEG. *See* Nuclear Regulatory Commission's "Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry." 62 FR 44077 (Aug. 19, 1997). As an NRC approved co-licensee of Hope Creek, Atlantic was required to be bound by the terms and conditions of a Standard Contract with DOE, which was entered into on Atlantic's behalf by PSEG. App. 2 at ¶ 5. Pursuant to NRC policy, in the case where there are multiple co-owners of a nuclear power facility, all co-owners are deemed to be co-operating licensees; one entity shall be designated to be the operator pursuant to 10 CFR 55. *Id.* The operator is empowered to act on behalf of the co-owners with respect to all matters affecting the plant and its operation, including the execution of all necessary contracts, subject to the oversight of the co-owners. *Id.* Atlantic is named co-owner in the Standard Contract affecting Hope Creek. *Id.* As such, Atlantic remained obligated pursuant to the

Standard Contract until the closing date for Hope Creek, at which time the contract was assigned to PSEG. *Id.*

**6. On June 13, 1983, PSEG executed its Standard Contracts with DOE concerning Salem Generating Station, Nos. 1 and 2, in which it indicated that it acted "on its own behalf as managing utility for Salem Generating Station, Nos. 1 and 2 Units and on behalf of the joint owners, ["PECO"], Atlantic City Electric Company, and Delmarva Power and Light Company." A.28. PSEG is identified as the "Purchaser" in this Standard Contract. Id.**

**Delmarva's and Atlantic's Response to No. 6.** Delmarva and Atlantic dispute the Government's sixth proposed finding of uncontroverted fact. Delmarva and Atlantic were express intended beneficiaries of their respective standard contracts. Delmarva and Atlantic were co-owners of Salem Generating Station, Nos. 1 and 2 ("Salem"), and had the same NWPA rights and responsibilities as PECO. *See* the Nuclear Regulatory Commission's "Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry." 62 FR 44077 (Aug. 19, 1997). As an NRC approved co-licensee of Salem, Delmarva and Atlantic were required to be bound by the terms and conditions of a Standard Contract with DOE, which was entered into on Delmarva's and Atlantic's behalf by PSEG. App. 2 at ¶ 5. Pursuant to NRC policy, in the case where there are multiple co-owners of a nuclear power facility, all co-owners are deemed to be co-operating licensees; one entity shall be designated to be the operator pursuant to 10 CFR 55. *Id.* The operator is empowered to act on behalf of the co-owners with respect to all matters affecting the plant and its operation, including the execution of all necessary contracts, subject to the oversight of the co-owners. *Id.* Delmarva and Atlantic are named co-owners and beneficiaries in the Standard Contracts affecting Salem. *Id.* As such, they each remained obligated pursuant to the Standard Contract until the closing date for Salem, at which time the contract was assigned to PSEG. *Id.*

**7. Pursuant to the Standard Contract, only the "Purchaser" is responsible for the quarterly payment to DOE of fees into the Nuclear Waste Fund. 10 C.F.R. § 961.11, Art. VIII, B.1. ("For electricity generated and sold by the Purchaser's civilian nuclear power reactor(s) on or after 7, 1983, fees shall be paid quarterly by the Purchaser...") see, e.g., A.6, A.20, A.33.**

**Delmarva's and Atlantic's Response to No. 7.** Delmarva and Atlantic dispute the Government's seventh proposed finding of uncontroverted fact. While Delmarva and Atlantic were not the names listed as "Purchasers," as co-owners, they were still obligated to comply with the terms of the Standard Contract. *See* Nuclear Regulatory Commission's "Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry." 62 FR 44077 (Aug. 19, 1997); *see also* App. 2 at ¶ 5; RPFF Nos. 4-6. PSE&G and PECO functioned as collection agents on behalf of the plant co-owners for NWF payments, but all of the co-owners themselves remained directly obligated for the payments under both the NWPA and the Standard Contract.

**8. PSEG and PECO, as the designated "Purchasers" under the Standard Contracts, were responsible for, and in fact did, make payments into the Nuclear Waste Fund. See, e.g., A.64-69. At no time did Delmarva or Atlantic make quarterly payments directly to DOE pursuant to the Standard Contract.**

**Delmarva's and Atlantic's Response to No. 8.** Delmarva and Atlantic dispute the Government's eighth proposed finding of uncontroverted fact. While Delmarva and Atlantic did not write a check directly to the Nuclear Waste Fund, as co-owners, they were obligated to (and did) make required payments every month. *See* Nuclear Regulatory Commission's "Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry." 62 FR 44077 (Aug. 19, 1997); *see also* App. 2 at ¶ 5; Response to PFF Nos. 4-6. In fact, as part owners of the Nuclear Stations, Delmarva and Atlantic made payments of $7.6 and $7.9 million respectively, to the Nuclear Waste Fund.

**9. Indeed, when DOE agreed to credit nuclear utilities for certain overpayments made into the Nuclear Waste Fund ("NWF") after the decision of the**

**United States Court of Appeals for the District of Columbia in Wisconsin Electric Power Co. v. Hodel, 778 F.2d 1 (D.C. Cir. 1895), which concluded that payments made into the NWF did not include electricity that a generating plant itself consumed, DOE credited PSEG and PECO for payments made on behalf of the Salem, Hope Creek, and Peach Bottom plants. DOE did not provide any credits directly to Delmarva or ACE. See, e.g., A.70-89.**

**Delmarva's and Atlantic's Response to No. 9.** Delmarva and Atlantic dispute the Government's ninth uncontested finding of fact, for the reasons stated in their response to No. 8.

## III. PLAINTIFFS' COMPLAINTS AND ASSIGNMENTS OF CONTRACTS

**10. DOE did not begin accepting SNF and/or HLW from the nuclear utilities under the Standard Contract by January 31, 1998.**

**Delmarva's and Atlantic's Response to No. 10.** Delmarva and Atlantic do not dispute the Government's tenth proposed finding of uncontroverted fact except to state that Delmarva and Atlantic were Standard Contract holders on January 31, 1998 that complied with all fee payment and other obligations pursuant to the Contract, and that the breach affected all aspects of operation at the Nuclear Stations, including diminishing their value.

**11. In their complaints, Atlantic City and Delmarva allege that, on October 1, 2001, and December 29, 2000, respectively, Atlantic City sold its minority interests in the Hope Creek, Salem, and Peach Bottom nuclear generating facilities, and Delmarva sold its minority interests in the Salem and Peach Bottom, to PSEG and/or PECO. See Atlantic Amed. Compl. ¶ 2; Delmarva Amend. Compl. ¶ 2.**

**Delmarva's and Atlantic's Response to No. 11.** Delmarva and Atlantic do not dispute the Government's eleventh proposed finding of uncontroverted fact except to state that by the date of the closing of Delmarva's and Atlantic's sale of the Nuclear Stations there was no prospect that DOE would take custody of SNF from any nuclear utility in the foreseeable future, as it had not (and still has not) sited, licensed, constructed or placed in operation an SNF disposal facility.

**12. In their Purchase Agreements with PSEG and PECO, Delmarva and Atlantic City expressly purported to assign all of their claims relating to, arising out of or in connection with Seller's rights, title and interests in and to the purchased assets, or any portion thereof, whether accruing prior to, on, or after the closing date of the sale:**

> **2.1 <u>Transfer of Purchased Assets</u>. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, (i) Seller shall sell, assign, convey, transfer and deliver to [the purchase], and [the purchaser] shall purchase, assume and acquire from Seller, free and clear of all Encumbrances, except for Permitted Encumbrances, the Purchased Assets..., including the following Purchased Assets:**
>
> *** * ***
>
> **(l) All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(j); and**
>
> **(m) The rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each cash, relating to any period prior to, on or after the Closing Date.**

**<u>See</u>, <u>e.g.</u>, A.45-46.**

**Delmarva's and Atlantic's Response to No. 12.** Delmarva and Atlantic do not dispute the Government's twelfth statement of uncontested fact only as to its breach of contract claims and otherwise disputes the statements of the Government. To the extent that the Government's argument, made in both *Entergy Nuclear Indian Point 2, LLC v. United States*, No. 03-2622C (Fed. Cl. filed Nov. 4, 2004) and *Rochester Gas & Electric Corp. v. United States*, No. 04-118C (Fed. Cl. filed Sept. 22, 2004 ) is finally

upheld, however, then the assignment of Delmarva's and Atlantic's breach claims would be void *ab initio* under the Assignment of Claims Act, 31 U.S.C. 3727. As to their takings claims, Delmarva and Atlantic did not, and in fact legally could not, assign their takings claims to PSEG and PECO. *See Rochester Gas and Electric Corp. v. United States*, No. 04-118, slip. op. at 14 (Fed. Cl. May 12, 2005) (finding that "for a party to allege that its property right has been taken, it must have owned the property at the time that the alleged taking occurred. *See United States v. Dow*, 357 U.S. 17, 20-21 (1958); *Cavin v. United States*, 956 F.2d 1131 (Fed. Cir. 1992); *System Fuels, Inc. v. United States*, __ Fed. Cl. __, __, 2005 WL 950497, at *6 (Apr. 20, 2005); *Smith v. United States*, 28 Fed. Cl. 430, 436 (1993).").

**13. The only excluded claims identified in the Purchase Agreements were claims pertaining to a refund of fees paid related to DOE's special assessment of utilities for the Uranium Enrichment Decontamination and Decommissioning Fund—a matter unrelated to the Standard Contract, A.47 (Section 2.2(j)).**[2]

**Delmarva's and Atlantic's Response to No. 13.** Delmarva and Atlantic dispute the Government's thirteenth uncontested finding of fact for the reasons stated in their response to No. 12.

[2] Even with regard to claims for refunds of fees from the Uranium Enrichment Decontamination and Decommissioning Fund, the Purchase Agreement purports to bar Delmarva and Atlantic City from maintaining any action to recoup those fees separately from PSEG and Exelon, with "such action controlled by [the purchaser] in its sole discretion." See, e.g., A.47.

Date: May 25, 2005

Respectfully submitted,

s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

*Counsel of Record for*
*Atlantic City Electric Company*

Of Counsel:
Nicholas W. Mattia, Jr.
Bradley D. Wine
Jeffery P. Becherer
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, NW
Washington, DC 20037
(202) 785-9700

Todd Goodman, Esq.
Assistant General Counsel
Conectiv
P. O. Box 231
Wilmington, DE 19899
(302) 429-3786

CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2005, a copy of the foregoing "PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Bradley D. Wine