IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04–0034C, into which has |
| v. | ) | been consolidated No. 04-0036C |
| | ) | (Judge Christine Miller) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, the United States, respectfully submits this reply to "Plaintiff Delmarva Electric Company's Brief In Response To Defendant's Motion For Summary Judgment," dated May 25, 2005.

SUMMARY OF ARGUMENT

Although plaintiffs, Delmarva Power & Light Company ("Delmarva"), and Atlantic City Electric Company ("Atlantic City"), recite a litany of distinguishable and inapplicable case law in support of their opposition to the Government's motion for summary judgment, what is telling is what plaintiffs do not dispute with respect to the Government's motion, namely:

- Plaintiffs assigned all of their contract claims against the Government to Philadelphia Electric Company (now Entergy Generation Company, LLC ("Exelon")) and Public Service Electric and Gas Company ("PSEG");

- The Government has not challenged the assignments in this case;

- There is no legal basis for assignors such as plaintiffs to challenge, even in a "protective" manner, the validity of their assignments to assignees.

- The purpose of the Standard Contract is to ensure the protection of the public and the environment from the hazards posed by spent nuclear fuel ("SNF") by establishing the Government's responsibility for the acceptance of title to and disposal of SNF, with the commensurate obligation on the part of contact holders to pay for the costs of such acceptance and disposal; and plaintiffs' sales of their

> interests in the Nuclear Stations[1] to third parties constitute distinct and collateral transactions unrelated to this purpose.

Given these undisputed facts, plaintiffs have failed to articulate any valid legal basis for allowing their breach of contract claim to proceed, and summary disposition is appropriate.

With respect to plaintiffs' takings claim concerning the alleged diminution in value of their property as the result of the Government's failure to begin performance by January 1998, although plaintiffs may have a protected property interest in their real property, that does not change the fact that any right plaintiffs had to the Government's acceptance and removal of their SNF derived solely from the Standard Contract. They do not dispute that plaintiffs owned the SNF generated by their nuclear facilities. They also do not dispute that, absent the Standard Contract, plaintiffs would have been responsible for the storage and disposition of their SNF. At bottom, plaintiffs' alleged "taking" is simply the Government's failure to begin performance under the Standard Contract by January 31, 1998. Indeed, plaintiffs seek to recover under a contract theory for precisely the same type of injury – the alleged diminution in value of their ownership interests in their nuclear facilities – that they seek to recover under their takings claim. Furthermore, plaintiffs have not alleged that the Government took their contract remedies. Rather, plaintiffs voluntarily sold their contract rights to PSEG and Exelon. Because the sole basis for plaintiffs' takings claim derives from their contracts with the Government, plaintiffs simply cannot establish their takings claims as a matter of law.

---

[1] The Government uses the term "Nuclear Stations" to refer to Peach Bottom Atomic Power Stations Units 2 and 3, Salem Generating Station Nos. 1 and 2, and Hope Creek Generating Station, No. 1, the utilities in which plaintiffs possessed minority ownership interests.

Finally, with respect to plaintiffs' takings claim concerning the Secretary of Energy's continued collection of fees pursuant to the Nuclear Waste Fund ("NWF") after January 31, 1998, plaintiffs do not dispute the following facts:

- Pursuant to the Standard Contracts in this case, neither plaintiff was identified as the "Purchaser" as that term is used in the contracts;

- The Purchaser is the only entity <u>legally obligated under the Standard Contract</u> to pay <u>the Government</u> fees pursuant to the NWF;

- Plaintiffs have never paid fees directly to the Government pursuant to the NWF, and the Government could not seek payment directly from plaintiffs had they refused to pay their share of the fees to the designated "Purchaser" under the Standard Contracts at issue;

As we stated in our motion, the fact that plaintiffs paid monies to PSEG and Exelon (which, in turn, ultimately paid money to DOE) cannot form the basis for a takings claim. Plaintiffs cannot, <u>as a matter of law</u>, demonstrate that the Government compelled plaintiffs to make payments into the NWF pursuant to the Standard Contract. Rather, any obligation that plaintiffs had were to PSEG and Exelon, and, consequently, any remedy that plaintiffs may have for an alleged overcollection of fees lies with PSEG and Exelon. In addition, as discussed in our motion and as discussed in detail below, plaintiffs have failed to articulate why this Court possesses jurisdiction to adjudicate challenges to the Secretary of Energy's decision to continue the collection of fees past the date plaintiffs believe was authorized by the Nuclear Waste Policy Act ("NWPA"). Accordingly, summary judgment is appropriate.

## DISCUSSION

### I. PLAINTIFFS HAVE PROVIDED NO LEGAL BASIS ENTITLING THEM TO CHALLENGE THE VALIDITY OF THEIR ASSIGNMENTS TO PSEG AND EXELON AND, CONSEQUENTLY, THEIR "PROTECTIVE" CONTRACT CLAIM FAILS AS A MATTER OF LAW

As we established in our motion for summary judgment, as putative assignors of their Standard Contract interests and claims to PSEG and Exelon, both of the plaintiffs here are estopped from challenging the validity of those assignments themselves. Neither Delmarva nor Atlantic City has addressed, much less disputed, this fatal flaw in their "protective" contract claims. Indeed, plaintiffs have not cited to a single case to support their novel and speculative proposition that they may raise a "protective" contract claim, even though both PSEG and Exelon filed their own breach of contract actions arising under the Standard Contracts at issue in this case, to protect against the possibility that the Government will challenge their contract claim assignments in the cases that PSEG and Exelon filed and that those challenges are successful on appeal.

Here, both of the entities to which Delmarva and Atlantic City purported to assign their claims filed suits against the Government in this Court, seeking damages arising out of those contracts and asserting their right to maintain an ownership interests in those actions. See PSEG Nuclear L.L.C. v. United States, No. 01-551C (Fed. Cl.); Exelon Generation Co., LLC v. United States, No. 04-0102C (Fed. Cl.). If the Government elects to challenge any of those ownership interests in the cases in which Delmarva's and Atlantic City's assignees have filed, and if the Government's challenge is successful, Delmarva and Atlantic City will have an opportunity to substitute themselves as the real parties in interest in those cases pursuant to RCFC 15(c) and 17(a), eliminating any concerns about statute of limitations issues. See System Fuels, Inc. v.

United States, No. 03-2623C, 2005 WL 950497, at *7 (Fed. Cl. Apr. 20, 2005). Nevertheless, as the entities that provided written assignments of all of their claims to both PSEG and Exelon, neither Delmarva nor Atlantic City should be permitted to maintain breach of contract actions here, particularly when neither of them has attempted to join PSEG or Exelon in this action to resolve the ownership interests of the claims covered by their written assignment agreements. As we established in our summary judgment motion, "[a]s against the assignee, an assignor is not permitted to raise the question of nonassignability." 6 Am. Jur. 2d Assignments § 155, at 245 (1999); see In re Kaufman, 37 P.3d 845, 855 (Okla. 2001) ("[t]he rule that an assignor cannot as against his assignee allege nonassignability is well settled"); see also Sullivan v. United States, 46 Fed. Cl. 480, 488 (2000) ("doctrine of equitable estoppel is a remedy by which a party may be precluded, by a party's own act or omission, from asserting a right to which it otherwise would have been entitled"). In the world that Delmarva and Atlantic City wish to create, the Government must defend the contract claims asserted in separate lawsuits by the assignees and by the assignors, with the Government carrying the risk of duplicative liability if it is found liable in the separate suits both to the assignees and to the assignors through inconsistent trial court rulings. In these circumstances, and with neither Delmarva nor Atlantic City having joined PSEG or Exelon in this action, Delmarva and Atlantic City should be estopped from raising their own breach of contract claims at this time as part of this action.

The issue of whether the Government could challenge these assignments is still unsettled. Recently, in Rochester Gas & Electric Co. v. United States, No. 04-118C, 2005 WL 1125658 (Fed. Cl. May 12, 2005), this Court determined that the assignment provision of the Nuclear Waste Policy Act, 42 U.S.C. § 10222(b)(3), overrides the general bar on the assignment of

contract claims established by the Assignment of Claims Act, 31 U.S.C. § 3727. The NWPA's assignment provision provides that "[t]he rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved." 42 U.S.C. § 10222(b)(3). This Court determined that this language, which is incorporated into the Standard Contract along with a requirement for notice of the assignment within 90 days of the transfer of title to spent nuclear fuel, 10 C.F.R. § 961.11, Art. XIV, permits the contract holder to assign its pre-assignment contract claims to the new contract holder to which it has assigned title to its spent nuclear fuel. Rochester Gas, 2005 WL 1125658, at *10. Under the rationale of Rochester Gas, the assignments that Delmarva and Atlantic City made to PSEG and Exelon are enforceable, leaving Delmarva and Atlantic City with no basis for asserting contract claims against the Government. Nevertheless, Delmarva and Atlantic City filed their breach of contract claims in this Court, despite the fact that both PSEG and Exelon also filed suits in this Court seeking damages under the same Standard Contracts at issue here, without including either PSEG or Exelon in the suit to ensure a consistent and final resolution of the assignment validity issue in this case. Given these circumstances, the plaintiffs in this case should be barred from continuing to litigate their contract claims, outside the context of the cases that PSEG and Exelon filed.[2]

---

[2] As the Court is aware, the Government has settled its dispute with Exelon, and Exelon's cases have been dismissed. Delmarva and Atlantic City could have sought to intervene in those cases, challenging the validity of their own contract claim assignments, but failed to do so. In fact, when they filed their complaints in this Court, neither Delmarva nor Atlantic City submitted any notice of related cases that identified the fact that the contracts at issue in their cases were the same as the contracts at issue in the PSEG and Exelon cases. Further, they did not identify the existence of any assignment of claims to Exelon or PSEG until after the Government had settled its dispute with Exelon, and the Department of Energy was unaware (having been provided no notice by Delmarva or Atlantic City) of any contention that Exelon did

Finally, plaintiffs request that "the Court deny the Government's present Motion and permit them to pursue their breach claims, at least until such time as the Government's assignment argument is rejected in its entirety." Pl. Resp. 6.[3] To the extent that plaintiffs are requesting that the Court allow them to pursue their breach claims until the United States Court of Appeals for the Federal Circuit resolves the assignment issue raised in Rochester Gas, the Court, if it grants plaintiffs' request, should stay the proceedings in this case pending such resolution. Indeed, because Rochester Gas has not begun discovery yet or even been scheduled for trial, it is possible that plaintiffs' case here could be complete before the Federal Circuit resolves the assignment issue raised in Rochester Gas. Therefore, should plaintiffs wish to maintain their contract claims pending the Federal Circuit's resolution of the assignment issue in Rochester, the more appropriate course would be to stay this case pending such resolution.

---

not own all of the contract claims under the Standard Contract prior to the settlement. Given the plaintiffs' lack of disclosure regarding their assignments and their challenges to those assignments, as well as their lack of diligence in ensuring that no prejudice resulted to the Government from the assignments or challenges to them, Delmarva and Atlantic City should not be heard to complain that it is unlikely that, having settled its disputes, Exelon will need to return to this Court for further resolution of matters arising out of its Standard Contracts.

[3] Plaintiffs claim that the Government has challenged the assignments in both Rochester Gas & Electric Corp. v. United States, No. 04-118 (Fed. Cl.) (Lettow, J.) and Entergy Nuclear Indian Point 2, LLC v. United States, No. 03-2622 (Fed. Cl.) (Lettow, J.) ("ENIP"). Pl. Resp. 8. To date, the Government has not challenged the validity of the assignment from Consolidated Edison Company of New York ("ConEd") to ENIP. However, the Government has raised an issue concerning whether the notice that ConEd provided to the Department of Energy was adequate, as it appears inconsistent with the terms of the actual language of the assignment contained in the parties' asset and purchase agreement.

## II. EVEN IF PLAINTIFFS COULD PURSUE A BREACH CLAIM DESPITE THEIR ASSIGNMENTS, PLAINTIFFS' CLAIM FOR THE DIMINISHED SALES PRICE OF THEIR REACTORS IS A CLAIM FOR UNRECOVERABLE CONSEQUENTIAL DAMAGES AS A MATTER OF LAW

### A. Plaintiffs Do Not Dispute That The Sale Of Their Ownership Interests In The Nuclear Stations Constitutes A Collateral Undertaking Unrelated To The Purpose Of The Standard Contract

Plaintiffs spend the bulk of their response to the Government's motion discussing how damages for diminished value are "classic contract damages." Pl. Resp. 10. Of course, under the appropriate circumstances, recovery of lost profits may be a proper measure of damages in a breach of contract action against the Government. However, there can be little disagreement with the proposition that remote and consequential damages are not recoverable against the Government for breach of contract. See Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (citing Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 720 (1975)). Therefore, the issue before the Court is not whether, as a general matter, diminution in value is a proper measure of breach of contract damages. Rather, the issue before the Court is whether plaintiffs' claim for the diminution in value of their ownership interests in their nuclear facilities when they sold their facilities to third parties is a type of damage directly related to the purposes of the Standard Contract or, instead, constitutes a remote and collateral undertaking. As we explained in our motion, and as we discuss below, plaintiffs' claim that the value of their ownership interests in the Nuclear Stations decreased as a result of the Government's breach of the Standard Contract constitutes a consequential and, hence, unrecoverable form of damages as a matter of law.

The main focus of plaintiffs' response is that, because the sale of their ownership interests in the Nuclear Stations to third parties was foreseeable, such damages are recoverable against the Government. Pl. Resp. 12-16. However, foreseeability is a necessary element for any damages claim. In determining whether claimed damages are consequential as a matter of law, rather than focus solely on foreseeability, as plaintiffs urge, the predecessor to the Federal Circuit has articulated the following analysis:

> [T]here is a distinction by which all questions of this sort can easily be tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. These are part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into. But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and too remote to be taken into consideration as part of the damages occasioned by the breach of the contract in suit.

Ramsey v. United States, 121 Ct. Cl. 426, 433-34, 101 F. Supp. 353, 357-58 (1951) (emphasis added) (quoted in Morris v. United States, 39 Fed. Cl. 7, 24 (1997)).

This Court has recognized that, under the appropriate circumstances, claimed damages may be so remote or unrelated to the purpose of the contract as to be deemed consequential as a matter of law. As this Court explained in Smokey Bear, Inc. v. United States, 31 Fed. Cl. 805 (1994):

> [T]here are certain kinds of damages which have long been determined to be consequential and unrecoverable as a matter of law. Thus, the court and its predecessor has previously held that damages for the loss of future profits and lost profitable business opportunities arising from potential contracts with others are per se unrecoverable. Olin Jones Sand Co. v. United States, 225 Ct.

> Cl. 741, 742, 1980 WL 13211 (1980); Ramsey v. United States, 121 Ct. Cl. 426, 433-34, 101 F. Supp. 353, 357 (1951) cert. denied, 343 U.S. 977, 72 S. Ct. 1072, 96 L. Ed. 1369 (1952); Lucas v. United States, 25 Cl. Ct. 298, 310-11 (1992); Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142, 159-60 (1991).

Id. at 808 (emphasis added); see Southern California Edison v. United States, 58 Fed. Cl. 313, 323 (2003) (explaining that, as a matter of law, certain consequential damages may be too remote to be recoverable).

Indeed, application of this well-established principle illustrates the inapplicability of the cases cited by plaintiffs in support of their claim that their diminution in value claims do not constitute a consequential damage. For example, plaintiffs rely heavily upon the Court of Claims' decision in Neely v. United States, 152 Ct. Cl. 137, 285 F.2d 438 (1961), as support for their position that they are entitled to seek damages for the alleged diminution in value of their former ownership interests in Nuclear Stations upon sale to third parties. Pl. Resp. 13. In Neely, the plaintiff had entered into a lease with the Government to mine coal. Neely, 152 Ct. Cl. at 138, 285 F.2d at 439. The plaintiff had intended to mine coal through strip mining. Id. However, the Government refused to allow the plaintiff to engage in strip mining, and the plaintiff sued the Government for breach of the lease agreement. Id. at 139, 285 F.2d at 440. The plaintiff sought loss of anticipated profits as damages. Id. at 142, 285 F.2d at 443. The Court of Claims allowed for the recovery of lost anticipated profits, but remanded the case to allow the plaintiff to present evidence of its alleged losses. Id. at 142-43, 285 F.2d at 443-44. In Neely, the alleged damages – lost profits as a result of an inability to engage in strip mining –

were a direct and natural outgrowth of the subject of the lease agreement, which was to mine coal.[4]

Similarly, the Court's decision in Suess v. United States, 52 Fed. Cl. 221 (2002), is yet another example of a circumstance where the claimed damages were found to flow directly from the subject matter of the contract. In Suess, the plaintiffs, former shareholders of a failed savings and loan, sought to recover the lost franchise value of the thrift as a result of the passage of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which the plaintiffs alleged was a breach of their contract with the Government regarding the regulatory treatment of goodwill. Id. at 223. Plaintiffs contended that, as a result of the passage of FIRREA, the thrift fell out of compliance and was seized by the Government. Id. The Court interpreted the purpose of the contract governing the treatment of goodwill as:

> part of a promise by regulators to protect the institution from regulatory insolvency for an extended period. While the transactions clearly were designed to buy time for interest rates to go down, they were also designed to protect the viability of the acquiring thrift so that it would not be pulled under water by the net worth deficits of the acquired firms.

[4] Plaintiffs rely upon the Court of Federal Claim's decision in Southern National Corp. v. United States, 57 Fed. Cl. 294 (2003), for the proposition that the Court "should determine at trial whether plaintiff could prove the diminished value of its business opportunity." Pl. Resp. 12. In Southern National, the Government moved for summary judgment on damages based upon the lost profits model utilized by the plaintiffs' expert. Southern National, 57 Fed. Cl. at 306-07. The Court denied the Government's motion for summary judgment because there was a "material dispute regarding the viability" of the expert's model. Id. at 308. The Court did not address in its decision whether the alleged lost profits were directly related to the subject of the contract allowing for the use of goodwill. Therefore, Southern National does not support plaintiffs' claim that the Court in this case should deny the Government's motion for summary judgment.

Id. at 230. Consequently, the Court concluded that, because it was "both foreseeable and actually foreseen that breach of the contractual promise regarding the regulatory treatment of goodwill would push the thrift into insolvency and subject it to seizure," the plaintiffs were entitled to the lost equity value of the thrift. Id. at 231. Thus, Seuss is simply an example of a circumstance in which the Court determined that, in the Winstar context, the loss in value of the thrift was not a consequential damage resulting from the passage of FIRREA.

Finally, plaintiffs rely upon the Court of Federal Claims' recent decision in another SNF case, Boston Edison Company v. United States, 64 Fed. Cl. 167 (2005), for the proposition that plaintiffs' damages for diminished value are not too remote and speculative. Pl. Resp. 10. In Boston Edison, the Government moved alternatively for dismissal and summary judgment of Boston Edison's claim for diminution in value based upon the Government's inability to begin acceptance of SNF by January 1998, contending that such damages were too remote, speculative, and unforseeable to be recoverable. Id. at 183. The Court in Boston Edison disagreed with the Government's contention because, "[i]n this case, causation of damages measured by diminution in value is an issue of fact, to be determined in future proceedings." Id. We respectfully disagree with the Court's conclusion in Boston Edison that a determination of whether claimed damages directly flow from the purposes of the Standard Contract is a factual matter. Rather, as we discussed above, plaintiffs' claimed damages are so remote and unrelated to the purposes of the contract that this Court should deem them consequential as a matter of law. See, e.g., Olin Jones, 225 Ct. Cl. at 742; Ramsey, 121 Ct. Cl. at 433-34, 101 F. Supp. at 357-58; Smokey Bear, Inc., 31 Fed. Cl. at 808; Southern California Edison, 58 Fed. Cl. at 323.

In this case, no factual development is necessary to resolve whether plaintiffs' diminution of value claims flow directly from the subject matter of the Standard Contract or, instead, constitutes a collateral undertaking. As we discussed in our motion, and as plaintiffs do not dispute, the sole purpose of the Standard Contract is to ensure the protection of the public and the environment from the hazards posed by SNF by creating a commitment on the part of the Department of Energy to accept and dispose of commercial utilities' SNF, with a corresponding obligation on the part of commercial utilities to pay for the cost of such acceptance and disposal. See 10 C.F.R. § 961.11; 42 U.S.C. § 10131(b)(1)-(4) (2004). Plaintiffs' claims for the alleged diminution in value in the Nuclear Stations, as realized upon the sale of their minority ownership interests to third parties, clearly do not flow from the purposes of the Standard Contract. Instead, such damages are a paradigmatic example of a distinct and collateral transaction. As such, plaintiffs' claim for diminution in value constitutes an unrecoverable consequential damage and summary disposition is appropriate.

B. Plaintiffs Have Offered No Evidence That The Alleged Damages They Sustained As a Result Of The Sale Of Their Interests In The Nuclear Stations To Third Parties Was Foreseeable At The Time The Standard Contract Was Executed

Even if foreseeability were the sole determinant of whether a claimed damage was consequential as a matter of law, plaintiffs have failed to offer any evidence in support of their assertion that the claimed diminution in value of their ownership interests in the Nuclear Stations, as realized upon sale of these interests to third parties, was reasonably foreseeable at the time the Standard Contracts at issue were executed.

For example, plaintiffs allege that "the Government knew that nuclear plants had finite storage capacity on-site and would be required to cease operations when that capacity was

exhausted," that the Government "knew that expanding that storage capacity was not as-of-right, but depended on uncertain regulatory approvals," and that "the Government knew that it alone was practically and legally able to offer SNF disposal services, and that the purchasers of those services could not obtain 'cover' from any other source when the Government failed to provide these critical services." Pl. Resp. 15. First, although plaintiffs refer to its responses 1, 2 and 3 to the Government's proposed findings of undisputed fact in support of these factual contentions, no such statements are contained in plaintiffs' responses. Second, and more importantly, the fact that the Government may have known that utilities had limited on-site storage, that utilities would have to obtain regulatory approval to expand their SNF storage capacity, and that the Government had a legal responsibility to dispose of SNF owned by parties to the Standard Contract does not establish that the Government could foresee that, at the time the Standard Contract was executed in 1983, plaintiffs would claim as damages the alleged decreased value of their interests in the Nuclear Stations upon sale to third parties should the Government be unable to begin SNF acceptance on an industry-wide basis beginning in January 1998.

Plaintiffs also assert that their claimed damages were foreseeable because the Government "was aware that the Federal Energy Regulatory Commission ["FERC"], <u>in the late 1990s</u>, was strongly urging competitive markets in electric energy sales and the separation of ownership of electric generating facilities from traditional utilities." Pl. Resp. 16 (emphasis supplied).[5] The Federal Circuit has unequivocally held that foreseeability must be measured at

[5] Plaintiffs rely upon paragraph 8 of the affidavit of Mr. Thomas Shaw, which is attachment one of plaintiffs' appendix, for the proposition that the Government was aware that FERC was urging competitive markets through separation of ownership of electric generating facilities from traditional facilities. However, nowhere in Mr. Shaw's affidavit does he state of what the Government was, or was not, aware of in 1983 or at any other time. Indeed, Mr. Shaw,

the time of contract formation, rather than at the time of breach or some other date. See Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986). Therefore, plaintiffs' reference to FERC's actions in the late 1990s has absolutely no relevance to whether plaintiffs' claim for diminution in value based upon the sale of their interests in the Nuclear Stations to third parties was foreseeable at the time the Standard Contract was executed in 1983.[6]

Finally, plaintiffs rely upon the assignment provision contained in the Standard Contract and the NWPA in claiming that the "Government knew that nuclear plants could and likely would be sold." Pl. Resp. 16. Again, plaintiffs miss the point. As we explained in our motion, although the NWPA and the Standard Contract contemplate that a party to the Standard Contract may assign its rights and interests in the contract with transfer of title of the SNF, 10 C.F.R. § 961.11, Art. XIV, the Standard Contract is not concerned with assisting in sales transactions or with the value or price of any sale. Indeed, the purpose of the assignment provision of the Standard Contract is to ensure that the SNF remains with the utility upon sale, as part of the statute's overall purpose of protecting the public health and safety. 42 U.S.C. § 10131(b). It is not to ensure that a prospective seller obtain the best price that it can upon sale of its interests in

---

an employee of Delmarva for 33 years, see Shaw Aff. ¶ 1, has offered no basis for stating what the Department of Energy may have known concerning FERC.

[6] Plaintiffs also state that the claimed damages were foreseeable because "the Government also knew that the NRC's regulations directly linked the approved status of the nuclear plant's operating license with DOE's determination as to whether a Standard Contract holder was current in satisfying DOE's demands for the payment of fees." Pl. Resp. 15. Although the Government disagrees with plaintiffs' legal characterization of the NRC's regulations, even accepting such a characterization as true, this contention does nothing to establish that, at the time the Standard Contract was executed in 1983, it was foreseeable that utilities would claim as damages the alleged diminution in value of their nuclear facilities upon sale to third parties should the Government be unable to begin SNF acceptance on an industry-wide basis by January 1998.

a particular utility. Indeed, the potential sale of a nuclear utility from one private entity to another is a transaction wholly separate and distinct from the Standard Contract. Consequently, the fact that the Standard Contract provides a mechanism for the assignment of a contract holder's interest to a third party does not support the conclusion that the alleged diminution in value as a result of such a sale is directly related to the purposes of the Standard Contract.[7]

## III. PLAINTIFFS' TAKINGS CLAIMS FAIL BECAUSE THEY ARE PREDICATED UPON A BREACH OF A CONTRACT WITH THE GOVERNMENT

### A. A Takings Claim Cannot Be Predicated Upon A Breach Of Contract

As we demonstrated in our motion for summary judgment, it is well-established that, where a party's rights are created by contract with the Government, the alleged "taking" is the Government's failure to perform under such a contract, and the party has not alleged a "taking" of its contract remedies, that party cannot state a takings claim founded upon a breach of that contract. See Def. Br. 21-25. Although we cited to an extensive number of cases to support this rule of law, plaintiffs have not even attempted to address, much less explain, why the cases cited in the Government's motion do not control. Rather, plaintiffs seek to avoid this well-established rule of law by contending that they are claiming property interests that arise independent of the

[7] In Boston Edison, 64 Fed. Cl. at 183-84, the Court held that, based upon the existence of the assignment provision contained in the Standard Contract, "[i]t is a fair inference that failure to implement the Standard Contract might engender a diminution in the value obtained from a sale" and, therefore, that such a diminution in value constitutes a foreseeable damage. As discussed above, the fact that such damages were foreseeable at the time that the Standard Contract was signed in 1983 – a conclusion with which the Government respectfully disagrees – does not, by itself, mean that the consequential damages directly resulted from the Government's breach. Rather, the Court must decide whether plaintiffs' claimed damages flow directly from the subject matter of the Standard Contract. As we discuss above, plaintiffs have not even attempted to argue that their alleged damages flow directly from the subject matter of the Standard Contract.

Standard Contract. Specifically, plaintiffs allege property interests in: (1) their real property; (2) the assets associated with the Nuclear Stations; and (3) the value of the Nuclear Stations as a going concern. Pl. Resp. 26.[8]

That plaintiffs may possess property interests outside of those arising under the Standard Contract does not change the fact that any right plaintiffs had to the Government's removal of SNF derives solely from the Standard Contract. Indeed, this Court granted the Government's motion to dismiss a virtually identical takings claim in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), explaining:

> Plaintiff incorrectly argues that its "real property rights" are "separate and distinct" from its rights under the Standard Contract. Although plaintiff may have real property interests that are separate from its interests under the Standard Contract, plaintiff does not have a takings claim absent the rights and obligations granted to the parties by the Standard Contract. Plaintiff asserts that it has been deprived of the "full valuable economic use" of its sites and real property because it must use that property for the storage of SNF and HLW that has accumulated as a result of defendant's breach.
>
> But, as defendant correctly points out, prior to the Standard Contract DOE did not have an obligation to accept or dispose of plaintiff's SNF or HLW. Plaintiff alone was responsible for the storage and disposal of its SNF and HLW prior to the Standard Contract. Therefore, absent the contract, plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim. The court finds that plaintiff's

[8] Notably, plaintiffs previously had taken the untenable position that they possessed a protected property interest in the NWPA or some other statute or regulation. As we discussed in our motion, plaintiffs may not allege a property interest in a statute or the rule of law. Def. Br. 25-28. Although it appears that plaintiffs are no longer taking the position that they have a protected property interest in the NWPA or any other statute or regulation, to the extent plaintiffs maintain such a position, for the reasons stated in our motion, such a position fails as a matter of law.

> claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy.

Id. at 656 (citations and footnote omitted). Plaintiffs do not, and cannot, explain why the Court's rationale in Commonwealth Edison does not control the resolution of their takings claims.

Indeed, as Justice Scalia has recognized, "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance. The duty to keep a contract at common law means a predication that you must pay damages if you do not keep it – and nothing else." United States v. Winstar Corp., 518 U.S. 839, 919 (1996) (Scalia, J., concurring) (citations omitted). Likewise, this Court has held that, when a party enters into a contract, that party has either the right to receive performance or, if a breach occurs, the right to receive damages pursuant to contract law. Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 187 n.9 (1997), aff'd, 133 F.3d 874 (Fed. Cir. 1998); see Northwest Airlines, Inc. v. United States Dep't of Transp., 15 F.3d 1112, 1121 n.5 (D.C. Cir. 1994). That is why "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)).

In Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002), the Court of Federal Claims rejected a takings claim predicated upon a breach of contract despite plaintiffs' allegations that it possessed a separate property interest in its real property. The plaintiffs alleged that the passage of FIRREA "effected a taking of both their

ownership interest in Western Empire and their contractual agreement with the government." 48 Fed. Cl. at 217. The Court explained that, because the plaintiffs retained contract-based claims, "plaintiffs' expectations with regard to their property interests have not been contravened and the value of those interests have not been diminished." Id. The Federal Circuit affirmed the Court of Federal Claim's conclusion, explaining:

> The government did not deprive the plaintiffs from a contractual remedy . . . [n]or . . . remove the plaintiffs' cause of action for damages. . . . [T]he plaintiffs retained the full range of remedies associated with any contractual property right they possessed. Consequently, we hold that even assuming the [breaching a contract], it did not constitute a taking of the contract.

301 F.3d at 1342.[9]

Adopting the analysis utilized in Castle, the Court of Federal Claims recently granted the Government's motion to dismiss a takings claim that was predicated upon a breach of contract in Zoeller v. United States, No. 04-1496C, 2005 WL 1125667 (Fed. Cl. May 12, 2005). In Zoeller, plaintiff had a lease agreement with the Government for three parcels of land upon which plaintiff grew perennials. After September 11, 2001, the Government effectuated a partial termination of the lease and took back portions of the leased land for base security and other projects. Id. at *1. Plaintiff sued the Government, alleging a breach of contract and a taking of both its lease agreement and its perennials. Id. at *2. The Court of Federal Claims dismissed the takings claim, explaining that plaintiff's claim for damages and a right to remove his perennials

---

[9] Further, it is irrelevant whether the plaintiff actually has any rights under the contract that it could pursue, as the only relevant issue is whether those contractual remedies that the plaintiff had, if any, were "taken" from him. Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1340 (Fed. Cir. 2004). Therefore, to the extent that plaintiffs may have assigned their contract rights to third parties, that fact does not change the result in this case.

arose out of a termination of the lease agreement, and that the "government has not prevented the plaintiff from seeking contractual remedies for losses related to the partial termination, including damages for the destroyed plants . . ." Id. at *14.

As in Commonwealth Edison, Castle, Zoeller, and the numerous cases cited in the Government's motion, the fact that plaintiffs allege a property interest outside of the Standard Contract does not change the conclusion that: (1) any right that plaintiffs had to the removal of SNF derives solely from the Standard Contract; (2) plaintiffs' alleged "taking" is simply the Government's failure to perform under the Standard Contract; and (3) plaintiffs have not and, indeed, cannot allege that the Government took plaintiffs' contractual remedies. Under these circumstances, plaintiffs have failed to state a cognizable takings claim as a matter of law.

B. Plaintiffs' Contention That The Federal Circuit Has Already Determined That Spent Nuclear Fuel Plaintiffs May Pursue Contract And Takings Claims Concurrently Is Unfounded And Misleading

Plaintiffs also contend that the Federal Circuit has "recognized that a nuclear utility's legal and property rights existed prior to and, thus, independent from, the execution of the Standard Contract," citing Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223 (1998), and the decision issued by the Federal Circuit upon review of the Yankee decision, Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Pl. Resp. 27. Plaintiffs' interpretation of the Court's decision is highly misleading. In Maine Yankee, the Government filed a motion to dismiss the plaintiff's complaint for lack of jurisdiction, arguing that the plaintiff was required to exhaust its administrative remedies before it could proceed with either its breach of contract and takings claim in this Court. However, the Court found that, with regard to the plaintiff's breach of contract claim, the "Avoidable Delays" and "Disputes" clauses

contained in the Standard Contract did not encompass the delay at issue in this case and that, therefore, no administrative exhaustion was required before the plaintiff could pursue its contract claim. See Maine Yankee, 225 F.3d at 1342. The Court stated that the Mainee Yankee plaintiff "was not required to invoke the contract's disputes clause before bringing suit" and that its takings count "cannot be viewed as constituting avoidable delays under that clause." Id. at 1342-43.

Contrary to plaintiffs' contention, the Federal Circuit in Maine Yankee did not make any determination that the plaintiff's takings claim stated a viable cause of action. To the contrary, the only motion that the Court was considering was a jurisdictional motion requesting dismissal based upon the plaintiff's failure to exhaust its administrative remedies. The Federal Circuit was neither presented with nor considered arguments regarding the viability of a takings claim outside the context of the Standard Contract. Plaintiffs' suggestion that the Federal Circuit somehow already has ruled favorably upon the merits of their takings claim is simply unfounded.

C. Plaintiffs Cannot Establish A Physical Taking Absent The Government's Physical Invasion Or The Government Forcing Plaintiffs To Accept The Presence Of A Third Party On Plaintiffs' Property

Plaintiffs allege that the Government's failure to remove SNF by January 31, 1998, "infringed upon [plaintiffs'] fair use and enjoyment of the Nuclear Stations resulting in the physical taking of [plaintiffs'] real property."[10] Pl. Resp. 29-30. Specifically, plaintiffs contend

[10] Plaintiffs cite to 42 U.S.C. Section 10222(a)(5)(B), as support for their contention that, pursuant to the NWPA, the Government had an obligation to accept title to and dispose of SNF by January 31, 1998. Pl. Resp. 30. Section 10222(a)(5)(B) provides that "Contracts entered into under this section" shall provide that, in return for the payment of fees, the Secretary will dispose of SNF beginning no later than January 31, 1998. As discussed in our motion and as discussed above, at most, the Government's failure to commence acceptance of SNF on an industry-wide basis by January 31, 1998 constitutes, at best, a breach of contract and cannot form the basis for

that the Government's failure to begin SNF acceptance by January 31, 1998, caused plaintiffs to use their real property for interim storage of their SNF. Pl. Resp. 31. However, plaintiffs' physical takings claim is barred by the Federal Circuit's recent decision in The Stearns Co. v. United States, 396 F.3d 1394 (Fed. Cir. 2005).

As we discussed in our motion, the Federal Circuit in Stearns identified two exclusive means by which a plaintiff can establish a physical takings claim. First, the Government itself may occupy the plaintiff's land. Id. at 1357. Second, the Government may require the plaintiff to submit to the physical occupation of its land by a third party. Id.

In this case, plaintiff cannot establish either of these bases for a physical takings claim. Plaintiffs have not alleged, nor can they, that anyone other than plaintiffs (and their co-owners) held title to the SNF at all relevant times. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (explaining that DOE does not hold, and has not taken, title to the utilities' SNF). Nor have plaintiffs alleged that the Government has forced plaintiffs to accept a third party on plaintiffs' property.[11] Simply put, until the date of sale, plaintiffs were storing their own SNF on their own property. The fact that plaintiffs claim that they held their own SNF longer than they otherwise would have based upon the Government's breach of the Standard Contract does not give rise to physical takings claim.

---

a takings claim.

[11] Because plaintiffs have failed to properly allege a physical invasion, their reliance upon cases involving the physical occupations of property by the Government (see, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 421 (1982)), and from the federalization of private enterprises (see, e.g., United States v. Pewee Coal Co., 341 U.S. 114 (1951); Kimball Laundry Co. v. United States, 338 U.S. 1 (1949)), is misplaced.

In support of their proposition that they suffered a physical invasion by being forced to hold their own SNF longer than they allege they otherwise would have, plaintiffs cite to the decision of the Court of Federal Claims in Sacramento Municipal Utility District v. United States, 61 Fed. Cl. 438 (2004) ("SMUD"). In SMUD, the Court held that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Id. at 442. With all due respect, we disagree with the Court's conclusion that a plaintiff may allege a physical takings claim where the plaintiff must store its SNF longer than it believes it was required to pursuant to a government contract. As the Court recognized in Commonwealth Edison, 56 Fed. Cl. at 656, where a plaintiff alleges it has stored its own SNF on its own property longer than it otherwise would have because of a breach of contract, the plaintiff's remedy lies in breach of contract, not the Takings Clause. More importantly, the Court in SMUD did not have the benefit of the Federal Circuit's decision in Stearns, which rejected the notion that a physical takings claim may be established short of the Government's physical invasion or the Government requiring the physical presence of a third party on plaintiff's property.

Finally, plaintiffs' attempt to analogize their claim with the taking at issue in Benenson v. United States, 212 Ct. Cl. 375, 548 F.2d 939 (1977), ignores obvious – and relevant – differences between the two cases. In Benenson, the Government's actions precluded the property owner from utilizing his property. Plaintiffs themselves quote the Benenson Court, which found that "the net effect of the acts of the Government is that plaintiffs cannot use their property for any income-producing purpose." Id. at 947. Here, plaintiffs do not allege that, based upon the presence of SNF in the Nuclear Stations' wet pools, the Nuclear Stations cannot be used for "any

income-producing purpose." In fact, no such allegation could be made. At most, plaintiffs allege that, at some point in the future, current or future owners of the Nuclear Stations may be forced to find additional on-site storage for SNF generated by the Nuclear Stations. Yet, even if those allegations were true, Benenson would not apply because plaintiffs do not allege that the purpose of the Nuclear Stations property – the production of nuclear power – would be affected by the continued presence of SNF on-site.[12] In fact, contrary to plaintiffs' suggestion that the Government's breach resulted in plaintiffs having to store SNF on an interim basis, storage of SNF is a byproduct of nuclear power generation. Based upon plaintiffs' failure to identify any appellate opinion that supports the maintenance of their claim here, this Court should follow the applicable precedent and dismiss plaintiffs' physical takings claim.

### D. The Government's Failure To Begin Acceptance Of Spent Nuclear Fuel By January 31, 1998 Does Not Constitute A Regulatory Taking

In addition to their allegations concerning a physical takings claim, plaintiffs also assert that DOE's failure to begin accepting their SNF by January 31, 1998, constitutes a regulatory taking. Pl. Resp. 34. The Supreme Court recently explained that there are two categories of regulatory action that generally will be deemed *per se* takings under the Fifth Amendment. Lingle v. Chevron U.S.A., Inc., No. 04-163, 2005 WL 1200710, *7 (U.S. May 23, 2005). First, a *per se* taking may arise where the Government forces an owner to suffer a permanent physical invasion of the owner's property. Id. (citing Loretto v. Teleprompter Manhattan CATV Corp.,

---

[12] Plaintiffs' assertion that they were deprived "of the fair use and enjoyment of the Nuclear Stations that must be used for the interim storage of SNF" is incredible. Pl. Resp. 29. Indeed, plaintiffs have not alleged that, during their ownership period, the Nuclear Stations' SNF was stored in any location other than the Nuclear Stations' wet pools. Based upon our experience in SNF cases, we are unaware of any "use or enjoyment" that could be made of the wet pools other than the storage of nuclear waste.

458 U.S. 419 (1982); and Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 (1992)). Second, a *per se* taking may arise where a regulation "completely deprive[s] an owner of 'all economically beneficial us[e]' of her property." Id. (citing Lucas, 505 U.S. at 1019) (emphasis in original).

As discussed above, plaintiffs cannot establish that the Government, through regulation or otherwise, forced plaintiffs to suffer a physical invasion of their Nuclear Stations. To the contrary, they owned the SNF on that property until the sale to PSEG and Exelon. Moreover, plaintiffs concede that the Government did not deprive the plaintiffs of all economically beneficial use of their property. They claim that the Government's failure to perform on an industry-wide basis beginning on January 31, 1998 caused plaintiffs to suffer "substantial economic harm including a drastic reduction in the fair market value of the Nuclear Stations." Delmarva Amend. Compl. ¶5; Atlantic City Amend. Compl. ¶5, not the complete elimination of all economically beneficial use.

In Lingle, the Supreme Court explained that, outside of these two *per se* categories of takings discussed above, all other regulatory takings challenges are governed by the standards set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104 (1978). Lingle, 2005 WL 1200710, at *7. Under Penn Central, three factors have "particular significance" in the takings analysis: (1) the character of the Government action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with "reasonable investment-backed expectations." Branch v. United States, 69 F.3d 1571, 1579 (Fed. Cir.) (citing Connolly v. Pension Benefit Guarantee Corp., 475 U.S. 211, 224 (1986), and Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984)).

However, before it analyzes whether Government action constituted a regulatory taking, the Court must identify whether a protected property interest exists or, in other words, whether "the use interest proscribed by the government action was part of the owner's title to begin with." M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995). Here, as previously discussed, because the NWPA did not create a right in a particular utility to SNF acceptance beginning by January 31, 1998, outside the existence of a contract, see 42 U.S.C. § 10222, plaintiffs could not have had a "right" to SNF acceptance by a date certain outside of the Standard Contracts. Accordingly, the "character of the governmental action" is contractual, because, absent the Standard Contracts between DOE and PSEG and between DOE and Exelon, PSEG and Exelon would have to store the SNF generated at the Nuclear Stations indefinitely. Although the terms of the Standard Contract were promulgated through notice-and-comment rulemaking in the Federal Register and should, like clauses from the Federal Acquisition Regulation, be interpreted by reference to the rules applicable to regulatory interpretation, see Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981), that rule of interpretation does not change the character of the action here: a claim for a breach of contract affecting rights created by contract. As a result, it is clear that no regulatory action has "taken" plaintiffs' real property. Instead, plaintiffs' claim arises from DOE's failure to begin acceptance of SNF under the terms of the Standard Contracts, precluding a takings claim.[13]

---

[13] In addition, in discussing the "economic impact of the regulation on the claimant" prong, the Federal Circuit has recognized that "it is rational to attempt to impose the costs inherent in a certain type of business activity on 'those who have profited from the fruits' of the business in question," Branch, 69 F.3d at 1580 (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 18 (1976)), which, in this case, would be the nuclear power utilities that generated

To the extent that plaintiffs assert that they had some general expectation of SNF acceptance, this Court has recognized that an "investment-backed expectation is not property." Ambase Corp. v. United States, 58 Fed. Cl. 32, 51 (2003). In Ambase, the plaintiff had alleged that, "as the sole shareholder of [the contracting party], it had a reasonable investment-backed expectation that the government would honor the goodwill contracts with [the contracting party], and that the enforcement of FIRREA confiscated that expectation . . . ." Id. at 50. The Court rejected this argument, finding that, because the "right" at issue was created through a contract with the Government, the only remedy was a contract-based remedy by the contract holder:

> In light of these general concepts, the issue in this case is whether an action by the government against the corporation, that destroys the corporation's value, can be the legal cause of the shareholder's loss in value. The answer seems to the Court to depend on what the character of the government action was. If the government's action is legally compensable under some remedial system then the answer appears to be that there is no legal cause that would justify a takings claim. In this case that is clearly the situation. The

---

SNF while profiting from their generation and sale of nuclear power. See Nuclear Energy Institute, Inc. v. Environmental Protection Agency, 373 F.3d 1251, 1259 (D.C. Cir. 2004) ("To finance the creation and operation of such repositories, the NWPA established the Nuclear Waste Fund to ensure that 'the costs of carrying out activities relating to the disposal of [radioactive] waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.' 42 U.S.C. § 10131(b)(4) (2000).").

Furthermore, in analyzing the "reasonable investment-backed expectations" prong, the Supreme Court has held that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." Connolly, 475 U.S. at 227. The "legislative end" of the NWPA is identified in the Act itself: to protect the public health and safety, to establish Federal responsibility and policy for disposal of SNF, and to ensure that the costs of carrying out activities relating to disposal are "borne by the persons responsible for generating such waste and spent fuel." 42 U.S.C. § 10131(b). Because of the important need to ensure the public health and safety, the nuclear industry is heavily regulated, see Rushton v. Nebraska Public Power Dist., 844 F.2d 562, 566 (8th Cir. 1988), weighing heavily against the existence of any regulatory taking outside the context of a breach of contract action.

> government's breach of contract creates in the corporation, here Carteret, a cause of action against the government. If Carteret prevailed in the breach of contract action, the corporation would be restored to the position it would have been in and the shareholder would have lost nothing by the government's action. Therefore, the takings claim can only exist if there is no remedy other than a takings claim for the government's breach of contract. But clearly there is a contract remedy.

Id. at 52 (emphasis added; citations omitted). Similarly, in this case, because PSEG and Exelon have contract remedies – and have availed themselves of those contract remedies by filing suit against the Government for breach of contract in this Court (Docket Nos. 01-551C (now pending) and 04-102C (subsequently amicably resolved)) – no basis for a regulatory takings claim exists.

In support of its regulatory takings claim, plaintiffs rely upon the Court of Federal Claims' decision in Boston Edison. In Boston Edison, the Court denied the Government's motion for summary judgment because it found disputed issues of material fact, including: (1) whether plaintiff's right to removal of SNF derives from the Standard Contract or pre-dates the Standard Contract; (2) whether the right allegedly taken was a property right or a contract right; (3) the voluntariness of the contract; and (4) the reasonableness of the parties' expectations. Boston Edison, 64 Fed. Cl. at 188. However, contrary to plaintiffs' contention, the Court in Boston Edison did not find that the takings claim arose from something other than the Standard Contract. Rather, the Court in Boston Edison concluded that a factual dispute precluded resolution of the Government's summary judgment motion as a matter of law. Id.

To the extent that the Court in Boston Edison concluded that the determination of right to SNF removal was factual question, we respectfully disagree. First, as discussed in our motion, a plaintiff may not claim a property interest in a statute. See, e.g., Adams v. United States, 391

F.3d 1212 (Fed. Cir. 2004). Therefore, to the extent that plaintiffs are alleging that the NWPA or some other statute or regulation created a right to have their SNF accepted, such a claim fails as a matter of law. Second, even if plaintiffs could allege a property interest in a Federal statute, plaintiffs have failed to cite to any specific provision of the NWPA or any other statutory or regulatory provision that would confer such a property interest in the acceptance of SNF. The determination of where the property right to the disposal of SNF derives is a question of law, and no factual development is necessary to resolve this issue. Additionally, although the Court in Boston Edison denied summary judgment based upon the disputed fact concerning the reasonable expectations of the parties, this issue need not be addressed if the Court first determines as a matter of law that plaintiffs' right to the Government's removal of SNF derives solely from the Standard Contract and that the Government did not "take" plaintiffs' contractual remedies.[14]

Finally, it is not surprising that, other than a discussion of Boston Edison, plaintiffs' legal analysis of its regulatory takings claim is circumscribed, at best. With literally hundreds of cases analyzing regulatory takings, plaintiffs rely upon only three easily distinguishable cases. In Yancey v. United States, 915 F.2d 1534 (Fed. Cir. 1991), the quarantine placed upon the plaintiffs' otherwise healthy turkeys by the Government deprived the plaintiffs of their investment-backed expectation that their turkeys could be used for breeding. Id. at 1536.

[14] Although the Court in Boston Edison concluded that the voluntariness of the Standard Contract was an issue of fact that precluded granting the Government summary judgment, we respectfully disagree with this conclusion. We do not see how the issue of the voluntariness of the Standard Contract affects whether plaintiffs have stated a legally cognizable takings claim. Potentially, if entry into the contract was not voluntary, plaintiffs could seek to void the contract. However, without a contract, the utilities, not the Government, would be fully responsible for disposal of their own SNF.

Instead, based upon the regulatory action of the Government, the plaintiffs were required to sell the turkeys for meat at a far lower price. Id. Notably, there was no contract between the plaintiffs and the Government in that case.

In Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440 (2005), regulations that were imposed after September 11, 2001, resulted in the federalization of airport security. Plaintiff alleged that these regulations interfered with its private contracts with certain private airports and deprived the plaintiff of the contractual rights that it possessed with third parties. Id. at 442. Moreover, because the case involved private contracts, no contract remedy existed against the Government. Id. at 447-48.[15] Likewise, Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), involved the implementation of regulations that interfered with the plaintiffs' investment-backed expectations in contracts that it had with third parties. Once again, because the Government was not a party to the contracts, no contract remedy existed, and a regulatory taking was found. Id. at 1325; see Allegra Villa v. United States, 60 Fed. Cl. 11, 19 (2004) (explaining rationale of taking in Cienega).

These three cases are easily distinguished. The actions of the Government in each of these cases went to the underlying ability of the plaintiffs to obtain their investment-backed expectations from their property. Here, there is no allegation that the presence of SNF upon the Nuclear Stations interfered with the production of electricity by the Nuclear Stations or that the electricity sold by those Nuclear Stations was sold at a lower price based upon the presence of SNF. Indeed, such an allegation could not be made in good faith. Likewise, both Huntleigh and

[15] Huntleigh cannot be described as definitive precedent. Indeed, the decision simply rejected the Government's motion to dismiss, allowing the case to be litigated upon the facts. Id. at 451.

Cienega Gardens involved alleged regulatory takings that affected contract rights between private parties, a fact that renders these decisions inapplicable here.

## IV. PLAINTIFFS' ASSERTION THAT PAYMENT OF FEES INTO THE NUCLEAR WASTE FUND SOMEHOW CONSTITUTES A "TAKING" OF THEIR PROPERTY IS MERITLESS

### A. Because An Obligation To Pay Fees Into The Nuclear Waste Fund Is Created By Contract, That Obligation Cannot Form The Basis Of A Takings Claim

Plaintiffs also allege a takings claim predicated upon the Secretary of Energy's continued collection of fees pursuant to the NWF after January 31, 1998. Pl. Resp. 37. Plaintiffs appear to contend that the NWPA limited the Secretary's authority to collect fees to those sufficient to construct a Federal repository by January 1998 and that this authority expired after the January 1998 date passed. Id. Yet, absent the Standard Contract, no fees need be paid into the Nuclear Waste Fund ("NWF"). See 10 C.F.R. § 961.11, Art. VIII. Although the amount of the fee is set by statute, based upon a "1.0 mil per kilowatt-hour" charge, 42 U.S.C. § 10222(a)(2), nothing in the NWPA itself requires any entity to pay this fee into the NWF. Instead, the NWPA provides that contracts into which the Secretary of Energy enters pursuant to the NWPA "shall provide for the payment to the Secretary of [these] fees . . . sufficient to offset expenditures . . ." and that, if an entity enters into a contract with the Secretary for disposal of its SNF, the contract will require the contract holder to pay the fees. 42 U.S.C. § 10222(a)(1). For the reasons previously explained, plaintiffs cannot take a fee payment required only by contract and somehow create a cognizable takings claim.

B. Because The Standard Contracts At Issue Did Not Require *Atlantic City* And *Delmarva* To Pay Fees Into The Nuclear Waste Fund, Any Payment Of Fees By Plaintiffs Was Not "Compelled" By The Government

As discussed in the Government's motion, plaintiffs have no basis upon which to raise an excess payments claim.[16] Only the party to the Standard Contract is responsible for paying the fees associated with the SNF generation at its facility. The Standard Contracts for the Hope Creek and Salem nuclear reactors identified the predecessor of PSEG as the "Purchaser" under those Standard Contracts, and the Standard Contract for the Peach Bottom reactors identified the predecessor of Exelon as the "Purchaser." Those Standard Contracts also provide that the "Purchaser" shall be charged a fee, see 10 C.F.R. § 961.11, Art. VIII.A.1, and that the "fee shall be paid quarterly by the Purchaser . . . ." 10 C.F.R. § 961.11, Art. VIII.B.1 (emphasis added). Plaintiffs concede that they were not signatories to any of those Standard Contracts, Pl. Resp. 23, and were not identified as the "Purchaser" obligated to pay fees into the NWF under any of those contracts. As previously discussed, except through those contracts, no fees had to be paid.

[16] In support of their takings claim related to the Secretary's fee collection practices, plaintiffs rely upon the Federal Circuit's decision in Aerolineas Argentinas v. United States, 77 F.3d 1564 (Fed. Cir. 1996). However, Aerolineas Argentinas was not a takings case, but rather was an illegal exaction case. Indeed, to the extent plaintiffs are alleging that the Secretary was not authorized to collect fees after January 31, 1998, plaintiffs appear to be alleging an illegal exaction claim rather than a takings. Of course, every court to consider this issue in the context of SNF cases has rejected illegal exaction claims because they concluded such claims were predicated upon rights arising under the Standard Contract. See, e.g., Consumers Energy Co. v United States, 57 Fed. Cl. 278, 282 (2003) (rejecting illegal exaction claim because, absent Standard Contract, no obligation to pay fees into NWF); Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223, 236-37 (1998) (concluding that costs of storing SNF after DOE breached contract could not be recovered as an illegal exaction). In SMUD, the Court granted the Government's unopposed motion to dismiss plaintiff's illegal exaction claim. SMUD, 61 Fed. Cl. at 442.

Accordingly, plaintiffs cannot identify any basis upon which they were contractually or otherwise obligated to pay NWF fees.

In a last-ditch effort to establish that the Government compelled them to pay fees into the NWF, plaintiffs cite to a "final policy statement" published by Nuclear Regulatory Commission ("NRC"), in 1997. Pl. Resp. 23. Plaintiffs assert that this policy statement "makes clear that while a party may not have a license to operate a nuclear facility – there may be only *one* operator – the co-owners still have obligations to comply with the terms of the license." Pl. Resp. 23. Plaintiffs then leap to the conclusion that, if co-owners of a utility are responsible to comply with the utility's license, it necessarily follows that, although plaintiffs were not listed as the "Purchasers" under the Standard Contract, they still had a contractual obligation to pay monies into the NWF. Pl. Resp. 23. To make this statement is at the same time to refute it.

First, the NRC's final policy statement cited by plaintiffs has nothing to do with a co-owner's obligation under the Standard Contract between the Department of Energy and commercial utilities. Rather, the NRC issued a final policy statement because it had "concerns about the possible effects that rate deregulation and disaggregation resulting from various restructuring actions involving power reactor licensees could have on the protection of public health and safety." 62 Fed. Reg. 44071, 44071 (Aug. 19, 1997). With respect to the effect of co-ownership on deregulation in the nuclear generating and distribution industries, the NRC explained:

> Many of the NRC's power reactor licensees own their plants jointly with other, unrelated organizations. Although some co-owners may only be authorized to have an ownership interest in the nuclear facility and its nuclear material, and not to operate it, the NRC views all co-owners as co-licensees who are responsible for complying with the terms of their licenses. The NRC is

> concerned about the effects on the availability of operating and decommissioning funds, and about the division of responsibility for operating and decommissioning funds, when co-owners file for bankruptcy or otherwise encounter financial difficulty. The NRC recognizes that co-owners and co-licensees generally divide costs and output from their facilities using a contractually defined, pro rata share standard. The NRC has implicitly accepted this practice in the past and believes that it should continue to be the operative practice, but reserves the right, in highly unusual situations where adequate protection of public health and safety would be compromised if such action were not taken, to consider imposing joint and several liability on co-owners of more than de minimis shares when on or more co-owners have defaulted.

62 Fed. Reg. at 44076-77.

Even a cursory reading of this final policy statement promulgated by the NRC reflects that it has no bearing on the issue presented in this case; namely, whether the Government has compelled plaintiffs to make payments into the NWF pursuant to the Standard Contract. Indeed, plaintiffs fail to explain what relevance a 1997 policy statement from the NRC has on the interpretation of a 1983 contract that contains an integration clause. Consequently, the NRC's policy statement has absolutely no bearing in this case, and plaintiffs have failed to demonstrate that the Government has compelled plaintiffs to pay monies into the NWF.[17]

"To hold the United States liable for a taking, plaintiffs must show that the federal government has done some affirmative act that deprives the plaintiffs of their property or that interfered with or disturbed their property rights." Custom Contemporary Homes, Inc. v. United States, 5 Cl. Ct. 88, 90 (1984) (citing D.R. Smalley & Sons, Inc. v. United States, 178 Ct. Cl.

[17] Notably, when a commentator requested that the NRC urge the Department of Energy to proceed with interim spent fuel storage to reduce uncertainty and costs facing nuclear plant operators, the NRC unequivocally stated that it "does not have a role in advocating the positions" stated in that comment. 62 Fed. Reg. at 44075.

593, 598-99, 372 F.2d 505, 508, cert. denied, 389 U.S. 835 (1967)). "A fundamental requirement for any taking is that the challenged governmental action create legal compulsion." Hinesburg Sand & Gravel, Co., Inc. v. Chittendon Solid Waste Dist., 959 F. Supp. 652, 657 (D. Vt. 1997). Here, plaintiffs cannot establish any basis upon which they were "compelled" by the Government to pay fees into the NWF. Certainly, given that they were not the named "Purchaser" in the Standard Contracts at issue, the Government could not have compelled plaintiffs to pay those fees. To the contrary, the only entities with a legal liability for those fees under the Standard Contracts at issue are PSEG and Exelon. To the extent that plaintiffs voluntarily paid fees for PSEG or Exelon, their voluntary actions cannot form the basis of a takings claim against the Government. To the extent that plaintiffs had arrangements with PSEG and/or Exelon to pay fees for those entities, plaintiffs' complaint is with PSEG and Exelon, not the Federal Government, and their internal agreements cannot create the type of "compulsion" by the Federal Government giving rise to a takings claim. As a result, plaintiffs cannot assert a taking.

### C. This Court Lacks Jurisdiction To Entertain Claims Relating To The Amount Of The Nuclear Waste Fund Fees

Even if plaintiffs had been compelled to pay fees into the NWF, this Court would lack jurisdiction to adjudicate plaintiffs' challenge to the legality of DOE's actions concerning the collection of those fees. In response to the Government's motion for summary judgment, plaintiffs contend that they are not contesting the Secretary of Energy's authority to assess or alter fees, but rather rely upon this Court's statement at the December 3, 2004 hearing that plaintiffs have brought a "challenge to the fact that [the NWF fee] has continued to be assess[ed] after there essentially is no quid pro quo." Pl. Resp. 41. Yet, even this interpretation of

plaintiffs' amended complaint falls squarely under the jurisdiction of the United States courts of appeals.

Section 10139 of Title 42 of the United States Code provides that the United States Court of Appeals shall have original and exclusive jurisdiction over, among other things, any of the following civil actions: (1) review of any final decision or action of the Secretary of Energy; (2) allegations concerning the failure of the Secretary of Energy in making any decisions or taking any actions under this section; and (3) challenges to the constitutionality of any decision made, or action taken under this section. 42 U.S.C. § 10139(a)(1)(A), (B), & (C). In this regard, section 10222(a)(4) provides that the Secretary shall annually review the amount of the fee and, if he views it as insufficient or excessive, to report to Congress:

> The Secretary shall annually review the amount of the fees established by paragraphs (2) and (3) above to evaluate whether collection of the fee will provide sufficient revenues to offset the costs as defined in subsection (d) of this section. In the event the Secretary determines that either insufficient or excess revenues are being collected, in order to recover the costs incurred by the Federal Government that are specified in subsection (d) of this section, the Secretary shall propose an adjustment to the fee to insure full cost recovery. The Secretary shall immediately transmit this proposal for such an adjustment to Congress. The adjusted fee proposed by the Secretary shall be effective after a period of 90 days of continuous session have elapsed following the receipt of such transmittal.

42 U.S.C. § 10222(a)(4). The District of Columbia Circuit has held unequivocally that challenges relating to the collection of fees under the NWPA are under the original and exclusive jurisdiction of the United States Court of Appeals. General Elec. Uranium Mgt. Corp. v. United States Dep't of Energy, 764 F.2d 896, 907 (D.C. Cir. 1985); see Natural Resources Defense Council, Inc. v. Abraham, 244 F.3d 742, 743 (9th Cir. 2001) (acknowledging original and

exclusive jurisdiction of United States Courts of Appeal to entertain challenges relating to NWF).[18]

Plaintiffs' allegation that the continued collection of fees by the Secretary of Energy constitutes a taking falls squarely under the original and exclusive jurisdiction of the courts of appeals pursuant to Section 10222(a)(1). First, plaintiffs are asking the Court to review the final decision of the Secretary of Energy in continuing the collection of fees after January 31, 1998. See 42 U.S.C. § 10222(a)(1)(A). Second, plaintiffs are asserting that the Secretary of Energy failed to discontinue the collection of fees under the NWF after January 31, 1998. See 42 U.S.C. § 10222(a)(1)(B). Finally, plaintiffs are challenging the constitutionality of the Secretary of Energy's decision to continue the collection of fees after January 31, 1998, asserting that such conduct constitutes a taking pursuant to the Fifth Amendment of the United States Constitution. 42 U.S.C. § 10222(a)(1)(C). Therefore, regardless of whether plaintiffs are challenging the amount of the fees collected by the Secretary of Energy or the fact that the Secretary has continued to collect fees after January 31, 1998, this Court does not possess jurisdiction to adjudicate such claims.

Moreover, although plaintiffs contend that DOE's alleged over-collection of fees into the NWF constitutes a taking of plaintiffs' property, neither plaintiffs nor the "Purchasers" under the

[18] In Boston Edison, the Court concluded that "[t]he plain meaning of Section 119 is that it grants original and exclusive jurisdiction to courts of appeals in six instances, each of which relates to actions under portions of Title I and Title II of the NWPA. Jurisdiction over actions taken under Title III is not affected at all by Section 119." Boston Edison, 64 Fed. Cl. at 179. Yet, the Court in Boston Edison also recognized the D.C. Circuit's decision in General Electric, a decision in which the Court of Appeals asserted original and exclusive jurisdiction over a challenge to the Secretary of Energy's actions regarding the collection of the one-time fee under Title III of the NWPA. Boston Edison, 64 Fed. Cl. at 178 n.13.

Standard Contracts at issue in this case, PSEG and Exelon, have ever previously challenged DOE's assessment of the fee, either pursuant to the "Disputes" provision of the Standard Contract, 10 C.F.R. § 961.11, Art. XVI, or through a direct challenge at a United States Court of Appeals. If the Governmental action about which a party complains leaves open the possibility that the owner of the property may obtain a change or exception to the Government action, the owner must pursue that possibility and be denied before a taking can occur. Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc. v. United States, 452 U.S. 264, 297 (1981); E-Systems, Inc. v. United States, 2 Cl. Ct. 271, 278 (1983). Plaintiffs' failure to pursue any challenge to DOE's fee collections since 1983, either through the contract or through a challenge to the United States Courts of Appeal, precludes a challenge to the fee here.[19]

D. An Obligation To Pay Money Does Not Constitute A "Taking"

Finally, to the extent that plaintiffs are seeking a refund of their alleged portion of NWF payments, their claim does not constitute a proper "takings" claim. "[W]hile a taking may occur when a specific fund of money [in a private party's possession] is involved, the mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause of the Fifth Amendment." Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001); see United States Shoe Corp. v. United States, 296 F.3d 1378, 1383 (Fed. Cir. 2002). "Unlike real or personal property, money is fungible." United States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989), quoted in Commonwealth, 271 F.3d at 1338. Accordingly, "[r]equiring

[19] We are not suggesting that, if plaintiffs had pursued a challenge to the fee collection at a United States Court of Appeals and was denied, they would then have a basis for asserting a takings claim in this Court. To the contrary, the United States Courts of Appeals have exclusive jurisdiction to entertain challenges to the fee. However, having failed to pursue that avenue of relief, plaintiffs cannot circumvent that requirement by proceeding directly in this Court.

money to be spent is not a taking of property." Atlas Corp. v. United States, 895 F.2d 745, 756, cert. denied, 498 U.S. 811 (1990).

## V. THERE ARE NO FACTUAL DISPUTES THAT WOULD PRECLUDE THE COURT FROM GRANTING SUMMARY JUDGMENT IN THE GOVERNMENT'S FAVOR

Finally, plaintiffs contend summary judgment is inappropriate because the Government has not offered "a single factual argument to suggest that [plaintiffs'] damages are not recoverable." Pl. Resp. 24.[20] However, there is no factual dispute that this Court needs to resolve in order to grant the Government's motion for summary judgment with respect to plaintiffs' breach of contract and good faith and fair dealing claims. For example, this Court may decide as a matter of law that plaintiffs, as the assignor of their contracts to PSEG and Exelon, may not now challenge the validity of those assignments. Similarly, this Court may determine as a matter of law that plaintiffs' claimed diminution of the value of their interests in their Nuclear Stations realized through the sale to third parties does not directly flow from the purposes of the Standard Contract – which are to promote the public health, safety and welfare. No factual development is necessary to resolve these dispositive legal issues.

Plaintiffs also argue that, because takings claims are "extremely fact-intensive," it is typically inappropriate for the Court to decide a takings claim on a dispositive motion. Pl. Resp. 40. Indeed, plaintiffs contend that several issues would benefit from factual development in this

[20] Plaintiffs also contend that "[p]rior to a ruling on damages, [plaintiffs] should be afforded the opportunity to obtain discovery as well as to offer proof of the properly asserted allegations they have made in the Amended Complaint." Pl. Resp. 24. However, plaintiffs have been in possession of the Government's discovery productions to date since November 2004. See Appendix to reply brief, at 1. Additionally, plaintiffs fail to explain why the Government would have discoverable evidence related to plaintiffs' damages claims. Indeed, plaintiffs are in exclusive possession of evidence related to their damages claims.

case, including "the extent of the Government's taking and the nature of [plaintiffs'] expectations regarding the use of their property." Id. However, neither of these suggested factual issues overcome the plain legal deficiency contained in plaintiffs' amended complaints.

Indeed, contrary to plaintiffs' suggestion, this Court has disposed of numerous takings claims on dispositive motion because they failed to state a claim as a matter of law. See, e.g., Commonwealth Edison, 56 Fed. Cl. at 656; Granite Mgt. Corp. v. United States, 55 Fed. Cl. 164, 167 (2003) (dismissing takings claim for failure to state a claim); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 152 (2002) (dismissing takings claim prior to trial for damages on breach of contract); Home Sav. of America, FSB v. United States, 51 Fed. Cl. 487, 494-96 (2002) (same); Franklin Sav. Corp. v. United States, 46 Fed. Cl. 533, 537-38 (2000) (same). In light of the facially deficient nature of plaintiffs' takings claim as a matter of law, no "factual development" would improve the viability of plaintiffs' claim. As a result, dismissal under the circumstances is appropriate.

## CONCLUSION

For the foregoing reasons, and those set forth in our motion for summary judgment, the Government respectfully requests that the Court grant our motion and dismiss plaintiffs' complaints.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

s/Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

June 7, 2005

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June 2005, a copy of foregoing "DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Joshua E. Gardner