# ATTACHMENT

# In the United States Court of Federal Claims

No. 04-0035C
Filed: June 9, 2005

* * * * * * *

CANAL ELECTRIC COMPANY, *

Plaintiff, *

v. *

UNITED STATES OF AMERICA, *

Defendant. *

* * * * * * *

Nuclear Waste Policy Act of 1982; Title 42 U.S.C. §§ 10101-10270; Spent Nuclear Fuel Case; Standard Contract; Fifth Amendment Takings; Breach of Contract.

Richard J. Conway, Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., for plaintiff.

John C. Ekman, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington D.C., for defendant.

## ORDER AND OPINION

**HODGES**, Judge.

The Department of Energy agreed to remove and dispose of spent nuclear fuel and high-level nuclear waste at the Seabrook Nuclear Generating Station in New Hampshire, beginning in 1998. DOE has stated that it will be unable to meet these statutory and contractual obligations until 2010 at the earliest. Canal Electric owned an interest in Seabrook for a period of four years after defendant's breach of these obligations, and it has filed breach of contract and takings claims for resulting damages. Plaintiff's Complaint describes its case as "an action . . . for just compensation for uncompensated taking in violation to the Fifth Amendment to the U.S. Constitution caused by DOE's failure to meet its obligations under the Nuclear Waste Policy Act of 1982 . . . . (Pl.'s Am. Compl., ¶ 1.)

COPY

Defendant filed a motion to dismiss plaintiff's Fifth Amendment takings claims. We heard oral arguments and issued an Order seeking additional information concerning the basis for plaintiff's claims under the Takings Clause. Plaintiff has not stated Fifth Amendment claims for which this court may grant relief.

**BACKGROUND**

Canal Electric paid $3.4 million into the Nuclear Waste Fund during the time that it owned a 3.52 % interest in the Seabrook nuclear power plant in New Hampshire, until November 2002. That amount was plaintiff's share of the fees required by the Standard Contract of the Nuclear Waste Policy Act of 1982. See generally 42 U.S.C. §§ 10101-10270. North Atlantic Energy Services Corporation held the operating license for Seabrook, and it signed the Standard Contract on Canal's behalf.[1] Canal Electric sold its minority interest to FPL Energy Seabrook in November 2002.[2]

Canal Electric claims a taking based on the United States' "sovereign obligation" to dispose of nuclear waste developed from the operation of nuclear plants over the past fifty years. Plaintiff argues that its legal rights exist independent of the Standard Contract because of this "long standing Government undertaking." Canal states:

> For more than fifty years, the federal Government systematically acted to induce electric utilities, including Canal, to invest in nuclear technology on the promise,

---

[1] Canal contends that it is a third-party beneficiary of the Standard Contract. Defendant no longer disputes plaintiff's status as a third party-beneficiary, though it questions whether Canal can "maintain[] its own lawsuit in this Court seeking to recover all damages related to the contract breach . . . ."

[2] FPL Energy is the plaintiff in a related case in this court. FPL Energy Seabrook, LLC v. United States, 04-0088C (Damich, C.J.). Plaintiff Canal Electric distinguishes its case from FPL Energy and others pending in this court, however:

> To date, sixty-six cases have been filed in the COFC against DOE related to its failure to meets its obligations under the NWPA and the Standard Contract, predominately by the existing owner/operators of nuclear facilities seeking damages related to ongoing SNF storage costs. As a seller of a nuclear facility, Canal is seeking just compensation for the government's wrongful taking which caused substantial economic harm to Canal, including a drastic reduction in the value of Seabrook, the value of the Standard Contract, and other related costs incurred up to the closing date of the sale.

(Pl.'s Am. Compl., ¶ 53.)

> both implied and explicit, that key issues affecting utilities' adoption of the technology would be resolved in a timely and economic manner. Among the promises of the federal Government was that it would adequately provide for assuming custody and disposal of SNF. Canal relied on these representations and made substantial capital investments in the construction of Seabrook in order to support Seabrook's continued operation.

(Pl.'s Am. Compl., ¶ 14.) Plaintiff's suit is based not on the Standard Contract but upon the Government's statutory obligation to handle nuclear material.

## DISCUSSION

### I. Applicable Standards

Rule 12(b)(6) authorizes dismissal of a claim for failure to state a claim upon which relief may be granted if plaintiff cannot prove sufficient facts. E.g., Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998). "The complaint should not be dismissed unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." Hamlet v. United States, 873 F.2d 1414, 1416 (Fed. Cir. 1989) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Allegations in the complaint are presumed to be true, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988), and they "should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (noting that "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.").

### II. Takings Claims

Canal's takings arguments are diffuse. It is not clear whether plaintiff has alleged a physical or a regulatory taking, or whether the takings were temporary or permanent.[3] Plaintiff states that it has suffered a physical taking by the presence of spent nuclear fuel on its premises, but it also cites regulatory takings cases. Canal's regulatory taking theory apparently arises from a series of federal statutes culminating with the Nuclear Waste Policy Act, but it has not cited government regulatory actions that affected plaintiff's rights. The only statute mentioned in plaintiff's Amended Complaint other than the NWPA is the Atomic Energy Act of 1954.

Plaintiff argues that "[a] taking occurs when the Government forces a business to dedicate its own resources for the benefit of the public, or to perform activities and provide services that should be undertaken by the Government." Canal states that it was "compelled to set aside and

---

[3] Canal Electric owned its minority interest in Seabrook for about four years after the Government's breach of the Standard Contract. The date of the breach is also the date that plaintiff claims the taking occurred.

dedicate its property to activities and purposes that were specifically assigned to the Government by the NWPA."

Plaintiff cites United States v. Pewee Coal Co., 341 U.S. 114 (1951), and Kimball Laundry Co. v. United States, 338 U.S. 1 (1949), in support of its takings argument. The facts of those cases are distinctively different, however. The United States in Pewee Coal took possession and control of plaintiff's mine pursuant to Executive Order because a strike was threatened. 341 U.S. at 115-16. Kimball Laundry was an eminent domain proceeding wherein the Government took over a business to provide laundry and dry cleaning service for the Military. 338 U.S. at 3. Each case involved the Government's taking over or "federalizing" a business.[4] The facts in those cases highlight the relatively minor intrusions suffered by Canal Electric during the four-year period after the breach. In fact, it is difficult to know what resources, activities, or services Canal claims to have dedicated to the public in this case.

Canal's breach of contract claims, such as increased costs to store and maintain nuclear waste prior to sale, seemed plain but we did not have a clear understanding of the property rights that Canal alleged to have been taken by the Government. "[A] court must first determine what was taken" when analyzing a takings claim. Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). We directed Canal to "[e]xplain the nature of the taking alleged" and whether it was physical or regulatory, temporary or permanent, categorical or partial. Canal Elec. Co. v. United States, No. 04-0035C (Fed. Cl. Feb. 3, 2005). We asked that plaintiff "[i]nclude the basis for such allegations. For example, if plaintiff alleges a regulatory taking, identify the applicable regulation. If plaintiff alleges a physical taking, describe the invasion alleged." Id.

A. Regulatory Taking

Canal alleges that it purchased the Seabrook property in the late 1970's with the understanding that the Government was responsible for the permanent disposal of Seabrook's spent nuclear fuel. The Nuclear Waste Policy Act of 1983 requires that the Government provide a repository for permanent disposal of spent nuclear fuel. 42 U.S.C. §§ 10101-10270. The basis for Canal's regulatory taking claim is "the Government's failure to abide by its obligations under the NWPA":

> By obligating Canal to use Seabrook as an interim SNF storage facility, the Government deprived Canal of its investment-backed expectations in Seabrook, including the expectation that the owners of Seabrook (including Canal) would not otherwise be required to store SNF at the Seabrook facility. Since Canal was forced to sell its interest in Seabrook, the Government's taking was permanent.

[4] Plaintiff describes a third case, Kaiser Aetna v. United States, 444 U.S. 164, 180 (1979), as finding a taking where the "Government imposed a navigational servitude on the landowner's 'private pond.'"

Pl.'s Resp. to Feb. 3 Order at 8 (emphasis added). Plaintiff did not allege in its Amended Complaint that it was forced to sell its interest in Seabrook.

Plaintiff contends that the Government's prohibiting Canal from reprocessing the fuel, followed by its failure to take custody of SNF as required, accompanied by the continuous collection of fees, significantly deprived Canal of its investment-backed expectations in Seabrook. The central justification for plaintiff's regulatory takings theory is that the "utilities invested in their facilities with the expectation that the Government would fulfill its long-standing obligation to accommodate the storage of SNF." Plaintiff claims that these expectations arose from the fact that "the Government has historically recognized its obligation to provide for the permanent storage of SNF. Government actions toward this end began in 1954 with the passage of the Atomic Energy Act, and have continued up to and including the passage of the NWPA in 1983." Plaintiff has not discussed the terms of the Atomic Energy Act or subsequent legislation that could have created in Canal Electric the expectation that the Government would remove spent nuclear fuel from its premises in 1998 – or at any other specific time.

Plaintiff stated, "Canal's takings claim is premised upon property interests and supporting facts that have been previously recognized and endorsed by this court as grounds from which to advance a Fifth Amendment cause of action." We requested a summary of such cases in the February Order. Plaintiff responded that Sacramento Municipal Utility District supported both its regulatory takings theory and its physical takings theory. See Sacramento Mun. Util. Dist. v. United States, 61 Fed. Cl. 438 (2004). That court rejected the Government's motion to dismiss a takings claim primarily because regulatory takings analyses are "ad hoc and fact intensive." Sacramento, 61 Fed. Cl. at 442 (citing Eastern Enters. v. Apfel, 524 U.S. 498, 523 (1998)). The court emphasized that discovery had only recently begun. Id.

Plaintiff cited Boston Edison Co. v. United States for support of its regulatory taking theory. 64 Fed. Cl. 167 (2005). That court found that factual issues prevented it from ruling on the takings claim, including reasonableness of plaintiff's investment-backed expectations. Id. at 187. This factual issue would not arise in our case unless plaintiff could show that a regulatory takings theory applies. Plaintiff also cited Delmarva Power & Light Co. v. United States, No. 04-34C (Fed. Cl. Dec. 3, 2004), and Atlantic Electric Co. v. United States, No. 04-36C (Fed. Cl. Jan. 11, 2005).

According to plaintiff, "property rights [in Delmarva] indistinguishable from those articulated by Canal could not be taken without just compensation pursuant to the Fifth Amendment and relevant takings case law." However, the court's Order in Delmarva merely deferred a ruling on defendant's motion to dismiss; it did not rule on the merits of plaintiff's claims.[5] See Delmarva Power & Light Co. v. United States, No. 04-34C (Fed. Cl. Dec. 3, 2004).

---

[5] The Order also refers to "a tentative ruling that defendant's motion should be denied" issued during the hearing. Plaintiff has not provided a transcript of that hearing and we do not (continued...)

The Atlantic Electric Order directed that the case be transferred to another judge. See Atlantic Elec. Co. v. United States, No. 04-36C (Fed. Cl. Jan. 11, 2005). The court denied defendant's motion to dismiss, without prejudice to defendant's right to renew the motion before the new judge. Id. These rulings do not support the merits of plaintiff's regulatory takings theory.

B. Physical Taking

Plaintiff argues that a physical taking arose from its obligation to store nuclear fuel that the Government should have begun collecting before Canal sold its interest in Seabrook. Canal stated in response to the February Order that the property right acquired by the Government's taking was "an easement/constructive easement to use Seabrook as an interim storage facility for an indefinite period of time . . . ." The Government must occupy a person's land or cause someone else to do so for a physical taking to occur, however. See, e.g., Stearns Co., v. United States, 396 F.3d 1354, 1357 (2005) (citing Forest Props., Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999). See also Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1136 (Fed. Cir. 2004) (noting that "the sole question governing physical takings is whether or not the government has physically occupied the plaintiff's property.").

The court in Sacramento Municipal Utility District addressed the possibility of a physical taking in this context, stating "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Sacramento, 61 Fed. Cl. at 442-443 (citing Webb's Fabulous Pharms., Inc. v. Beckwith, 449 U.S. 155, 164 (1980). Webb's ruled that a county in Florida could not permanently take interest accrued on funds deposited with the Clerk of Court. The facts of Webb's are divergent, however, and the Court was careful to limit its ruling. Id. at 164-165.[6]

Plaintiff cannot show that the Government has "forced storage on [Canal's] private

---

[5](...continued)
know the extent to which the court addressed the merits.

[6] The Court stated:

> We hold that under the narrow circumstances of this case -- where there is a separate and distinct state statute authorizing a clerk's fee 'for services rendered' based upon the amount of principal deposited; where the deposited fund itself concededly is private; and where the deposit in the court's registry is required by state statute in order for the depositor to avail itself of statutory protection from claims of creditors and others -- Seminole County's taking unto itself . . . the interest earned on the interpleader fund while it was in the registry of the court was a taking violative of the Fifth and Fourteenth Amendments.

Webb's Fabulous Pharms., Inc. v. Beckwith, 449 U.S. 155, 164-165 (1980).

property" in our case. Sacramento, 61 Fed. Cl. at 442-443. The nuclear waste remained the property of Canal Electric during the four-year period at issue. The Standard Contract requires defendant to dispose of the nuclear waste but its duty to take title to the waste arises "when a generator or owner of SNF makes a request to DOE." Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (observing that "DOE's duty . . . to take title to the SNF is linked to the commencement of repository operations and is triggered when a generator or owner of SNF makes a request to DOE."). Thus, "[t]he duties imposed on DOE [by the Standard Contract] . . . are triggered at different times . . . ."[7]). Id.; 42 U.S.C. §§ 10222(a)(5)(A)-(B).[8] Defendant does not own the nuclear waste that created the physical taking of its property that plaintiff complains of. See Id.; Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336,1342 (Fed. Cir. 2000) (noting that the contract contains no schedules for individual utilities, and "[i]t is uncertain when they will be adopted . . . .").

Plaintiff states that "[t]he Government's failure to remove and dispose of SNF in express disregard of the NWPA, requiring instead that Canal provide its own property and facility to store SNF beyond the date when the Government was required to assume such obligations, constitutes a taking of Canal's physical property without just compensation." The NWPA authorized DOE to enter contracts with private utilities to dispose of Spent Nuclear Fuel. See generally 42 U.S.C. §§ 10101-10270. If the Department of Energy "expressly disregarded" such authority, this does not of itself give rise to a taking.

III. "Origin of Rights"

An important issue in this case is whether plaintiff's property rights could have arisen

---

[7] The Government argued that Congress must have intended that DOE take title to the nuclear waste before disposing it because otherwise title to the waste and physical possession would be in different hands. The court ruled that sections 302(a)(5)(A) and (B) of the Nuclear Waste Policy Act "clearly set forth two independent requirements. These separate obligations are independent of whether DOE holds title to SNF when it begins to dispose of the material. The duties imposed on DOE under subsections (A) and (B) are linked to different events and are triggered at different times." Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996). One triggering event is "the arrival of January 31, 1998." Id. However, the Government's duty to take title to the waste begins when the utility requests delivery after the repository begins operation. Id.; 42 U.S.C. §§ 10222(a)(5)(A)-(B).

[8] Those sections provide that the Standard Contract shall require –
(A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner . . . ; and
(B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel . . . .
42 U.S.C. §§ 10222(a)(5)(A)-(B) (emphasis added).

from a source other than the Standard Contract. If not, Canal's only source of damages is the Contract itself. Tyler House Apts. v. United States, 38 Fed. Cl. 1 (1997), has interesting parallels to this case, though different facts. Plaintiffs, who had interests in an apartment building subsidized by the Department of Housing and Urban Development, filed a complaint against the United States alleging breach of contract and an "uncompensated taking under the Fifth Amendment." Id. at 2. They sued HUD for its alleged lack of assistance in financing the building, which led to the parties' bankruptcy. Id. at 9-10. The court termed plaintiff's efforts to claim a taking of contract rights, "[c]lutching for a last straw." Id. at 9. The argument to which the court referred was that plaintiffs' contracts provided them "property rights in the receipt of the cooperation and assistance contemplated and necessary to provide the contracted low income housing." Id. Plaintiffs' Complaint included the following allegations:

> HUD's unreasonable and unlawful refusals to cooperate and provide a fair opportunity for Plaintiffs' participation in its various housing subsidy and assistance programs caused the subsequent financial difficulties which led to foreclosure on the mortgage and loss of the property. . . . HUD's unreasonable failure to make the requested assistance and subsidies available in a timely manner reduced the returns that should have been made to all who had an interest in Tyler House. This lack of assistance and subsidy constitutes a taking of plaintiffs' property for public use and require just compensation under the Fifth Amendment of the U.S. Constitution.

Id. at 9-10 (citing Compl., ¶¶ 112-13). According to the court, plaintiffs seemed to argue a "'permanent, physical occupation' of Tyler House, citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982)." Id. at 10. The court noted that "taking claims cannot be founded on the mere allegation of a breach of contract. If a contract was breached, the remedy is contractual." Id.

Canal maintains that its taking claim is not derivative of a breach of contract claim but premised upon duties imposed on the Government that are independent of the obligations imposed by the Standard Contract. Plaintiff argues, "Canal's claim relates to the Government's unconstitutional taking of Canal's property interests which emanate from a decades-long statutory framework. . . . [It] is premised upon duties imposed on the Government and the nuclear industry *by statute*; duties that are independent from obligations imposed by the Standard Contract."

Plaintiff cites Boston Edison v. United States for support of its argument that Canal Electric's takings claim did not arise from the Standard Contract. 64 Fed. Cl. 167 (2005). However, that court listed "the origin of plaintiff's rights" as a factual issue in dispute. Id. at 187. The court noted that "[p]laintiff argues that the right to removal of its SNF by the Government existed prior to the Standard Contract, while the Government argues those rights derived from the Standard Contract itself." Id. This was a factual issue that prevented summary judgment. The court also observed, "Boston Edison may bring contract and takings claims concurrently, but, if both claims remain viable, recovery under the contract damages theory is

appropriate." Id. (citations omitted).

This court has ruled "that plaintiff's claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy." Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2003). "Although plaintiff may have real property interests that are separate from its interests under the Standard Contract, plaintiff does not have a takings claim absent the rights and obligations granted to the parties by the Standard Contract." Id. The Commonwealth Edison facts that are important to its legal rulings are similar to those of this case. We agree with the court that "absent the contract, plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim." Id.

Canal contends that damages related to defendant's physical or regulatory taking may be measured by the diminution in market value of its property upon the sale of its interest in Seabrook.[9] It alleges that the Department of Energy's continued collection of fees for the Nuclear Waste Fund after the breach in January 1998 resulted in systematic and unreasonable over-collection of such fees and adversely affected the market value of Canal's interest in Seabrook. Prospective buyers factored the demand for such fee payments into their valuation models and reduced their purchase price accordingly, plaintiff alleges. Potential buyers elected not to bid on Canal's interest in Seabrook because of increased risks and anticipated expenses associated with storing spent nuclear fuel on-site indefinitely. The Federal Circuit held that such fees did not constitute a compensable taking, however. Roedler v. Dep't of Energy, 255 F.3d 1347 (Fed. Cir. 2001); Commonwealth Edison Co., v. United States, 271 F.3d 1327, 1329 (Fed. Cir. 2001) (ruling that "the Takings Clause does not apply to legislation requiring the payment of money.").

Plaintiff has not shown that it is entitled to damages under a theory independent of the rights accorded Canal Electric under the Standard Contract.[10] Plaintiff's assertions that the

---

[9] It is interesting to note that the Government used Kimball's laundry for four years and the owners argued that the measure of damages for the temporary taking should be the difference between the laundry's market value before and after the taking. Kimball Laundry Co. v. United States, 338 U.S. 1, 6-7 (1949). Instead, the Court ruled that "the proper measure of compensation is the rental that probably could have been obtained . . . ." Id. at 7. The Court pointed out that otherwise "there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy." Id.

[10] "The concept of a taking has limited application when the parties' rights have been voluntarily created by contract." Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2003) (citing Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978)). "Interference with contractual rights generally gives rise to a breach of contract claim, not a takings claim." Id.
(continued...)

Government's failure to remove and dispose of nuclear waste required Canal to provide facilities to "store SNF beyond the date when the Government was required to assume such obligations," and that the Government "forced nuclear utilities, including Canal, to expend their own resources to plan for the disposal of SNF," are classic breach of contract allegations. See Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754, 759 (D.C. Cir. 1997) (holding that utilities "must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its duty to dispose of the SNF by January 31, 1998.").

Plaintiff complains of being "deprived of the fair use and enjoyment of its physical property" to support its taking claim. Canal has not alleged that the Government's breach prevented it from producing electricity profitably, however, or pursuing normal corporate activities.

## CONCLUSION

Canal Electric argues that the only question before the court is whether plaintiff has presented a viable takings claim, and we agree. Plaintiff has not established a physical or a regulatory takings theory that is consistent with takings jurisprudence in this Circuit. Ruling that the parties should conduct discovery on investment-backed expectations or other factual issues as plaintiff has urged would only create delay and waste resources. We must dismiss the takings portion of this case. Appellate review of the applicability of takings law to the Spent Nuclear Fuel cases could assist these parties and others with similar cases pending before this court.

The Fifth Amendment takings allegations of plaintiff's Amended Complaint do not state a cause of action for which this court may grant relief. Defendant's motion to dismiss plaintiff's takings claims is GRANTED. Counsel will advise the court no later than June 17 how they propose to proceed in light of this ruling.

s/Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge

---

[10](...continued)
(citing Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (quoting Sun Oil, 572 F.2d at 818)).

CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2005, a copy of the foregoing "DEFENDANT'S NOTICE OF ADDITIONAL AUTHORITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Joshua E. Gardner