# EXHIBIT 1

**IN THE MATTER OF THE ARBITRATION OF:**

PSEG POWER LLC, and PSEG NUCLEAR LLC,

Claimants,

v.

PEPCO HOLDINGS, INC., ATLANTIC CITY ELECTRIC CO., and DELMARVA POWER AND LIGHT CO.,

Respondents.

ATLANTIC CITY ELECTRIC CO., and DELMARVA POWER AND LIGHT CO.,

Claimants,

v.

PSEG POWER LLC, and PSEG NUCLEAR LLC,

Respondents.

## Opinion and Order

The parties have filed reciprocal arbitration demands seeking this Panel's consideration of whether PSEG Power LLC and PSEG Nuclear LLC (collectively, "PSEG") waived its right to arbitrate its claim that Atlantic City Electric Co. ("ACE") and Delmarva Power and Light Co. ("Delmarva," and, collectively with ACE,

"ACE/Delmarva")[1] assigned Fifth-Amendment-based takings claims against the United States to PSEG, and, if not, whether such assignments were made. For the reasons outlined below, we find that PSEG did not waive or otherwise lose its right to arbitrate, and that the takings claims at issue were assigned to PSEG.

## FACTS & PROCEDURAL POSTURE

The factual background is largely undisputed and is set forth in material part below.

### I. SPENT NUCLEAR FUEL REGULATION

Spent nuclear fuel ("SNF") is fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing. 42 U.S.C. § 10101(23). Under the Nuclear Waste Policy Act of 1982 ("NWPA"), "the Federal Government has the responsibility to provide for the permanent disposal of . . . [SNF] as may be disposed of in order to protect the public health and safety and the environment." Id. § 10131(a)(4). However, "the costs of such disposal should be the responsibility of the generators and owners of such . . . [SNF]." Id.

Pursuant to the above mandate, the Department of Energy ("DOE") was tasked with constructing a facility for the long-term storage of SNF. See id. § 10131(b). In order to cover the costs of building and maintaining a facility to house SNF, among other materials, the NWPA authorized DOE "to enter into contracts with any person who generates or holds title to . . . [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C.

[1] Although PEPCO Holdings, Inc. ("PEPCO"), the parent of ACE and Delmarva, is named as a respondent in PSEG's demand, it is not a claimant in ACE/Delmarva's demand and apparently is not being represented by ACE/Delmarva's lawyers (according to the signature blocks on the briefs). Because there has been no attempt by PEPCO to object to the arbitration, it should be bound by this decision.

§ 10222(a)(1). Renewal of nuclear facilities' licenses to operate was conditioned on entering into such contracts. Id. § (b)(1)(A).

DOE adopted a form contract – the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract" or "Contract") – that nuclear facilities were required to execute. 10 C.F.R. § 961.11. Under the Standard Contract, nuclear facilities pay a one-time fee for past nuclear energy production and a continuing fee for on-going production, id. art. VIII.B, and DOE was required to complete its storage facility by January 31, 1998. The nuclear facilities upheld their end of the bargain, but DOE did not. DOE projects that a federal storage facility will be available at the earliest by 2010, if then. 59 Fed. Reg. 27007, 27008 (May 25, 1994).

## II. THE PURCHASE AGREEMENTS

On September 27, 1999, PSEG purchased ACE/Delmarva's minority interests in three facilities: Hope Creek Station ("Hope Creek"), Salem Station ("Salem") and Peach Bottom Station ("Peach Bottom," and, collectively with the other facilities, the "Facilities") pursuant to three purchase agreements (the "PAs").[2] See Opening Jurisdictional Brief of ACE/Delmarva at 2. PSEG also purchased the majority interests in Hope Creek and Salem from Public Service Electric & Gas Co. ("PSE&G").

The PAs define the Purchased Assets to include SNF. PAs § 2.1(c) (including Nuclear Materials, a term defined in § 1.1(91) to include SNF). Section 2.6 gives PSEG "all rights of recovery from third parties and the Department of Energy

[2] The PAs govern different facilities, but their substantive terms are identical. Opening Merits Br. of PSEG at 3.

relating to, arising from or in connection with the [DOE's] failure to take [SNF]."

Similarly, Section 2.1(1) includes in the purchased assets:

> All claims of Seller [ACE/Delmarva] relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims describe in Section 2.2(1).[3]

Section 2.1(m) adds:

> [t]he rights of Seller in, to and under all causes of action against third parties with respect to, arising out of or in connection with Seller's rights, title and interests in and to the Purchased Assets or the Assumed Liabilities, or any portion thereof, whether accruing prior to, on or after the Closing Date, other than any such causes of action as constitute Excluded Assets or Excluded Liabilities, whether received as payment or credit against future liabilities, in each case, relating to any period prior to, on or after the Closing Date, other than the claims described in Section 2.2(m).[4]

PSEG also bargained for the right "exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Purchased Assets or Assumed Liabilities . . . ." PAs § 2.5(b).

The PAs have a standard no-waiver clause, providing that "[t]he failure of a Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights." PAs § 10.5.

---

[3] The § 2.2(l) carve-out is for DOE refunds for decontamination and decommissioning costs.

[4] The § 2.2(m) carve-out is for particular litigations of no relevance here. The other Excluded Assets are also not pertinent to the present issues.

The PAs are governed by New Jersey law, PAs § 10.10, and provide for arbitration under the American Arbitration Association rules of "any dispute between Seller and Buyer . . . relating to or arising out of any provision of" the PAs, PAs § 8.6.

## III. THE LITIGATIONS

The current arbitration concerns separate actions brought against DOE by PSEG and ACE/Delmarva, respectively. The first was brought by PSEG to recover for, among other things, DOE's breach under the Standard Contracts in failing to take SNF by 1998. Later, ACE/Delmarva sued DOE for failure to provide just compensation pursuant to the Fifth Amendment in exchange for the "taking" that resulted from its failure to take SNF.

### A. PSEG's Suit Against DOE

PSEG filed its suit in the Court of Federal Clams ("CoFC") on September 26, 2001. That suit contains claims for breach of the Standard Contracts, for breach of the implied covenant of good faith and fair dealing, and to recover compensation for a taking. Sellers' Appendix ("SA"), Tab 2 at 8-11. The facts underlying all claims are that DOE promised to take SNF from Hope Creek and Salem Station, but failed to do so, and also kept the money paid to DOE under the Standard Contracts.[5] On January 6, 2004,

[5] PSEG did not sue DOE with respect to Peach Bottom because its contract claims against the DOE were settled prior to the filing of the PSEG suit by Peach Bottom's majority owner Exelon. While the settlement was rejected by the Eleventh Circuit for certain reasons regarding the source of the funds, a subsequent settlement was reached after the rejection. Transcript of Arbitration Proceedings of May 24, 2007 ("Tr.") at 157:8-158:22. Counsel for ACE/Delmarva argued that the Peach Bottom settlement shows that the government is open to settling SNF contract claims without settling the takings claims. Id. at 107:24-108:6. But Counsel for PSEG responded that the government's current insistence that PSEG settle its contract claims with all associated takings claims comes from the government's experience in settling Peach Bottom, as, while it believed it was ending the entire matter with the settlement, it found itself facing takings claims notwithstanding the settlement. Id. at 135:18-136:14. Whether the government is willing to settle the SNF contract claims in the absence of the takings claims is not relevant here; we must simply decide who owns the takings claims.

PSEG amended its complaint to add PSE&G as a plaintiff, presumably in case DOE argued that the takings claims were not transferable by PSE&G.

On January 31, 2005, the CoFC dismissed PSEG's breach of contract claims on jurisdictional grounds and stayed the remaining claims pending appeal. PSEG's Appendix ("PA") at A16. On November 20, 2006, some 22 months later, the Federal Circuit reversed the CoFC's jurisdictional ruling. PA at A37.

On January 5, 2007, DOE moved to consolidate PSEG's case with ACE/Delmarva's, and PSEG's case was subsequently stayed on PSEG's motion for stay pending completion of binding arbitration. PA at A46.

**B. ACE/Delmarva's Suit Against DOE**

On September 26, 2003, representatives of ACE/Delmarva met with representatives of PSEG to discuss ACE/Delmarva's intention to sue DOE based on takings claims that ACE/Delmarva believed it could bring arising from DOE's failure to take SNF from the Facilities. Opening Jurisdictional Br. of ACE/Delmarva at 3. PSEG asserted that any such lawsuit would contravene the PAs, as all claims were assigned to PSEG. Id. ACE/Delmarva apparently explained why it believed the takings claims were distinct from the assigned claims, and PSEG offered no response. Id. (citing Affidavit of Nicholas W. Mattia, at SA Tab 1 ¶¶ 4-10); see also Declaration of Harold W. Borden at A3-A5 ¶¶ 2-8.

ACE and Delmarva filed separate takings actions in the CoFC on January 13, 2004. On December 2, 2004, both ACE and Delmarva added "protective" breach of contract and breach of the implied covenants of good faith and fair dealing claims

(making the suits essentially identical to the PSEG suit). The ACE and Delmarva cases were consolidated on January 21, 2005. The CoFC denied DOE's motion for summary judgment in the consolidated case on July 1, 2005.

ACE/Delmarva then subpoenaed documents from PSEG on September 29, 2005. In response, on October 6, 2005, PSEG again asserted that ACE/Delmarva had no right to pursue the takings claims under the PAs and requested that those claims be voluntarily dismissed forthwith. Documents Relating to ACE/Delmarva – PSEG Arbitration ("Documents"), Tab II.C. PSEG also threatened to initiate arbitration under the PAs if ACE/Delmarva continued to press the takings claims. Id. ACE/Delmarva replied by letter (from an officer of Pepco Holdings, Inc.) that it would not dismiss those claims because it did not believe that they overlapped PSEG's claims and it did not intend to and could not have transferred them in the PAs. Documents, Tab II.D. PSEG replied with a letter reiterating its position regarding assignment of the claims and another letter objecting to the subpoena. Documents, Tabs II.E & II.F.

ACE/Delmarva moved on January 12, 2006 to compel production. PSEG responded by again asserting that the takings claims did not belong to ACE/Delmarva in light of the PAs. The CoFC granted the motion to compel (without ruling on PSEG's assignment claims), SA, Tab 5; SA, Tab 8 at 7 (noting that the CoFC "has not addressed the issue of the impact of the assignment of claims directly"), and PSEG produced the requested documents.

On January 5, 2007, DOE moved to consolidate the ACE/Delmarva and PSEG cases. ACE/Delmarva opposed consolidation (as did PSEG). See PA at A43;

Opening Jurisdictional Brief of PSEG, at 11; Tr. at 47:13-48:11. PSEG followed this with a Notice of Dispute under the PAs to ACE/Delmarva. Pursuant to the Notice of Dispute, on April 5, 2007, PSEG served ACE/Delmarva with the arbitration demand that resulted in this proceeding. ACE/Delmarva responded on April 16, 2007 with its own arbitration demand, which was superseded by an amended demand served April 23, 2007.

Judge Miller issued an order on April 12, 2007 denying in part without prejudice and granting in part[6] DOE's consolidation motion and stayed the case temporarily pending this arbitration. SA, Tab 8 at 2.

**C. The Arbitration Claims**

PSEG's arbitration demand seeks declarations that: (1) ACE/Delmarva assigned all claims including the takings claims to PSEG under the PAs; (2) PSEG received the right to control all litigations concerning SNF including the takings claims under the PAs; (3) ACE/Delmarva breached the PAs by initiating the Delmarva litigation and by refusing to dismiss; (4) ACE/Delmarva breached the PAs by not giving PSEG pre-closing notice of the existence of the takings claims; (5) ACE/Delmarva breached the PAs by failing to attempt to secure the government's consent to assign the takings claims to PSEG; and (6) the PAs obligate ACE/Delmarva to assign to PSEG all earnings from the takings claims.

ACE/Delmarva's demand seeks: (1) consideration of ACE/Delmarva's claim that PSEG's Notice of Dispute and demand for arbitration are invalid; (2) a declaration that the Notice of Dispute and arbitration demand are barred by laches or

[6] It is not clear what part of the motion was granted. See Tr. at 130:5-10.

contain claims not subject to arbitration; and (3) a dismissal of the claims set forth in PSEG's arbitration demand.

## ANALYSIS

### I. THE CLAIMS AT ISSUE ARE ARBITRABLE

ACE/Delmarva contends that the present dispute over whether it assigned the SNF takings claims to PSEG is beyond the scope of the arbitration clauses in the PAs. Opening Jurisdictional Br. of ACE/Delmarva at 18. Although ACE/Delmarva recognizes that the clauses are broad enough to encompass any dispute arising out of any provision of the PAs, it contends that, because the takings claims are not assignable and cannot provide PSEG with any benefit, they cannot arise out of any provision of the PAs. Id. This argument is essentially a recasting of ACE/Delmarva's arguments as to why the claims were not assigned by the PAs. But it seems to us logical to the point of being tautological that, if the PAs confer on this Panel jurisdiction to decide whether certain claims ***were*** assigned, we must also have jurisdiction to decide whether the same claims ***were not*** assigned. ACE/Delmarva does not appear to contend that the Panel lacks jurisdiction over the former question, only over the latter. Accordingly, ACE/Delmarva's contention that the present disputes are beyond the scope of the arbitration clause is without merit.

### II. PSEG'S CLAIMS HAVE NOT BEEN WAIVED

ACE/Delmarva's more serious objection to arbitrability is that PSEG lost its right to arbitrate this dispute due to its litigation conduct in the ACE/Delmarva case and its delay in bringing this arbitration. Initially, we must decide whether this question is more properly addressed by the CoFC.

## A. This Panel May Resolve the Waiver/Laches/Estoppel Question

"The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983). ACE/Delmarva asserts that this general rule does not apply to its allegation here that PSEG waived arbitration through litigation conduct, relying principally on the Third Circuit's recent decision in Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207 (3d Cir. 2007), in which the court stated that it "has long decided questions of waiver based on litigation conduct instead of referring the issue to an arbitrator." Id. at 217.

Ehleiter and the cases discussed therein involve parties litigating before a particular court when one of those parties moves for a stay in order to arbitrate, and the other objects based on the movant's waiver of the arbitration right through litigation conduct. Those cases hold that, as is apparent, a court is both in a better position and more suited than arbitrators to determine whether the litigation conduct at issue evinces a waiver, and to control its own proceedings and address abuses of the judicial system. See, e.g., Ehleiter, 482 F.3d at 218.

Here, on the other hand, the parties have not been litigating the merits of their cases before the same Judge, and there continues to be no court case to which both ACE/Delmarva and PSEG are parties. Indeed, ACE/Delmarva has opposed DOE's consolidation motions that would put both parties before the same Judge. Thus, no court

is in any better position than this Panel to determine whether PSEG's litigation conduct waived its arbitration rights. Judge Miller, when given the opportunity to deny a stay in the ACE/Delmarva case based on PSEG's litigation conduct, declined to do so.[7] SA, Tab 7 at 8. Moreover, ACE/Delmarva itself submitted the litigation waiver issue to this Panel in its arbitration demand, and did not suggest that this Panel did not have jurisdiction to decide the issue until weeks later.[8]

In sum, we do not believe that Ehleiter stands for the proposition that only a court may decide issues of waiver of arbitrability based on litigation conduct. See Ehleiter, 482 F.3d at 221 ("[W]e hold that waiver of the right to arbitrate based on litigation conduct remains ***presumptively*** an issue for the court to decide . . . .") (emphasis added). This is especially true in a case, such as this, in which both parties have submitted the issue to arbitration and there is no single court before which both parties' litigation conduct took place. Accordingly, we have jurisdiction to consider ACE/Delmarva's litigation waiver defense to arbitration.

---

[7] ACE/Delmarva's assertion that Judge Miller "retained jurisdiction of [sic] the question whether [PSEG] by its delay and litigation conduct has waived the right to arbitrate," Opening Jurisdictional Br. of ACE/Delmarva at 11, is actually contradicted by the statement by the court upon which it relies. The court said that "should the arbitrators fail to consider delay in the arbitration proceeding, the court cautions [the] parties that it will address the issue." SA, Tab 7 at 8-9. This implies that this Panel can decide the issue, and if it does, then the court need not do so.

To the extent that ACE/Delmarva is contending that Judge Miller erred in granting the stay because she did not rule on the litigation conduct waiver question, that is an issue for the Federal Circuit, not this Panel.

[8] ACE/Delmarva's contention that it "can hardly [be] fault[ed] for the fact that the [Ehleiter] issue was raised on May 9th; Ehleiter was raised by the Panel at the outset of the prehearing conference," Responsive Jurisdictional Br. of ACE/Delmarva at 3, is puzzling. Ehleiter did not establish new law in the Third Circuit and ACE/Delmarva could have raised the issue before Judge Miller or in an answer to PSEG's arbitration demand.

### B. PSEG Did Not Forfeit its Right to Arbitration

ACE/Delmarva relies on three related theories to contend that PSEG forfeited its rights to arbitration: waiver through litigation conduct, laches and equitable estoppel. ACE/Delmarva has the burden of proving these defenses. See Great Western Mortgage Corp. v. Peacock, 110 F.3d 222, 233 (3d Cir. 1997) ("Given the burden that Peacock bears in demonstrating waiver, and her lack of evidence in support of her assertions, we are satisfied that Great Western clearly preserved the right to refer Peacock's claim to arbitration. As we have stated, waiver is not to be lightly inferred.").

#### 1. Waiver by Litigation Conduct

In order to show that PSEG waived its right to arbitrate the question whether the takings claims at issue were assigned under the PAs, ACE/Delmarva must show, among other things, that the conduct caused it prejudice. "'[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived' by litigation conduct." Ehleiter, 482 F.3d at 222 (quoting Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 925 (3d Cir. 1992)). A "nonexclusive list of factors relevant to the prejudice inquiry" with respect to litigation conduct includes: "[1] the timeliness or lack thereof of a motion to arbitrate . . . [; 2] the degree to which the party seeking to compel arbitration [or to stay court proceedings pending arbitration] has contested the merits of its opponent's claims; [3] whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings; [4] the extent of its non-merits motion practice; [5] its assent to the [trial] court's pretrial

orders; and [6] the extent to which both parties have engaged in discovery." Id. at 222-23 (quoting Hoxworth, 980 F.2d at 926-27).

Here, the first factor – timeliness – is offset by the third – notice of intent to seek arbitration. Although PSEG delayed in filing this arbitration after being on notice that ACE/Delmarva was litigating the takings claims, it made clear to ACE/Delmarva from the outset its objections and intention to arbitrate. The remaining factors are difficult to assess; PSEG's litigation conduct has not been as a party to ACE/Delmarva's suit, but rather as a third-party opposing a document subpoena in that case. Indeed, the factors listed above measure the ***voluntary*** actions in the litigation at issue by the party seeking arbitration. Such action is absent here. All of PSEG's actions taken in ACE/Delmarva's suit identified by ACE/Delmarva – "opposing amotion to compel discovery, later producing 38,500 pages of documents [under court order] and more recently responding to the Court's Order to Show Cause," Opening Jurisdictional Br. of ACE/Delmarva at 13 – were involuntary. ACE/Delmarva has failed to carry its burden of showing that PSEG actively participated in the takings litigation so as to waive its right to arbitration of the present claims.

### 2. Laches And Equitable Estoppel

For ACE/Delmarva to prevail on the defense of laches, it must show both an unexplained and inexcusable delay by PSEG in asserting its rights, and resulting prejudice. Mitchell v. Alfred Hofmann Inc., 48 N.J. Super. 396, 403 (App. Div. 1958); see also Kepner-Tregoe, Inc. v. Executive Dev., Inc., 79 F. Supp. 2d 474, 487 (D.N.J. 1999).

ACE/Delmarva argues that PSEG delayed over three years in filing this arbitration after being given notice of ACE/Delmarva's intention to file takings claims, and also acquiesced in ACE/Delmarva's assertion of those claims by adding PSE&G to its own suit containing takings claims for Hope Creek and Salem. However, the latter point suggests that PSEG agreed with ACE/Delmarva that PSEG itself might not be able to bring the takings claims – and has nothing to do with whether PSEG thought that the claims were assigned under the PAs.

There is no dispute that PSEG waited over three years from the filing of ACE/Delmarva's suit to file its dispute notice that initiated this arbitration. But ACE/Delmarva must show that this delay was inexplicable and unreasonable – that it "lull[ed] [it] into a false sense of security or belief that [PSEG] acquiesced in what [ACE/Delmarva] [was] doing." Murphy v. Trapani, 255 N.J. Super. 65, 75 (App. Div. 1992). It has not made this showing. PSEG objected repeatedly to ACE/Delmarva proceeding with the takings claim, based on the PAs' assignment of the claims and its rights to arbitrate over the objections. See id. (rejecting laches defense despite two-year delay in filing as plaintiffs immediately complained about defendants actions when they were taken); see also King v. Innovation Books, 976 F.2d 824, 832-33 (2d Cir. 1992) (rejecting laches when plaintiff had timely warned defendants of his claims). All of PSEG's actions were consistent with its belief that ACE/Delmarva assigned all of its rights to PSEG, including the takings claims.[9] ACE/Delmarva was on notice of PSEG's

---

[9] The dissent points to a letter from PSEG to ACE/Delmarva dated April 20, 2005 in which PSEG stated that it "simply has no interest or desire to prosecute or defend" the sort of claims ACE/Delmarva was pressing in the ACE/Delmarva litigation, and suggests that statement is irreconcilable with PSEG's position here. We disagree. It is one thing to have no interest in pursuing a particular legal theory or

objections, and knew as well their basis in the clear language of the PAs discussed below. Nonetheless, it proceeded to litigate. If ACE/Delmarva wanted to resolve PSEG's stated objections sooner, it could have filed for arbitration. ACE/Delmarva's litigation was undertaken with a clear-eyed awareness of the risks, including the cost of legal fees.

We also observe that the PAs themselves plainly state that non-assertion of rights shall not be construed as a waiver of those rights. Although the prevailing view is that such clauses themselves may be waived by agreement or conduct, see 13 Williston on Contracts § 39:36 (4th ed. 2007 supp.), here PSEG's conduct was consistent with the non-waiver clause.

PSEG's delay in bringing an arbitration while its own claims before the CoFC were dismissed is perhaps understandable. During the period before its claims were resurrected, PSEG stood to gain little if anything from expending its efforts and money in arbitrating against ACE/Delmarva over claims it could not bring without DOE's consent. Accordingly, it was logical for PSEG to stand by during the pendency of its appeal after having already made its objections and their basis clear to ACE/Delmarva.

Because of PSEG's repeated assertions of its rights under the PAs and the PAs' non-waiver clause, we find on balance that PSEG's delay was not unreasonable and should not have led ACE/Delmarva to conclude that PSEG acquiesced in its takings suit;

---

claim, perhaps for strategic or valuation reasons, but quite another to yield to another the right to pursue that theory or claim. PSEG's April 20 letter suggests only the former, and its communications both before and after the April 20 letter (orally in September 2003 and by a letter dated October 6, 2005) explicitly deny the latter.

therefore we reject the laches defense.[10] For the same reasons, we reject ACE/Delmarva's equitable estoppel defense.

## III. ACE/DELMARVA ASSIGNED THE TAKINGS CLAIMS TO PSEG

Having rejected ACE/Delmarva's jurisdictional and equitable defenses, we now reach the merits of the dispute – whether ACE/Delmarva assigned the takings claims to PSEG in the PAs.

### A. The Takings Claims Are Clearly Covered by the Assignments in the PAs

Under the PAs, ACE/Delmarva assigned "[a]ll claims of Seller [ACE/Delmarva] relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) . . . and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets." PAs § 2.1(l). The PAs also grant PSEG "all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the [DOE's] failure to take [SNF]." Id. § 2.6. PSEG further received the right "exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Purchased Assets [which include SNF]." Id. § 2.5(b).

[10] Although we do not reach the second element of laches – prejudice – we note in passing that ACE/Delmarva's proof of prejudice appears to be thinner than ACE/Delmarva suggests. ACE/Delmarva contended at argument that prejudice should be measured hypothetically, in that, had PSEG brought its arbitration claim in the fall of 2003, it likely would have included Peach Bottom and, had PSEG won, ACE/Delmarva never would have brought its suit at all. Tr. at 80:5-81:5. However, we believe that prejudice should be measured based on what actually happened. In other words, the proper question is, in light of the delay, what did ACE/Delmarva do that would be to its detriment if it now loses this arbitration. ACE/Delmarva is not contending that the Peach Bottom settlement was contrived in bad faith to rebut its prejudice argument here. Tr. at 107:8-10.

These broad assignments make no exceptions for particular kinds of claims, and the detailed Excluded Assets list in the PAs make no mention of any takings claims. See PAs § 2.2. It is hard to imagine a more comprehensive assignment of claims. On their face, the PAs leave no doubt that the takings claims at issue here were assigned to PSEG and that PSEG received the exclusive right to control the litigation over the claims.

In the face of this unmistakable language, ACE/Delmarva makes two principal arguments as to why the takings claims were not assigned: (1) they arise independent of the Standard Contract, and (2) they could not have been assigned as a matter of law.

The first argument ignores the second half of § 2.1(l), which goes beyond claims arising out of the Standard Contract and covers "all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets," as well as § 2.6, which confers to PSEG "all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the Department of Energy's failure to take Spent Nuclear Fuel." The Purchased Assets explicitly include SNF, and the takings claims indisputably arise out of or are in connection with DOE's failure to take SNF. Accordingly, it is irrelevant whether the takings claims arise from the Standard Contract or from some other source – in either case, they are covered by the PAs assignment clauses.[11]

[11] We note that, while ACE/Delmarva quotes Judge Miller's opinion denying summary judgment in stating that "[t]he court also noted that Sellers' takings claim 'is not predicated upon any rights emanating from the Standard Contract,'" Opening Jurisdictional Br. of ACE/Delmarva at 5, this is a distortion of the actual statement. The opinion was simply describing another opinion in stating that a takings claim ***might*** be viable "***insofar*** as the takings claim is not predicated upon any rights emanating from the Standard Contract." SA, Tab 4 at 4 (emphasis added). This is hardly an actual finding that the claim does not arise

As to the second argument, ACE/Delmarva contends that the Assignment of Claims Act (or Anti-Assignment Act)[12] bars an assignment of the claims and, alternatively, that takings claims are "personal" and cannot be assigned in any event.[13] We need not dwell on the latter point, as ACE/Delmarva offers no authority in support of it nor any rationale to distinguish takings claims from any other claim with respect to assignability.[14]

The Anti-Assignment Act argument fails for two independent reasons: (1) the Act is not absolute, and therefore cannot render an assignment void *ab initio*, and (2) the Act may not be invoked by a party other than the United States.

It is undisputed that the government may consent to an assignment of a claim that would otherwise violate the Anti-Assignment Act. See, e.g., Vt. Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236, 240 (2006) ("The prohibitions of

---

from the rights in the Standard Contract. Indeed, the very opinion that Judge Miller was describing – Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005) – found that, if both a takings claims and a contract claim simultaneously existed, the contract claim would provide the preferable basis for recovery. Id. at 187; cf. Slack v. McDaniel, 529 U.S. 473, 485 (2000) ("[T]he 'Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of . . . .'") (quoting Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

[12] While ACE/Delmarva points out that the Assignment of Claims Act, 31 U.S.C. § 3727 is different from the Anti-Assignment Act, 41 U.S.C. § 15, courts have often referred to the Assignment of Claims Act as the Anti-Assignment Act (for obvious reasons) and we use the terms interchangeably to refer to the former statute.

[13] To the extent that ACE/Delmarva's position is that the anti-assignment statute should be considered by the Panel in determining whether ACE/Delmarva ***intended*** to assign the takings claims, it must be rejected. The PAs are unambiguous on this point, and therefore intent is irrelevant. Counsel for ACE/Delmarva recognized as much at argument, and it appears that the parties have agreed that the PAs are unambiguous and are not presenting evidence as to intent. See, e.g., Tr. at 21:12-17; 109:20-110:18; 140:14-17.

[14] ACE/Delmarva's argument is essentially that the claims are *per se* unassignable because the buyer of such a claim would be doubly benefiting – both from the depreciated value of the subject of the sale and from the takings claim. But this presupposes that none of the purchase price is attributable to the claim itself. Because that assumption is not a necessary one, ACE/Delmarva's justification for the assignment bar is unconvincing. Even if the assumption were correct, it could simply reflect the parties' views of the merits of the claim at the time the PA's were executed.

the Anti-Assignment Acts notwithstanding, 'assigned contracts are valid when the assignment takes place by operation of law, or when the government consents to and recognizes the assignment.'") (quoting Rochester Gas and Elec. Corp. v. United States, 65 Fed. Cl. 431, 437 (2005)). Accordingly, ACE/Delmarva's contention that it could not have assigned the takings claims at issue rings hollow; although it may be true that the government generally would not agree to such an assignment, that does not change the fact that it is at least possible for the assignment to take place.

Moreover, even if the Anti-Assignment Act does bar PSEG from asserting the claim, that Act may not be invoked by ACE/Delmarva to void the assignment. "The Anti-Assignment Act is for the government's protection and only the United States may assert it." United States v. Certain Space in Property Known as Chimes Bldg., 320 F. Supp. 491, 496 (N.D.N.Y. 1970), aff'd, 435 F.2d 872 (2d Cir. 1970). While "[a]n invalid attempted assignment does not forfeit the claim [(]it leaves it as it was before the purported assignment[),] . . . the assignment remains enforceable as between the parties to the assignment." Saint John Marine Co. v. United States, 92 F.3d 39, 45 (2d Cir. 1996); see also 91 Sonja Larsen et al., Corpus Juris Secundum: United States § 196 ("[T]he invalidity of the assignment will not enable the assignor to recover from the United States after it has paid the claim to the assignee."). ACE/Delmarva does not point to any cases in which the Act has been used to invalidate an assignment as between private parties.

ACE/Delmarva argues that it must be able to bring the takings claims if PSEG may not bring them. Assuming that DOE would not consent to the assignment and

that PSEG may not bring the takings claims, ACE/Delmarva's argument still relies on the incorrect assumption that some party has to be able to bring the claims. Indeed, ACE/Delmarva goes so far as suggesting that it would be ***unconstitutional*** for a governmental taking to go uncompensated. See, e.g., Responsive Merits Br. of ACE/Delmarva at 2-3. That is simply an overstatement. Indeed, if the failure to take SNF actually does constitute a taking, it could go uncompensated if neither ACE/Delmarva nor PSEG actually sought compensation from DOE. It is not reasonable to interpret the Anti-Assignment Act, which exists solely to protect the government, to force the government to answer for claims against it.

In sum, we find that the PAs' comprehensive assignment language included the takings claims at issue and that the Assignment of Claims Act does not alter that conclusion or void the assignment as between ACE/Delmarva and PSEG. Accordingly, PSEG was assigned both the claims themselves and the right to control litigation over them.

### B. ACE/Delmarva's Judicial Estoppel Argument Is Without Merit

ACE/Delmarva contends that PSEG's "pursu[it] [of] a sellers takings claim on behalf of one of its sellers [PSE&G]" is flatly inconsistent with its position that ACE/Delmarva has no right to pursue its takings claim. This argument suffers from multiple weaknesses.

The doctrine of judicial estoppel bars a party from asserting a position contrary to a position that the party has successfully asserted in previous litigation. Murray v. Silberstein, 882 F.2d 61, 66 (3d Cir. 1989); Wein v. Morris, 388 N.J. Super.

640, 658 n8 (App. Div. 2006). Here, the allegedly inconsistent positions identified by ACE/Delmarva are not in fact inconsistent at all. PSEG is not asserting in this proceeding that the takings claims at issue are not legitimate; it is asserting that they were assigned under the PAs. Moreover, PSEG has not prevailed on any position with respect to this claim, and therefore cannot be judicially estopped.

## IV. ACE'S WINDFALL ARGUMENTS CANNOT OVERCOME THE PLAIN LANGUAGE OF THE PAS

The theme behind ACE/Delmarva's arguments on the merits is that a finding that PSEG acquired the takings claims would lead to a windfall in favor of PSEG. As the argument goes, ACE/Delmarva sold its interests in the plants for less than they were worth because of DOE's failure to take SNF, and, if PSEG may assert the claims for this diminished value, it is recovering twice for the value – once in the discount and again in the recovery. Whatever rhetorical force this argument may have, it does not give the Panel license to rewrite the PAs, which plainly state (multiple times) that all claims relating to SNF are assigned to PSEG. See generally St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden, 88 N.J. 571 (1982).

Moreover, ACE/Delmarva and, as importantly, the Board of Public Utilities, thought ACE/Delmarva was getting fair value for the facilities regardless of any takings claims. See PA at A108-A133. In explaining its findings, the Board of Public Utilities noted, in particular, the major risks that PSEG assumed under the PAs for the "operational risks of the units" which were "particularly significant" because the facilities "have historically experienced substantial performance and cost uncertainty," and also for "all of the responsibility and risk associated with unforeseen escalation in the cost of decommissioning of the plant." PA at A20. The amount of the liabilities assumed by PSEG under the PAs remains uncertain. It is also uncertain whether the takings theory under which the claims are being brought will prove to be viable and to what extent ACE/Delmarva would be able to show any significant loss as a minority owner. Further, assuming the sellers were able to proceed with the takings claims, it is unclear whether

and to what extent any takings damages would remain for the sellers in these cases after the buyer's contract claims were resolved. See Boston Edison, 64 Fed. Cl. at 187. Thus, the idea that recognition of ACE/Delmarva's assignment to PSEG of the takings claims is against the public interest is speculative and may also be exaggerated. It appears that ACE/Delmarva is asking this Panel to ignore the deal reached in the PAs and the Board of Public Utilities' findings and apply the medieval doctrine of the just price. We cannot do so, and, to the extent that the doctrine could possibly be applied here, cf. In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 854 n.32 (3d Cir. 1994) ("[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price.") (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992) (Posner, J.), it already has been applied by the Board of Public Utilities.

* * *

We find that ACE/Delmarva assigned the takings claims at issue here to PSEG, and that ACE/Delmarva's initiation of its takings litigation and its refusal to dismiss that litigation breached the PAs. Accordingly, PSEG's other claims regarding (1) ACE/Delmarva's failure to give notice of the takings claims; (2) ACE/Delmarva's failure to make efforts to assign the claims; and (3) assignment by ACE/Delmarva to PSEG of the proceeds of the ACE/Delmarva takings case are moot.

[signature]

C. Michael Loftus

Dated: June 20, 2007

**Separate Opinion of John D. Aldock**

I respectfully dissent. In my opinion PSEG's more than three-year delay in bringing this arbitration was inexcusable and the more than $3.5 million in legal and expert fees and other company resources expended in litigating those claims over that period constituted substantial prejudice.[15] I would find that PSEG has forfeited its claim to arbitration through litigation conduct and laches.

ACE/Delmarva filed suit against the U.S. Government on January 14, 2005. PSEG issued its arbitration demand on April 5, 2007. While PSEG disputed ACE/Delmarva's right to bring its suit against the Government I believe it was incumbent on PSEG to do more.[16] I do not believe the burden was on ACE/Delmarva to initiate an arbitration solely to determine its right to litigate against the U.S. Government

Moreover, I find PSEG's letter of April 20, 2005 to counsel for ACE/Delmarva and the U.S. Government difficult to reconcile with its position in this arbitration. In that letter PSEG asked that Judge Miller be advised as follows: "PSEG Nuclear understands that Delmarva is pursuing various legal theories, such as diminution in value, which PSEG Nuclear simply has no interest or desire to prosecute or defend. PSEG Nuclear is also opposed to consolidating its pending case, No. 01-551C (J. Futey), with the Delmarva case because the cases are in completely different procedural

---

[15] While PSEG speculates that ACE/Delmarva may have brought the Peach Bottom claim even if the other claims had been assigned, I do not believe hindsight speculation on that point removes the substantial prejudice ACE/Delmarva have incurred in litigating these claims against the U.S. Government for more than three years.

[16] I do not see PSEG's inaction during the period while its claim against the Government was dismissed as a justification for delay. Judge Miller clearly treated that dismissal as temporary and urged the parties to do the same. (See April 7, 2005 Hearing transcript at p. 23 attached to PSEG's prehearing brief.)

postures." (April 20, 2005 letter from Alex D. Tomaszczuk to Richard J. Conway and Harold D. Lester.)

PSEG apparently had no interest in the ACE/Delmarva claims against the Government until the Government conditioned settlement of PSEG's separate claims against the Government on settlement or extinguishment of the ACE/Delmarva claims (PSEG's Arbitration Demand at pp. 2 and 3). While this may in part explain PSEG's delay I do not believe it justifies it.[17]

Finally, I believe that Judge Miller, who has presided over the ACE/Delmarva litigation against the U.S. Government for more than three years, and who has pending a renewed motion for consolidation of the PSEG case against the Government, is in a better position than this panel to evaluate the waiver/laches/prejudice arguments. See Ehleiter v. Grapetree Shares, Inc., 482 F.3d 207 (3d Cir. 2007).

Dated: June 20, 2007

[17] Whether PSEG had no interest in the ACE/Delmarva claims because it believed them to be without merit, or because it could not benefit from claims that ACE/Delmarva was bringing on behalf of state rate payers is not material. PSEG clearly had no interest in the claims at issue here other than as a chip in its negotiations of its separate claims against the U.S. Government.