lease, maintenance or operation of the Purchased Assets prior to, on or after the Closing Date, including liabilities and obligations arising out of or resulting from the transportation, treatment, storage or disposal of Nuclear Materials, including liabilities and obligations arising out of or resulting from a "nuclear incident" or "precautionary evacuation" (as such terms are defined in the Atomic Energy Act) at the Salem Station, or any other licensed nuclear reactor site in the United States, or in the course of the transportation of Nuclear Materials to or from the Salem Station, or any other such site prior to, on or after the Closing Date, including liability for all deferred premiums assessed in connection with such a nuclear incident or precautionary evacuation under any applicable NRC or industry retrospective rating plan or insurance policy, including any mutual insurance pools established in compliance with the requirements imposed under Section 170 of the Atomic Energy Act and 10 C.F.R. Part 140 or 10 C.F.R. § 50.54(w), including all liabilities and obligations of Seller for retrospective premium obligations under Seller's Insurance Policies or Buyer's Insurance Policies (collectively, "Assumed Nuclear Liabilities");

(f) All liabilities and obligations of Seller in respect of Spent Nuclear Fuel, including Spent Nuclear Fuel Fees, whether such liability or obligation is known or unknown, contingent or accrued, and whether arising or occurring prior to, on or after the Closing Date, except as specified in Section 2.6 (collectively, "Assumed Spent Fuel Liabilities"); and

(g) With respect to the Purchased Assets, any Tax that may be imposed on Seller by any Governmental Authority on the ownership, lease, maintenance, operation, or use of the Purchased Assets on or after the Closing Date, except for any Income Tax attributable to income (including proceeds representing the Purchase Price or proceeds of asset sales) received by Seller and any Transfer Taxes for which Seller is liable pursuant to Section 6.5.

2.4 Excluded Liabilities. Notwithstanding anything to the contrary in Section 2.3, Buyer shall not assume or be obligated to pay, perform or otherwise discharge the following liabilities or obligations of Seller (the "Excluded Liabilities"):

(a) Any liabilities or obligations of Seller arising out of, in respect of, or in connection with, any Excluded Assets or other assets of Seller which are not Purchased Assets;

(b) Any liabilities or obligations of Seller arising out of, in respect of, or in connection with, Taxes attributable to the Purchased Assets for taxable



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000325

periods, or portions thereof, ending before the Closing Date, except for Transfer Taxes and Taxes for which Buyer is liable pursuant to Section 6.5;

(c) Any liabilities or obligations of Seller accruing under any of the Seller's Agreements prior to the Closing Date;

(d) Any payment obligations of Seller under the Owners Agreement, as amended by the Amendment to Owners Agreement, for goods delivered or services rendered or liabilities incurred prior to the Closing Date, except for such obligations for which Buyer or any other Person (other than Seller) is liable under the Owners Agreement, as amended by the Amendment to Owners Agreement;

(e) Any and all asserted or unasserted liabilities or obligations to third parties (including employees of Seller) for personal injury or tort, or similar causes of action relating to Seller's acts or omissions in connection with the ownership of the Purchased Assets arising during or attributable to the period prior to the Closing Date, other than liabilities or obligations assumed by Buyer under Sections 2.3(c) and (e);

(f) Any fines or similar penalties imposed by and payable to any Governmental Authority under applicable Law (as in effect prior to the Closing Date, notwithstanding any provision hereof to the contrary) with respect to the Purchased Assets resulting from (i) an investigation, proceeding, request for information or inspection before or by a Governmental Authority directly relating to actions or omissions by Seller prior to the Closing Date or (ii) violations of applicable Law (as in effect prior to the Closing Date, notwithstanding any provision hereof to the contrary), wilful misconduct or gross negligence directly relating to actions or omissions by Seller prior to the Closing Date;

(g) Any liabilities or obligations of Seller arising under or relating to any claim in respect of Environmental Conditions or Hazardous Substances, in each case, relating to the Purchased Assets, but only to the extent relating to any Off-Site Location and of which Seller has Knowledge prior to the Closing Date; and

(h) Any liabilities or obligations of Seller arising under or relating to Nuclear Laws, and any liabilities or obligations of Seller arising under or relating to Nuclear Materials or to any claim in respect thereof, whether based on Nuclear Laws, Environmental Laws, common law or otherwise, in connection with the ownership, lease, maintenance or operation of the Purchased Assets, but only to the extent relating to any written assessment by any Governmental Authority prior to the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

Closing Date with respect to any Nuclear Incident (as defined in the Atomic Energy Act) occurring prior to the Closing Date, which assessment exceeds the aggregate amount of the policy limits under all applicable Buyer's Insurance Policies.

2.5 Control of Litigation.

(a) The Parties acknowledge and agree that, from and after the Closing Date, Seller shall be entitled exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Excluded Assets or Excluded Liabilities, so long as such control, defense or settlement does not unreasonably interfere with Buyer's operation of the Salem Station; and Buyer agrees to cooperate fully in connection therewith, provided, however, that Seller shall reimburse Buyer for all reasonable costs and expenses incurred in providing such cooperation.

(b) The Parties acknowledge and agree that, from and after the Closing Date, Buyer shall be entitled exclusively to control, defend and settle any suit, action or proceeding, and any investigation arising out of or related to any Purchased Assets or Assumed Liabilities, so long as such control, defense or settlement does not unreasonably interfere with Seller's ownership of the Excluded Assets or with the Excluded Liabilities; and Seller agrees to cooperate fully in connection herewith provided, however, that Buyer shall reimburse Seller for all reasonable costs and expenses incurred in providing such cooperation.

2.6 Spent Nuclear Fuel Fees. Seller, to the extent of the Salem Interest, shall be liable for and pay, pursuant to the Owners Agreement, all Spent Nuclear Fuel Fees in effect prior to the Closing Date with respect to its share of electricity generated at and sold from the Salem Station prior to the Closing Date, and Buyer shall have no liability or obligation in respect thereof. Buyer shall be liable for and pay all Spent Nuclear Fuel Fees with respect to its share of electricity generated at and sold from the Salem Station, including that relating to the Salem Interest, from and after the Closing Date, together with all additional Spent Nuclear Fees that are assessed or become effective on or after the Closing Date, whether assessed with respect to electricity generated at and sold from the Salem Station prior to, on or after the Closing Date, and Seller shall have no further liability or obligation in respect thereof. Without limiting the liability of Buyer under Sections 2.3(e) and (f), from and after the Closing Date, Buyer shall assume title to, and such liabilities and obligations as Seller may have for the storage and disposal of, Spent Nuclear Fuel presently stored at the Salem Station (including any such fuel which may have been used in connection with generating Seller's share of electricity at the Salem Station).



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000327

From and after the Closing Date, Buyer shall have all rights of recovery from third parties and the Department of Energy relating to, arising from or in connection with the Department of Energy's failure to take Spent Nuclear Fuel.

2.7 Department of Energy Decommissioning and Decontamination Fees. Seller, to the extent of the Salem Interest, shall be liable for and pay, pursuant to the Owners Agreement, its pro rata share of Department of Energy Decommissioning and Decontamination Fees prior to the Closing Date, and, thereafter, Buyer shall be liable for and pay, and Seller shall have no liability for, such Department of Energy Decommissioning and Decontamination Fees, together with all additional assessments for Department of Energy Decommissioning and Decontamination Fees that become effective on or after the Closing Date, whether assessed with respect to any period occurring prior to, on or after the Closing Date.

## ARTICLE III

## THE CLOSING

3.1 Closing. Upon the terms and subject to the satisfaction of the conditions contained in Article VII, the sale, assignment, conveyance, transfer and delivery of Seller's rights, title and interests in and to the Purchased Assets by Seller to Buyer, and the purchase, assumption and acquisition by Buyer of the Purchased Assets and the Assumed Liabilities, and the consummation of the other transactions contemplated hereby, shall take place at a closing (the "Closing ") to be held at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, Wilmington, Delaware, at 10:00 a.m. local time, or at such other time and location as may be agreed upon in writing between Buyer and Seller, within five (5) Business Days following the date on which the last of the conditions precedent to the Closing set forth in Sections 7.1(a), 7.2(a), (h) and (i), and 7.3(a) and (f) of this Agreement, shall have been satisfied or, to the extent permitted by applicable Law, waived by the Party for whose benefit such conditions precedent exist. The date on which the Closing actually occurs is hereinafter called the "Closing Date." The Closing shall be effective for all purposes as of 12:01 a.m., New York City time, on the Closing Date.

3.2 Payment of Purchase Price.

(a) Upon the terms and subject to the satisfaction of the conditions set forth in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of Seller's rights, title and interests in and to the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000328

Purchased Assets, Buyer shall, at the Closing, (i) pay, or cause to be paid, to Seller cash in an amount equal to the sum of (A) $4,100,000 plus (B) 7.41% of the Net Book Value, as of the Closing Date, of the Nuclear Fuel Supplies (the "Purchase Price") and (ii) assume and agree to pay, perform or otherwise discharge the Assumed Liabilities.

(b) At least five (5) Business Days prior to the Closing Date, Buyer shall provide to Seller a written estimate of 7.41% of the Net Book Value, as of the Closing Date, of the Nuclear Fuel Supplies (the "Estimated Nuclear Fuel Supply Amount"), which shall be certified in writing by an appropriate officer of Buyer.

(c) At the Closing, in furtherance but not in duplication of Section 3.2(a), Buyer shall pay to Seller cash in an aggregate amount equal to the sum of (i) $4,100,000 plus (ii) the Estimated Nuclear Fuel Supply Amount (the "Closing Payment"). The Closing Payment shall be paid to Seller by Buyer at the Closing by wire transfer of immediately available funds to the account of Seller designated by Seller at least two (2) Business Days prior to the Closing Date.

3.3 Adjustment to Nuclear Fuel Supply Payment.

(a) Within sixty (60) days after the Closing Date, Buyer shall deliver to Seller, at Buyer's sole cost and expense, a statement ("Closing Statement") setting forth 7.41% of the Net Book Value, as of the Closing Date, of the Nuclear Fuel Supplies (the "Closing Nuclear Fuel Supply Amount"), together with a calculation of the Purchase Price. Concurrently with the delivery of the Closing Statement, Buyer shall furnish to Seller such documents and other records as may be reasonably requested by Seller in order to confirm the information and calculation set forth in the Closing Statement.

(b) In the event that Seller is in disagreement with the Closing Nuclear Fuel Supply Amount, and in the event that the aggregate amount of such disagreements exceeds $100,000, Seller shall, within ten (10) Business Days after receipt of the Closing Statement, notify Buyer of such disagreements setting forth with specificity the nature and amounts thereof. In the event that Seller is in disagreement with only a portion of the Closing Nuclear Fuel Supply Amount, Buyer or Seller, as the case may be, shall pay all undisputed amounts in the manner set forth in Section 3.3(c); and all other amounts shall be paid at such time as all disagreements are resolved in accordance with this Section 3.3(b). If (i) the aggregate amount of the disagreements referred to in this Section 3.3(b) does not exceed $100,000 or



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000329

(ii) Seller fails to notify Buyer of all disagreements within the ten (10) Business Day period provided for herein, then the Closing Nuclear Fuel Supply Amount, as delivered by Buyer pursuant to Section 3.3(a), shall be final, binding and conclusive on the Parties. If Seller is in disagreement with the Closing Nuclear Fuel Supply Amount and notifies Buyer within such ten (10) Business Day period, then the Parties shall promptly attempt to resolve such disagreements by negotiation. If the Parties are unable to resolve such disagreements within thirty (30) days following such notice of disagreement by Seller, then the Parties shall appoint an Independent Accounting Firm within forty-five (45) days following such notice, which shall review the Closing Statement and determine the Closing Nuclear Fuel Supply Amount. Resolution of any disagreements shall be made by the Independent Accounting Firm in a writing addressed to all Parties within thirty (30) days following referral to it by the Parties of such disagreements in accordance with this Agreement. The findings of such Independent Accounting Firm shall be final, binding and conclusive on the Parties. All costs and fees of the Independent Accounting Firm shall be borne equally by Seller and Buyer.

(c) No later than the fifth (5th) Business Day following the determination of the Closing Nuclear Fuel Supply Amount pursuant to Section 3.3(b), either (i) Buyer shall pay to Seller the amount, if any, by which the Purchase Price exceeds the Closing Payment, or (ii) Seller shall pay to Buyer the amount, if any, by which the Closing Payment exceeds the Purchase Price, in either case, together with simple interest accruing on such payment at the Prime Rate (as defined below) from the Closing Date through and including the date of payment, by wire transfer of immediately available funds to an account designated by the receiving Party. As used herein, "Prime Rate" means, as of any date, the prime rate as published in The Wall Street Journal on such date or, if not published on such date, on the most recent date of publication.

3.4 Tax Reporting and Allocation of Purchase Price. Buyer and Seller shall treat the transactions contemplated by Article II as the acquisition by Buyer of a trade or business for all United States federal income tax purposes and agree that no portion of such transactions will be treated in whole or in part as a payment for services (or future services) for United States federal income tax purposes. Buyer shall deliver to Seller at the Closing a preliminary allocation among the Purchased Assets of the Purchase Price and such other consideration paid to Seller pursuant to this Agreement, and, as soon as practicable following the Closing (but in any event within ten (10) Business Days following the final determination of the Closing Nuclear Fuel Supply Amount), Buyer shall prepare and deliver to Seller a final allocation of the Purchase Price and additional consideration described in the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000330

preceding clause, and the post-closing adjustments pursuant to Section 3.3(b), among the Purchased Assets (the "Allocation"). The Allocation shall be consistent with Section 1060 of the Code and the regulations thereunder ("Applicable Tax Law"). Seller hereby agrees to accept Buyer's Allocation unless Seller determines that such Allocation (including any valuations and the determination of the Purchase Price or other consideration) was not prepared in accordance with Applicable Tax Law. If Seller so determines, Seller shall within twenty (20) Business Days thereafter propose any changes necessary to cause the Allocation to be prepared in accordance with Applicable Tax Law. Within ten (10) Business Days following delivery of such proposed changes, Buyer shall provide Seller with a statement of any objections to such proposed changes, together with a reasonably detailed explanation of the reasons therefor. If Buyer and Seller are unable to resolve any disputed objections within ten (10) Business Days thereafter, such objections shall be referred to the Independent Accounting Firm, who shall determine the Allocation (including any valuations and the determination of the Purchase Price or other consideration). The Independent Accounting Firm shall be instructed to deliver to Buyer and Seller a written determination of the proper allocation of such disputed items within twenty (20) Business Days. Such determination shall be final, conclusive and binding upon the Parties for all purposes, and the Allocation shall be so adjusted (the Allocation, including the adjustment, if any, to be referred to as the "Final Allocation"). The fees and disbursements of the Independent Accounting Firm attributable to the Allocation shall be shared equally by Buyer and Seller. Each of Buyer and Seller agrees to timely file Internal Revenue Service Form 8594, and all Federal, state, local and foreign Tax Returns, in accordance with such Final Allocation and to report the transactions contemplated by this Agreement for Federal Income Tax and all other tax purpose in a manner consistent with the Final Allocation. Each of Buyer and Seller agrees to promptly provide the other Parties with any additional information and reasonable assistance required to complete Form 8594, or compute Taxes arising in connection with (or otherwise affected by) the transactions contemplated hereunder. Each of Buyer and Seller shall timely notify the other Parties and each shall timely provide the other Parties with reasonable assistance in the event of an examination, audit or other proceeding regarding the Final Allocation.

3.5 Prorations.

(a) Buyer and Seller agree that, except as otherwise provided in this Agreement, all of the items customarily prorated relating to the ownership, lease, maintenance and operation of the Purchased Assets, including those listed below (but not including Income Taxes), shall be prorated as of the Closing Date, without any duplication of payment under the Owners Agreement, as amended by the Amend-



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000331

ment to Owners Agreement, with Seller liable to the extent such items relate to any period prior to the Closing Date, and Buyer liable to the extent such items relate to any period on or after the Closing Date (measured in the same units used to compute the item in question, or otherwise measured by calendar days):

(i) Personal property, real estate and occupancy Taxes, assessments and other charges, if any, on or arising out of, in respect of, or in connection with, the ownership, lease, maintenance or operation of the Purchased Assets;

(ii) Rent, Taxes and all other items (including prepaid services and goods not included in Inventories), in each case, payable by or to Seller under any of the Seller's Agreements assigned to and assumed by Buyer;

(iii) Any permit, license, registration, compliance assurance fees or other fees arising out of, in respect of, or in connection with, any Transferable Permit;

(iv) Sewer rents and charges for water, telephone, electricity and other utilities arising out of, in respect of, or in connection with, the Purchased Assets;

(v) Insurance premiums paid on or with respect to the ownership, lease, maintenance or operation of the Purchased Assets, to the extent payable under the Buyer's Insurance Policies;

(vi) Spent Nuclear Fuel Fees, in the manner contemplated by Section 2.6;

(vii) Department of Energy Decommissioning and Decontamination Fees, in the manner contemplated by Section 2.7; and

(viii) Prepaid operating and maintenance expenses, whether arising under the Owners Agreement or otherwise.

(b) Seller or Buyer, as the case may be, shall promptly reimburse the other Party that portion of any amount paid by such other Party to the extent relating to the period for which Seller or Buyer, as the case may be, is liable under Section 3.5(a), in each case, upon presentation of a statement setting forth in reasonable detail the nature and amount of any such payment. In connection with the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000332

prorations set forth in Section 3.5(a), if actual figures are not available on the Closing Date, the proration shall be calculated based upon the respective amounts accrued through the Closing Date or paid for the most recent year or other appropriate period for which such amounts paid are available. All prorated amounts shall be recalculated and paid to the appropriate Party within sixty (60) days after the date that the previously unavailable actual figures become available. Seller and Buyer shall furnish each other with such documents and other records as may be reasonably requested in order to confirm all proration calculations made pursuant to this Section 3.5. Notwithstanding anything to the contrary herein, no proration shall be made under this Section 3.5 with respect to (i) real property Tax refunds that are Excluded Assets under Section 2.2(h) or (ii) Taxes payable by Buyer pursuant to Section 6.5(a).

3.6 Deliveries by Seller. At the Closing, Seller shall deliver, or cause to be delivered, the following to Buyer:

(a) The Deeds, duly executed by Seller and in recordable form, subject only to Permitted Encumbrances, and any owner's affidavits or similar documents reasonably required by Buyer's title insurance company;

(b) The Bill of Sale, duly executed by Seller;

(c) The Assignment and Assumption Agreement, duly executed by Seller;

(d) Evidence, in form and substance reasonably satisfactory to Buyer and its counsel, of Seller's receipt of (i) the Seller's Required Regulatory Approvals and (ii) the consents and approvals set forth on Schedule 4.3(a);

(e) The opinions of counsel to Seller to the effect set forth in Exhibit D hereto, subject to customary limitations and qualifications;

(f) A Certificate of Good Standing with respect to Seller, as of a recent date, issued by the Secretary of State of the State of New Jersey;

(g) To the extent available, originals of all Seller's Agreements to which Seller is a party and Transferable Permits issued to Seller and, if not available, true and correct copies thereof;



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000333

(h) A certificate dated the Closing Date executed by the duly authorized officers of Seller to the effect that, to such officers' Knowledge, the conditions set forth in Sections 7.2(b) and (c) have been satisfied by Seller and that each of the representations and warranties of Seller made in this Agreement are true and correct in all material respects as though made at and as of the Closing Date;

(i) The Amendment to Owners Agreement, duly executed by Seller;

(j) A FIRPTA Affidavit, duly executed by Seller;

(k) Copies, certified by the Secretary or Assistant Secretary of Seller, of corporate resolutions authorizing the execution and delivery of this Agreement, each Additional Agreement to which Seller is a party and all of the other agreements and instruments, in each case, to be executed and delivered by Seller in connection herewith;

(l) A certificate of the Secretary or Assistant Secretary of Seller identifying the name and title and bearing the signatures of the officers of Seller authorized to execute and deliver this Agreement, each Additional Agreement to which Seller is a party and the other agreements and instruments contemplated hereby;

(m) All such other agreements, documents, instruments and writings as shall, in the reasonable opinion of Buyer and its counsel, be necessary to sell, assign, convey, transfer and deliver to Buyer, Seller's rights, title and interests in and to the Purchased Assets, in accordance with this Agreement and, where necessary or desirable, in recordable form, provided that Seller shall not be required to prepare or obtain any survey, abstract, title opinion or title insurance policy with respect to the Real Property; and

(n) All such other agreements, documents, instruments and writings as are required to be delivered by Seller at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably required in connection herewith.

3.7 Deliveries by Buyer. At the Closing, Buyer shall deliver, or cause to be delivered, the following to Seller:



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000334

(a) The Closing Payment, by wire transfer of immediately available funds to the account of Seller designated by Seller at least two (2) Business Days prior to the Closing Date;

(b) The Assignment and Assumption Agreement, duly executed by Buyer;

(c) The Amendment to Owners Agreement, duly executed by PSE&G Utility and Buyer;

(d) Copies, certified by the Secretary or Assistant Secretary of Buyer, of resolutions authorizing the execution and delivery of this Agreement, each Additional Agreement to which Buyer is a party and all of the agreements and instruments, in each case, to be executed and delivered by Buyer in connection herewith;

(e) A certificate of the Secretary or Assistant Secretary of Buyer identifying the name and title and bearing the signatures of the officers of Buyer authorized to execute and deliver this Agreement, each Additional Agreement to which Buyer is a party and the other agreements contemplated hereby;

(f) Certificates of insurance required pursuant to 10 C.F.R. Parts 50 and 140;

(g) Evidence, in form and substance reasonably satisfactory to Seller and its counsel, of Buyer's receipt of the Buyer's Required Regulatory Approvals;

(h) The opinions of counsel to Buyer to the effect set forth in Exhibit E hereto, subject to customary limitations and qualifications;

(i) A Certificate of Good Standing with respect to Buyer, as of a recent date, issued by the Secretary of State of the state of organization of Buyer;

(j) A certificate dated the Closing Date executed by the duly authorized officers of Buyer to the effect that, to such officers' Knowledge, the conditions set forth in Sections 7.3(b) and (c) have been satisfied by Buyer and that each of the representations and warranties of Buyer made in this Agreement are true and correct in all material respects as though made at and as of the Closing Date;



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000335

(k) All such other agreements, documents, instruments and writings as shall, in the reasonable opinion of Seller and its counsel, be necessary for Buyer to purchase and acquire Seller's rights, title and interests in and to the Purchased Assets, and to assume the Assumed Liabilities, in each case, in accordance with this Agreement and, where necessary or desirable, in recordable form; and

(l) All such other agreements, documents, instruments and writings as are required to be delivered by Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably required in connection herewith.

3.8 <u>Relationship of this Agreement and Collateral Agreement</u>. The transactions contemplated by this Agreement, together with the transactions contemplated by the Collateral Agreement, are intended by the Parties to be consummated substantially simultaneously; and if any of the transactions contemplated hereby or by the Collateral Agreement are not consummated on the Closing Date in accordance with the terms and subject to the conditions set forth herein and therein, as applicable, then each Party shall take, or cause to be taken, all actions, and do, or cause to be done, all things, in each case, that are necessary to dissolve and invalidate all transactions contemplated hereby; provided, however, that if the failure to consummate the transactions contemplated hereby or by the Collateral Agreement results from a default or breach of a party under this Agreement or the Collateral Agreement, then nothing in the foregoing shall preclude or limit the rights or remedies of any Party in connection with such default or breach.

3.9 <u>Owners Agreement to Govern</u>. The Parties agree that, except as otherwise expressly provided in Section 6.1 of this Agreement, the Parties' ownership, lease, maintenance and operation prior to the Closing Date of the Salem Station shall be governed by the Owners Agreement.

3.10 <u>Additional Agreements</u>. The Parties acknowledge that the Additional Agreements shall be executed and delivered on or before the Closing Date, and each Party shall execute and deliver, in connection with the Closing, each Additional Agreement to which it is to be a party, substantially in the form of each Additional Agreement attached hereto.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1 Organization, Qualification. Seller is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of New Jersey and has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as it is now being conducted.

4.2 Authority. Seller has full corporate power and authority to execute and deliver this Agreement and each Additional Agreement to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each such Additional Agreement by Seller and the consummation by Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action required on the part of Seller, and no other corporate proceeding on the part of Seller is necessary to authorize this Agreement and each of the Additional Agreements to which Seller is a party or to consummate the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by Seller and constitutes, and upon the execution and delivery by Seller of each Additional Agreement to which it is a party, each such Additional Agreement will constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.3 No Violations; Consents and Approvals

(a) Except as set forth in Schedule 4.3(a), and subject to obtaining any Seller's Required Regulatory Approvals, none of the execution, delivery and performance of this Agreement, the execution, delivery and performance of the Additional Agreements, or the consummation by Seller of the transactions contemplated hereby and thereby will (i) conflict with or result in any breach of any provision of the Articles of Incorporation or Bylaws of Seller; (ii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, lease, agreement or other instrument or obligation to which Seller is a party or by which it, or any of the Purchased Assets, may be bound (other than the Seller's Agreements referred to in clause (ii) of the definition thereof), except for such



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000337

defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or that would not, individually or in the aggregate, have a Material Adverse Effect; or (iii) constitute violations of any Law, order, judgment or decree applicable to Seller or any of its assets, including the Purchased Assets, which violations, individually or in the aggregate, would have a Material Adverse Effect.

(b) Except for consents, approvals, filings and notices (i) required under the HSR Act, or (ii) set forth in Schedule 4.3(b) (the consents, approvals, filings and notices referred to in clause (ii) of this sentence are collectively referred to herein as the "Seller's Required Regulatory Approvals"), no consent, authorization or approval of, declaration, filing or registration with, or notice to, any Governmental Authority is necessary for the execution and delivery by Seller of this Agreement and the Additional Agreements or the consummation by Seller of the transactions contemplated hereby or thereby, other than (i) such consents, authorizations, approvals, declarations, filings, registrations with and notices which, if not obtained or made, would not, individually or in the aggregate, have a Material Adverse Effect, or prevent Seller from performing its material obligations under this Agreement or the Additional Agreements; and (ii) such consents, authorizations, approvals, declarations, filings, registrations with or notices which become applicable to Seller or the Purchased Assets as a result of the status of Buyer (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which Buyer (or any of its Affiliates) is or proposes to be engaged.

4.4 Permits. Prior to the Closing Date, Seller will hold all permits, registrations, franchises, certificates, licenses and other authorizations, consents and approvals of all Governmental Authorities that Seller requires in order to own any of the Purchased Assets (collectively, "Seller Permits"), except for (a) Seller Nuclear Permits (which are governed by Section 4.7) and (b) such failures to hold or comply with such Seller Permits as would not, individually or in the aggregate, have a Material Adverse Effect or would not, individually as in the aggregate, materially impair Seller's ability to consummate the transactions contemplated hereby. Schedule 4.4(a) sets forth a complete list, as of the date hereof, of all Seller Permits issued to Seller through the date hereof. Schedule 4.4(b) sets forth a complete list, as of the date hereof, of all Transferable Permits issued to Seller through the date hereof.

4.5 Seller's Qualified Decommissioning Funds

(a) Each of Seller's Qualified Decommissioning Funds is a trust validly existing and in good standing under the laws of the Commonwealth of



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000338

Pennsylvania with all requisite authority to conduct its affairs as it now does. Seller has heretofore delivered to Buyer a copy of the Trust Agreement as in effect on the date of this Agreement. Seller agrees to furnish Buyer with copies of all amendments of the Trust Agreement adopted after the date of this Agreement promptly after each such amendment has been adopted. Each of Seller's Qualified Decommissioning Funds satisfies the requirements necessary to be treated as a "Nuclear Decommissioning Reserve Fund" within the meaning of Code Section 468A(a) and as a "nuclear decommissioning fund" and a "qualified nuclear decommissioning fund" within the meaning of Treas. Reg. § 1.468A-1(b)(3). Each of Seller's Qualified Decommissioning Funds is in compliance in all material respects with all applicable rules and regulations of the NRC, NJBPU and the Internal Revenue Service. The Seller's Qualified Decommissioning Funds have not engaged in any acts of "self-dealing" as defined in Treas. Reg. § 1.468A-5(b)(2). No "excess contribution" as defined in Treas. Reg. § 1.468A-5(c)(2)(ii) has been made to Seller's Qualified Decommissioning Funds which has not been withdrawn within the period provided under Treas. Reg. § 1.468A-5(c)(2)(i) for withdrawals of excess contributions to be made without resulting in a disqualification of such funds under Treas. Reg. § 1.468A-5(c)(1). Seller has made timely and valid elections to make annual contributions to the Seller's Qualified Decommissioning Funds since the formation of such trusts. Seller has delivered, or will deliver prior to the Closing, copies of such elections to Buyer.

(b) Subject to the receipt of Seller's Required Regulatory Approvals and amendment of the Trust Agreement, Seller has all requisite authority to cause the assets of the Seller's Qualified Decommissioning Funds to be transferred in accordance with the provisions of this Agreement.

(c) Seller or the trustees of each of the Seller's Qualified Decommissioning Funds have filed or caused to be filed with the NRC, the Internal Revenue Service and any state or local authority all material forms, statements, reports, documents (including all exhibits, amendments and supplements thereto) required to be filed by either of them. Seller has delivered, or will deliver prior to the Closing, to Buyer a copy of the schedule of ruling amounts most recently issued by the Internal Revenue Service for each of the Seller's Qualified Decommissioning Funds, a copy of the request that was filed to obtain such schedule of ruling amounts and a copy of any pending request for a revised ruling amounts, in each case together with all exhibits, amendments and supplements thereto. As of the Closing, Seller will have timely filed all requests for revised schedules of ruling amounts for Seller's Qualified Decommissioning Funds to the extent required by and in accordance with Treas. Reg. § 1.468A-3(i). Seller shall furnish Buyer with copies of such request for



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000339

revised schedules of ruling amounts, together with all exhibits, amendments and supplementals thereto, promptly after they have been filed with the Internal Revenue Service. Any amounts contributed to Seller's Qualified Decommissioning Funds while such requests are pending before the Internal Revenue Service and which turn out to be in excess of the applicable amounts provided in the schedule of ruling amounts issued by the Internal Revenue Service will be withdrawn from the Seller's Qualified Decommissioning Funds within the period provided under Treas. Reg. § 1.468A-5(c)(2)(i) for withdrawals of excess contributions to be made without resulting in a disqualification of the Funds under Treas. Reg. § 1.468A-5(c)(1). There are no interim rate orders that may be retroactively adjusted or retroactive adjustments to interim rate orders that may affect amounts that may be contributed to Seller's Qualified Decommissioning Funds or may require distributions to be made from the Seller's Qualified Decommissioning Funds.

(d) Seller has made or prior to the Closing will make available to Buyer the balance sheet for each of the Seller's Qualified Decommissioning Funds as of March 31, 1999 and as of the fourth Business Day before Closing, as prepared by the trustee of Seller's Qualified Decommissioning Fund in the ordinary course and consistent with past practice. Seller has made, or prior to the Closing will make, available to Buyer information from which Buyer can determine the Tax Basis of all assets in Seller's Qualified Decommissioning Funds as of the fourth Business Day before Closing. There are no liabilities (whether absolute, accrued, contingent or otherwise and whether due or to become due), including any acts of "self-dealing" as defined in Treas. Reg. § 1.468A-5(b)(2) or agency or other legal proceedings that may materially affect the financial position of each of the Seller's Qualified Decommissioning Funds other than those that are disclosed on Schedule 4.5(d).

(e) Seller has made or prior to the Closing will make available to Buyer all contracts and agreements to which the trustee of each of the Seller's Qualified Decommissioning Funds, in its capacity as such, is a party.

(f) Each of the Seller's Qualified Decommissioning Funds has filed all Tax Returns required to be filed and all Taxes shown to be due on such Tax Returns have been paid in full. Except as shown in Schedule 4.5(f), no notice of deficiency or assessment has been received from any taxing authority with respect to liability for Taxes or the Seller's Qualified Decommissioning Funds which have not been fully paid or finally settled, and any such deficiency shown in such Schedule 4.5(f) is being contested in good faith through appropriate proceedings. Except as set forth in Schedule 4.5(f), there are no outstanding agreements or waivers extending



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000340

the applicable statutory periods of limitations for Taxes associated with each of the Seller's Qualified Decommissioning Funds for any period.

(g) To the extent Seller has pooled the assets of the Seller's Qualified Decommissioning Funds for investment purposes in periods prior to Closing, such pooling arrangement is a partnership for federal income tax purposes and Seller has filed all Tax Returns required to be filed with respect to such pooling arrangement for such periods or the pooling arrangement has elected out of partnership status, and the distributive or allocable share of any income, gain or loss of such pooling arrangement is includable in the income of Seller's Qualified Decommissioning Funds.

4.6 <u>Seller's Nonqualified Decommissioning Funds</u>

(a) Each of Seller's Nonqualified Decommissioning Funds is a trust validly existing and in good standing under the laws of the Commonwealth of Pennsylvania with all requisite authority to conduct its affairs as it now does. Each of Seller's Nonqualified Decommissioning Funds is in compliance in all material respects with all applicable rules and regulations of the NRC and the NJBPU.

(b) Subject only to receipt of the Seller's Required Regulatory Approvals and amendment of the Trust Agreement, Seller has all requisite authority to cause the assets of the Seller's Nonqualified Decommissioning Funds to be transferred to Buyer's nonqualified decommissioning funds in accordance with the provisions of this Agreement and amendment of the Trust Agreement.

(c) Seller or the trustee of the Seller's Nonqualified Decommissioning Funds have filed or caused to be filed with the NRC and any state or local authority all material forms, statements, reports, documents (including all exhibits, amendments and supplements thereto) required to be filed by either of them.

(d) Seller has made or prior to the Closing will make available to Buyer the balance sheet for each of Seller's Nonqualified Decommissioning Funds as of March 31, 1999 and as of the fourth Business Day before Closing, as prepared by the trustee of Seller's Nonqualified Decommissioning Fund in the ordinary course and consistent with past practice. There are no liabilities (whether absolute, accrued, contingent or otherwise and whether due or to become due) including agency or other legal proceedings that may materially affect the financial position of Seller's Nonqualified Decommissioning Funds other than those, if any, that are disclosed on Schedule 4.6(d).



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000341

(e) Seller has made or prior to the Closing will make available to Buyer all contracts and agreements to which the trustee of the Seller's Nonqualified Decommissioning Funds, in its capacity as such, is a party.

(f) To the extent Seller has pooled the assets of Seller's Nonqualified Decommissioning Funds for investment purposes in periods prior to closing, such pooling arrangement is not an association taxable as a corporation for federal income tax purposes.

4.7 Nuclear Law Matters. Seller is a licensed co-owner, but not an operator, of the Salem Station. Subject to this fact, and except as set forth in Schedule 4.7, prior to the Closing Date, Seller will hold all Seller Permits in respect of Nuclear Laws that Seller requires in order to own its rights, title and interests in and to the Purchased Assets (collectively, "Seller Nuclear Permits").

4.8 Legal Proceedings. Except as set forth in Schedule 4.8, there is no claim, action, proceeding or investigation pending, or to Seller's Knowledge, threatened against or relating to Seller or its Affiliates before any court, arbitrator or Governmental Authority, which could, individually or in the aggregate, reasonably be expected to result, or has resulted, in (a) the institution of legal proceedings to prohibit or restrain the performance of this Agreement or any of the Additional Agreements, or the consummation of the transactions contemplated hereby or thereby, (b) a claim against Buyer or its Affiliates for damages as a result of Seller entering into this Agreement or any of the Additional Agreements, or the consummation by Seller of the transactions contemplated hereby or thereby, (c) a material impairment of Seller's ability to perform its obligations under this Agreement or any of the Additional Agreements, or (d) a Material Adverse Effect. Except as set forth in Schedule 4.8, Seller is not subject to any outstanding judgments, decrees or orders of any court, arbitrator or Governmental Authority that would, individually or in aggregate, have a Material Adverse Effect.

4.9 Personal Property. Seller has such title to all personal property included in the Purchased Assets as arises by reason of Seller's rights under the Owners Agreement and owns such personal property free and clear of all Encumbrances created by Seller, except for Permitted Encumbrances and the Encumbrances set forth on Schedule 4.9.

4.10 Real Property. Seller owns good, valid and marketable fee simple title to the Salem Interest in the Real Property described by metes and bounds in the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000342

deeds listed as items 1.a., 1.b. and 2.a. through 2.h. in Schedule 1.1(105), subject only to Permitted Encumbrances.

4.11 Contracts. Except as disclosed in Schedule 4.11, (i) each Seller's Agreement listed on Schedule 1.1(119) constitutes a legal, valid and binding obligation of Seller and, to Seller's Knowledge, constitutes a valid and binding obligation of the other parties thereto, (ii) to Seller's Knowledge is in full force and effect, and (iii) may be transferred to Buyer as contemplated by this Agreement without the consent of the other parties thereto and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder, except for such breaches, forfeitures or impairments which would not, individually or in the aggregate, have a Material Adverse Effect.

4.12 Certain Environmental Liabilities. Except as set forth on Schedule 4.12, there are no liabilities or obligations arising under or relating to Environmental Laws or relating to any claim with respect to Environmental Conditions or Hazardous Substances with respect to the Purchased Assets, in any case, which relate to any Off-Site Location and of which Seller has Knowledge.

4.13 Undisclosed Liabilities. Except for liabilities and obligations specifically referred to in Section 2.3(a) through (g) or Section 2.4(a) through (h), or on Schedule 4.3(a) or 4.9, the Purchased Assets are not, to the Knowledge of Seller, subject to any material liability or obligation that has arisen solely as a result of an act or omission by Seller (other than Permitted Encumbrances).

4.14 Intellectual Property. Seller does not own or otherwise have any right to use any patent, trade name, trademark, service mark or other intellectual property that is used in and necessary for the operation of the Salem Station, other than such as may be included in the Purchased Assets.

4.15 Taxes. With respect to the Purchased Assets (i) all income Tax Returns required to be filed have been filed, and (ii) all income Taxes shown to be due on such income Tax Returns have been paid in full. Except as set forth in Schedule 4.15, no notice of deficiency or assessment has been received from any taxing authority with respect to liabilities for income Taxes of Seller in respect of the Purchased Assets, which have not been fully paid or finally settled, and any such deficiency shown in such Schedule 4.15 is being contested in good faith through appropriate proceedings. Except as set forth in Schedule 4.15, there are no outstanding agreements or waivers extending the applicable statutory periods of limitations



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000343

for income Taxes associated with the Purchased Assets for any period. Schedule 4.15 sets forth the taxing jurisdictions in which Seller owns assets or conducts business that require a notification to a taxing authority of the transactions contemplated by this Agreement, if the failure to make such notification, or obtain Tax clearances in connection therewith, would either require Buyer to withhold any portion of the Purchased Price or would subject Buyer to any liability for any income Taxes of Seller.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1 Organization; Qualification. Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and properties and to carry on its business as it is now being conducted. Buyer is, or by the Closing Date will be, qualified to do business in the State of New Jersey.

5.2 Authority. Buyer has full power and authority to execute and deliver this Agreement and each Additional Agreement to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement by Buyer and each such Additional Agreement to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby by Buyer have been duly and validly authorized by all necessary action required on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement or each of the Additional Agreements or to consummate the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by Buyer and constitutes, and upon the execution and delivery by Buyer of each Additional Agreement to which it is a party, each such Additional Agreement will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3 No Violations; Consents and Approvals

(a) Except as set forth in Schedule 5.3(a), and subject to obtaining any Buyer's Required Regulatory Approvals, none of the execution, delivery or



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000344

performance of this Agreement, the execution, delivery and performance of the Additional Agreements or the consummation by Buyer of the transactions contemplated hereby and thereby will (i) conflict with or result in any breach of any provision of the certificate of formation or operating agreement (or similar governing documents) of Buyer, (ii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, lease, agreement or other instrument or obligation to which Buyer is a party, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or that would not, individually or in the aggregate, have a Material Adverse Effect; or (iii) constitute violations of any Law, order, judgment or decree applicable to Buyer, which violations, individually or in the aggregate, would have a Material Adverse Effect.

(b) Except for consents, approvals, filings and notices (i) required under the HSR Act, or (ii) set forth in Schedule 5.3(b) (the consents, approvals, filings and notices referred to in clause (ii) of this sentence are collectively referred to herein as the "Buyer's Required Regulatory Approvals"), no consent, authorization or approval of, declaration, filing or registration with, or notice to, any Governmental Authority is necessary for the execution and delivery by Buyer of this Agreement and the Additional Agreements or the consummation by Buyer of the transactions contemplated hereby and thereby, other than (i) such consents, authorizations, approvals, declarations, filings, registrations with, or notices, which, if not obtained or made, would not, individually or in the aggregate, have a Material Adverse Effect or prevent Buyer from performing its material obligations under this Agreement or the Additional Agreements and (ii) such consents, authorizations, approvals, declarations, filings, registrations with, or notices which become applicable to Buyer as a result of the specific regulatory status of Seller (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which Seller (or any of its Affiliates) is or proposes to be engaged.

5.4 Buyer Permits. Prior to and on the Closing Date, subject to the receipt of Buyer's Required Regulatory Approvals, Buyer will hold all permits, certificates, licenses and other authorizations of all Governmental Authorities that Buyer requires in order to own, lease, maintain and operate the Salem Station, including the Purchased Assets (collectively, "Buyer Permits"), except, in each case, for (a) Buyer Nuclear Permits (which are governed by Section 5.5) and (b) such failures to hold or comply with such Buyer Permits as would not result in a Material Adverse Effect or would not, individually or in the aggregate, materially impair Buyer's ability to consummate the transactions contemplated hereby.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

5.5 Nuclear Law Matters.

(a) PSE&G Utility is a licensed co-owner, and the licensed operator, of the Salem Station.

(b) Prior to and on the Closing Date, subject to the receipt of Buyer's Required Regulatory Approvals, Buyer will hold all Buyer Permits in respect of Nuclear Laws that Buyer requires in order to own, lease, maintain and operate the Salem Station, including, on the Closing Date, the Purchased Assets (collectively, "Buyer Nuclear Permits").

5.6 Legal Proceedings.

(a) Except as set forth in Schedule 5.6(a), there is no action, proceeding or investigation pending or, to Buyer's Knowledge, threatened against or relating to Buyer or its Affiliates before any court, arbitrator or Governmental Authority, which could, individually or in the aggregate, reasonably be expected to result, or has resulted, in (i) the institution of legal proceedings to prohibit or restrain the performance of this Agreement or any of the Additional Agreements, or the consummation of the transactions contemplated hereby or thereby, (ii) a claim against Seller or its Affiliates for damages as a result of Buyer entering into this Agreement or any of the Additional Agreements, or the consummation by Buyer of the transactions contemplated hereby or thereby, (iii) a material impairment of Buyer's ability to perform its obligations under this Agreement or any of the Additional Agreements, or (iv) a Material Adverse Effect. Except as set forth in Schedule 5.6(a), Buyer is not subject to any outstanding judgments, decrees or orders of any court, arbitrator or Governmental Authority that would, individually or in the aggregate, have a Material Adverse Effect.

(b) As of the date of this Agreement, to the Knowledge of Buyer, there is no action, proceeding or investigation involving an amount in dispute in excess of $1 million pending or threatened against any third party (other than those referred to in Section 2.1(l), 2.2(l) or (m)) with respect to the ownership, lease, operation or maintenance of the Salem Station.

5.7 Qualified Buyer. As of the date of this Agreement, to Buyer's Knowledge, there is no fact, circumstance, event or condition reasonably expected to impair Buyer's ability, on or prior to the Closing Date, to obtain all Buyer Permits, including Buyer Nuclear Permits and Environmental Permits, necessary for Buyer to



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

own, lease, maintain and operate the Salem Station, including on the Closing Date, the Purchased Assets.

5.8 Inspections. Buyer has, prior to its execution and delivery of this Agreement, had full opportunity to conduct to its satisfaction Inspections of the Purchased Assets. Buyer acknowledges, after such review and Inspections, that no further investigation is necessary for purposes of acquiring Seller's rights, title and interests in and to the Purchased Assets for Buyer's intended use.

5.9 Certain Environmental Liabilities. Except as set forth on Schedule 5.9, there are no liabilities or obligations arising under or relating to Environmental Laws or relating to any claim in respect to Environmental Conditions or Hazardous Substances with respect to the Purchased Assets, in any case, which relate to any Off-Site Location and of which Buyer has Knowledge.

## ARTICLE VI

## COVENANTS OF THE PARTIES

6.1 Certain Buyer Covenants.

(a) Notwithstanding any provision of the Owners Agreement to the contrary, Buyer shall reimburse Seller for all costs and expenses relating to Inventories at the Salem Station for which Seller is liable, whether under the Owners Agreement or otherwise, between September 1, 1999 and the Closing Date to the extent that the amount of such costs and expenses exceeds the product obtained by multiplying (i) the average monthly costs and expenses for Inventories at the Salem Station for which Seller was liable during the twelve-month period ended August 31, 1999, by (ii) the number of months (including partial months, prorated on a daily basis) between September 1, 1999 and the Closing Date. Any such reimbursement payable by Buyer to Seller pursuant to this Section 6.1(a) shall be paid in the manner contemplated by Section 3 of the Amendment to Owners Agreement.

(b) Schedule 6.1(b) sets forth the aggregate forecasted budget prepared by Buyer (the "Salem Station Budget") for capital expenditures (other than Nuclear Fuel Supplies), and operations and maintenance expenses (whether ordinary course or otherwise) for the Salem Station (together, "Defined Expenses"), for the months from and after September 1, 1999. Notwithstanding any provision of the Owners Agreement to the contrary, the amount of Defined Expenses allocable to the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000347

Salem Interest from and after September 1, 1999 shall be reduced to the extent that the amount of such Defined Expenses exceeds, in the aggregate, the product obtained by multiplying (i) the sum of all Defined Expenses allocated in the Salem Station Budget to each month (including partial months, prorated on a daily basis) which has elapsed prior to the Closing Date, times (ii) 1.05, times (iii) 0.0741. The amount of such reduction is referred to as the "Defined Expenses Excess." The Defined Expenses Excess shall be taken into account for purposes of and as set forth in Section 3 of the Amendment to Owners Agreement.

6.2 Public Statements. Except as required by applicable Law, any Governmental Authority or applicable rules of any national securities exchange, in which event the Parties shall consult with each other in advance, prior to the Closing Date, no press release or other public announcement, statement or comment relating to this Agreement, the Additional Agreements or the transactions contemplated by this Agreement shall be issued, made or permitted to be issued or made by any Party or its Representatives without the prior written consent of the other Party (which approval shall not be unreasonably withheld or delayed).

6.3 Further Assurances.

(a) Subject to the terms and conditions of this Agreement, each Party shall use its Commercially Reasonable Efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under Law to consummate and make effective the purchase, sale, assignment, conveyance, transfer and delivery of the Purchased Assets and the assumption of the Assumed Liabilities pursuant to this Agreement as soon as practicable. Such actions shall include, without limitation, each Party using its Commercially Reasonable Efforts to ensure satisfaction of the conditions precedent to its obligations hereunder, including obtaining all necessary consents, approvals, and authorizations of third parties and Governmental Authorities required to be obtained in order to consummate the transactions hereunder, and to effectuate a transfer of the Transferable Permits to Buyer, and providing access to such books and records of the other Party as may reasonably be requested for such purpose. No Party shall, without the prior written consent of the other Party, take or fail to take any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement; provided that the good faith exercise of any approval rights or discretion provided for in this Agreement shall not be deemed in violation of the requirements of this Section 6.3(a).



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000348

(b) Without limiting the generality of Section 6.3(a):

(i) In the event that any part of Seller's rights, title and interests in and to Purchased Assets shall not have been assigned, conveyed, transferred or delivered to Buyer at the Closing, Seller shall, subject to Section 6.3(b)(ii), use Commercially Reasonable Efforts after the Closing to assign, convey, transfer or deliver such rights, title and interests to Buyer as promptly as practicable.

(ii) To the extent that Seller's rights under any Seller's Agreement may not be assigned without the consent, approval or authorization of any third party which consent, approval or authorization has not been obtained by the Closing Date, this Agreement shall not constitute an agreement to assign such right if an attempted assignment would constitute a breach of such Seller's Agreement or violate any applicable Law and Seller, at its sole cost and expense, shall use Commercially Reasonable Efforts to obtain any such required consents, approvals or authorizations as promptly as practicable. If any consent, approval or authorization to an assignment of any Seller's Agreement shall not be obtained, or if any attempted assignment would be ineffective or would impair Buyer's rights and obligations under such Seller's Agreement, such that Buyer would not, subject to the terms and conditions hereof, acquire and assume the benefit and detriment of all such rights and obligations, Seller, at Buyer's option and to the fullest extent permitted by Law and such Seller's Agreement, shall, after the Closing Date, appoint Buyer to be Seller's agent with respect to such Seller's Agreement, and, to the maximum extent permitted by Law and such Seller's Agreement enter into such reasonable arrangements with Buyer or take such other actions as are necessary to provide Buyer with the same or substantially similar rights and obligations of such Seller's Agreement as Buyer may reasonably request.

6.4 Consents and Approvals. Without limiting the generality of Section 6.3(a):

(a) As promptly as practicable after the date of this Agreement, Seller and Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice all notifications required to be filed under the HSR Act and the rules and regulations promulgated thereunder, as amended from time to time, with respect to the transactions contemplated hereby and by the Additional Agreements. The Parties shall use their Commercially Reasonable Efforts to respond promptly to any requests for additional information made by, either of such agencies, and to cause the applicable waiting period under the HSR



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000349

Act relating to the Purchased Assets to terminate or expire at the earliest possible date after the date of filing of such notification. Buyer shall pay all filing fees payable under the HSR Act but each Party shall bear its own costs and expenses of the preparation of any filing.

(b) As promptly as practicable after the date of this Agreement, Seller and Buyer shall take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to obtain all required consents and approvals of the NJBPU, the SEC and all other Governmental Authorities, and make all other filings and give all other notices required to be made prior to the Closing with respect to the transactions contemplated hereby and by the Additional Agreements. The Parties shall respond promptly to any requests for additional information made by such Persons, and use their respective Commercially Reasonable Efforts to cause all such consents and approvals to be obtained or waived at the earliest possible date after the date of filing. Each Party will bear its own costs of the preparation of any such filing or notice.

(c) Seller and Buyer shall cooperate with each other and promptly prepare and file notifications with, and request Tax clearances from, state and local taxing authorities in jurisdictions in which a portion of the Purchase Price may be required to be withheld or in which Buyer would otherwise be liable for any Tax liabilities of Seller pursuant to state or local Tax Law.

(d) Without limiting the generality of Section 6.4(b), as promptly as practicable after the date of this Agreement, Buyer shall make all filings required by the Federal Power Act, individually or jointly with Seller, as reasonably determined by the Parties. Prior to filing any application with the FERC, Buyer shall submit such application to Seller for review and comment and shall incorporate into such application all revisions reasonably requested. If any filing is rejected by the FERC, Buyer shall petition the FERC for rehearing or permission to re-submit an application with the FERC, provided that, in either case, such action has been approved by Seller.

(e) Without limiting the generality of Section 6.4(b), as promptly as practicable after the date hereof, Seller and Buyer shall jointly submit NRC Applications requesting the NRC Approvals. The Parties shall respond promptly to any requests for additional information made by the NRC, cooperate in connection with any presentation or proceeding associated with such NRC Applications and use their respective Commercially Reasonable Efforts to cause such NRC Approvals to be obtained at the earliest practicable date after the date of filing. Seller and Buyer



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000350

each shall bear its own costs relating to the NRC Applications and shall pay one-half of all NRC fees payable in connection with the NRC Applications and the NRC Approvals, provided that, notwithstanding the foregoing, Buyer shall, at its sole expense, comply with all conditions and requirements imposed by the NRC relating to the amount, including the sufficiency and adequacy, of the Decommissioning Funds and similar such external trust funds of Buyer.

6.5 Certain Tax Matters.

(a) All Transfer Taxes incurred in connection with this Agreement and the Additional Agreements, and the transactions contemplated hereby and thereby (including (i) sales Tax on the sale or purchase of the Purchased Assets imposed by the State of New Jersey, and (ii) Transfer Taxes or conveyance fees on conveyances of interests in real and/or personal property imposed by the State of New Jersey or any county or municipality therein) shall be borne equally by Seller and Buyer. Seller, at its expense, shall prepare and file, to the extent required by, or permissible under, applicable Law, all necessary Tax Returns and other documentation with respect to all such, Transfer Taxes, and, if required by Law, Buyer shall join in the execution of all such Tax Returns and other documentation. Prior to the Closing Date, to the extent applicable, Buyer shall provide to Seller appropriate certificates of Tax exemption from each applicable Governmental Authority.

(b) With respect to Taxes to be prorated in accordance with Section 3.5, Buyer shall prepare and timely file all Tax Returns required to be filed after the Closing Date with respect to the Purchased Assets, if any, and shall duly and timely pay all such Taxes shown to be due on such Tax Returns. Buyer's preparation of such Tax Returns shall be subject to Seller's approval, which approval shall not be unreasonably withheld or delayed. Buyer shall make each such Tax Return available for Seller's review and approval (which approval shall not be unreasonably withheld or delayed) no later than fifteen (15) Business Days prior to the due date for filing such Tax Return, it being understood that Seller's failure to approve any such Tax Return shall not limit Buyer's obligation to timely file such Tax Return and duly and timely pay all Taxes shown to be due thereon. Seller shall, to the extent required by Law, join in the execution of any such Tax Returns.

(c) Buyer and Seller shall provide the other with such assistance as may reasonably be requested by the other Party in connection with the preparation of any Tax Return, audit or other examination, or any proceeding, by or before any Governmental Authority relating to liability for Taxes, and each Party shall retain and provide the requesting Party with all books and records or other information



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000351

which may be relevant to such Tax Return, audit, examination or proceeding. All books, records and information obtained pursuant to this Section 6.5(c) or pursuant to any other Section hereof that provides for the sharing of books, records and information or review of any Tax Return or other instrument relating to Taxes shall be kept confidential by the parties hereto in accordance with the terms and conditions set forth in the Confidentiality Agreement.

(d) Buyer and Seller shall cooperate and provide each other with such assistance as may be reasonably requested by the other Party in connection with obtaining private letter rulings from the Internal Revenue Service pertaining to the transfers of the Decommissioning Funds contemplated by this Agreement. Without limiting the generality of the foregoing, Seller and Buyer shall use its best efforts to obtain a private letter ruling from the Internal Revenue Service determining that the transfer of assets from Seller's Qualified Decommissioning Funds to Buyer's Qualified Decommissioning Funds is a disposition that satisfies the requirements of Treas. Reg. § 1.468A-6(b) or Treas. Reg. § 1.468A-(6)(g)(1). Neither Seller nor Buyer shall take any action that would cause (i) such transfer to fail to satisfy the requirements of Treas. Reg. § 1.468A-6(b) or Treas. Reg. § 1.468A-6(g)(1) or (ii) Seller and Buyer to fail to obtain such private letter ruling.

(e) In the event that a dispute (other than with respect to the Decommissioning Funds) arises between Seller and Buyer regarding Taxes or any amount due under this Section 6.5, Seller and Buyer shall attempt in good faith to resolve such dispute and any agreed upon amount shall be promptly paid to the appropriate Party. If any such dispute is not resolved within thirty (30) days after notice thereof is given to any Party, upon the written request of any Party, the Parties shall submit the dispute to an Independent Accounting Firm for resolution, which resolution shall be final, binding and conclusive on such Parties. Notwithstanding anything in this Agreement to the contrary, the fees and expenses of the Independent Accounting Firm in resolving the dispute shall be borne equally by Seller and Buyer. Any payment required to be made as a result of the resolution by the Independent Accounting Firm of any such dispute shall be made within five (5) Business Days after such resolution, together with any interest determined by the Independent Accounting Firm to be appropriate.

(f) If Buyer or Seller receives a refund of Taxes in respect of the Purchased Assets (other than with respect to the Decommissioning Funds) for a taxable period including the Closing Date, Buyer shall pay to Seller the portion of any such refund attributable to the portion of the taxable period prior to the Closing



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000352

Date, and Seller shall pay to Buyer the portion of any such refund attributable to the portion of such taxable period on and after the Closing Date.

(g) From and after the Closing Date, Buyer and, to the extent permitted by applicable Law, the Buyer's Qualified Decommissioning Funds shall indemnify, defend and hold harmless the Seller's Qualified Decommissioning Funds from and against any and all Indemnifiable Losses asserted against or suffered by the Seller's Qualified Decommissioning Funds relating to, resulting from or arising out of the imposition of any federal, state or local Tax on any income or gain recognized by the Seller's Qualified Decommissioning Funds as the result of transfers contemplated by this Agreement of the assets in the Seller's Qualified Decommissioning Funds to the Buyer's Qualified Decommissioning Funds not qualifying under Treas. Reg. § 1.468A-6 (each, a "Fund Tax Loss") (other than those Fund Tax Losses that occur directly as a result of Seller's conduct or a breach of Seller's representations and warranties set forth in Section 4.5). From and after the Closing Date, Buyer shall indemnify, defend and hold harmless Seller's Indemnitees from and against any and all Indemnifiable Losses asserted against or suffered by any Seller's Indemnitee relating to, resulting from or arising out of the imposition on any of Seller's Indemnitees of any federal, state or local Tax in connection with any income or gain recognized by any of the Seller's Qualified Decommissioning Funds to the extent such Tax was not paid by any of the Seller's Qualified Decommissioning Funds as the result of transfers contemplated by this Agreement of the assets in the Seller's Qualified Decommissioning Funds to the Buyer's Qualified Decommissioning Funds not qualifying under Treas. Reg. § 1.468A-6 (each, a "Seller Tax Loss") (other than those Seller Tax Losses that occur directly as a result of Seller's conduct or a breach of Seller's representations and warranties set forth in Section 4.5). Buyer shall pay the amount of any Fund Tax Loss or Seller Tax Loss within ten (10) days of receipt of written notice setting forth with reasonable specificity the nature and amount of such Fund Tax Loss or Seller Tax Loss.

6.6 Advice of Changes. Prior to the Closing, each Party shall advise the other Party in writing with respect to any matter arising after the date of this Agreement of which that Party obtains Knowledge and which, if existing or occurring on or prior to the date of this Agreement, would have been required to be set forth in this Agreement, including any of the Schedules hereto. Seller may at any time notify Buyer, in writing, of any fact, event, circumstance or condition that constitutes or results in a breach of any of its representations and warranties in Article IV; provided, however, that no such notice shall constitute a supplement or amendment of any Schedule hereto. No supplement or amendment of any Schedule made pursuant



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

to this Section shall be deemed to cure any breach of any representation or warranty made in this Agreement unless the Parties agree thereto in writing.

6.7 ISRA Compliance.

(a) Prior to the Closing.

(i) Prior to the Closing, Buyer shall be responsible for taking all necessary actions to comply with the requirements of the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6, et seq. ("ISRA") applicable to the transactions contemplated hereby and by the Additional Agreements, including filing all necessary forms and conducting any Remediation as may be required by NJDEP criteria, procedures and time schedules. Buyer shall fully cooperate with Seller with respect to such compliance, including, providing Seller with advance copies of all submittals to be filed in connection with ISRA and incorporating comments provided by Seller into such filings as and where appropriate, in Buyer's reasonable judgment, and providing to Seller copies of correspondence and documents received from the New Jersey Department of Environmental Protection ("NJDEP") on a timely basis; provided, that neither Buyer nor Seller shall take any action that would result in a violation of ISRA by either person. Without limiting the generality of the foregoing, Buyer shall, with cooperation from Seller, prepare and file an application for a Letter of Non-Applicability or another appropriate exemption or limitation on the scope of ISRA review if, in the judgment of Buyer, such application is reasonably likely to be approved by the NJDEP.

(ii) Seller shall fully cooperate with Buyer in connection with Buyer's compliance with ISRA under subsection (a)(i), including providing full cooperation and support to Buyer in connection with the preparation and prosecution of an application for a Letter of Non-Applicability, providing information as may be required to prepare and file any ISRA-related submission, providing comments on any draft ISRA-related submittals forwarded by Buyer for Seller review, executing any ISRA or ISRA-related forms reasonably requiring Seller's signature that are necessary to allow the Parties to consummate the transactions contemplated by this Agreement and the Additional Agreements in accordance with ISRA requirements, including a form of application for a Letter of Non-Applicability, and providing to Buyer copies of correspondence and documents received from the NJDEP, all on a timely basis.

(iii) Notwithstanding anything to the contrary herein, Seller shall be responsible for filing a General Information Notice (as such term is defined



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER