by ISRA) if, in the judgment of Seller, such action is necessary to ensure compliance with ISRA, provided, however, that if on or by the date required under ISRA for filing a General Information Notice related to the transactions contemplated by this Agreement, Buyer has filed an application for a Letter of Non-Applicability, Seller shall not make a General Information Notice filing related to the transaction at such time without Buyer's written approval and such filing otherwise shall not be made unless and until the NJDEP makes a written determination that a Letter of Non-Applicability will not be issued. Buyer shall defend, indemnify and hold harmless Seller from all Indemnifiable Losses incurred by Seller that arise as a result of Seller's not filing a General Information Notice on or by the date required by ISRA. Furthermore, to the extent that the NJDEP alleges, because of Buyer's actions or omissions prior to Closing, that a violation of ISRA is alleged to have occurred for which NJDEP alleges Seller is liable, Seller shall provide written notice to Buyer of such allegation and Buyer shall have five (5) days from receipt of such written notice to Buyer to cure such alleged violation. If Buyer fails to cure such alleged violation to the satisfaction of the NJDEP, Seller may assume responsibility for complying with the requirements of ISRA until Closing. In such event, Buyer shall promptly reimburse Seller for all reasonable costs and expenses incurred by Seller in connection with actions taken by Seller to comply with ISRA prior to the Closing, including all reasonable costs and expenses of attorneys, environmental consultants and engineers retained by Seller to comply with ISRA. Buyer shall fully cooperate with Seller in connection with Seller's compliance with ISRA under this subsection, including executing any forms necessary to allow the Parties to consummate the transactions contemplated by this Agreement and the Additional Agreements in accordance with ISRA requirements, providing reasonable access to the Salem Station, and assisting Seller and its Representatives and consultants in conducting any required field work. Buyer shall defend, indemnify and hold harmless Seller from all Indemnifiable Losses incurred by Seller as a result of any violation of ISRA for which NJDEP alleges Seller is liable because of Buyer's actions or omissions prior to Closing that Buyer does not cure as provided in this subsection.

(iv) (A) If the NJDEP determines that ISRA is applicable to the transactions contemplated by this Agreement and the Additional Agreements, Buyer shall conduct a Preliminary Assessment and submit a Preliminary Assessment Report to the NJDEP that seeks the NJDEP's written concurrence that neither Buyer nor Seller shall be required to Remediate potential contamination at the Sites by radionuclides in connection with the actions that Seller or Buyer will be required to take to comply with ISRA as a result of the transactions contemplated by this Agreement and the Additional Agreements. Notwithstanding anything to the contrary herein, Buyer shall not be obligated to commence work on the Preliminary



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

Assessment until such time as the NJDEP has ruled on the application for a Letter of Non-Applicability.

(B) Except as provided in subsection (C) below, if the NJDEP rules adversely on Buyer's and Seller's application for a Letter of Non-Applicability and the request as set forth in subsection (A) above, then Buyer, pursuant to Section 9.1(h) of this Agreement, may terminate the Agreement.

(C) Notwithstanding the foregoing, if the NJDEP determines that ISRA is applicable to the transfer by PSE&G Utility of its interest in the Real Property to any Affiliate of PSE&G Utility (the "PSE&G Reorganization"), and PSE&G Utility and such Affiliate decide to proceed with the PSE&G Reorganization whether or not PSE&G Utility or any Affiliate of PSE&G Utility will or may be required to Remediate potential contamination of the Sites by radionuclides pursuant to ISRA, then Buyer shall not have a right to terminate the Agreement pursuant to Section 9.1(h) of this Agreement.

(v) Except as set forth in subsection (a)(iii) above, Buyer and Seller shall each be responsible for the costs and expenses each incurs in connection with the actions each is required to take to comply with ISRA prior to Closing pursuant to Section 6.7(a), including all costs and expenses of attorneys, environmental consultants and engineers each may retain to comply with ISRA prior to Closing; provided, that if Buyer is required to conduct a Preliminary Assessment and submit a Preliminary Assessment Report in accordance with subsection (a)(iv) above, Buyer and Seller shall bear equally all costs and expenses incurred by Buyer and Seller in connection with the performance of such Preliminary Assessment and preparation of such Preliminary Assessment Report. Such costs and expenses do not include any costs or expenses incurred by Buyer or PSE&G Utility in connection with the PSE&G Reorganization.

(b) Closing Covenant. Seller and Buyer acknowledge and agree that in order to consummate the transactions contemplated by this Agreement and the Additional Agreements, it may be necessary to enter into one or more Remediation Agreements, as such term is used in ISRA, or alternative agreements or orders whereby the party executing such agreements or orders commits to comply with all requirements of ISRA after the Closing. Such Remediation Agreements or alternative agreements or orders may require the party or parties executing such agreements or orders to establish financial assurance in accordance with NJDEP regulations. If the NJDEP does not issue a Letter of Non-Applicability with respect to the transactions contemplated by this Agreement, Buyer shall execute or cause to be executed



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000356

by PSE&G Utility Remediation Agreements, as such term is used under ISRA, and establish financial assurance as necessary, subject to Buyer's right to terminate this Agreement under Section 9.1.

(c) Post-Closing. After the Closing, Buyer shall be liable for compliance with ISRA in connection with all of the Purchased Assets that are subject to ISRA, including with respect to the Remediation of all areas of environmental concern to the extent required by the NJDEP or ISRA, whether or not Buyer, PSE&G Utility or Seller have executed any Remediation Agreements or alternative agreements or orders. Notwithstanding anything to the contrary herein, Buyer shall indemnify, defend and hold harmless Seller for all Indemnifiable Losses incurred by Seller after the Closing Date in connection with ISRA compliance in connection with the Purchased Assets, including any fines, penalties or costs related to a Remediation incurred because of Buyer's failure to comply with ISRA or the terms of any Remediation Agreement or alternative agreement or order.

6.8 Risk of Loss. From the date hereof through (but not including) the Closing Date, all risk of loss or damage to the assets or properties included in the Purchased Assets (other than the Decommissioning Funds) shall be borne by Seller. Notwithstanding any provision hereof to the contrary, subject to Section 9.1(g), if, before the Closing Date, all or any portion of the Purchased Assets is (i) condemned or taken by eminent domain or is the subject of a pending or threatened condemnation or taking which has not been consummated or (ii) damaged or destroyed by fire or other casualty, Seller shall notify Buyer promptly in writing of such fact, and (x) in the case of a condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing and (y) in the case of a fire or other casualty, Seller shall either restore such damage or assign the insurance proceeds therefor (and pay the amount of any deductible and/or self-insured amount in respect of such casualty) to Buyer at the Closing. Notwithstanding the foregoing, if such condemnation, taking, damage, destruction or other casualty results in a Material Adverse Effect, Buyer and Seller shall negotiate to settle the loss resulting from such condemnation, taking, damage, destruction or other casualty (and such negotiation shall include the negotiation of a fair and equitable reduction of the Purchase Price). If no such settlement can be agreed upon within sixty (60) days after Seller has notified Buyer of such casualty or loss, then Buyer or Seller may terminate this Agreement pursuant to Section 9.1(g).

6.9 Cooperation after Closing. From and after the Closing Date, Seller shall have access to and rights to copy all books and records, and other documents, relating to the Purchased Assets to the extent that such access may reasonably be



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000357

required by Seller in connection with matters relating to or affected by the ownership, lease, maintenance or operation of the Purchased Assets prior to the Closing Date. Such access shall be afforded by Buyer upon receipt of reasonable advance notice and during normal business hours. Seller shall be solely responsible for all costs or expenses incurred by Seller or Buyer pursuant to this Section 6.9. Notwithstanding the foregoing, Buyer shall not have any obligation to Seller under this Agreement to maintain any books, records or other documents relating to the ownership, lease, maintenance or operation of the Purchased Assets prior to the Closing Date beyond seven (7) years from the Closing Date, except to the extent that such books and records, or other documents, are required to be maintained under applicable Law. If Buyer shall desire to dispose of any of such books and records, or other documents, that may relate to ownership, lease, maintenance or operation of the Purchased Assets prior to the Closing Date, Buyer shall, prior to such disposition, give to Seller a reasonable opportunity, but in no event less than sixty (60) days, at Seller's expense, to segregate and remove such books and records, or other documents, as Seller may select.

6.10 Decommissioning Funds.

(a) At the Closing, Seller will direct the trustee and investment managers of Seller's Qualified Decommissioning Funds for the Salem Station to transfer all of the assets of such funds to the trustee of Buyer's Qualified Decommissioning Funds for the Salem Station; provided, however, that, upon written request of the trustee of Seller's Qualified Decommissioning Funds, Buyer shall cause the trustee of the Buyer's Qualified Decommissioning Funds to reimburse promptly, but in no event later than thirty (30) days after such notice (with respect to expenses) and the due date (with respect to income taxes), the trustee of Seller's Qualified Decommissioning Funds for expenses associated with the transfer of the assets and the termination of such funds and any related income taxes due with respect to such funds for the period prior to Closing. If Buyer does not obtain a private letter ruling from the Internal Revenue Service determining that the transfer of Seller's Qualified Decommissioning Funds to Buyer's Qualified Decommissioning Funds satisfies the requirements of Treas. Reg. § 1.468A-6(b) or Treas. Reg. § 1.468A-6(g)(1), then Seller shall transfer the assets in Seller's Qualified Decommissioning Funds to such trust(s) as directed by Buyer at least two (2) Business Days prior to the Closing Date.

(b) At the Closing, Seller will direct the trustee and investment managers of Seller's Nonqualified Decommissioning Funds for the Salem Station to transfer all of the assets of such funds to the trustee of Buyer's nonqualified decommissioning funds for the Salem Station; provided, however, that, upon written



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000358

request of the trustee of Seller's Nonqualified Decommissioning Funds, Buyer shall cause the trustee of the Buyer's nonqualified decommissioning funds to reimburse promptly, but in no event later than thirty (30) days after such notice, the trustee of Seller's Nonqualified Decommissioning Funds for expenses associated with the transfer of the assets and the termination of such funds.

(c) Schedule 6.10(c) sets forth a true and correct list of all investment manager agreements and investment management policies relating to the Trust Agreement and the Decommissioning Funds. Prior to the earlier of the Closing Date and any date on which this Agreement is terminated pursuant to Section 9.1, except as required by applicable Law, Seller shall not amend, modify or change any investment manager agreement or investment management policy relating to the Trust Agreement or the Decommissioning Funds, whether orally or in writing, nor appoint a successor investment manager without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed).

(d) To the extent not prohibited by the terms of the Trust Agreement, Seller shall (i) instruct the trustee and investment managers of the Decommissioning Funds to manage, invest and maintain the assets and properties held by the Decommissioning Funds in a manner consistent with suggestions provided in writing by Buyer to Seller from time to time and (ii) afford Buyer the opportunity, as reasonably requested, to review information regarding the management, investment and maintenance of the Decommissioning Funds; provided that neither Seller, the trustee nor any investment manager of the Decommissioning Funds shall be required to take, or fail to take, any action pursuant to this Section 6.10(d) if either Seller, such trustee or any such investment manager, in the exercise of its reasonable judgment, shall determine in good faith that effecting any such suggestion would reasonably be expected to (x) constitute a breach or violation of any other provision of this Agreement, or impair the ability of any Party to perform its obligations hereunder or consummate the transactions contemplated hereby, (y) constitute a breach or violation of its certificate of incorporation or bylaws, or similar governing documents, of any applicable Law, or applicable order, decree or judgment, or of any other contract, agreement or other arrangement to which it is a party or by or to which it or its assets or properties are bound or subject, including any agreement between Seller and such trustee or any investment manager, and any investment policy that is effective on the date hereof with respect to the Decommissioning Funds, or (z) result in an adverse effect on Seller, its businesses, assets or properties, including the Decommissioning Funds, or their respective conditions (financial or otherwise); and provided further, that Buyer shall maintain the confidentiality of any



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000359

information reviewed pursuant to clause (ii) above in accordance with the terms and conditions set forth in the Confidentiality Agreement.

(e) Subject to applicable Law and to the extent not prohibited by the Trust Agreement, immediately prior to the Closing, Seller shall withdraw from the Seller's Nonqualified Decommissioning Funds an amount equal to all amounts in respect of contributions made by Seller to the Decommissioning Funds during the period commencing on April 1, 1999 and ending on the Closing Date, provided that in the event that such withdrawal is not permitted by applicable Law or the Trust Agreement, then promptly, but in no event later than thirty (30) days, after the Closing Date, Buyer shall reimburse to Seller all such amounts, by wire transfer of immediately available funds to an account designated by Seller. The Decommissioning Funds shall retain all income, interest and other earnings accrued on the Decommissioning Funds as of Closing. Seller shall furnish to Buyer such documents and other records as may be reasonably requested by Buyer in order to confirm the amount of the withdrawal provided for in this Section 6.10(e), as well as all income, interest and other earnings accrued on the Decommissioning Funds between the date hereof and the Closing Date.

(f) To the extent permitted by applicable Law and the terms of the Trust Agreement, Seller shall, after the date hereof, not contribute additional amounts to the Decommissioning Funds.

6.11 Amendment to Seller's Agreements. From and after the date hereof and prior to the Closing Date, Seller shall not enter into any Seller's Agreement as a party, or modify, amend, extend or voluntarily terminate, prior to its expiration date, any Seller's Agreement to which Seller is a party or any of the Transferable Permits issued to Seller, in any material respect.

6.12 Exclusivity. Effective as of the date of this Agreement through and until the earlier to occur of the termination of this Agreement and the Closing, Seller shall not market its rights, title or interests in the Purchased Assets to any other Person, or accept or pursue any other offers or bids for Seller's rights, title or interests in and to the Purchased Assets, provided this provision is not applicable to assets of the Decommissioning Funds to the extent sold in accordance with Section 6.10.

6.13 Insurance.

(a) Buyer shall obtain and maintain the insurance required pursuant to 10 C.F.R. Parts 50 and 140, and in accordance with all Nuclear Laws for



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000360

so long as Buyer shall be the licensed operator of the Salem Station; provided that this provision is not intended to grant to Seller rights or interests in any such insurance.

(b) Seller shall use its Commercially Reasonable Efforts to assist Buyer in making any claims relating to pre-Closing periods against Seller's Insurance Policies that may provide coverage related to the Assumed Liabilities. Buyer shall use its Commercially Reasonable Efforts to assist Seller in making any claims relating to pre-Closing periods against Buyer's Insurance Policies that may provide coverage related to the Excluded Liabilities.

## ARTICLE VII

## CONDITIONS

7.1 Conditions to Obligation of Each Party. The respective obligations of each Party hereto to effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a) The waiting period under the HSR Act applicable to the consummation of the transactions contemplated hereby shall have expired or been terminated; and

(b) No preliminary or permanent injunction or other order or decree by any Governmental Authority which prevents the consummation of the transactions contemplated hereby or by the Additional Agreements shall have been issued and remain in effect (each Party agreeing to use its Commercially Reasonable Efforts to have any such injunction, order or decree lifted), and no Law shall be in effect which prohibits the consummation of the transactions contemplated hereby or thereby.

7.2 Conditions to Obligations of Buyer. The obligations of Buyer to effect the transactions contemplated by this Agreement shall be subject to the satisfaction (or the waiver in writing, to the extent permitted by applicable Law, by Buyer) at or prior to the Closing of the following conditions:

(a) (i) Buyer shall have received all of the Buyer Required Regulatory Approvals (other than with respect to ISRA which is governed by Sections 7.2(h) and (i)) and, except as set forth in Schedule 7.2(a)(i), in form and



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000361

substance reasonably satisfactory to Buyer (including adverse conditions relating to Buyer, the Affiliates of Buyer listed in Schedule 7.2(a)(ii) or the Purchased Assets), and all conditions to effectiveness prescribed therein or otherwise by Law shall have been satisfied; provided, however, that if at the time any Buyer's Required Regulatory Approval is obtained, Buyer reasonably expects a request for rehearing or a challenge thereto to be filed or if a request for rehearing or a challenge thereto has been filed, in each case, which, if successful, would cause such Buyer's Required Regulatory Approval to be reversed, stayed, enjoined, set aside, annulled, suspended or, except as set forth in Schedule 7.2(a)(i), modified in such manner as to result in such Buyer's Required Regulatory Approval not being reasonably satisfactory as set forth above, then Buyer may by notice to Seller within five (5) Business Days after receipt of such Buyer's Required Regulatory Approval, delay the Closing Date until the time for requesting rehearing has expired or until such challenge is decided, in each case, whether or not any appeal thereof is pending; and (ii) Seller shall have received all of Seller's Required Regulatory Approvals and Buyer shall have received evidence thereof, in form and substance reasonably satisfactory to Buyer.

(b) Seller shall have in all material respects performed and complied with the covenants and agreements contained in this Agreement which are required to be performed and complied with by Seller on or prior to the Closing Date;

(c) The representations and warranties of Seller set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of such time (other than representations and warranties that are made as of a specific date which shall have been true and correct as of such date), except where the failure to be so true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) would not, individually or in the aggregate, have a Material Adverse Effect;

(d) Buyer shall have received a certificate from an authorized officer of Seller, dated the Closing Date, to the effect that, to such officer's Knowledge, the conditions set forth in Sections 7.2(b) and (c) have been satisfied by Seller;

(e) Seller shall have delivered, or caused to be delivered, to Buyer at the Closing, Seller's closing deliveries set forth in Section 3.6;

(f) The lien of the Mortgage Indenture on the Purchased Assets and any other Encumbrance (other than Permitted Encumbrances) on the Purchased



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

Assets, including the Nuclear Fuel Supplies, arising under or through Seller shall have been released and any documents necessary to evidence such release shall have been delivered to Buyer;

(g) The Collateral Agreement shall be in full force and effect and the valid and binding obligation of each party thereto (other than Buyer); and all conditions to the obligations of all parties to the Collateral Agreement to consummate the transactions contemplated thereby shall have been satisfied or, to the extent permitted by applicable Law, waived;

(h) Buyer shall, with respect to the Salem Station, have (i) obtained a Letter of Non-Applicability (as such term is used in ISRA); (ii) obtained a No Further Action Letter (as such term is used in ISRA) from the NJDEP; (iii) obtained the approval of a Remedial Action Workplan (as such term is used in ISRA); or (iv) executed a Remediation Agreement (to be executed by Buyer or PSE&G Utility to the extent allowed by ISRA) or an alternative agreement or order that will allow Buyer and Seller to consummate the transactions contemplated by this Agreement and the Additional Agreements in compliance with ISRA;

(i) (A) The NJDEP shall have determined that ISRA is not applicable to the transactions contemplated by this Agreement and the Additional Agreements or (B) Seller and Buyer shall have received prior to the Closing the NJDEP's written concurrence that neither Buyer nor Seller shall be required to Remediate potential contamination of the Sites by radionuclides in connection with the actions that Seller or Buyer will be required to take to comply with ISRA as a result of the transactions contemplated by this Agreement and the Additional Agreements; provided, that the condition set forth in this subsection shall be deemed satisfied if the NJDEP determines that (i) a Letter of Non-Applicability will not be issued for the Sites as requested by PSE&G Utility in connection with the PSE&G Reorganization and (ii) PSE&G Utility and any Affiliate of PSE&G Utility decide to proceed with the PSE&G Reorganization whether or not PSE&G Utility or any Affiliate of PSE&G Utility will or may be required to Remediate potential contamination of the Sites by radionuclides pursuant to ISRA.

(j) There shall not have occurred and be continuing a Material Adverse Effect;

(k) Buyer shall have received a title report or commitment with respect to the Real Property that does not include any exceptions other than Permit-



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

ted Encumbrances and such matters as a current survey of the Real Property may show; and

(l) Buyer shall have received a private letter ruling issued by the Internal Revenue Service to the effect that Buyer will not recognize gain or otherwise take into account any income for federal income tax purposes by reason of the transfer of the assets of the Seller's Nonqualified Decommissioning Funds to the Buyer's nonqualified decommissioning funds.

7.3 Conditions to Obligation of Seller. The obligation of Seller to effect the transactions contemplated by this Agreement shall be subject to the satisfaction (or the waiver in writing, to the extent permitted by applicable Law, by Seller) at or prior to the Closing of the following conditions:

(a) (i) Seller shall have received all of the Seller Required Regulatory Approvals, in form and substance reasonably satisfactory to Seller (including adverse conditions relating to Seller or the Purchased Assets), and all conditions to effectiveness prescribed therein or otherwise by Law shall have been satisfied; provided, however, that if at the time any Seller Required Regulatory Approval is obtained, Seller reasonably expects a request for rehearing or a challenge thereto to be filed or if a request for rehearing or a challenge thereto has been filed, in each case, which, if successful, would cause such Seller Required Regulatory Approval to be reversed, stayed, enjoined, set aside, annulled, suspended or modified in such manner as to result in such Seller Required Regulatory Approval not being reasonably satisfactory as set forth above, then Seller may by notice to Buyer within five (5) Business Days after receipt of such Seller Required Regulatory Approval, delay the Closing Date until the time for requesting rehearing has expired or until such challenge is decided, in each case, whether or not any appeal thereof is pending; and (ii) Buyer shall have received all of Buyer's Required Regulatory Approvals and Seller shall have received evidence thereof, in form and substance reasonably satisfactory to Seller.

(b) Buyer shall have in all material respects performed and complied with the covenants and agreements contained in this Agreement which are required to be performed and complied with by Buyer on or prior to the Closing Date;

(c) The representations and warranties of Buyer set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of such time (other than representations and



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000364

warranties that are made as of a specific date which shall have been true and correct as of such date) except where the failure to be so true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) would not, individually or in the aggregate, have a Material Adverse Effect;

(d) Seller shall have received a certificate from an authorized officer of Buyer, dated the Closing Date, to the effect that, to such officer's Knowledge, the conditions set forth in Sections 7.3(b) and (c) have been satisfied by Buyer;

(e) Buyer shall have delivered, or caused to be delivered, to Seller at the Closing, Buyer's closing deliveries set forth in Section 3.7;

(f) Buyer shall, with respect to the Salem Station, have (i) obtained a Letter of Non-Applicability (as such term is used in ISRA); (ii) obtained a No Further Action Letter (as such term is used in ISRA) from the NJDEP; (iii) obtained the approval of a Remedial Action Workplan (as such term is used in ISRA); or (iv) executed a Remediation Agreement (to be executed by Buyer or PSE&G Utility to the extent allowed by ISRA) or an alternative agreement or order that will allow Buyer and Seller to consummate the transactions contemplated by this Agreement and the Additional Agreements in compliance with ISRA;

(g) The Collateral Agreement shall be in full force and effect and the valid and binding obligation of each party thereto (other than Seller); and all conditions to the obligations of all parties to the Collateral Agreement to consummate the transactions contemplated thereby shall have been satisfied or, to the extent permitted by applicable Law, waived; and

(h) Seller shall have received a private letter ruling issued by the Internal Revenue Service to the effect that Seller will be allowed current ordinary deductions for federal income tax purposes for any amounts treated as realized by Seller, or otherwise recognized as income to Seller, as a result of Buyer's assumption of the Assumed Decommissioning Liabilities.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

PSEG-0000365

## ARTICLE VIII

## INDEMNIFICATION AND ARBITRATION

8.1 Indemnification.

(a) From and after the Closing, Buyer shall indemnify, defend and hold harmless Seller and its Representatives (each, a "Seller's Indemnitee") from and against any and all claims, demands, suits, losses, liabilities, penalties, damages, obligations, payments, costs and expenses (including the cost and expense of any action, suit, proceeding, assessment, judgment, settlement or compromise relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) and including costs and expenses incurred in connection with investigations and settlement proceedings (each, an "Indemnifiable Loss") asserted against or suffered by any Seller's Indemnitee relating to, resulting from or arising out of or in connection with (i) any breach by Buyer of any representation or warranty of Buyer contained in this Agreement; (ii) any breach by Buyer of any covenant or agreement of Buyer set forth in this Agreement, (iii) the Assumed Liabilities, (iv) the failure by Buyer or its Representatives to comply with ISRA with respect to the Purchased Assets that are subject thereto; or (v) any Third-Party Claim against any Seller's Indemnitee to the extent arising out of or in connection with Buyer's ownership, lease, maintenance or operation of any of the Purchased Assets on or after the Closing Date (other than to the extent such Third-Party Claim constitutes an Excluded Liability); provided, however, that Buyer shall be liable pursuant to clauses (i) and (ii) of Section 8.1 (a) only for Indemnifiable Losses for which any Seller's Indemnitee gives written notice to Buyer (setting forth with reasonable specificity the nature and amount of the Indemnifiable Loss) during the period for which such representations, warranties, covenants or agreements survive the Closing in accordance with Section 10.6.

(b) From and after the Closing, Seller shall indemnify, defend and hold harmless Buyer and its Representatives (each, a "Buyer's Indemnitee" and, together with Seller's Indemnitees, an "Indemnitee") from and against any and all Indemnifiable Losses asserted against or suffered by any Buyer's Indemnitee in any way relating to, resulting from or arising out of or in connection with (i) any breach by Seller of any covenant or agreement of Seller set forth in this Agreement; (ii) any breach by Seller of any representation or warranty of Seller contained in this Agreement; (iii) the Excluded Liabilities; (iv) any Third-Party Claim against any Buyer's Indemnitee to the extent arising out of or in connection with Seller's ownership or operation of the Excluded Assets (other than to the extent such Third-Party Claim



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

constitutes an Assumed Liability); provided, however, that Seller shall be liable pursuant to clause (i) and (ii) of this Section 8.1(b) only for Indemnifiable Losses for which any Buyer's Indemnitee gives written notice to Seller (setting forth with reasonable specificity the nature and amount of the Indemnifiable Loss) during the period for which such covenants or agreements survive the Closing in accordance with Section 10.6.

(c) In furtherance, and not in limitation, of the provisions set forth in Section 8.1(b), without any further action required by any Person, from and after the Closing Date, Buyer shall be deemed to release, hold harmless and forever discharge Seller from any and all Indemnifiable Losses of any kind or character, whether known or unknown, contingent or accrued, arising under or relating to Environmental Laws, or relating to any claim in respect of any Environmental Condition or Hazardous Substance, whether based on common law or Environmental Laws relating to the Purchased Assets ("Environmental Claims") (other than those described in Section 2.4(g)). In furtherance of, and to the extent set forth in, the foregoing, Buyer shall, at Closing, irrevocably waive any and all rights and benefits with respect to such Environmental Claims that it now has or in the future may have conferred upon it by virtue of any Law or common law principle, which provides that a general release does not extend to claims which a party does not know or suspect to exist in its favor at the time of executing the release, if knowledge of such claims would have materially affected such party's settlement with the obligor. In this connection, Buyer hereby acknowledges that it is aware that factual matters now unknown to it may have given, or hereafter may give, rise to Environmental Claims that are presently unknown, unanticipated and unsuspected, and Buyer further agrees that the release from and after the Closing provided for in this Section 8.1(c) has been negotiated and agreed upon in light of that awareness, and Buyer nevertheless hereby intends, effective from and after the Closing, irrevocably to release, hold harmless and forever discharge Seller from all such Environmental Claims to the extent provided and in the manner contemplated by this paragraph.

(d) Any Indemnifiable Loss shall be (i) net of the dollar amount of any insurance or other proceeds actually receivable by the Indemnitee or any of its Affiliates with respect to the Indemnifiable Loss, (ii) reduced to take account of any Tax Benefit realized by the Indemnitee arising from the incurrence or payment of such Indemnifiable Loss (a "Tax Benefit" meaning for this purpose the positive excess of the Tax liability of Indemnitee without regard to such Indemnifiable Loss over the Tax liability of such Indemnitee taking into account such Indemnifiable Loss, with all other circumstances remaining unchanged), and (iii) increased to take account of any Tax Cost incurred by Indemnitee arising from the receipt of indem-



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

nity payments hereunder (grossed up for such increase) (a "Tax Cost" meaning for this purpose the positive excess of the Tax liability of such Indemnitee taking such indemnity payment into account over the Tax liability of such Indemnitee without regard to such payment, with all other circumstances remaining unchanged).

(e) The rights and remedies of Seller, and Buyer under this Article VIII are, solely as between Seller and Buyer, exclusive and in lieu of any and all other rights and remedies which each of Seller and Buyer may have under this Agreement, under applicable Law, with respect to any Indemnifiable Loss, whether at common law or in equity, including for declaratory, injunctive or monetary relief. The indemnification obligations of the Parties set forth in this Article VIII apply only to matters arising out of this Agreement and the transactions contemplated hereby, but do not extend to matters arising out of the Owners Agreement, the Collateral Agreement or any of the Additional Agreements. Any Indemnifiable Loss arising under or pursuant to the Owners Agreement, the Collateral Agreement or any of the Additional Agreements shall be governed by the indemnification obligations, if any, contained in such agreement under which the Indemnifiable Loss arises.

(f) Notwithstanding anything to the contrary contained herein:

(i) No Party (including an Indemnitee) shall be entitled to recover from any other Party (including any Party hereto required to provide indemnification under this Agreement or any Additional Agreement (an "Indemnifying Party")) for any liabilities, damages, obligations, payments, losses, costs, or expenses under this Agreement any amount in excess of the actual compensatory damages, court costs and reasonable attorney's and other advisor fees suffered by such Party;

(ii) No Party shall have any liability or obligation to indemnify under Section 8.1(a) or 8.1(b), as the case may be, unless and until the aggregate amount of Indemnifiable Losses for which such Party would be liable thereunder, but for this provision, exceeds, together with all such Indemnifiable Losses for which such Party is so liable under the Collateral Agreement, $100,000; provided that, thereafter, such Party shall be liable for all such Indemnifiable Losses;

(iii) To the fullest extent permitted by Law, each of Buyer and Seller hereby waives any right to recover punitive, incidental, special, exemplary and consequential damages arising in connection with or with respect to this Agreement or any breach or violation hereof; provided that the provisions of this clause (iii) shall not apply to indemnification for a Third-Party Claim.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000368

(g) An Indemnitee shall use Commercially Reasonable Efforts to mitigate all losses, damages and the like relating to a claim under the indemnification provisions in this Section 8.1, including availing itself of any defenses, limitations, rights of contribution, claims against third Persons and other rights at law or equity. For purposes of this Section 8.1(g), the Indemnitee's Commercially Reasonable Efforts shall include the reasonable expenditure of money to mitigate or otherwise reduce or eliminate any losses or expenses for which indemnification would otherwise be due, and, in addition to its other obligations hereunder, the Indemnifying Party shall reimburse the Indemnitee for the Indemnitee's reasonable expenditures in undertaking the mitigation.

(h) The expiration, termination or extinguishment of any covenant or agreement shall not affect the Parties' obligations under Sections 8.1(a) through 8.1(b) hereof if the Indemnitee provided the Indemnifying Party with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

8.2 Defense of Claims.

(a) If any Indemnitee receives notice of the assertion of any claim or of the commencement of any suit, action or proceeding made or brought by any Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement (a "Third-Party Claim") with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee shall give such Indemnifying Party reasonably prompt written notice thereof, but in no event later than twenty (20) Business Days after the Indemnitee's receipt of notice of such Third-Party Claim. Such notice shall describe the nature of the Third-Party Claim in reasonable detail and shall indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be incurred by the Indemnitee. The Indemnifying Party shall have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third-Party Claim at such Indemnifying Party's expense and by such Indemnifying Party's own counsel; provided that the counsel for the Indemnifying Party who shall conduct the defense of such Third-Party Claim shall be reasonably satisfactory to the Indemnitee. The Indemnitee shall cooperate in good faith in such defense at such Indemnitee's own expense. If an Indemnifying Party elects to assume the defense of any Third-Party Claim, the Indemnitee shall (i) cooperate in all reasonable respects with the Indemnifying Party in connection with such defense, (ii) not admit any liability with respect to, or settle, compromise or discharge, any Third-Party Claim without the Indemnifying Party's prior written consent and (iii) agree to any settlement, compromise or discharge of a Third-Party



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000369

Claim which the Indemnifying Party may recommend and which by its terms obligates the Indemnifying Party to pay the full amount of the liability in connection with such Third-Party Claim and unconditionally releases the Indemnitee completely in connection with such Third-Party Claim. In the event that the Indemnifying Party shall assume the defense of any Third-Party Claim, the Indemnitee shall be entitled to participate in (but not control) such defense with its own counsel at its own expense. If the Indemnifying Party does not assume the defense of any such Third-Party Claim, the Indemnitee may defend the same in such manner as it may deem appropriate, including settling, compromising or discharging such claim or litigation after giving notice to the Indemnifying Party of the terms of the proposed settlement, compromise or discharge and the Indemnifying Party will promptly reimburse the Indemnitee upon written request. Anything contained in this Agreement to the contrary notwithstanding, no Indemnifying Party shall be entitled to assume the defense of any Third-Party Claim if such Third-Party Claim seeks an order, injunction or other equitable relief or relief for other than monetary damages against the Indemnitee which, if successful, would materially adversely affect the business of the Indemnitee; provided that such Indemnifying Party shall continue to be obligated to such Indemnitee pursuant to this Article VIII for all Indemnifiable Losses relating to, resulting from or arising out of such Third-Party Claim.

(b) If, within ten (10) Business Days after an Indemnitee gives written notice to the Indemnifying Party of any Third-Party Claim, such Indemnitee receives written notice from the Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third-Party Claim as provided in Section 8.2(a), the Indemnifying Party shall not be liable for any costs, fees or expenses subsequently incurred by the Indemnitee in connection with the defense, compromise or settlement thereof; provided, however, that if the Indemnifying Party shall fail to take reasonable steps necessary to defend diligently such Third-Party Claim within ten (10) Business Days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense and the Indemnifying Party shall be liable for all reasonable costs, fees and expenses thereof.

(c) Without the prior written consent of the Indemnitee, the Indemnifying Party shall not admit any liability with respect to, or enter into any settlement, compromise or discharge of, or any voluntary consent decree, order or injunction with respect to, any Third-Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle, compromise or discharge, or to enter into any voluntary consent decree, order



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000370

or injunction with respect to, a Third-Party Claim, which offer would not lead to liability or the creation of any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder, and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) Business Days after its receipt of such notice, the Indemnifying Party shall be relieved of its obligations to defend such Third-Party Claim and the Indemnitee may contest or defend such Third-Party Claim. In such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim will be the amount of such settlement offer plus reasonable costs and expenses paid or incurred by Indemnitee up to the date of said notice.

(d) Subject to Section 8.3, any claim by an Indemnitee on account of an Indemnifiable Loss which does not constitute a Third-Party Claim (a "Direct Claim") shall be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, but in no event later than twenty (20) Business Days after the Indemnitee becomes aware of such Direct Claim, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, of such Indemnifiable Loss; and the Indemnifying Party shall have a period of twenty (20) Business Days within which to respond to such Direct Claim. If the Indemnifying Party fails to respond during such twenty (20) Business Day period, the Indemnifying Party shall be deemed to have accepted such claim and, subject to this Article VIII, shall promptly reimburse the Indemnitee for the Indemnifiable Losses set forth in the Indemnitee's notice. If the Indemnifying Party rejects such claim, subject to Section 8.3, the Indemnitee shall be free to seek enforcement of its right to indemnification under this Agreement.

(e) If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement, compromise, discharge or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement, compromise, discharge or payment by, from or against any other Person, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the Prime Rate) shall promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any indemnity payment, the Indemnifying Party shall, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided, however, that (i) the Indemnifying Party shall then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said indemnity payment is hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party. Without limiting the generality or effect of any other provision hereof, each such Indemnitee and Indemnifying Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights, and otherwise cooperate in the prosecution of such claims at the direction of the Indemnifying Party. Nothing in this Section 8.2(e) shall be construed to require any Party hereto to obtain or maintain any insurance coverage.

(f) A failure to give timely notice as provided in this Section 8.2 shall not affect the rights or obligations of any Party hereunder except to the extent that, as a result of such failure, the Party which was entitled to receive such notice was actually prejudiced as a result of such failure.

8.3 Arbitration.

(a) Notwithstanding any provision hereof to the contrary, in the event of any dispute between Seller and Buyer arising after the Closing (whether relating to facts, events or circumstances occurring or existing prior to, on or after the Closing Date) and relating to or arising out of any provision of this Agreement (other than disputes arising under Section 2.3, 2.4, 3.2, 3.3, 3.4, 6.5, 8.1(a)(iii) or 8.1(b)(iii)), the sole remedy available to either Party is the dispute resolution procedure set forth in this Section 8.3; provided, however, that either Party may seek a preliminary injunction or other provisional judicial remedy if such action is necessary to prevent irreparable harm or preserve the status quo, in which case both Parties shall nonetheless continue to pursue resolution of the dispute by means of this procedure. The Party asserting such dispute shall give written notice to the other of the fact that a dispute has arisen pursuant hereto. Such notice shall include (i) a statement setting forth in reasonable detail the facts, events, circumstances, evidence and arguments underlying such dispute and (ii) proposed arrangements for a meeting to attempt to resolve the dispute to be held within sixty (60) days after such notice is given. Within thirty (30) days after such notice is given, the other Party hereto shall submit to the Party giving such notice a written summary responding to such statement of facts, events, circumstances, evidence and arguments contained in the notice and an acceptance of or proposed alternative to the meeting arrangements set forth in the initial notice.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000372

(b) The chief executive officers (or any other executive officer or officers directly reporting to, and duly designated by, such chief executive officers) of each of the Parties shall meet at a mutually acceptable time and place to attempt to settle any dispute in good faith; provided, however, that such meeting shall be held at the principal offices of the Party receiving the notice of dispute unless otherwise agreed; and provided further, that any such meeting shall be held no later than sixty (60) days after the written notice of dispute is given pursuant to Section 8.3(a) hereof. Each Party shall bear its own costs and expenses with respect to preparation for, attendance at and participation in such meeting.

(c) In the event that (i) a meeting has been held in accordance with Section 8.3(b) and (ii) any such dispute of the kind referred to in Section 8.3(a) shall have not been resolved at such meeting, then, upon the written request of any Party, the Parties shall submit such dispute to binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "Commercial Arbitration Rules"). In the event that such dispute is submitted to arbitration pursuant to the Commercial Arbitration Rules, then the arbitration tribunal shall be composed of three arbitrators (one such arbitrator to be selected by each Party within thirty (30) days after the meeting held in accordance with Section 8.3(b) with the third such arbitrator, who shall be a former U.S. District Court or U.S. Circuit Court of Appeals judge and shall serve as chairperson of such tribunal, selected by the other two arbitrators or, in the absence of agreement between such arbitrators, by the American Arbitration Association). The venue of the arbitration shall be Wilmington, Delaware, the language of the arbitration shall be English and the arbitration shall commence no later than sixty (60) days after the meeting held in accordance with Section 8.3(b). The decision, judgment and order of the arbitration tribunal shall be final, binding and conclusive as to the Parties involved in such dispute, and their respective Representatives, and may be entered in court of competent jurisdiction. Other than the fees and expenses of the arbitrators, which shall be shared equally by the Parties, each Party shall bear its own costs and expenses (including attorneys' fees and expenses) relating to the arbitration.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

## ARTICLE IX

## TERMINATION

9.1 Termination.

(a) This Agreement may be terminated at any time prior to the Closing by mutual written consent of the Parties.

(b) This Agreement may be terminated by Seller, on the one hand, or Buyer, on the other hand, upon written notice to the other Party, (i) at any time prior to the Closing if any court of competent jurisdiction shall have issued an order, judgment or decree permanently restraining, enjoining or otherwise prohibiting the Closing, and such order, judgment or decree shall have become final and nonappealable; (ii) at any time prior to the Closing if any Law shall have been enacted or issued by any Governmental Authority which, directly or indirectly, prohibits the consummation of the transactions contemplated by this Agreement, by any Additional Agreement or the Collateral Agreement; or (iii) at any time after the first anniversary of the date of this Agreement if the Closing shall not have occurred on or before such date (the "Termination Date").

(c) This Agreement may be terminated by Buyer, upon written notice to Seller, if any of Buyer's Required Regulatory Approvals, the receipt of which is a condition to the obligation of Buyer to consummate the Closing as set forth in Section 7.2(a), shall have been denied (and a petition for rehearing or refiling of an application initially denied without prejudice shall also have been denied), and such denial was not caused by or the result of a breach of this Agreement by Buyer, or if the Buyer's Required Regulatory Approvals, other than those set forth in Schedule 7.2(a)(i), shall have been granted but are not in form and substance reasonably satisfactory to Buyer (including adverse conditions relating to Buyer, the Affiliates of Buyer listed in Schedule 7.2(a)(ii) or the Purchased Assets).

(d) This Agreement may be terminated by Seller, upon written notice to Buyer, if any of the Seller's Required Regulatory Approvals, the receipt of which is a condition to the obligation of Seller to consummate the Closing as set forth in Section 7.3(a), shall have been denied (and a petition for rehearing or refiling of an application initially denied without prejudice shall also have been denied), and such denial was not caused by or the result of a breach of this Agreement by Seller,



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000374

or shall have been granted but are not in form and substance reasonably satisfactory to Seller (including adverse conditions relating to Seller or the Purchased Assets).

(e) Except as otherwise provided in this Agreement, this Agreement may be terminated by Buyer, upon written notice to Seller, if there has been a breach by Seller of any covenant, agreement, representation or warranty contained in this Agreement, which has resulted in a Material Adverse Effect and such violation or breach is not cured by the earlier of the Closing Date or the date thirty (30) days after receipt by Seller of notice specifying in reasonable detail the nature of such breach, unless Buyer shall have previously waived such breach

(f) Except as otherwise provided in this Agreement, this Agreement may be terminated by Seller, upon written notice to Buyer, if there has been a breach by Buyer of any covenant, agreement, representation or warranty contained in this Agreement, which has resulted in a Material Adverse Effect and such violation or breach is not cured by the earlier of the Closing Date or the date thirty (30) days after receipt by Buyer of notice specifying in reasonable detail the nature of such breach, unless Seller shall have previously waived such breach.

(g) This Agreement may be terminated by Seller, on the one hand, or Buyer, on the other hand, upon written notice to the other Party, in accordance with the provisions of Section 6.8, provided that the Party seeking to so terminate shall have complied in all material respects with its obligations under Section 6.8.

(h) This Agreement may be terminated by Buyer, upon written notice to Seller, in accordance with the provisions of Section 6.7(a)(iv)(B), provided that Buyer has complied in all respects with its obligations under Section 6.7.

9.2 Effect of Termination. Upon termination of this Agreement prior to the Closing pursuant to Section 9.1, this Agreement shall be null and void and of no further force or effect (except that the provisions set forth in this Section 9.2 and Article X, and the Confidentiality Agreement, shall remain in full force and effect in accordance with their respective terms); and no Party shall have any further liability or obligation under this Agreement (other than for any willful breach of its obligations hereunder). If this Agreement is terminated as provided herein, all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000375

9.3 Additional Effects of Termination. In the event that this Agreement is terminated by Buyer pursuant to (a) Section 9.1(b)(iii) due to the failure to satisfy the condition set forth in Section 7.2(a) or (b) Section 9.1(c), in each case due to the inclusion of an adverse condition in any Buyer's Required Regulatory Approval (each, a "Regulatory Termination"), then, notwithstanding any provision hereof or of the Owners Agreement, as may then be in effect, to the contrary, upon any exercise by Buyer or PSE&G Utility of its rights under Section 26.3 of the Owners Agreement, Buyer or PSE&G Utility shall exercise such rights in such manner as to acquire the Salem Interest pursuant to a transaction (the "Subsequent Transaction") on terms and conditions that are no less favorable to Seller than those set forth in this Agreement; provided that the Subsequent Transaction shall provide for the termination of Buyer's and PSE&G Utility's rights under Section 26.3 of the Owners Agreement upon the occurrence of a Regulatory Termination of such Subsequent Transaction prior to the consummation thereof.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

10.1 Amendment and Modification. Subject to applicable Law, this Agreement may be amended, supplemented or otherwise modified only by written agreement entered into by the Parties.

10.2 Expenses. Except to the extent provided herein, whether or not the transactions contemplated hereby are consummated, all costs, fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such costs, fees and expenses, including the fees and commissions referred to in Section 10.3. Notwithstanding the foregoing, in no event shall Seller bear or be liable for the payment of any costs, fees or expenses (other than attorneys' fees and expenses and the fees and commissions referred to in Section 10.3) incurred by Seller to obtain any approval of FERC or the NRC Approvals included among the Buyer's Required Regulatory Approvals or the Seller's Required Regulatory Approvals, or to transfer the Decommissioning Funds to Buyer at the Closing, to the extent that the aggregate amount of such costs, fees and expenses exceeds, together with all such costs, fees and expenses which Seller bears or is liable for under the Collateral Agreement, $200,000; and Buyer shall bear and be liable to the extent of any such excess.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000376

10.3 Fees and Commissions. Seller, on the one hand, and Buyer, on the other hand, represent and warrant to the other that, except for Credit Suisse First Boston, Inc. ("CSFB") and Reed/Navigant Consulting Group, which are acting for and at the expense of Seller, no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transactions contemplated hereby by reason of any action taken by such Party or its Representatives. Seller shall pay or otherwise discharge all such brokerage fees, commissions and finder's fees so incurred by Seller.

10.4 Bulk Sales Laws. Buyer hereby acknowledges that, notwithstanding anything in this Agreement to the contrary, Seller will not comply with the provisions of the bulk sales laws of any jurisdiction in connection with the transactions contemplated by this Agreement and Buyer hereby irrevocably waives compliance by Seller with the provisions of the bulk sales laws of all jurisdictions.

10.5 Waiver of Compliance. To the extent permitted by applicable Law, any failure of any of the Parties to comply with any obligation, covenant, agreement or condition set forth herein may be waived by the Party entitled to the benefit thereof only by a written instrument signed by such Party, but any such waiver shall not operate as a waiver of, or estoppel with respect to, any prior or subsequent failure to comply therewith. The failure of a Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

10.6 Survival.

(a) The representations and warranties given or made by any Party or in any certificate or other writing furnished in connection herewith shall survive the Closing for a period of one (1) year after the Closing Date and shall thereafter terminate and be of no further force or effect, except that (i) all representations and warranties relating to Taxes and Tax Returns, including those set forth in Sections 4.5 and 4.6, shall survive the Closing for the period of the applicable statutes of limitation plus any extensions or waivers thereof, and (ii) any representation or warranty as to which a claim (including a contingent claim) shall have been asserted during the survival period shall continue in effect with respect to such claim until such claim shall have been finally resolved or settled. Each Party shall be entitled to rely upon the representations and warranties of the other Party set forth herein, notwithstanding any investigation or audit conducted before or after the Closing Date or the decision of any Party to complete the Closing.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000377

(b) The covenants and agreements of the Parties contained in this Agreement, including those set forth in Article VIII and Section 6.5, shall survive the Closing in accordance with their respective terms.

10.7 Disclaimers. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE IV, THE PURCHASED ASSETS ARE SOLD "AS IS, WHERE IS", AND SELLER EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO SELLER, THE PURCHASED ASSETS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE IV OR IN THE DEEDS, SELLER EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES REGARDING LIABILITIES, OWNERSHIP, LEASE, MAINTENANCE AND OPERATION OF THE PURCHASED ASSETS, THE TITLE, CONDITION, VALUE OR QUALITY OF THE PURCHASED ASSETS OR THE PROSPECTS (FINANCIAL AND OTHERWISE), RISKS AND OTHER INCIDENTS OF THE PURCHASED ASSETS; AND SELLER EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE PURCHASED ASSETS, OR ANY PART THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, OR COMPLIANCE WITH ENVIRONMENTAL REQUIREMENTS, OR THE APPLICABILITY OF ANY REQUIREMENTS OF ANY GOVERNMENTAL AUTHORITY, INCLUDING ANY NUCLEAR LAWS OR ENVIRONMENTAL LAWS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER FURTHER EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE ABSENCE OF HAZARDOUS SUBSTANCES OR LIABILITY OR POTENTIAL LIABILITY ARISING UNDER NUCLEAR LAWS OR ENVIRONMENTAL LAWS WITH RESPECT TO THE PURCHASED ASSETS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN OR IN THE DEEDS, SELLER EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND REGARDING THE CONDITION OF THE PURCHASED ASSETS AND NO SCHEDULE OR EXHIBIT TO THIS AGREEMENT, NOR ANY OTHER MATERIAL OR INFORMATION PROVIDED, OR COMMUNICATIONS MADE, BY SELLER OR ITS REPRESENTATIVES, INCLUDING ANY BROKER OR INVESTMENT BANKER, WILL CAUSE OR CREATE ANY SUCH REPRESENTATION OR



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, CONDITION, VALUE OR QUALITY OF THE PURCHASED ASSETS.

10.8 Notices. All notices and other communications hereunder shall be in writing and shall be deemed given on the day when delivered personally or by facsimile transmission (with confirmation), on the next Business Day when delivered to a nationally recognized overnight courier or five (5) Business Days after deposited as registered or certified mail (return receipt requested), in each case, postage prepaid, addressed to the recipient Party at its address set forth below (or at such other address or facsimile number for a Party as shall be specified by like notice; provided, however, that any notice of a change of address or facsimile number shall be effective only upon receipt thereof):

(a) If to Seller, to:

Atlantic City Electric Company
In care of Conectiv
800 King Street
P.O. Box 231
Wilmington, Delaware 19899
Attention: Chairman
Facsimile: (302) 429-3367

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, Delaware 19801
Attention: Steven J. Rothschild, Esquire
Facsimile: (302) 651-3001



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000379

(b) If to Buyer, to:

PSEG Power LLC
80 Park Plaza
T-5A
P.O. Box 570
Newark, New Jersey 07101
Attention: Harold W. Borden, Vice President
and General Counsel
Facsimile: (973) 639-0741

with a copy to:

Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Attention: Filiberto Agusti, Esquire
Facsimile: (202) 429-3902

10.9 Assignment, No Third-Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, and, except as set forth in this Section 10.9, neither this Agreement nor any of the rights, interests, obligations or remedies hereunder shall be assigned by any Party hereto without the prior written consent of the other Party, nor is this Agreement intended to confer upon any other Person any rights, interests, obligations or remedies hereunder. This Agreement shall create no third-party beneficiary rights of any kind in any Representative or former employee of Seller or Buyer. Notwithstanding the foregoing, (a) Seller may assign any or all of its rights, interests, obligations and remedies hereunder to one or more Affiliates of Seller; provided, however, that no such assignment shall relieve or discharge Seller from any of its obligations hereunder, and (b) Buyer may (i) assign any or all of its rights, interests, obligations and remedies hereunder to one or more Affiliates of Buyer, including Public Service Enterprise Group, provided that each such Affiliate shall, at the time of such assignment be qualified under applicable Law to obtain all Buyer Permits, including Buyer Nuclear Permits and Environmental Permits, necessary for such Affiliate to own, lease, maintain and operate the Salem Station including, on the Closing Date, the Purchased Assets, (ii) assign, transfer, pledge or otherwise dispose of its rights and interest in this Agreement to a trustee, lending institution or other Person for financing purposes, including upon or pursuant to the exercise of remedies under such financing or refinancing, or by way of assignments, transfers, convey-



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

ances or dispositions in lieu thereof, or (iii) assign to any Affiliate of PSEG such Purchased Assets as are not material in the aggregate to the extent necessary to assure that the Purchased Assets may be operated as an exempt wholesale generator under Section 32(g) of PUHCA; provided, however, that no such assignment, transfer, pledge, conveyance or disposition pursuant to this Section 10.9(b) shall (A) impair or materially delay the consummation of the transactions contemplated hereby or (B) relieve or discharge Buyer from any of its obligations hereunder.

10.10 Governing Law, Forum, Service of Process. This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without giving effect to conflicts of law principles) as to all matters, including validity, construction, effect, performance and remedies. Venue in any and all suits, actions and proceedings related to the subject matter of this Agreement shall be in the state and federal courts located in and for the State of New Jersey (the "Courts"), which shall have exclusive jurisdiction for such purpose, and the Parties hereby irrevocably submit to the exclusive jurisdiction of such Courts and irrevocably waive the defense of an inconvenient forum to the maintenance of any such suit, action or proceeding. Service of process may be made in any manner recognized by such Courts. Each of the Parties hereby irrevocably waives its right to a jury trial in any suit, action or proceeding arising out of any dispute in connection with this Agreement or the transactions contemplated hereby. Nothing in this Section 10.10 is intended to modify or expand the terms and provisions of Section 8.3 with respect to the rights of the Parties to seek judicial remedy of any dispute relating to or arising out of any provision of this Agreement.

10.11 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.12 Entire Agreement. This Agreement (including the Schedules and Exhibits), together with the Confidentiality Agreement, embodies the entire agreement and understanding of the Parties hereto in respect of the transactions contemplated by this Agreement and the Additional Agreements and supersede all prior agreements and understandings among the Parties with respect to such transactions. There are no representations, warranties, covenants or agreements between or among the Parties with respect to the subject matter set forth in such agreements, other than those expressly set forth or referred to herein or therein. Without limiting the generality of the foregoing, Buyer hereby acknowledges and agrees that there are no representations, warranties, covenants or agreements among the Parties with respect



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000381

to the subject matter set forth in such agreements contained in any material made available to Buyer pursuant to the terms of the Confidentiality Agreement (including the Offering Memorandum dated July 2, 1999, previously provided to Buyer by or on behalf of Seller, Reed/Navigant Consulting Group and CSFB).

**[SIGNATURE PAGE FOLLOWS]**



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER PSEG-0000382

IN WITNESS WHEREOF, Seller and Buyer have caused this Purchase Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first written above.

ATLANTIC CITY ELECTRIC COMPANY

By: [signature]

Name: Thomas S. Shaw

Title: Executive Vice President

PSEG POWER LLC

By:____________________

Name:____________________

Title:____________________

(ACE/SALEM)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER 

IN WITNESS WHEREOF, Seller and Buyer have caused this Purchase Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first written above.

ATLANTIC CITY ELECTRIC COMPANY

By:____________________________

Name:____________________________

Title:____________________________

PSEG POWER LLC

By: [signature]

Name: Robert W. Metcalfe

Title: Vice President - Development

(ACE/SALEM)

178025.09-WilmingtonS1A