IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04–0034C, into which has |
| v. | ) | been consolidated No. 04-0036C |
| | ) | (Judge Christine Miller) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO THE COURT'S AUGUST 30, 2007 ORDER

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
SCOTT R. DAMELIN
STEPHEN FINN
Trial Attorneys

JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

September 12, 2007

Attorneys for Defendant

**TABLE OF CONTENTS**

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. If the PAs transferred all extant claims as of September 27, 1999, were plaintiffs' takings claims in existence at the effective date of transfer? . . . . . . . . . . . . . . . . . . 1

2. What effect does defendant's notice formally accepting plaintiffs' assignment of claims to PSEG have on plaintiffs' maintenance of a suit under a theory of retained takings claims? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3. Can an independent takings claim be maintained concurrently with a breach of contract claim pursuant to the Standard Contract? If not, how can a takings claim be maintained separately by bifurcating the claims through an assignment of the contract claims to a third-party? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4. If the court enters an order ruling that plaintiffs have no takings claims because the source of their claims was a viable contract at the time that the putative takings claim arose, see Detroit Edison v. United States, 56 Fed. Cl. 299, 302 (2003), can any takings claims survive? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5. If the source of the takings claim is independent from the Standard Contract and/or arises from a statute or regulation, see Boston Edison, 64 Fed. Cl. 167, 187 (2005), what precisely is that source? Can the source of the right be resolved as a matter of law? If such an independent source exists, on what date did each takings claim arise? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6. If the court cannot resolve plaintiffs' takings claims as this juncture, should plaintiffs's case be consolidated with PSEG's earlier-filed case? See Vt. Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236, 242 (2006) 16

7. Defendant should state for the record whether it renews its motion to dismiss filed May 12, 2004, for purposes of this court's final ruling. . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

### CASES

Adams v. United States,
391 F.3d 1212 (Fed. Cir. 2004) . . . . . . . . . . 10

Boston Edison Co. v. United States,
64 Fed. Cl. 167 (2005) . . . . . . . . . . 15

Boston Edison Co. v. United States,
67 Fed. Cl. 63 (2005) . . . . . . . . . . 18

Branch v. United States,
69 F.3d 1571 (Fed. Cir. 1995) . . . . . . . . . . 10

Canal Electric Co. v. United States,
65 Fed. Cl. 650 (2005) . . . . . . . . . . 12

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . . . 8

Cermak v. Babbitt,
234 F.3d 1356 (Fed. Cir. 2000) . . . . . . . . . . 15

Coast Indian Cmty. v. United States,
213 Ct. Cl. 550 F.2d 639 (1977) . . . . . . . . . . 15

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . 11

Concrete Pipe & Products of Calif. v. Construction Laborers Pension Trust For S. Calif.,
508 U.S. 602 (1993) . . . . . . . . . . 12, 13

Detroit Edison Co. v. United States,
56 Fed. Cl. 299 (2003) . . . . . . . . . . 14

Erosion Victims of Lake Superior Regulation v. United States,
12 Cl. Ct. 68, 72 (1987), aff'd, 833 F.2d 297 (1987) . . . . . . . . . . 3

Fern v. United States,
908 F.2d 955 (Fed. Cir. 1990) . . . . . . . . . . 10

Jentgen v. United States,
228 Ct. Cl. 527, 687 F.2d 1210 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Klamath Irrigation District v. United States,
67 Fed. Cl. 504 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Maffia v. United States,
143 Ct. Cl. 198, 163 F. Supp. 859 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Mesa Ranch Partnership v. United States,
2 Cl. Ct. 700 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Members of the Peanut Quota Holders Association, Inc. v. United States,
421 F.3d 1323 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Northern States Power Co. v. United States,
1998 WL 276581 (D.C. Cir. May 5, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

NRG Company v. United States,
31 Fed. Cl. 659 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Pacific Gas & Electric Co. v. United States,
70 Fed. Cl. 766 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Pittman v. Chicago Bd. of Education,
64 F.3d 1098 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Riviera Fin. of Texas, Inc. v. United States,
58 Fed. Cl. 528 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rochester Gas & Electric Corporation v. United States,
65 Fed. Cl. 431 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Texas State Bank v. United States,
423 F.3d 1370 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tuftco Corp v. United States,
222 Ct. Cl. 614 F.2d 740 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Dow,
357 U.S. 17 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

**STATUTES**

48 Fed. Reg. 16,590 (Apr. 18, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 . . . . . . . . . . . . . . . . . . . . 3, 4, 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DELMARVA POWER & LIGHT COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04–0034C, into which has been consolidated No. 04-0036C (Judge Christine Miller) |

DEFENDANT'S RESPONSE TO THE COURT'S AUGUST 30, 2007 ORDER

Defendant, the United States, respectfully responds to the questions posed by the Court in its order dated August 30, 2007.

DISCUSSION

In its order dated August 30, 2007, the Court asked a series of questions to which it requested the parties to respond. Below, we repeat each of the Court's questions, followed by our responses.

**1. If the PAs transferred all extant claims as of September 27, 1999, were plaintiffs' takings claims in existence at the effective date of transfer?**

Yes, assuming only for the purpose of the question that there is any type of "taking" in this case,[1] the takings, as alleged in the amended complaint of plaintiffs, Atlantic City Electric Company ("ACE") and Delmarva Power & Light Company ("Delmarva"), occurred on January 31, 1998 – well before the September 27, 1999 transfer of claims contained in the purchase agreements ("PAs"). As plaintiffs allege in their amended complaints, the failure to begin performance on January 31, 1998 under the Standard Contract is what gave rise to plaintiffs' alleged takings:

[1] As discussed below, there were no takings claims to transfer, because any such claims derive from plaintiffs' rights under the Standard Contract.

> DOE's failure to dispose of Delmarva's SNF by January 31, 1998 as required by the [Nuclear Waste Policy Act] deprived Delmarva of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities and the Standard Contract. This failure constitutes a taking of Delmarva's vested property rights without just compensation.

Delmarva Amend. Compl. ¶86; Atlantic Amend. Compl. ¶86 (emphasis supplied). Similarly, plaintiffs alleged in their amended complaints:

> In the alternative, Delmarva was an intended beneficiary of the Standard Contract at all relevant times prior to and including January 31, 1998. Under the Standard Contract, DOE was obligated to accept and/or dispose of Delmarva's SNF. Accordingly, as an intended beneficiary to the Standard Contract, Delmarva possessed property rights to have DOE dispose of Delmarva's SNF in a manner and at a cost consistent with the express terms of the Standard Contract. DOE's failure to commence taking custody of Delmarva's SNF by January 31, 1998, as required by the Standard Contract, deprived Delmarva of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities and the Standard Contract. This failure constitutes a taking of Delmarva's vested property rights without just compensation.

Delmarva Amend. Compl. ¶88; Atlantic Amend. Compl. ¶88 (emphasis supplied).

Any doubt about the basis for plaintiffs' takings claim was laid to rest at the August 22, 2007 hearing, when counsel for plaintiffs admitted that the basis for the diminution in value claim was the Government's delay in SNF acceptance under the Standard Contract:

> I mean, the purchase price took into account the breach. The purchase price was diminished as a result of the government's [breach] and the diminution in value was for the benefit of the buyer. The buyer bought the asset for less than its fair market value absent the breach.

Tr. 75 (transcript of August 22, 2007 hearing) (emphasis added).

For plaintiffs properly to allege a takings claim, they must allege some action by the Government that deprived plaintiffs of their property interest, and that plaintiffs are entitled to compensation for that governmental action. See Erosion Victims of Lake Superior Regulation v. United States, 12 Cl. Ct. 68, 72 (1987) (holding that plaintiffs may not establish takings claim based upon actions of non-governmental entities), aff'd, 833 F.2d 297 (1987). In this case, the taking could not occur at the time plaintiffs sold their minority interests to PSEG Nuclear L.L.C ("PSEG"), because the sale was solely the actions of plaintiffs, not the Government. In other words, the Government may not be held liable for a takings claims based upon the unilateral actions of the plaintiffs in deciding to sell their interests to PSEG. To so hold would result in plaintiffs creating a takings claim where one otherwise would not exist. Indeed, under such a theory, had plaintiffs decided not to sell their minority interest to PSEG, a takings would not have occurred. Obviously, plaintiffs do not have the right to trigger liability in the Government for a purported taking of plaintiffs' property interests. Consequently, any claimed taking in this case must be based upon the Government's actions, not plaintiffs' actions, and the sale of plaintiffs' interests to PSEG does not involve any governmental action.

Further, plaintiffs' assertions as to when the alleged taking occurred are significant, as it highlights the fact that plaintiffs' takings claim is, in reality, a disguised contract claim. Prior to 1983, the Department of Energy ("DOE") had no statutory, regulatory, or other legal obligation to accept or dispose of the spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") that nuclear utilities generated through their production of nuclear power. In 1983, however, Congress enacted the Nuclear Waste Policy Act of 1982 ("NWPA"), 42 U.S.C. §§ 10101-10270. See Delmarva Amend. Compl. ¶20; Atlantic Amend. Compl. ¶20.

In section 302 of the NWPA, 42 U.S.C. § 10222(a)(5), which is contained in Title III of the Act, Congress authorized the Secretary of Energy to enter into contracts with generators of SNF and HLW for the acceptance and disposal of their SNF and HLW. The statute provided that any contracts that DOE entered shall provide as follows:

> Contracts entered into under this section shall provide that —
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

Id.

Although Title III of the NWPA required DOE to include in contracts language providing for SNF acceptance to begin by January 31, 1998, Congress did not identify or mention the January 31, 1998 date anywhere else in the statute. Instead, the only requirement relating to the January 31, 1998 date was the requirement that DOE include it in the contracts that DOE entered.

Pursuant to the statutory authority in section 302(a), DOE promulgated standardized contracts through notice and comment rulemaking. On February 4, 1983, DOE published "for public comment a proposed standard contract to be used by the Department of Energy (DOE) in furnishing disposal services to the owners of generators of [SNF] and/or [HLW] and DOE's proposed procedures designed to implement section 302 of the Nuclear Waste Policy Act." 48 Fed. Reg. 5458, 5458 (Feb. 4, 1983). In accordance with section 302(a)(5)(B) of the NWPA,

DOE included a clause providing that "[t]he disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix 'A' . . . has been disposed of as provided for in this contract." Id. at 5463. After receiving public comments, DOE published a final rule on April 18, 1983, containing the final draft of the Standard Contract terms. 48 Fed. Reg. 16,590 (Apr. 18, 1983). In June 1983, DOE entered into Standard Contracts with numerous nuclear utilities, including PSEG. See PSEG Amend. Compl. ¶9.[2]

Consequently, plaintiffs' claim that the "taking" occurred on January 31, 1998 is simply a thinly veiled attempt of arguing that the Government's delay in accepting SNF under the Standard Contract constituted a taking. In any event, to the extent the conduct, as alleged, constituted a viable takings – a proposition with which the Government strongly disagrees – plaintiffs' alleged takings claims occurred on January 31, 1998, well before plaintiffs assigned all of their claims to PSEG.

**2. What effect does defendant's notice formally accepting plaintiffs' assignment of claims to PSEG have on plaintiffs' maintenance of a suit under a theory of retained takings claims?**

The Government's notice recognizing plaintiffs' assignment of all claims to PSEG, including plaintiffs' alleged takings claims, results in the extinction of any claims plaintiffs may previously have possessed, and plaintiffs' amended complaints should be dismissed.

---

[2] PSEG's Standard Contract with the United States relates to Unit 1 and 2 of the Salem Nuclear Plant and the Hope Creek Nuclear Plant. See PSEG Amend. Compl. ¶2. Plaintiffs concede in their amended complaints that they were not signatories to the Standard Contract. See Delmarva Amend. Compl. ¶26; Atlantic Amend. Compl. ¶26.

Relying upon the Supreme Court's decision in United States v. Dow, 357 U.S. 17 (1958), plaintiffs previously have argued that, as a matter of law, takings claims may not be assigned. However, as we previously have explained, Dow does not support plaintiffs' contention. In Dow, the Supreme Court tied the prohibition against the assignment of takings claims to the Assignment of Claims Act. Id. at 20. In Dow, a condemnation proceeding resulted in the Government acquiring an easement as a result of eminent domain. Id. at 18. The issue in Dow was when a claim to just compensation vested. Id. In 1943, the Government instituted a condemnation proceeding and obtained the easement pursuant to court order. Id. at 19-20. However, Dow did not receive a conveyance of the subject property through a general warranty deed until 1945. Id. at 20. In 1946, the Government filed a declaration of taking under the Declaration of Taking Act. Id. at 19. Consequently, the issue before the Court was whether the taking vested in 1943, in which case Dow lacked standing to bring a takings claim, or in 1946, in which case Dow properly could bring a takings claim. The Supreme Court ultimately held that the Government's 1943 acquirement of the easement was the time at which the takings claim vested. Id. at 21. Consequently, the Court held that, absent the Government's consent, the Assignment of Claims Act precluded Dow's ability to allege a takings claim for periods of time before he owned the property:

> It is well established, as the Court of Appeals recognized, that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property. United States v. Shannon, 342 U.S. 288, 72 S. Ct. 281, 96 L. Ed 321. In view of the express finding of the District Court that Dow's grantors intended to convey to him their right to the condemnation award, we think that the transfer of the claim in this case must be considered to have been such a voluntary assignment, rather than, as Dow argues, an assignment taking effect by operation of law, and thus not within the Act's prohibition. We

> would not be justified in relaxing the rigor of the Act, especially in view of the fact that under its very terms the way was left open for the parties to accomplish a transfer of the award by valid means. Accordingly, Dow can prevail only if the "taking" occurred while he was the owner.

Id. at 20 (emphasis added; citations omitted; footnote omitted). Simply put, Dow stands for the unremarkable proposition that the owner of property after a takings occurs may not bring a takings claim in the absence of the Government's consent to an assignment of that claim under the Assignment of Claims Act. However, court decisions plainly reflect that the Government can, in its discretion, waive the prohibition of the Assignment of Claims Act and accept an assignment. See Vermont Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236, 241 (2006) ("an assignment of claims is permissible where the assignment occurs by operation of law, or where the government chooses to 'recognize' the assignment of a claim"); Riviera Fin. of Texas, Inc. v. United States, 58 Fed. Cl. 528, 530 (2003) ("It is well established in the case law of this circuit that the Government can waive coverage of the Anti-Assignment Acts, as the Government concedes in this case"); Tuftco Corp v. United States, 222 Ct. Cl. 277, 614 F.2d 740, 745 (1980); Maffia v. United States, 143 Ct. Cl. 198, 163 F. Supp. 859, 862 (1958) ("the Government, if it chooses to do so, may recognize an assignment") (cited in Riviera Fin,, 58 Fed. Cl. at 530). Indeed, this Court has recognized that, where the Government consents to the assignment, a takings claim may be assigned. See NRG Company v. United States, 31 Fed. Cl. 659, 662 (1994) (holding that Government waived the provisions of Assignment of Claims Act and, consequently, takings claim could be assigned).[3] Consequently, because the Government in

---

[3] Plaintiffs also previously have relied upon this Court's decision in Rochester Gas & Electric Corporation v. United States, 65 Fed. Cl. 431 (2005), for the proposition that takings claims may not be assigned. In Rochester, the Court held that "[f]or a party to allege that its

this case has accepted plaintiffs' assignment of all of their claims to PSEG, including their purported takings claims, plaintiffs do not possess any claims against the Government. As a result, plaintiffs' amended complaints should be dismissed.

**3. Can an independent takings claim be maintained concurrently with a breach of contract claim pursuant to the Standard Contract? If not, how can a takings claim be maintained separately by bifurcating the claims through an assignment of the contract claims to a third-party?**

To the extent plaintiffs' takings claims derive exclusively from the Standard Contract, plaintiffs may not maintain a takings claim concurrently with a breach of contract claim. In Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit expressly rejected the notion that a takings claim may be brought as an alternative to a breach of contract claim, holding that, where a plaintiff retains its contractual remedies, it may not maintain a takings claim based upon a breach of a Government contract. Id. at 1341-42. In this case, where there is no allegation that the Government has taken plaintiffs' contract remedies, plaintiffs may not, as a matter of law, maintain a takings claim – whether as an alternative to its breach claim or otherwise.

Further, as we explained in our response to plaintiffs' motion to vacate the arbitration decision, this Court in Klamath Irrigation District v. United States, 67 Fed. Cl. 504 (2005),

---

property right had been taken, it must have owned the property at the time that the alleged taking occurred. Id. at 441. In reaching this conclusion, however, the Court relied upon the decision in Dow, which, as explained above, tied the restriction of assignment of takings claims to the Assignment of Claims Act. To the extent the Court in Rochester held that a takings claim may not be assigned, where the Government otherwise consents to the assignment under the Assignment of Claims Act, this opinion appears to conflicts with this Court's opinion in NRG Company v. United States, 31 Fed. Cl. 659, 662 (1994), which expressly held that a takings claim may be assigned where the Government waives the provisions of the Assignment of Claims Act.

reaffirmed the notion that a party cannot bring a takings claim as an "alternative" to a breach of contract claims, explaining that it was inconsistent with the nature of rights created by a contract with the Government:

> To be sure, some cases suggest that, under this rule, a takings claim is resurrected if a breach of contract is not found, see Systems Fuels, Inc. v. United States, 65 Fed. Cl. 163, 172-73 (2005). But such suggestions reflect a misunderstanding of the rationale for this rule. At least as described in Winstar and Castle, the rule favoring contract remedies depends upon there being symmetry between the contract rights to be enforced and the contract damages that are potentially available. Once this symmetry is established, a finding on the merits that no breach occurred does not break that relationship, but merely reflects that the contract rights that were asserted either never existed or were not adversely affected by the government's actions. Under either scenario, those same contract rights cannot provide the predicate for a takings because the government cannot take what the claimant does not have.

Id. at 432 n.31 (citations omitted).

In this case, there can be no "alternative" takings claim as a matter of fact or law. As the Court explained in Klamath, to the extent that the Court determines that plaintiffs' contract claims are not viable because they assigned them to PSEG, that does not lead to the conclusion that plaintiffs may assert a takings claim. Rather, that simply means that plaintiffs did not have the rights that they claimed or that such rights had not been adversely affect by the Government.

In previous pleadings, plaintiffs have suggested that they have somehow have a protected property interest in the NWPA. However, the Federal Circuit recently has rejected the notion that statutes like the NWPA may form the basis of a protected property interest that is compensable under the Fifth Amendment. In Members of the Peanut Quota Holders Association, Inc. v. United States, 421 F.3d 1323 (Fed. Cir. 2005), the Federal Circuit held that

the Government was not responsible for paying the holders of peanut quotas just compensation when the Government made the quotas less valuable. Id. at 1334. The Federal Circuit explained that the plaintiffs were not entitled to compensation

> because the property interest represented by the peanut quota is entirely the product of a government program unilaterally extending benefits to the quota holders, and nothing in the terms of the statute indicated that the benefits could not be altered or extinguished at the government's election.

Id. The Federal Circuit further explained that, although the quotas were a form of property, they were subject to alteration or elimination by changes in the Federal program and that such changes did not give rise to a takings claim. Id. As in Peanut Quota, plaintiffs may not assert a protected property interest in the NWPA, as a matter of law, for purposes of compensation under the Fifth Amendment.[4]

Indeed, even if plaintiffs could allege a property interest in the NWPA, which they cannot, the NWPA is not self-executing. As the United States Court of Appeals for the District of Columbia Circuit expressly acknowledged in Northern States Power Co. v. United States,

---

[4] Peanut Quota is entirely consistent with other decisions from the Federal Circuit and other courts of appeals that have held that statutes may not confer upon a plaintiff a protected property interest compensable under the Fifth Amendment. See Adams v. United States, 391 F.3d 1212, 1220 (Fed. Cir. 2004) (holding that statutory right to be paid money could not constitute a protected property interest for purposes of the takings clause); Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) ("[T]he law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations."); Branch v. United States, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995) ("If every time a man relied on the existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever") (quoting L. Fuller, The Morality of Law 60 (1964)); Pittman v. Chicago Bd. of Education, 64 F.3d 1098, 1104-05 (7th Cir. 1995) ("A statute is not a commitment by the legislature never to repeal the statute . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred.").

1998 WL 276581 (D.C. Cir. May 5, 1998), the NWPA merely "requires the DOE to include an unconditional obligation in the Standard Contract [and] does not itself require performance. Breach by the DOE does not violate a statutory duty . . . ." Northern States, 1998 WL 276581, at *2. The only relevant statutory duty with which DOE was charged was to ensure that, with regard to "[c]ontracts entered into under this section," those contracts would "provide that . . . in return for the payment of fees . . ., the Secretary, beginning not later than January 31, 1998, will dispose" of the SNF. 42 U.S.C. § 10222(a)(5)(B).[5]

Further, the fact that plaintiffs may have possessed a property interest in their real property does not support their takings claims in this case. This Court in Pacific Gas & Electric Co. v. United States, 70 Fed. Cl. 766 (2006), recently rejected a takings claim raised by another SNF plaintiff alleging substantially similar property interests. Id. at 778-80. Specifically, the Court in PG&E, referring to its prior decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 656 (2003), explained as follows:

> Plaintiff alone was responsible for the storage and disposal of its SNF and HLW prior to the Standard Contract. Therefore, absent the contract, plaintiff would have been obligated to conduct the same or similar storage activities that it now asserts create a takings claim . . . [P]laintiff's claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy.

Id. at 778.

---

[5] As discussed above, the January 31, 1998 date appears nowhere else in the NWPA. That is, the only provision in the NWPA regarding a January 31, 1998 acceptance date is one that instructs DOE to include that date in any contracts that it enters. DOE complied with this duty by promulgating contract terms in April 1983, which formed the basis of contracts that nuclear power owners and generators entered in June 1983.

The Court further rejected PG&E's claim that a taking had occurred because it had to continue storing SNF on its site and explained, "[t]he court finds that plaintiff's unilateral decision to build an ISFSI to continue to store this SNF cannot amount to the accrual of a taking of plaintiff's property by the government any more than can its storage activities to date. Indeed, the costs associated with the construction of such a facility, if they are found to be reasonably foreseeable by the government, caused by the government's breach, and proved to a reasonable certainty, may be fully vindicated through a breach of contract remedy." Id. at 779 (citation omitted).

The Court reached a similar conclusion in Canal Electric Co. v. United States, 65 Fed. Cl. 650 (2005). In Canal, the Court, faced with a complaint that was almost identical to the ones in this case, dismissed plaintiff's takings claim, concluding:

> Plaintiff has not shown that it is entitled to damages under a theory independent of the rights accorded Canal Electric under the Standard Contract. Plaintiff's assertions that the Government's failure to remove and dispose of nuclear waste required Canal to provide facilities to "store SNF beyond the date when the Government was required to assume such obligations," and that the Government "forced nuclear utilities, including Canal, to expend their own resources to plan for the disposal of SNF," are classic breach of contract allegations.

Id. at 656.

Consequently, the fact that plaintiffs, as minority interest holders, had to hold on to their minority ownership interest in the SNF owner by PSEG and PECO Energy Company ("PECO") longer than they otherwise anticipated on property they co-owned, as a result of DOE's delay of SNF acceptance under the Standard Contract, does not result in a cognizable takings. In short,

the Court's reasoning in PG&E, Commonwealth Edison, and Canal should apply with equal force in this case.

Further, plaintiffs' assertion that the Government's failure to accept SNF beginning on January 31, 1998, resulted in a diminution of their property interests – even if accepted as true – does not give rise to a takings claim. As the Supreme Court has held, "mere diminution in the value of property, however, serious, is insufficient to demonstrate a taking." See Concrete Pipe & Products of Calif. v. Construction Laborers Pension Trust For Southern Calif., 508 U.S. 602, 645 (1993) (citing Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 384 (1926) (approximately 75% diminution in value), Hadacheck v. Sebastian, 239 U.S. 394, 405 (1915) (92.5% diminution)). "Mere diminution in value, rather than complete destruction of all economically viable uses, cannot establish a taking." Mesa Ranch Partnership v. United States, 2 Cl. Ct. 700, 708 (1983) (citing Penn Central Transp. Co. v. New York City, 438 U.S. 104, 131 (1978)); Jentgen v. United States, 228 Ct. Cl. 527, 687 F.2d 1210, 1213 (1981) (same).

In their amended complaints, plaintiffs contend that the Government's delay in SNF acceptance resulted in the reduction in the value of their property interests rather than a complete elimination of all economically viable uses:

> 5. As a direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF on January 31, 1998, Delmarva suffered substantial economic harm including a drastic reduction in the fair market value of the Nuclear Stations. Delmarva realized significantly less value in the sale of the Nuclear Stations than it would have received had the DOE properly fulfilled its statutory and contractual obligations. The value of the Nuclear Stations was significantly diminished when it became apparent that DOE would not begin accepting and removing SNF by January 31, 1998.

Delmarva Amend. Compl. ¶5, Atlantic Amend. Compl. ¶5 (emphasis added). Consequently, even accepting as true plaintiffs' assertions, they fail as a matter of law to constitute a viable takings claim.

Finally, in response to the Court's inquiry as to whether the plaintiffs can maintain their takings claim independently of their now-assigned contract claims, they cannot. As this Court held in Detroit Edison Co. v. United States, 56 Fed. Cl. 299 (2003), where a plaintiff presents a viable contract action, "the court will award only the damages contemplated by the Standard Contract and will not permit plaintiff to circumvent the limitations inherent in its contractual relationship with the Government" through an alternative takings action. Id. at 303. In Detroit Edison, the Court allowed the plaintiff's taking suit to continue, but only "assuming that plaintiff cannot recover under the Standard Contract." Id.

Here, the plaintiffs have assigned their contract claims to PSEG and to Exelon, yet they argue that they should be allowed to maintain a takings claim here independently of the assigned contract claims. Through their actions, the plaintiffs are attempting to avoid the limitations that the Court identified in Detroit Edison and to recover for a taking independently and in addition to any contract recovery that could have been viable had they not assigned their contract claims to a third party. Particularly where, as here, the plaintiffs have not identified any basis for a takings claim outside the context of the Standard Contract, the plaintiffs have identified no basis upon which this Court could adjudicate their takings claims without first adjudicating the viability of their now-assigned contract claims. Under the rationale of Detroit Edison, the plaintiffs here have made it impossible for the Court to adjudicate their takings claims independently of their now-assigned contract claims.

**4. If the court enters an order ruling that plaintiffs have no takings claims because the source of their claims was a viable contract at the time that the putative takings claim arose, see Detroit Edison v. United States, 56 Fed. Cl. 299, 302 (2003), can any takings claims survive?**

As our response to this question, we respectfully refer the Court to our response to Question No. 3 above.

**5. If the source of the takings claim is independent from the Standard Contract and/or arises from a statute or regulation, see Boston Edison, 64 Fed. Cl. 167, 187 (2005), what precisely is that source? Can the source of the right be resolved as a matter of law? If such an independent source exists, on what date did each takings claim arise?**

As an initial matter, the Court in Boston Edison did not conclude that the source of that plaintiff's takings claim was independent of the Standard Contract. Rather, the Court denied the Government's motion for summary judgment on the ground that a genuine issue of material fact existed regarding the origin of plaintiff's rights. See Boston Edison Co. v. United States, 64 Fed. Cl. 167, 187 (2005). However, as we have previously explained, the nature of a plaintiff's property interest is a question of law rather than a question of fact. See Texas State Bank v. United States, 423 F.3d 1370, 1379 (Fed. Cir. 2005) (citing Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980); Cermak v. Babbitt, 234 F.3d 1356, 1361 (Fed. Cir. 2000); Coast Indian Cmty. v. United States, 213 Ct. Cl.129, 550 F.2d 639, 649 (1977)). Consequently, the alleged source of plaintiffs' property interest should be resolved as a matter of law.[6]

---

[6] As we noted in our response to plaintiffs' motion to vacate the arbitration award, the plaintiff in Boston Edison voluntarily dismissed, with prejudice, its takings claim prior to trial. Specifically, when the Government served a Rule 30(b)(6) notice of deposition upon Boston Edison regarding the nature of its claimed property interest, Boston Edison indicated that it would withdraw its takings claim rather than produce a witness for the deposition.

Further, as discussed above, there is no source independent of the Standard Contract upon which plaintiffs may base a taking of their alleged property interest. In addition, as discussed above, plaintiffs' amended complaints confirm that the source of their alleged property interests arise exclusively from the Standard Contract, and that the date of the alleged "taking" was January 31, 1998 – the date contained in the Standard Contract upon which the Government was to commence performance on an industry-wide basis. Delmarva Amend. Compl. ¶¶86, 88; Atlantic Amend. Compl. ¶¶86, 88.

**6. If the court cannot resolve plaintiffs' takings claims as this juncture, should plaintiffs's case be consolidated with PSEG's earlier-filed case? See Vt. Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236, 242 (2006).**

To the extent the Court does not resolve plaintiffs' takings claims, plaintiffs' cases should be consolidated with PSEG. As we discussed in our motion for consolidation, dated January 5, 2007, there is significant overlap between the damages sought by plaintiffs and PSEG. Indeed, as has become apparent in these cases, Delmarva and PSEG's cases share substantial common issues of fact and law. These two cases involve the same contract, the same nuclear power facilities, and the same alleged breach of contracts.

Further, it is beyond serious dispute that Delmarva and PSEG had overlapping damages theories. In its complaint, Delmarva asserts that "DOE's failure to commence acceptance and disposal of SNF on January 31, 1998 significantly diminished the values of the Nuclear Stations and the Standard Contract." Delmarva Amend. Compl. ¶70; Atlantic Amend Compl. ¶70. Delmarva then asserts that it should recover the diminished value that it received upon its sale of the nuclear stations as damages in this case notwithstanding the fact that it has also purported to transfer its claims under the Standard Contracts to PSEG.

Conversely, PSEG is seeking to recover as damages in its litigation all of the costs that it allegedly incurred and will incur in storing SNF as a result of DOE's delays. That is, even though (according to Delmarva) PSEG has received compensation from Delmarva – in the form of a reduced purchase price – for DOE's delay in beginning SNF acceptance and was allegedly able to compensate itself, at least in part, for continuing additional SNF storage costs through that reduced purchase price, PSEG is seeking to recover all of those same costs from DOE in its litigation. As a result, Delmarva and PSEG are both claiming extensive damages from the United States based upon overlapping and duplicative theories of recovery.

Counsel for plaintiffs appeared to recognize the overlap in the nature of the various plaintiffs' theories of recovery during the August 22, 2007 hearing in this case:

> I don't believe there is any circumstance under which [PSEG] can claim entitlement to money we recover in this case, because they are the beneficiaries of the diminished value.
>
> So we have a facility that's worth $100 million and the buyer says, I agree it's worth $100 million, but I have to spend $50 million on storage, so I'm only going to pay you 50. Our position is that's reasonable because you have to incur that expense so we'll accept your 50, but the responsibility for that diminution in value belongs to the government who required you to build that extra storage. So they now have a $100 million facility, but they paid $50 million for.
>
> The notion that we could transfer to them our claim for $50 million, I think, is a ridiculous notion because if they recovered it, the cost of the facility would be zero. They would have gotten a $100 million facility for $50 million, and then recovered the $50 million.

Tr.18-29 (August 22, 2007 hearing). In short, to the extent that PSEG paid less for the nuclear facilities as a result of DOE's delay in performance under the Standard Contract, PSEG has compensated itself for some portion of its expected storage costs.

If the Court granted both plaintiffs' claims and PSEG's claims, the United States would pay damages twice for the same partial breach of contract under the same Standard Contracts, based upon duplicative and inconsistent theories of recovery. That type of double liability would be inappropriate, and the possibility of that result is eliminated if the Court consolidates these cases.

Indeed, as this Court recently recognized in partially granting the Government's motion for consolidation under identical circumstances in Boston Edison Co., 67 Fed. Cl. at 66, "[t]he possibility of an overlapping recovery deserves serious consideration." In Boston Edison, which also was a "diminished value" case, the Court consolidated the buyer and seller cases to address the following issues:

> (1) contract formation; (2) contact implementation through the date of sale of the Pilgrim Nuclear Power Station, and (3) Boston Edison Company's diminution-in-value claim and the government's attendant offset claim against Entergy.

Id. at 67. This method of consolidation worked smoothly in Boston Edison, with coordinated depositions and written discovery amongst the buyer, the seller, and the Government. Further, consolidation of the buyer and seller cases in Boston Edison, did not prejudice the seller, who had not produced a damages claim at the time of trial.

Further, not only do these two cases share the exact same factual basis, they share many of the same issues of law. For example, many of the legal defenses raised by the Government apply with equal force to both Delmarva and PSEG. As noted above, both Delmarva and PSEG are claiming damages for the costs associated with storing SNF. However, whether either of the plaintiffs have incurred damages associated with the cost of storing SNF turns in part upon the determination of the rate and schedule of SNF acceptance. Absent consolidation, there is the

potential that the Court could apply different rates of SNF acceptance to the damages award calculation, even though the same contract is at issue in both cases, leading to inconsistent judgments in the two cases.

The factual overlap between the cases is further demonstrated in part by the fact that many of the witnesses in both cases will be the same. Presumably, the studies and decisions that Delmarva or PSEG made regarding additional storage options will be at issue in both cases because both plaintiffs seek to recover the costs of that additional storage. Accordingly, former Delmarva and PSEG employees who were involved in these decisions will be called as witnesses in both cases. In addition, if discovery and the trial record in the other SNF cases is any indication, it is probable that the Government witnesses will be the same in both cases. The Government's witnesses will have no knowledge concerning Delmarva and PSEG's specific damages. However, Government witnesses have been deposed in the other SNF cases upon issues such as the rate and schedule of SNF acceptance, including issues related to exchanges of approved delivery commitment schedules, as well as the status of Greater-Than-Class-C ("GTCC") low-level radioactive waste, failed fuel, and SNF contained in canisters. Consequently, not only is there a factual overlap between the cases, we anticipate that many of the witnesses will be the same in both cases.

Finally, the interests of judicial economy are served by consolidating these cases. First, the cases are in similar procedural posture. Discovery has barely begun in Delmarva, leaving time for discovery in PSEG. Although motions to dismiss PSEG's takings claim and motions for summary judgment regarding liability, the rate of acceptance, and the acceptance of GTCC low-level radioactive waste are currently pending on the Court's docket, these motions have not been

ruled upon and may need to be updated given the passage of time.[7] Second, should the Court determine that resolution of the issue of liability is necessary in these cases, the Court's consideration of the parties' motions on liability will be aided by consolidation of the cases. With consolidation of the cases, the Court need only issue one ruling on the motions, a ruling which should apply equally to all plaintiffs.

**7. Defendant should state for the record whether it renews its motion to dismiss filed May 12, 2004, for purposes of this court's final ruling.**

The Government renews our motion to dismiss, filed May 12, 2004, as well as, in the alternative, our motion for summary judgment, filed April 28, 2005, as supplemented by the case law identified in our response to plaintiffs' motion to vacate the arbitration decision, filed July 19, 2007.

## CONCLUSION

For the foregoing reasons and those set forth in the Government's briefs in support of its motion to dismiss, motion for summary judgment, and response to plaintiffs' motion to vacate, we respectfully request that the Court dismiss plaintiffs' amended complaints.

---

[7] Although the Government filed a motion for summary judgement in Delmarva, which the Court denied on July 7, 2005 without prejudice to renew, the Government has not filed all of these same motions in Delmarva. If the Court wishes to consider these motions, the Government can file the same motions in Delmarva because the motions have equal applicability in that case. However, consolidation of the cases would make those duplicative filings unnecessary.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
SCOTT R. DAMELIN
STEPHEN FINN
Trial Attorneys

September 12, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September 2007, a copy of foregoing "DEFENDANT'S RESPONSE TO THE COURT'S AUGUST 30, 2007 ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Joshua E. Gardner