**Nos. 04-0034C & 04-0036C**
**(Judge Christine O.C. Miller)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**DELMARVA POWER & LIGHT COMPANY and**
**ATLANTIC CITY ELECTRIC COMPANY,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DELMARVA POWER & LIGHT COMPANY'S AND ATLANTIC CITY ELECTRIC COMPANY'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S AUGUST 30, 2007 ORDER

---

**Richard J. Conway**
**DICKSTEIN SHAPIRO LLP**
**1825 Eye Street NW**
**Washington, DC 20006**
**Tel: (202) 420-2200**
**Fax: (202) 420-2201**

**Attorney for Plaintiffs**

**Of Counsel:**
**Frederick M. Lowther**
**Bradley D. Wine**
**Nicholas W. Mattia, Jr.**
**Bernard F. Sheehan**
**Dickstein Shapiro LLP**
**1825 Eye Street NW**
**Washington, DC 20006**

**Todd Goodman, Esq.**
**Assistant General Counsel**
**Conectiv**
**P. O. Box 231**
**Wilmington, DE 19899**

**September 12, 2007**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 4

I. If the PAs transferred all extant claims as of September 27, 1999, were plaintiffs' takings claims in existence at the effective date of the transfer? ..... 4

II. What effect does defendant's notice formally accepting plaintiffs' assignment of claims to PSEG have on plaintiffs' maintenance of a suit under a theory of retained takings claims? ..... 7

A. The Assignment of Contracts Act and Assignment of Claims Act ..... 9

B. The Government's Arguments in *Delmarva* and *Rochester Gas* Are in Conflict ..... 10

C. The Government's Arguments in *Delmarva* Are Unsupported ..... 11

D. The Assignment of Claims and Assignment of Contracts Acts Must Be Construed Separately ..... 13

E. Takings Claims Cannot Be Assigned Under Binding Supreme Court and Federal Circuit Precedent and Therefore the Claims Act Cannot Be Waived As To Takings Claims ..... 14

F. Binding Precedent Prevents Assignment of Both Regulatory and Physical Takings Claims ..... 16

III. Can an independent takings claim be maintained concurrently with a breach of contract claim pursuant to the Standard Contract? If not, how can a takings claim be maintained separately by bifurcating the claims through an assignment of the contract claims to a third-party? ..... 18

A. Plaintiffs' Takings Claims Can Be Maintained Concurrently with a Breach of Contract Claim Pursuant to the Standard Contract Because Plaintiffs Have Property Rights in the Nuclear Stations Distinct from Those Granted by the Standard Contract ..... 19

B. Plaintiffs May Maintain Their Takings Claims Because the Sale of the Nuclear Stations Did Not Leave Delmarva and Atlantic Whole ..... 21

IV. If the court enters an order ruling that plaintiffs have no takings claims because the source of their claims was a viable contract at the time that the putative takings claim arose, *see Detroit Edison v. United States*, 56 Fed. Cl. 299, 302 (2003), can any takings claim survive? ..... 23

V. If the source of the takings claims is independent from the Standard Contract and/or arises from a statute or regulation, *see Boston Edison*, 64 Fed. Cl. 167, 187 (2005), what precisely is that source? Can the source of the right be resolved as a matter of law? If such an independent source exists, on what date did each takings claim arise? ..... 23

Page

A. The Source of Plaintiffs' Takings Claims Is the NWPA's Grant to DOE of the Sole and Exclusive Obligation and Ability to Remove and Dispose of SNF from the Nuclear Stations ..... 24

1. Physical Takings ..... 25

2. Regulatory Takings ..... 29

B. This Court May Conclude, as a Matter of Law, That the NWPA's Grant to DOE of the Sole and Exclusive Obligation and Ability to Handle the Removal and Disposal of SNF at the Nuclear Stations Is the Source of Plaintiffs' Takings Claims ..... 31

C. Plaintiffs' Takings Claims Arose on January 31, 1998, the Date That DOE Was Obligated to Begin Acceptance and Disposal of SNF ..... 31

VI. If the court cannot resolve plaintiffs' takings claims at this juncture, should plaintiffs' case be consolidated with PSEG's earlier-filed case? *See Vt. Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236, 242 (2006). ..... 31

CONCLUSION ..... 32

## TABLE OF AUTHORITIES

Page

Cases:

*Argent v. United States*, 124 F.3d 1277 (Fed. Cir. 1997) .......... 15

*Armstrong v. United States*, 364 U.S. 40 (1960) .......... 25

*Bailey v. United States*, --- Fed. Cl. ----, No. 02-1078L, 2007 WL 2317493 (Aug. 10, 2007) .......... 16, 17, 18

*Benenson v. United States*, 212 Ct. Cl. 375, 548 F.2d 939 (1977) .......... 28

*Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) .......... *passim*

*Canal Elec. Co. v. United States*, 65 Fed. Cl. 650 (2005) .......... 19

*Castle v. United States*, 48 Fed. Cl. 187 (2000) , *aff'd in relevant part, rev'd in part*, and *vacated and remanded in part*, 301 F.3d 1328 (Fed. Cir. 2002) .......... 20

*Cavin v. United States*, 956 F.2d 1131 (Fed. Cir. 1992) .......... 18

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999) .......... 26

*Detroit Edison Co. v. United States*, 56 Fed. Cl. 299 (2003) .......... *passim*

*Eyherabide v. United States*, 170 Ct. Cl. 598, 345 F.2d 565 (1965) .......... 16, 17

*Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) .......... 24

*Ind. Mich. Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) .......... 23, 24, 25

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......... 28

*Maffia v. United States*, 143 Ct. Cl. 198, 163 F. Supp. 859 (1958) .......... 11

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 19, 21

*Martin v. National Surety Co.*, 300 U.S. 588 (1937) .......... 12, 13

*McKenzie v. Irving Trust Co.*, 323 U.S. 365 (1945) .......... 12, 13

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) .......... 18

*Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978) .......... 29, 31

*Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295 (Fed. Cir. 1986) .......... 20

*Riviera Finance of Texas, Inc. v. United States*, 58 Fed. Cl. 528 (2003) .......... 11

*Rochester Gas & Electric Corp. v. United States*, 65 Fed. Cl. 431 (2005) .......... *passim*

*Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438 (2004) .......... 19-20, 26, 27

*Smith v. United States*, 28 Fed. Cl. 430 (1993) .......... 18

*Sys. Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) .......... 18

*Tuftco Corp. v. United States*, 222 Ct. Cl. 277, 614 F.2d 740 (1980) .......... 9, 11

*United States v. Dow*, 357 U.S. 17 (1958) .......... *passim*

*United States v. Shannon*, 342 U.S. 288 (1952) .......... 14, 15, 16, 17

Page

*Vt. Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236 (2006) ....................... 3, 12, 31

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) ....................................... 26

*Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990)........................................................... 30

U.S. Constitution:

Fifth Amendment ........................................................................................................... *passim*

Statutes:

Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201
(Jan. 7, 1983)......................................................................................................... *passim*

31 U.S.C. § 203.......................................................................................................................... 10

31 U.S.C. § 3727 ......................................................................................................... *passim*

41 U.S.C. § 15 ............................................................................................................ *passim*

42 U.S.C. § 10131 ........................................................................................................ 21, 23, 24

42 U.S.C. § 10222 ........................................................................................................ 24, 26, 27

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DELMARVA POWER & LIGHT COMPANY and ATLANTIC CITY ELECTRIC COMPANY,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Nos. 04-0034C & 04-0036C (Judge Christine Miller)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DELMARVA POWER & LIGHT COMPANY'S AND ATLANTIC CITY ELECTRIC COMPANY'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S AUGUST 30, 2007 ORDER**

Pursuant to the Court's August 30, 2007 Order, Delmarva Power & Light Company ("Delmarva") and Atlantic City Electric Company ("Atlantic") (collectively, "Plaintiffs") submit this supplemental brief in response to the Court's August 30, 2007 Order.

## INTRODUCTION

Plaintiffs allege both physical and regulatory takings claims arising from the Government's failure to begin accepting spent nuclear fuel and high-level radioactive waste ("SNF") on or before January 31, 1998, as expressly required by the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2201 (Jan. 7, 1983).

Both Delmarva and Atlantic, along with other public utility companies, owned direct, partial interests in Peach Bottom, Hope Creek, and Salem (the "Nuclear Stations").[1] The

[1] For ease of reference, Plaintiffs will refer to Peach Bottom, Hope Creek, and Salem collectively as the "Nuclear Stations" throughout their joint response, recognizing that Atlantic had an ownership interest in all three Nuclear Stations, while Delmarva had an ownership interest only in Peach Bottom and Salem. Notwithstanding the Government's argument in its August 22, 2007 notice that Plaintiffs have no outstanding claims related to Peach Bottom because of the Government's settlement with Exelon Generation Company, LLC, Plaintiffs' claims related to Peach Bottom remain at issue in this matter and will remain regardless of the outcome of the claims related to Hope Creek and Salem.

remaining interests in the Nuclear Stations were owned by PSEG Power LLC ("PSEG") and PECO Energy Company. Pursuant to purchase agreements dated as of September 27, 1999 ("PAs"), Atlantic sold its interests in the Nuclear Stations on October 18, 2001, and Delmarva sold its interests in the Nuclear Stations on December 29, 2000.

The Department of Energy ("DOE") did not begin to take custody or dispose of Delmarva's or Atlantic's SNF by January 31, 1998, or by the closing date of Delmarva's or Atlantic's sale of the Nuclear Stations. In fact, when Delmarva's and Atlantic's sale of the Nuclear Stations closed, there was still no prospect that DOE would take custody or dispose of SNF from Delmarva, Atlantic, or any other generator in the foreseeable future because DOE had not then (nor has DOE to this day) sited, licensed, constructed, or placed in operation an SNF disposal facility. And because Delmarva, Atlantic, and the other owners were precluded by the NWPA from removing or disposing of the SNF, they were forced to store the SNF on-site at the Nuclear Stations for what could be a significant period of time. As a result, the value of the Nuclear Stations was drastically reduced, and Plaintiffs received far less for their shares in the Nuclear Stations.

Plaintiffs have had to be patient regarding the prosecution of their claims against the Government. Although Plaintiffs have tried to move this litigation along since the complaints were first filed almost four years ago, the intervenor, PSEG, for its part, waited more than three years before deciding to assert a demand for arbitration.

The Government has done no better. Only now, after the August 22, 2007 hearing, nearly seven years after receiving notice of Plaintiffs' sale, and more than three and a half years after Plaintiffs' original complaints were filed, has the Government attempted to take a position on the assignment of claims at issue in this matter. After the hearing, the Government, for the first time in any SNF matter, filed a notice that purports to accept the assignment of Delmarva's

and Atlantic's claims to PSEG. Nonetheless, the Government is still trying to have it both ways. Despite the purported transfer and elimination of Plaintiffs' diminished value claims, the notice also attempts to retain the right to claim an offset for the diminished value claims against any damages awarded to PSEG.

The real intent of the Government here is to extinguish Delmarva's and Atlantic's claims in a way that still allows the Government to use those claims as an offset against PSEG for diminished value. Although the Government seems quite comfortable taking inconsistent positions in different cases in the same Court, and generally being guided by litigation tactics more than the law, the Fifth Amendment does not lend itself to such manipulation.

The Court's August 30, 2007 Order raised the following six issues:

- If the PAs transferred all extant claims as of September 27, 1999, were plaintiffs' takings claims in existence at the effective date of the transfer?

- What effect does defendant's notice formally accepting plaintiffs' assignment of claims to PSEG have on plaintiffs' maintenance of a suit under a theory of retained takings claims?

- Can an independent takings claim be maintained concurrently with a breach of contract claim pursuant to the Standard Contract? If not, how can a takings claim be maintained separately by bifurcating the claims through an assignment of the contract claims to a third-party?

- If the court enters an order ruling that plaintiffs have no takings claims because the source of their claims was a viable contract at the time that the putative takings claim arose, *see Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 302 (2003), can any takings claim survive?

- If the source of the takings claims is independent from the Standard Contract and/or arises from a statute or regulation, *see Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 187 (2005), what precisely is that source? Can the source of the right be resolved as a matter of law? If such an independent source exists, on what date did each takings claim arise?

- If the court cannot resolve plaintiffs' takings claims at this juncture, should plaintiffs' case be consolidated with PSEG's earlier-filed case? *See Vt. Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236, 242 (2006).

Plaintiffs' response to these issues is set out below.[2]

## ARGUMENT

I. If the PAs transferred all extant claims as of September 27, 1999, were plaintiffs' takings claims in existence at the effective date of the transfer?

Although Plaintiffs' takings claims were in existence at the effective date of the transfer, *see* Section V.C *infra*, Plaintiffs did not transfer their takings claims under the U.S. Constitution to PSEG in 1999. As such, the arguments of both PSEG and the Government that the Plaintiffs no longer have a right to bring these constitutionally based claims are without any support. To the contrary, Plaintiffs possessed and retained those takings claims both before and after the execution of the three agreements with PSEG at issue here.

The agreements that relate to this issue are the September 27, 1999 purchase agreements between PSEG and, respectively, Atlantic for Salem Station, Atlantic for Hope Creek Station, and Delmarva for Salem Station. PSEG acquired certain Purchased Assets, as defined in Section 2.1 of the PAs. For purposes of this analysis, these agreements contain identical provisions governing the sale of assets and the rights obtained by PSEG. As explained by Counsel to PSEG at the August 22, 2007 hearing on this matter (Tr. at 48), all three agreements contain the same section 2.1(l), which controls this issue. That section provides that PSEG was purchasing the following assets:

> All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing Date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(l).

[2] In its August 30, 2007 Order, the Court stated that the arbitration panel in the arbitration proceeding brought by PSEG did not purport to impact this Court's jurisdiction over this case. Plaintiffs agree that this Court's jurisdiction should not be impacted by the arbitration award, but reserve the right to reassert their positions, with the benefit of the *Ehleiter* precedent, should Judge Shuster reach a different conclusion.

There is no reasonable interpretation that Plaintiffs' takings claims are in any way included within the scope of this section. This section is squarely aimed at the claims of Plaintiffs arising out of DOE's contractual default of its obligations under the Standard Contract. These claims were transferred to PSEG, and PSEG now has the right to seek recovery of damages for any losses it has suffered as a result of DOE's failure to comply with its contractual obligations. As is explained below, Plaintiffs' takings claims are not based on the Standard Contract and do not emanate from that Contract. Rather, Plaintiffs' takings claims are based on its rights under the U.S. Constitution and are separate and apart from the Standard Contract with DOE.

The three PAs are each approximately eighty-three pages long, single spaced, before including exhibits, attachments, and schedules. The parties expressly retained sophisticated counsel to advise them and to draft these extremely detailed documents. There is no claim by any party to these proceedings that these PAs are in any way ambiguous on these issues or require the use of parol evidence to make sense of them. Yet, nowhere in these PAs do the parties express any intent or desire to transfer claims grounded on the U.S. Constitution or arising under the Constitution. Had the parties desired to do so, it would have been a relatively easy matter to include a separate clause providing that all Plaintiffs' claims arising under or grounded on the U.S. Constitution were transferred to PSEG and/or that those claims were no longer the property of Plaintiffs.

Moreover, the parties were clearly on notice in September 1999 that multiple lawsuits had been filed in the U.S. Court of Federal Claims raising separate breach of contract and takings counts against the Government concerning SNF, and that these claims were being pursued as separate and legally different types of claims for recovery. In fact, prior to the execution of the PAs, nearly a dozen complaints had been filed in the Court of Federal Claims that asserted

takings causes of action under the Fifth Amendment. *See, e.g.*, *Yankee Atomic Elec. Co. v. United States*, No. 98-126 (filed Feb. 18, 1998); *Conn. Yankee Atomic Power Co. v. United States*, No. 98-154 (filed Mar. 4, 1998); *Maine Yankee Atomic Power Co. v. United States*, No. 98-474 (filed June 2, 1998); *Fla. Power & Light Co. v. United States*, No. 98-483 (filed June 8, 1998).

Had PSEG desired to retain all of these different types of claims for itself going forward, it would have included explicit coverage of these takings claims in these agreements. Yet it did not. In fact, the PAs are devoid of any reference to takings claims or any claims arising under or involving the U.S. Constitution. Further, any suggestion that the term "all other claims" in Section 2.1 somehow included takings claims is ludicrous. It is clear that this section is focused on claims for default under the Standard Contract by DOE. The phrase "all other claims" must be read in that light and context. Constitutional claims are not mere afterthoughts to be subsumed in such imprecise and undefined language, particularly where virtually all of the remainder of the agreement is crafted in very precise terms.

Although Counsel for PSEG also directed the Court to review Sections 2.5 and 6.3 (Tr. at 54-55), those sections do not deal with transfer of claims or rights to takings claims. Rather, they simply deal with control of litigation and notice issues for assets that have already been transferred. They add nothing to support the position of PSEG here.

As this brief makes clear, Plaintiffs possessed separate takings claims arising out of the U.S. Constitution prior to September 27, 1999. These claims were neither transferred by nor included within the PAs. As a result, "at the effective date of transfer," Plaintiffs' takings claims were in existence and were (and continue to be) claims owned and controlled by Plaintiffs.

However, assuming arguendo that the PAs purported to transfer the takings as well as Delmarva's and Atlantic's breach claims, such an assignment is improper and ineffective as a

matter of law. As discussed in greater detail in Sections II.B-E below, such a purported transfer of Plaintiffs' takings claims is impermissible as a matter of law, in that the Assignment of Claims Act cannot be employed by the Government as an offensive tool to be utilized as a mere litigation tactic to extinguish a party's Constitutional rights. Although Delmarva's and Atlantic's breach claims can be (and were) validly transferred under the express terms of the Standard Contract, Plaintiffs' takings claims are, by their nature, inherently different such that the Government has no protected interest in waiving application of the Claims Act in this matter. Indeed, as illustrated in Section II.D, the Government's efforts to recognize a purported assignment of a takings claim appear to be unprecedented.

II. What effect does defendant's notice formally accepting plaintiffs' assignment of claims to PSEG have on plaintiffs' maintenance of a suit under a theory of retained takings claims?

The Notice Regarding the Assignment of Plaintiffs' Claims filed by the Government on August 22, 2007 ("Notice") is but the latest example of the Government's repeated attempts to deprive Delmarva and Atlantic of just compensation for the Government's failure to begin accepting SNF on or before January 31, 1998, as expressly required by the NWPA.

The Government's Notice, *in stark contrast to its previous exhortations that similar assignments were not legally cognizable*, purports to formally accept the assignment of Delmarva's and Atlantic's takings claims to PSEG (and presumably to waive application of the Anti-Assignment Act) – an assignment that did not, and could not, actually take place. The Government's position is based on the incorrect premise that a Fifth Amendment takings claim can be assigned to a successor in interest, so long as the Government consents to such an assignment. The Government's change of heart is little more than a transparent litigation tactic that, as described in detail below, runs afoul of the Fifth Amendment and the relevant Anti-Assignment statutes that the Notice seeks to invoke. Indeed, the Government's continued

attempts to manipulate Plaintiffs' and PSEG's claims are readily apparent from the face of the Notice itself. According to the Government:

> The claims that the plaintiffs have asserted before this Court, which relate to or arise from ownership interests or the sale of ownership interests in PSEG Nuclear's nuclear reactors, were all purportedly assigned to PSEG Nuclear. Those claims involve allegations that PSEG Nuclear was the beneficiary of a reduction in the purchase price for the plaintiffs' interests in the PSEG Nuclear reactors, and *any such claims would be offset by the benefits that PSEG Nuclear obtained through such a price reduction*.

Notice at 3 (emphasis added).

The Government is trying to have it both ways. Taken to its logical conclusion, the Government's argument would give the Government an unjustified windfall. The Government's Notice would eliminate Plaintiffs' claims for just compensation before this Court but would allow the Government to use those same claims as an offset against PSEG's claims before Judge Futey. In other words, the Government, by the device of the waiver/acceptance, seeks to deprive Plaintiffs of any compensation for the diminished value they suffered, while at the same time asserting that the diminished value suffered by Plaintiffs was in fact a benefit to PSEG that should offset (and to that extent preclude compensation for) PSEG's claims.

The Fifth Amendment's just compensation requirements prohibit the very type of windfall that the Government is trying to create for itself. Plaintiffs agree that the diminished value suffered by them was in fact a benefit to PSEG, which is one reason why (i) PSEG could not assert such a claim on its own behalf and (ii) such a claim cannot be assigned to a buyer. The "Catch-22" here is that the Government seeks to capture that benefit for itself, without compensating the parties that suffered the corresponding loss. As described below, that "gap" in logic is precisely what is "filled" by the Fifth Amendment's just compensation requirement.

A. The Assignment of Contracts Act and Assignment of Claims Act

The Assignment of Contracts Act, 41 U.S.C. § 15 ("Contracts Act"), establishes that no contract with the United States may be transferred to a third party:

> No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned.

41 U.S.C. § 15(a). Notably absent from this section of the Contracts Act is the word "claim." This absence reflects the purpose of the Contracts Act, which is designed to protect against assignment of performance rights against the Government. *Tuftco Corp. v. United States*, 222 Ct. Cl. 277, 614 F.2d 740, 744 n.4 (1980). Consequently, the Contracts Act does not apply to the agreements at issue here.

The Assignment of Claims Act, 31 U.S.C. § 3727 ("Claims Act"), places different limitations upon a company's ability to assign its damages claims against the Government to a third party, but allows assignments under certain conditions:

> (a) In this section, "assignment" means—
>
> (1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or
>
> (2) the authorization to receive payment for any part of the claim.
>
> (b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727(a)-(b) (formerly part of 31 U.S.C. § 203). As with the Contracts Act, exceptions to the Claims Act exist for certain financing institutions. 31 U.S.C. § 3727(c).

B. The Government's Arguments in *Delmarva* and *Rochester Gas* Are in Conflict

The Government's position in this case is diametrically opposite to the position taken by the Government in *Rochester Gas & Electric Corp. v. United States*, 65 Fed. Cl. 431 (2005).

In *Rochester Gas*, Rochester argued that, pursuant to Article XIV of the Standard Contract, it was entitled to assign title to "all of the rights and obligations under the DOE Standard Contract for the R.E. Ginna Nuclear Power Plant, 'including but not limited to the right to pursue and recover damages,'" to Ginna LLC. Plaintiff's Motion to Substitute Plaintiff and Amend Caption, for Substitution of Counsel, and for Limited Relief from Stay at 3, *Rochester Gas*, 65 Fed. Cl. 431 (No. 04-118C) (Appendix ("App.") at 3).

The Government argued strenuously in that case that "the Standard Contract does not permit the assignment of pre-existing 'claims.'" Defendant's Response in Opposition to Plaintiff's Motion to Substitute Plaintiff and Amend Caption, for Substitution of Counsel, and for Limited Relief from Stay at 13, *Rochester Gas*, 65 Fed. Cl. 431 (No. 04-118C) ("Defendant's Response in *Rochester Gas*") (App. at 26). Further, the Government argued that

> [b]ecause the Standard Contract does not permit assignment of claims, Rochester must comply with the strict requirements of the Claims Act to have a valid assignment. . . . Under the express terms of the Claims Act, an assignment may only be made after the claim is decided and upon issuance of a warrant for payment. Thus, there is no provision which allows an assignee simply to pursue undecided/unresolved claims [such as those in *Delmarva*] directly against the United States. . . . Failure of the contractor to abide by any of the Act's provisions will invalidate an attempted assignment.

*Id*. at 17-19 (App. at 30-32) (citations omitted).

Judge Lettow disagreed with the Government and interpreted NWPA section 302(b)(3) "to permit explicit assignments of pre-existing claims under the Standard Contract." 65 Fed. Cl. at 441. Rochester Gas's contract claims were properly assigned and the assignment of pre-existing claims was explicit. *Id*. But Judge Lettow agreed with the Government in

relation to Rochester Gas's takings claims, which he found could not be assigned for the reasons set forth below. *Id*. at 441-42.

C. The Government's Arguments in *Delmarva* Are Unsupported

The Government argues now that it may waive the application of the Claims Act. Notice at 1. The Government's position is that the "plaintiffs have identified no valid reason that the same rule regarding waiver of the Assignment of Claims Act as they apply to contract claims is somehow different as they apply to takings claims." *Id*. at 2.

The cases cited by the Government in support of its waiver argument are inapposite because they primarily address the Contracts Act, which does not apply here. *Tuftco Corp. v. United States*, 222 Ct. Cl. 277, 614 F.2d 740 (1980), involved payments due under a contract. The court found that the Contract Officer possessed authority to waive requirements of the "Anti-Assignment Act." The court also noted the difference between the Contracts Act and the Claims Act: "The present case, of course, deals with 41 U.S.C. § 15," the Contracts Act. 614 F.2d at 744 n.4. *Tuftco* did not involve takings claims. Likewise, *Maffia v. United States*, 143 Ct. Cl. 198, 163 F. Supp. 859, 862 (1958), cited by the Government, involved the assignment of a contract and discussed the Contracts Act, not the Claims Act. *Riviera Finance of Texas, Inc. v. United States*, 58 Fed. Cl. 528 (2003), likewise did not involve takings claims, but rather assignment of payment rights under the contract. Although the Claims Act was also mentioned, the case involved primarily the Contracts Act.

The Government also relies on *Vermont Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236 (2006), where the Government argued, as it did in *Rochester Gas*, that the Claims Act prevented Vermont Yankee from assigning "pre-existing claims." *Id*. at 241. Without addressing takings claims specifically, the court found that "[b]ecause the scope of the assignments of the Standard Contract in this case and in *Rochester Gas* are without practical

difference, the Court finds that Vermont Yankee's assignment of its pre-existing damages claims is not invalid for the reasons offered by Defendant." *Id*. at 242.

The Government argued in the alternative that if the assignments were valid, Vermont Yankee had no claims and its complaint should be dismissed. The court found that "[a]t this stage of the case, the Court is not able to determine as a matter of law whether all of Vermont Yankee's claim have been assigned to ENVY, or whether there is any overlap between the claims of Vermont Yankee and ENVY." *Id*. Some claims may have remained with Vermont Yankee, including its taking claims. Where *Vermont Yankee* stated that the Government may "recognize" the assignment of a claim, it was merely following *Rochester Gas*, *id*. at 241, and therefore it would follow the *Rochester Gas* holding that takings claims cannot be assigned.

Neither case cited by the Government's Notice supports its argument that "only the Government may assert [the] protections" of the Claims Act, Notice at 1, which regardless would be dicta as applied to a takings claim (unlike *United States v. Dow*, 357 U.S. 17 (1958), which squarely addressed takings claims). *Martin v. National Surety Co.*, 300 U.S. 588 (1937), merely stated that the Claims Act was enacted for the protection of the Government. *Id*. at 594. *McKenzie v. Irving Trust Co*., 323 U.S. 365 (1945), merely cited *Martin* and further stated that the statute is "not for the regulation of the equities of the claimants as between themselves." *Id*. at 369. By attempting to waive the application of the statute for the purpose of extinguishing one party's valid constitutional claim, the Government is attempting to regulate the balance of equities between the private claimants in *Delmarva*. As stated in *McKenzie*, that is not the purpose of the statute. Neither *Martin* nor *McKenzie* states that a private party cannot invoke the statute when it rightfully applies under binding case law. Any party has the right to ask a court to enforce and uphold the law.

D. The Assignment of Claims and Assignment of Contracts Acts Must Be Construed Separately

In *Rochester Gas*, the Government argued that these statutes must be construed differently according to their purpose:

> The fact that Congress passed one statute regarding the assignment of contracts and another statute regarding the assignment of claims is deliberate and reveals that such assignments are to be viewed and treated differently. . . . Because Congress enacted two separate statutes pertaining to assignment, using one for "contracts" and one for "claims," the distinction demonstrates congressional intent to have the statutes play different roles in achieving a broad, common goal.

Defendant's Response in *Rochester Gas* at 13-14 (App. at 26-27). The Government explained key differences between the statutes based on the result when an assignment is found to violate the statute:

> The permissibility of, restrictions upon, and effect of an assignment differ depending upon which Act is applied. Assignments of claims found to violate the Assignment of Claims Act, 31 U.S.C. § 3727, are invalid, returning the parties to the status quo ante. Colonial Navigation Company v. United States, 149 Ct. Cl. 242, 245, 181 F. Supp. 237, 240 (1960); see Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1349 (Fed. Cir. 2002). Under the Assignment of Contracts Act, 41 U.S.C. § 15, wrongful assignments of contracts are not only invalid, but may result in annulment of the contract by the Government. Tuftco Corp. v. United States, 222 Ct. Cl. 277, 284 n.5, 614 F.2d 740, 744 n.5 (1980). Another important conceptual difference between these two statutes is that 31 U.S.C. § 3727, which expressly concerns claims, "pertains to claims for work already done," whereas 41 U.S.C. § 15, which pertains to "executory contracts, is more concerned with continuing obligations." Tuftco Corp., 222 Ct. Cl. at 284 n.4, 614 F.2d at 744 n.4.

*Id*. at 14-15 (App. at 27-28).

These differences are enough to explain why the Government cannot waive application of the Claims Act in a takings case as it can with the Contracts Act or a payment claim under the Claims Act. When the Contracts Act is violated, the Government may annul the contract. But the Government may require performance of the contract and, accordingly, it may recognize the assignment to protect its interests. By contrast, an assignment of claim that

violates the statute merely returns the parties to the *status quo ante*. The Government has no protected interest in waiving application of the Claims Act in order to extinguish one party's valid constitutional claim. We are not aware of any case embracing a Government attempt to waive application of the Anti-Assignment Act in the context of takings claims.

E. Takings Claims Cannot Be Assigned Under Binding Supreme Court and Federal Circuit Precedent and Therefore the Claims Act Cannot Be Waived As To Takings Claims

Under *United States v. Shannon*, 342 U.S. 288 (1952), the Claims Act does not apply to assignments done by operation of law, and the only permissible voluntary assignments, other than those done pursuant to the Claims Act, were assignments by will or for the benefit of creditors:

> That an assignment is voluntary is not an end to the matter, however. In the ninety-nine-year history of the Anti-Assignment Act, this Court has recognized as exceptions to the broad sweep of the statute two types of voluntary assignments (aside from voluntary assignments made after a claim has been allowed): transfers by will, *Erwin v. United States*, 97 U.S. 392, 397 (1878), and general assignments for the benefit of creditors, *Goodman v. Niblack*, 102 U.S. 556, 560-561 (1881).

*Id*. at 292. In a more recent case, the Federal Circuit has stated that:

> Absent a valid voluntary assignment of a compensation claim against the Government for the taking of property, *see United States v. Shannon*, 342 U.S. 288, 72 S. Ct. 281, 96 L. Ed. 321 (1952), the general rule is that "[t]he owner at the time [of the taking] rather than the owner at an earlier or later date, is the one who has the claim and is to receive payment." *United States v. Dow*, 357 U.S. 17, 22, 78 S. Ct. 1039, 1044, 2 L. Ed. 2d 1109 (1958) (internal quotes omitted).

*Argent v. United States*, 124 F.3d 1277, 1287 (Fed. Cir. 1997). Thus, under the rule of *Argent* and *Shannon*, binding Federal Circuit and Supreme Court case law, the Claims Act applies to all takings claims, unless there is an assignment by operation of law, a voluntary assignment in accordance with the Claims Act, or an assignment by will or for a creditor. None of these

conditions exists in the *Delmarva* case. Neither *Argent* nor *Shannon* nor *United States v. Dow*, 357 U.S. 17 (1958), nor any other case, recognizes an attempt by the Government to "waive" application of the Claims Act in the context of a takings claim.

In *Rochester Gas*, Judge Lettow held that a takings claim cannot be assigned because of the Supreme Court's decision in *Dow*. In *Dow*, the Supreme Court held that a takings claim can be assigned by operation of law, but not by voluntary assignment, except under the express conditions of the Claims Act:

> It is well established, as the Court of Appeals recognized, that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property. In view of the express finding of the District Court that Dow's grantors intended to convey to him their right to the condemnation award, we think that the transfer of the claim in this case must be considered to have been such a voluntary assignment, rather than, as Dow argues, an assignment taking effect by operation of law, and thus not within the Act's prohibition. *We would not be justified in relaxing the rigor of the Act, especially in view of the fact that under its very terms the way was left open for the parties to accomplish a transfer of the award by valid means*. Accordingly, Dow can prevail only if the "taking" occurred while he was the owner. For it is undisputed that "[since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment."

*Id*. at 20-21 (emphasis added) (alteration in original) (citations omitted) (footnote omitted). The requirements of *Dow* have not been met in the *Delmarva* case.

The assignment of pre-existing claims in *Delmarva* is also invalid as to any takings claims because the assignment does not meet the express requirements of the Claims Act. Under the terms of the Claims Act, an assignment may be made only after the claim is decided and upon issuance of a warrant for payment. *See* 31 U.S.C. § 3727(b) ("An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.").[3] Nor was the assignment of pre-existing claims in *Delmarva* done

[3] This statutory provision underscores the real purpose of the Anti-Assignment Act, which was to prevent trafficking in claims against the Government or the need for the Government to litigate

by operation of law. Rather, it was a voluntary transfer, subject to the rule of *Dow* as reflected in *Rochester Gas*. The Government cannot waive application of the Claims Act, because such a waiver would have the effect of nullifying a decision of the Supreme Court based on the whim of Justice Department attorneys in their particular cases.

F. Binding Precedent Prevents Assignment of Both Regulatory and Physical Takings Claims

In *Dow*, the Supreme Court held that physical takings claim cannot be assigned voluntarily except under the express conditions of the Claims Act. The Federal Circuit's predecessor, the Court of Claims, adopted this rule in the context of temporary takings as well. In *Eyherabide v. United States*, 170 Ct. Cl. 598, 345 F.2d 565 (1965), the Court of Claims found that a party that acquired interest in a tract of land after the start of a temporary physical taking was prevented by the Anti-Assignment Act from "recover[ing] for any part of the claim accruing prior to that time." 345 F.2d at 571 (citing *Shannon*, 342 U.S. 288; *Dow*, 357 U.S. 17).

As Judge Wolski stated in his recent decision in a regulatory takings case addressing the Anti-Assignment Act, regulatory takings are all "*potential temporary takings*." *Bailey v. United States*, --- Fed. Cl. ----, No. 02-1078L, 2007 WL 2317493, at *30 (Aug. 10, 2007). Under *Eyherabide*, owners who obtain an interest after the temporary taking are "not prohibited from sharing in the just compensation awarded." *Id*. However, in the case of a temporary taking, just as in a permanent taking, a party that acquired interest after the start of the taking is prevented by the Anti-Assignment Act from "recovering for any part of the claim accruing prior to that time." *Id*. (quoting *Eyherabide*, 345 F.2d at 565 (citing *Shannon* and *Dow*)).

---

with multiple claimants over the same claim. It is only when the claim is resolved that the parties can engage in a valid assignment, because the Government no longer has an interest in the outcome.

In other words, the rule, "as we have seen in *Eyherabide*, is that whoever happens to own property while the temporary taking continues is entitled to compensation." *Bailey*, 2007 WL 2317493, at *33.

> Such an action [by the purchaser] is not a claim for the compensation the government would owe any predecessors, whose conveyance of the subject property truncates their claims to ones for temporary takings (the amount of which would be subtracted from the permanent taking compensation owing to the ultimate or, as a result, penultimate owner were the government to choose to allow the taking to be permanent). Thus, there is no assignment or transfer of any claim, but rather of real property—which brings with it the right of use and, thus, the right to maintain one's own claim against the government if use is so severely restricted as to be a taking.

*Id*.

Under the holding of *Bailey*, in the context of regulatory takings, "the rule that temporary takings compensation would be owed to the prior owner for the period of time up to the date of conveyance, and to the subsequent owner after that date, is an easily administered, bright-line rule." *Id*. at *34. Judge Wolski followed *Eyherabide* as "binding precedent." *Id*. at *30. The court in *Eyherabide* was bound by the Supreme Court decisions in *Shannon* and *Dow*, at least as applied to the claim that had accrued prior to transfer of property. This Court, like the court in *Bailey*, is bound by *Eyherabide*, as well as *Shannon* and *Dow*. The Government cannot waive application of the Claims Act without disregarding the decisions in *Eyherabide*, *Shannon*, and *Dow*.

The decisions of the Supreme Court, the Federal Circuit, and the Court of Claims are also ample support for Judge Lettow's decision in *Rochester Gas*. There, Judge Lettow relied on *Dow* and found that Rochester Gas could not assign its takings claims to Ginna LLC because, quite simply, the "Assignment of Claims Act bars the assignment of a takings claim against the United States." *Rochester Gas*, 65 Fed. Cl. at 441 (citing *Dow*, 357 U.S. at 20-21). The court stated that for a party to allege that its property right has been taken, it must have owned the

property at the time that the alleged taking occurred. *Id*. at 441-42 (citing *Dow*, 357 U.S. at 20-21; *Cavin v. United States*, 956 F.2d 1131, 1135 (Fed. Cir. 1992); *Sys. Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 170 (2005); *Smith v. United States*, 28 Fed. Cl. 430, 436 (1993)). Because the alleged taking occurred before Rochester Gas's ownership of the property right was transferred to Ginna LLC, Rochester Gas could not transfer its takings claims to Ginna LLC. *Id.*

Judge Lettow, applying the rule of *Dow*, recognized that Rochester Gas may have a regulatory takings claim rather than a physical takings claim. The court concluded that "it may be that both the assignor and assignee have separate takings claims." 65 Fed. Cl. at 442 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 626-28 (2001) (regulations in place prior to the purchase of an affected property were not dispositive of whether a taking occurred)). "Accordingly, Rochester Gas can properly assert its takings claims and may not transfer those claims to Ginna LLC, but Ginna LLC might have takings claims of its own that it could assert separate and apart from those being put forward by Rochester Gas." *Id*. In this holding, Judge Lettow is entirely consistent with Judge Wolski in *Bailey*, which took into account the effect of *Dow* on a regulatory taking. Just as Judges Lettow and Wolski were bound by precedent to conclude that a pre-existing takings claim cannot be assigned, this Court must also reach that conclusion, regardless of whether the taking is physical or regulatory, permanent or temporary, and regardless of which party is invoking the law.

III. Can an independent takings claim be maintained concurrently with a breach of contract claim pursuant to the Standard Contract? If not, how can a takings claim be maintained separately by bifurcating the claims through an assignment of the contract claims to a third-party?

Generally, a takings claim cannot be maintained concurrently with a breach of contract claim because "a takings claim has limited application when a claimant has a viable breach remedy." *Detroit Edison*, 56 Fed. Cl. at 301. When "'the relative rights of party litigants . . . have been voluntarily created by contract . . . interference with such contractual rights

generally gives rise to a breach claim not a taking[s] claim.'" *Id.* at 302 (citation omitted). In such a case, a breach of contract claim takes precedence over a takings claim.

That's not the case here. Delmarva's and Atlantic's rights arose separate and apart from the Standard Contract. Consequently, a breach of contract claim would not completely redress the damage that the Government caused Plaintiffs because such a claim would not take into account the damage to the total value of the Nuclear Stations that crystallized when Plaintiffs sold their interests.[4]

A. Plaintiffs' Takings Claims Can Be Maintained Concurrently with a Breach of Contract Claim Pursuant to the Standard Contract Because Plaintiffs Have Property Rights in the Nuclear Stations Distinct from Those Granted by the Standard Contract

Previously, this Court concluded that plaintiffs such as Delmarva and Atlantic could pursue a takings cause of action concurrently with a breach of contract action. *Detroit Edison*, 56 Fed. Cl. 299. This Court denied the Government's motion to dismiss and found that even if the plaintiffs could not recover damages under both theories, they should be allowed to pursue both theories and create a more fully developed record.[5] *Id.* at 301-02; *see also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) (breach and takings claims allowed to proceed concurrently); *Sacramento Mun. Util. Dist. v. United States*, 61 Fed. Cl. 438, 442 (2004) ("*SMUD*"). Similarly, in *Boston Edison*, Judge Lettow found that "Boston Edison may bring contract and taking claims concurrently, but, if both claims remain

[4] We acknowledge that the parties may act to preserve a diminished value claim as a contract claim by expressly agreeing that claims against the Government are not assigned. Such was the case in *Boston Edison*. The fact that there are alternative approaches to claims against the Government for diminished value does not, and could not, lead to the conclusion that such claims have been extinguished, as the Government argues here.

[5] In another SNF matter pending in the Court of Federal Claims, Judge Hodges rejected an SNF plaintiff's takings claim on similar facts. *Canal Elec. Co. v. United States*, 65 Fed. Cl. 650 (2005). This Court respectfully disagreed with that result and "view[ed] the rulings in Boston Edison and Sacramento Municipal Utility District [as] more aligned with the teachings of Penn Central." July 2005 Order at 5.

viable, recovery under the contract damages theory is appropriate." 64 Fed. Cl. at 187. This Court thereby allowed Delmarva and Atlantic the opportunity to pursue both takings and breach of contract claims in an effort to create a complete factual record.

Even aside from developing a complete factual record, it would be appropriate under certain circumstances for a party to maintain a takings claim concurrently with a breach of contract claim pursuant to the Standard Contract. This Court has already explained that where "the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings remedy to vindicate that right." *Detroit Edison*, 56 Fed. Cl. at 302.

For example, the Federal Circuit held that a plaintiff in an action against the Government for breach of a lease could recover under a takings theory. *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986). Allowing the takings claim to proceed was appropriate because "the landowner had rights in the property separate and distinct from any rights conferred by contract." *Castle v. United States*, 48 Fed. Cl. 187, 218-19 (2000), *aff'd in relevant part, rev'd in part*, and *vacated and remanded in part*, 301 F.3d 1328 (Fed. Cir. 2002).

Similarly, Delmarva and Atlantic have rights in the Nuclear Stations that are separate and distinct from any rights conferred by the Standard Contract: "(1) the real property interests in the property used for storage of the SNF necessitated by the government's actions; (2) the property interests in the assets associated with the nuclear stations; and (3) the ability to enjoy the use and benefit of the nuclear stations." Memorandum Opinion and Order at 5, *Delmarva Power & Light Co. v. United States*, Nos. 04-34C & 04-36C (Fed. Cl. filed July 1, 2005), (Miller, J.) ("July 2005 Order"). The remedies described in the Standard Contract alone are not necessarily sufficient to protect these property interests. *See Detroit Edison*, 56 Fed. Cl. at 302 (citing the Federal Circuit's discussion of the avoidable delays provision in *Maine Yankee*,

225 F.3d at 1342-43). Plaintiffs' takings claims would then be necessary to recover the damage that the Government did to these property interests.

Should this Court find, for example, that the breach of contract claims under the Standard Contract were limited to the expenses incurred in storing the SNF that the Government was supposed to remove, as in the owner-operator SNF cases, then damage to the value of the Nuclear Stations both physically and as a going concern would not be taken into account. And these damages, which ripened when Delmarva and Atlantic sold their interests, would be lost, to the exclusive benefit of the Government.

B. Plaintiffs May Maintain Their Takings Claims Because the Sale of the Nuclear Stations Did Not Leave Delmarva and Atlantic Whole

Even if this Court finds that Delmarva and Atlantic would not be able to maintain an independent takings claim concurrently with a breach of contract claim under the Standard Contract, Plaintiffs' takings claims would still survive. As described above, the sale of Delmarva's and Atlantic's interests in the Nuclear Stations both determined and finalized the damage to the value of the Nuclear Stations. When Delmarva and Atlantic sold their interests, they did not, and could not, get full value for those interests because of the Government's conduct. This gap, between what Delmarva and Atlantic received and what they should have received, is the basis for their takings claims. And it is this gap that the Government seeks to claim for itself by attempting to invalidate Plaintiffs' takings claims, while at the same time seeking to use those same claims as an offset against PSEG's damages claim.

Delmarva and Atlantic were (and the subsequent purchaser – PSEG – still is) unable to move the SNF to an off-site storage facility because the NWPA charges the Government with the sole responsibility for permanent SNF storage. 42 U.S.C. § 10131(a)(4). This condition severely restricted Delmarva's and Atlantic's fair use and enjoyment of the Nuclear Stations. As Judge Lettow held in *Boston Edison*:

> In the present case, the government has not completed its repository, and it has failed in its disposal duties. As a result, the value of Boston Edison's property allegedly dropped. The option of getting another contractor to repair the damage is unavailable to Boston Edison because there is no other approved provider of disposal services in this highly regulated industry. Diminution in value is left as the appropriate damage assessment.

64 Fed. Cl. at 183. The extent of the Government's failure to provide a repository for the SNF means that future owners' interests in the Nuclear Stations (including the utility that purchased Delmarva's and Atlantic's interest in the Nuclear Stations) will also be encumbered by this easement.

The purchasers of Delmarva's and Atlantic's interests took this encumbrance and its consequential effects on the value of the Nuclear Stations into account in the purchase price. Plaintiffs therefore received less value for their property interests precisely because of the Government's actions. In fact, Plaintiffs received less than 50% of the original value of their property interests and lost the balance of the value because of the Government's actions. Plaintiffs have suffered significant damages and clearly have not been made whole.

Added together, the value of Plaintiffs' takings claims and the value of Plaintiffs' breach of contract claims should equal the diminution in value of their property interests in the Nuclear Stations. The proper measure of compensation for Plaintiffs' takings claims would therefore be the difference between (1) the diminution in value of their property interests and (2) the value of any breach of contract claims that Delmarva and Atlantic originally owned. Plaintiffs' breach of contract claims were assigned to the purchasers as part of the purchase price, however. Consequently, the measure of Plaintiffs' takings claim becomes as a practical matter the difference between (1) the value of Plaintiffs' interests in the Nuclear Stations assuming the Government had fulfilled its statutory obligations and (2) the amount Plaintiffs actually received from the sale of the Nuclear Stations.

IV. If the court enters an order ruling that plaintiffs have no takings claims because the source of their claims was a viable contract at the time that the putative takings claim arose, *see Detroit Edison v. United States*, 56 Fed. Cl. 299, 302 (2003), can any takings claim survive?

If the Court rules that Plaintiffs' takings claims arise solely out of the Standard Contract, then no takings claims would survive under this Court's reasoning in *Detroit Edison*. Plaintiffs' takings claims arise, however, from the NWPA, which grants DOE the sole power to remove and dispose of SNF from the Nuclear Stations. *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (citing 42 U.S.C. § 10131(a)(4), (b)(2)); *see also* Section V *infra*.

V. If the source of the takings claims is independent from the Standard Contract and/or arises from a statute or regulation, *see Boston Edison*, 64 Fed. Cl. 167, 187 (2005), what precisely is that source? Can the source of the right be resolved as a matter of law? If such an independent source exists, on what date did each takings claim arise?

The source of Plaintiffs' takings claim is the NWPA, which granted DOE the *sole* and *exclusive* obligation and ability to handle the removal and disposal of SNF from the Nuclear Stations. *See Ind. Mich.*, 422 F.3d at 1374 (citing 42 U.S.C. § 10131(a)(4), (b)(2)). By forbidding other parties from removing or disposing of the SNF, the NWPA forced Plaintiffs' and other owners and operators of nuclear facilities to store SNF on-site when DOE failed to live up to its statutory obligations.

Based on this forced storage of SNF on-site and the consequent damage to the value of the Nuclear Stations, Delmarva and Atlantic have asserted both physical and regulatory takings of their property interests in the Nuclear Stations. First, the Government's failure to begin removal of SNF on or before January 31, 1998 constituted a taking of Delmarva's and Atlantic's land itself, forcing Delmarva and Atlantic to use identifiable portions of the Nuclear Stations as indefinite storage facilities for SNF. Since these portions of the Nuclear Stations cannot be used for any commercial purposes other than the interim storage of SNF in a manner

dictated by the Government, Delmarva and Atlantic have been deprived of the fair use and enjoyment of their physical property.

The Government's actions also amounted to a regulatory taking of Delmarva's and Atlantic's property interests as a direct result of the Government's failure to abide by its obligations under the NWPA. By obligating Delmarva and Atlantic to use the Nuclear Stations as an interim SNF storage facility, the Government deprived Delmarva and Atlantic of their investment-backed expectations in the Nuclear Stations, including the expectation that the owners of the facilities (including Delmarva and Atlantic) would not otherwise be required to store SNF at the Nuclear Stations. Since Delmarva and Atlantic were forced to sell their interest in the Nuclear Stations, the Government's taking was permanent as to Delmarva and Atlantic.

Indeed, the Government does not quarrel with Delmarva's and Atlantic's assertion that the NWPA imposed an unconditional obligation on the Government to remove and dispose of nuclear utilities' SNF on or before January 31, 1998. *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (citing 42 U.S.C. § 10222(a)(5)(B)). The taking occurred when the Government failed to perform its statutory obligations on January 31, 1998, and Delmarva and Atlantic were required to provide their own property and facilities to store SNF on-site at the Nuclear Stations.

### A. The Source of Plaintiffs' Takings Claims Is the NWPA's Grant to DOE of the Sole and Exclusive Obligation and Ability to Remove and Dispose of SNF from the Nuclear Stations

As noted above, the NWPA granted DOE the *sole* and *exclusive* obligation and ability to handle the removal and disposal of SNF from the Nuclear Stations. *See Ind. Mich.*, 422 F.3d at 1374 (citing 42 U.S.C. § 10131(a)(4), (b)(2)). No other parties, aside from DOE, had the legal authority to accept SNF from the Nuclear Stations. 422 F.3d at 1374. Absent a permanent repository, the only long-term option available to nuclear owners and operators, including

Delmarva and Atlantic, was on-site dry storage at the Nuclear Stations. The NWPA's strict regulation of the removal of SNF, which vested exclusive responsibility for that function in DOE, thus forced owners and operators to use their nuclear facilities as replacement repositories for SNF after DOE failed to fulfill its statutory obligations.

By forcing utilities to serve in the role that DOE was otherwise obligated to fill, DOE imposed a two-part burden upon owners and operators of nuclear facilities for which it is obligated to provide compensation. First, owners and operators had to reserve a portion of their facilities as physical repositories for the SNF. Second, owners and operators had to expend significant costs and effort to maintain storage of the SNF on-site at their facilities. The owners and operators were thereby forced to assume DOE's two-part custodial obligation under the NWPA to remove and to dispose of the SNF, and the owners and operators are therefore entitled to just compensation under the Fifth Amendment for both of these responsibilities.

Recognizing that the distinction between a physical and a regulatory taking is sometimes unclear, Delmarva and Atlantic have formulated their claims as both physical and regulatory takings. Both formulations are based on the NWPA's grant to DOE of the exclusive ability to remove and dispose of SNF from the Nuclear Stations.

1. Physical Takings

If the Government takes a person's property to benefit society, then society should pay. A principal purpose of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

By forcing the nuclear utilities to store the SNF on-site, the Government has physically taken Delmarva's and Atlantic's property interests. The Government's failure to remove SNF on or before January 31, 1998, as required by the NWPA, infringed upon

Delmarva's and Atlantic's fair use and enjoyment of the Nuclear Stations, resulting in the physical taking of Delmarva's and Atlantic's real property. *See* 42 U.S.C. § 10222(a)(5)(B). The Government's failure to remove SNF, thereby requiring Delmarva and Atlantic to take steps necessary for the interim storage of SNF at the Nuclear Stations, amounted to a confiscation of Delmarva and Atlantic's physical property.

Equitably, the Government owns the SNF even though it has never taken physical possession of the SNF. Under the NWPA, the Government has the responsibility to remove and to dispose of the SNF. And, under the NWPA, the Government retained control over the SNF by forbidding its removal from the nuclear facilities and by forcing nuclear owners and operators to assume all responsibility and liability for the storage of the SNF for an indefinite period of time. From a practical standpoint, it is as if the Government removed the SNF from the nuclear facilities and then turned around and dumped the SNF right back onto the nuclear facilities. *SMUD*, 61 Fed. Cl. at 442-43. Consequently, the Takings Clause of the Fifth Amendment is implicated. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation."); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 698, 721 (1999) (upholding taking damages where the government engaged in a series of pretextual refusals to allow development over an extended time period).

Contrary to the Government's previous assertions, an actual "invasion" is not the only factual predicate giving rise to a physical taking. Delmarva's and Atlantic's takings theory was previously adopted by Judge Braden in the *SMUD* decision. *See* 61 Fed. Cl. 438. In *SMUD*, Judge Braden found that the Government's failure to remove SNF amounted to a taking of the plaintiff's real property because the plaintiff was forced to utilize portions of its property to store SNF that the Government was otherwise obligated to take custody of no later than January 31,

1998, pursuant to the express obligations of the NWPA. *Id.* at 442-43; *see also* 42 U.S.C. § 10222(a)(5)(B). The Court agreed with the plaintiff's position that the Government's failure to begin removal of SNF on January 31, 1998 resulted in a physical taking and "forced SMUD to devote economically valuable real property to the storage of the SNF." *SMUD*, 61 Fed. Cl. at 442 (citation and internal quotation marks omitted). In denying the Government's Motion to Dismiss, the Court found that the plaintiff had properly alleged that "[t]he government has taken this real property by denying SMUD its rights as owner of this property to put it [the portion of the property SMUD was obligated to designate for interim SNF storage] to other valuable economic uses." *Id*. (citation and internal quotation marks omitted). As in *SMUD*, Delmarva's and Atlantic's physical takings claims seek just compensation for the Government's de facto physical invasion of the Nuclear Stations.

Delmarva's and Atlantic's physical takings claims are *identical* to the claim explicitly recognized by the Court in *SMUD*. As in *SMUD*, the Government has denied Delmarva and Atlantic the opportunity to put identifiable portions of the Nuclear Stations to other viable economic uses by forcing Delmarva and Atlantic (and other current and future owners of the Nuclear Stations) to preserve such property in order to store ever-increasing amounts of SNF for an indefinite period of time at the Nuclear Stations. The Government's failure to take custody of the Nuclear Stations' SNF required Delmarva and Atlantic to take steps to accommodate the storage of SNF at the Nuclear Stations, a function that the NWPA unambiguously imposed upon the Government. In particular, the owners of the Nuclear Stations – including Delmarva and Atlantic – were obligated to plan for, designate, and reserve certain identifiable portions of the Nuclear Stations for use as an interim storage facility. No other options for the handling of SNF were afforded to Delmarva and Atlantic. As such, the Government's failure to accept the

Nuclear Stations' SNF was akin to a confiscation of the portion of the Nuclear Stations that now must be used for interim SNF storage.

A Government-caused occupation of real property for public use constitutes a per se physical taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35, 441 (1982) (law allowing cable companies to attach equipment to apartment buildings requires just compensation). Likewise, a Government action that results in the use of private property for a public purpose also constitutes a physical taking. *See, e.g.*, *Benenson v. United States*, 212 Ct. Cl. 375, 548 F.2d 939, 947-48 (1977) (Government's actions barring owners from demolishing Willard Hotel and enjoining them from removing building's facade to determine whether structure could be used for profitable purposes other than operation of a hotel constituted a taking of owners' fee interest). As the Court explained in finding a taking in *Benenson*, "[t]he net effect of the acts of the Government is that plaintiffs cannot use their property for any income-producing purpose . . . . Consequently, plaintiffs are forced to preserve the structure for the benefit of the Government, which bears no part of the financial responsibility." 548 F.2d at 947.

As in *Benenson*, the Government has refused to allow owners and operators to remove SNF from the nuclear facilities while simultaneously depriving them of a federal repository for the storage of their SNF – a repository for which the owners and operators paid millions of dollars in fees. Adding insult to injury, the owners and operators are obligated by the Government to set aside otherwise commercially valuable property in order to store SNF at the nuclear facilities in accordance with exacting federal standards. Just as in *Benenson*, the Government's failure to remove SNF from the nuclear facilities, thereby requiring Delmarva and Atlantic to set aside commercially valuable property in order to store SNF on-site at the Nuclear Stations, constitutes a physical occupation of Delmarva's and Atlantic's real property and

deprives Delmarva and Atlantic of the fair use and enjoyment of the Nuclear Stations that must be used for the interim storage of SNF.

2. Regulatory Takings

The Government's failure to remove SNF from the Nuclear Stations on or before January 31, 1998 also amounted to a regulatory taking of Delmarva's and Atlantic's property. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) ("*Penn Central*") (holding that a determination of a regulatory taking of property is based upon: (1) the character of the Government's action; (2) the economic impact on the plaintiff; and (3) the extent to which the regulation has interfered with investment-backed expectations). The inability of Delmarva and Atlantic to remove or to dispose of the SNF at the Nuclear Stations had a significant impact on the value of the Nuclear Stations and significantly defeated Delmarva's and Atlantic's investment-backed expectations.

Although not binding on this Court, Judge Lettow's reasoning in *Boston Edison* is instructive here. Judge Lettow recognized that Boston Edison's takings claim does not arise from the Standard Contract, but rather, from the long line of Congressional involvement in SNF storage, culminating in the NWPA. 64 Fed. Cl. at 187 n.22. The Court held, "[a]s a matter of logic, that [the] NWPA may have altered a pre-existing right of Boston Edison does not mean that the right taken was created solely by the Standard Contract." *Id*.

Indeed, the Government has historically recognized its obligation to provide for the permanent storage of SNF. Government actions toward this end began in 1954 with the passage of the Atomic Energy Act, and have continued up to and have included the passage of the NWPA in 1983. Consequently, electric utilities (including Delmarva and Atlantic) designed, and the Atomic Energy Commission licensed and approved for operation, nuclear power facilities with limited SNF wet storage pool capacity, which were designed only for temporary storage and

for only a fraction of a nuclear plant's forty-year license life. In short, these utilities invested in their facilities with the expectation that the Government would fulfill its long-standing obligation to accommodate the storage of SNF. *Boston Edison* recognized that nuclear utilities, such as Delmarva and Atlantic, had reasonable investment-backed expectations in their facilities that did not include the interim storage of SNF. *See id*.

As this Court previously held, Delmarva and Atlantic each held significant property interests in their land, assets, and going-concern value. July 2005 Order at 5. For each of these property interests, Delmarva and Atlantic had reasonable investment-backed expectations (as manifested in the design and construction of the Nuclear Stations). And in each case, significant value was taken from these property interests as a result of the Government's failure to remove SNF from the Nuclear Stations on or before January 31, 1998. The Government's failure to begin removal of SNF coupled with the NWPA's ban on removal and disposal of SNF constituted interference with Delmarva's and Atlantic's investment-backed expectations in a facility unencumbered by SNF storage obligations.

The Federal Circuit has long recognized regulatory takings as a means for providing just compensation to takings plaintiffs similarly situated to Delmarva and Atlantic. For example, in *Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990), the Federal Circuit affirmed the plaintiffs' taking claim (brought after the plaintiffs' turkey farm was quarantined), finding that "[w]hen adverse economic impact and unanticipated deprivation of an investment backed interest are suffered, as when the poultry quarantine forced the Yanceys to sell their turkey flock, compensation under the Fifth Amendment is appropriate." *Id*. at 1542.

B. This Court May Conclude, as a Matter of Law, That the NWPA's Grant to DOE of the Sole and Exclusive Obligation and Ability to Handle the Removal and Disposal of SNF at the Nuclear Stations Is the Source of Plaintiffs' Takings Claims

The source of Delmarva's and Atlantic's takings claims can be resolved as a matter of law because the essential facts are not in dispute: (1) The NWPA granted DOE the *sole* and *exclusive* obligation and ability to handle the removal and disposal of SNF at the Nuclear Stations; and (2) the SNF has, in fact, remained at the Nuclear Stations. Although other fact-intensive questions may remain in dispute, such as whether the requirements of *Penn Central* have been satisfied, the actual source of the takings claims can be decided as a matter of law.

C. Plaintiffs' Takings Claims Arose on January 31, 1998, the Date That DOE Was Obligated to Begin Acceptance and Disposal of SNF

Plaintiffs' takings claims arose when the Government failed to provide a permanent SNF repository on or before January 31, 1998. The taking took place the moment that the Government refused to remove the SNF in accordance with the obligations of the NWPA. It was at that time that the brunt of the Government's coercive power was felt.

By failing to abide by the NWPA's mandates, the Government has acquired the use of the Nuclear Stations as interim storage facilities for an indefinite period of time in lieu of siting, constructing, and operating a federal SNF repository. Beginning on January 31, 1998, DOE used the nation's nuclear facilities, including Salem Station and Hope Creek Station, as a replacement for the repository that it was obligated by Congress to provide under the NWPA.

VI. If the court cannot resolve plaintiffs' takings claims at this juncture, should plaintiffs' case be consolidated with PSEG's earlier-filed case? *See Vt. Yankee Nuclear Power Corp. v. United States*, 73 Fed. Cl. 236, 242 (2006).

To the extent that the Court cannot resolve Plaintiffs' takings claims at this juncture, it is Plaintiffs' position that their case should not be consolidated with PSEG's for the reasons identified by the parties and the Court during the August 22, 2007 hearing. Given the factual, legal, and procedural distinctions between the two matters, consolidation is not warranted.

Rather, Plaintiffs propose that discovery and other case-development issues be coordinated among Plaintiffs, PSEG, and the Government in a manner that avoids duplicating efforts and conserves the parties' resources in a reasonable manner.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs hereby request that the Court enter a scheduling order setting forth further proceedings and establishing a date certain by which the trial in this matter will take place.

Date: September 12, 2007

Respectfully submitted,

s/Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006
(202) 420-2200

*Counsel of Record for*
*Delamarva Power & Light Company and*
*Atlantic City Electric Company*

Of Counsel:
Frederick M. Lowther
Bradley D. Wine
Nicholas W. Mattia, Jr.
Bernard F. Sheehan
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006
(202) 420-2200

Todd Goodman, Esq.
Assistant General Counsel
Conectiv
P. O. Box 231
Wilmington, DE 19899

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on September 12, 2007, a copy of the foregoing "Delmarva Power & Light Company's and Atlantic City Electric Company's Supplemental Brief in Response to the Court's August 30, 2007 Order" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. A courtesy copy was also sent to Chambers pursuant to the Court's Order dated February 9, 2004. Copies were also served upon counsel for plaintiffs and counsel for defendant in *PSEG Nuclear, L.L.C. v. United States,* No. 01-551C (Fed. Cl. filed Jan. 26, 2001).

s/ Bradley D. Wine