# In the United States Court of Federal Claims

Nos. 04-34C & -36C
(Filed November 13, 2007)

| | |
|---|---|
| **DELMARVA POWER & LIGHT CO., and ATLANTIC CITY ELECTRIC CO.,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**PSEG NUCLEAR, LLC, and PUBLIC SERVICE ELECTRIC AND GAS CO.,**<br><br>Limited purpose Intervenor-Defendants. | Contracts; takings; Spent Nuclear Fuel cases; Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (2000); effect of arbitration ruling on court's jurisdiction; Assignment of Claims Act(s), 41 U.S.C. § 15, 31 U.S.C. § 3727; whether takings claim can be assigned. |

Richard J. Conway, Washington, DC, for plaintiffs. Frederick M. Lowther, Beth L. Webb, and Nicholas W. Mattia, Jr., Dickstein Shapiro LLP, and Todd Goodman, Assistant General Counsel, Conectiv, Wilmington, DE, of counsel.

Joshua E. Gardner, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Jane K. Taylor, U.S. Department of Energy, Office of General Counsel, of counsel.

Alex D. Tomaszczuk, McLean, VA, for limited purpose intervenor-defendants PSEG Nuclear, LLC, and Public Service Electric and Gas Co. Jay E. Silberg, Daniel S. Herzfeld, and Jack Y. Chu, Pillsbury Winthrop Shaw Pittman LLP, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This matter is one of many that are pending in, and that have been before, the United States Court of Federal Claims involving contracts between the Department of Energy ("DOE") and commercial operators of nuclear power plants concerning the disposal of spent nuclear fuel ("SNF"). Both Delmarva Power & Light Co. ("Delmarva") and Atlantic City Electric Co. ("ACE") (collectively "plaintiffs") were owners, until September 27, 1999, of minority interests in two commercially operated nuclear power plants: the Salem Nuclear Generation Station Units 1 and 2 ("Salem") and the Peach Bottom Atomic Power Station Units 2 and 3 ("Peach Bottom"). ACE was also an owner of a minority interest in a third nuclear plant, the Hope Creek Nuclear Generating Station ("Hope Creek"). In the instant action, plaintiffs assert three causes of action. First, plaintiffs allege that DOE has committed a partial breach of its contractual obligation to receive SNF. Secondly, plaintiffs allege that DOE breached the implied covenant of good faith and fair dealing by failing to accept SNF. Finally, plaintiffs allege that DOE's failure to meet its obligations under both the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (2000) (the "NWPA"), and its contracts with plaintiffs forced plaintiffs to store SNF on their property, consequently reducing the value of their property and causing substantial economic harm that constituted a Fifth Amendment taking of property for which plaintiffs have received no just compensation.

Pending before the court are two separate motions. The first motion is plaintiffs' Motion To Vacate Arbitration Ruling filed July 2, 2007. PSEG Nuclear LLC and Public Service Electric and Gas Co. (collectively "PSEG") intervene as defendants in this case for the limited purpose of opposing this motion. The second motion is defendant's renewal of its motion to dismiss, originally filed May 12, 2004, or, in the alternative, its motion for summary judgment, originally filed April 28, 2005. These motions were renewed on September 12, 2007, upon inquiry by the court in its August 30, 2007 order requesting supplemental briefing concerning the Government's acceptance of plaintiffs' assignment of claims to the subsequent purchaser PSEG, which has intervened in these proceedings for the limited purpose of arguing its position on the issues addressed herein. Defendant's renewed motion for dismissal or, in the alternative, for summary judgment, addresses plaintiffs' amended complaints in both cases.

## BACKGROUND 1/

1/ The following background information is gleaned from plaintiffs' amended complaints and from the various briefs and exhibits accompanying the parties' motions over the last three years of litigation. This recitation of the background does not constitute findings of fact by the court.

Plaintiffs filed separate complaints on January 13, 2004, seeking relief solely on a takings theory. Atl. City Elec. Co. v. United States, No. 04-36C (Fed. Cl. filed Jan. 13, 2004); Delmarva Power & Light Co. v. United States, No. 04-34C (Fed. Cl. filed Jan. 13, 2004). Plaintiffs later amended their complaints to include damages based on a partial breach of contract. Compare Compl. filed Jan. 13, 2004, No. 04-34C, at ¶¶ 56-63, and Compl. filed Jan. 13, 2004, No. 04-36C (alleging only uncompensated taking) with Am. Compl. filed Dec. 2, 2004, No. 04-34C, at ¶¶ 76-91, and Am. Compl. filed Dec. 2, 2004, No. 04-36C (complaints with three counts including breach of contract, breach of implied covenant of good faith and fair dealing, and uncompensated taking). On January 21, 2005, Atl. City Elec. Co., No. 04-36C, was consolidated with Delmarva Power & Light and assigned to the undersigned. Both Delmarva and ACE were owners of minority interests in Salem and Peach Bottom; Atlantic held an ownership interest in Hope Creek, as well. They sold these ownership interests to PSEG and PECO Energy Company ("PECO") 2/ by Purchase Agreements dated September 27, 1999. Plaintiffs seek damages, alleging that DOE's failure to dispose of SNF reduced the value of their property and caused plaintiffs to receive a diminished price when they sold their interests to PSEG and PECO.

DOE's failure to dispose of SNF has been the topic of several cases and generated a number of opinions before the Court of Federal Claims principally dealing with the type and amount of damages that can be awarded. See, e.g., Sys. Fuels, Inc.v. United States, No. 03-2623C, 2007 WL 3033659 (Fed. Cl. Oct. 16, 2007); S. Nuclear Operating Co. v. United States, 77 Fed. Cl. 396 (2007); Vt. Yankee Nuclear Power Co. v. United States, 73 Fed. Cl. 236 (2006); Rochester Gas and Elec. Co. v. United States, 65 Fed. Cl. 431 (2005); Boston Edison Co. v. United States, 64 Fed. Cl. 167 (2005). The history of DOE's failure to dispose of SNF has been sufficiently chronicled in these and other cases. See also Me. Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1337-39 (Fed. Cir. 2000).

Briefly restated, the relevant history began in 1982 when Congress acknowledged that the disposal of nuclear waste was a matter of nationwide concern implicating commercial, health, and national security concerns and enacted the NWPA. The NWPA authorized the Secretary of Energy to enter into contracts with utilities for the disposal of SNF and high-level radioactive waste. See 42 U.S.C. § 10222(a)(1). The Act effectively made entry into these contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses to any operator who has not "entered into a contract with the Secretary" or who "is [not] actively and in good faith negotiating with the Secretary for a contract." Id. § 10222(b)(1)(A). The NWPA required that all such contracts "shall provide

---

2/ PECO later merged with Unicom, the owner of Commonwealth Edison, to become Exelon Generation Company ("Exelon").

that" DOE will dispose of the waste "beginning not later than January 31, 1998." Id. § 10222(a)(5)(B). DOE drafted a Standard Contract for Disposal of Spent Nuclear Fuel and promulgated it through the rule-making process. 10 C.F.R. § 961.11 (the "Standard Contract") (1983). The Standard Contract required utilities to pay DOE fees, including a one-time fee and ongoing fees based on the amount of electricity generated, in exchange for SNF disposal service. As the Act required, the contract obligated DOE to take title to, transport, and dispose of the nuclear waste stored at the utilities' facilities beginning "not later than January 31, 1998." Id. at art. II. In 2000 the United States Court of Appeals for the Federal Circuit held that DOE's failure to take SNF by January 31, 1998, constituted a partial breach of the Standard Contract. Maine Yankee, 225 F.3d at 1343. In effect, DOE is liable for partial breach of every contract into which it has entered with every commercial operator of nuclear power plants in the United States. The various cases before the Court of Federal Claims generally are limited to determining the nature and extent of damages caused by DOE's partial breach.

## PROCEDURAL HISTORY

Plaintiffs filed their complaints on January 13, 2004. On May 12, 2004, before the undersigned took Atlantic City from Judge George W. Miller, defendant moved to dismiss for failure to state a claim in Delmarva Power & Light, arguing that no cognizable takings claim had been stated. In briefs supporting the motion to dismiss, defendant argued, *inter alia*, that plaintiffs' takings claims must fail because they were predicated upon a breach of contract with the Government. In responding, plaintiffs expressed some concern that defendant was challenging the validity of plaintiffs' assignments of their various rights to PSEG and PECO under the so-called Anti-Assignment Acts. 3/ For these reasons on December 2, 2004, plaintiffs amended their complaints to include claims for partial breach of contract and breach of the implied covenant of good faith and fair dealing. Counsel for plaintiffs described this as a "protective matter." Transcript of Proceedings, Atl. City Elec. Co. v. United States, No. 04-36C, at 31 (Fed. Cl. Dec. 3, 2004) (G. Miller, J., presiding). With the filing of the amended complaint in Delmarva Power & Light, the court by order of December 3, 2004, deferred ruling on the motion to dismiss. On January 21, 2005, Atl. City

---

3/ Two statutes, 41 U.S.C. § 15 (2000), and 31 U.S.C. § 3727 (2000), concern the assignment of contracts with the United States and claims against the United States, respectively. They often are referred to collectively as the "Anti-Assignment Acts" because they proscribe the voluntary assignment of contracts or claims against the United States other than pursuant to a statutorily established scheme. A fuller discussion of these statutes and their application to these cases appears in the discussion portion of this opinion. See infra part II.1.3).

Elec. Co. v. United States, No. 04-36C, was consolidated with Delmarva Power & Light. Its procedural history tracked that of Delmarva Power & Light.

Following consolidation, the court ordered defendant to file a renewed motion for summary judgment in both cases; defendant did so on April 28, 2005. After extensive briefing, the court determined that a more fully developed record would be required and on July 1, 2005, it denied defendant's motion for summary judgment without prejudice. Over the next year and one half, the parties engaged in discovery. Then, on January 5, 2007, defendant filed a motion to consolidate this action with PSEG Nuclear L.L.C. and Pub. Serv. Elec. and Gas Co. v. United States, No. 01-551C (Fed. Cl. filed Sept. 26, 2001), or, in the alternative, to issue a summons joining PSEG as a third-party defendant in the instant cases. PSEG currently owns and operates all three nuclear power plants involved in these cases. In its motion for consolidation, defendant argued that common issues of fact and of law required consolidation; defendant was concerned particularly with the specter of inconsistent or duplicative judgments. Def.'s Br. filed Jan. 5, 2007, at 6-13. On plaintiffs' motion, on January 18, 2007, the court stayed the discovery schedule pending resolution of that motion for consolidation.

The purchase agreements for the nuclear power plants between plaintiffs and PSEG provide for binding arbitration for "any dispute between [PSEG] and [plaintiffs] . . . relating to or arising out of any provision of" those purchase agreements. See Purchase Agreement by and Between Atlantic City Electric Company and PSEG Power LLC, Sept. 27, 1999, § 10.6 (filed in No. 04-34C on Aug. 23, 2007) (the "PAs"). 4/ Immediately after defendant's January 5, 2007 motion to consolidate, PSEG sent plaintiffs a Notice of Dispute under the PAs. PSEG took the position that, through the purchase agreement, plaintiffs had assigned to PSEG and to Exelon whatever claims against DOE they might have had in connection to the purchased assets (the interest in the nuclear power plants and the associated SNF), regardless of the legal nature of those claims, *i.e.*, regardless of whether those claims arose under a theory of partial breach of contract or constituted takings without just compensation. Plaintiffs argued that PSEG's delay in seeking arbitration and conduct in the course of litigation constituted a waiver of PSEG's right to pursue arbitration. Following briefing, on March 27, 2007, the court issued an order to show cause to plaintiffs and defendant whether the court should grant a stay pending the resolution of the arbitration unless the arbitrators,

---

4/ The several purchase agreements between Delmarva, ACE, and PSEG are almost identical. Their differences are slight and concern only the identification of which minority ownership interest in which plant is being conveyed. All of the substantive portions of the purchase agreements relevant to this matter are identical. For the sake of convenience, the purchase agreements will be referred to collectively as the "PAs."

in resolving the dispute, would consider plaintiffs' arguments concerning delay, laches, waiver, and/or estoppel. On April 5, 2007, PSEG served plaintiffs with an arbitration demand, pursuant to the Notice of Dispute. On April 12, 2007, the court stayed the cases for 90 days, *nunc pro tunc*, from March 6, 2007, to June 4, 2007, in order to allow for completion of the binding arbitration.

After demanding arbitration, PSEG sought a stay in its own case before Sr. Judge Bohdan A. Futey, PSEG Nuclear L.L.C., No. 01-551C (Fed. Cl. filed Sept. 26, 2001). Copies of PSEG's briefs from that case were filed as appendices to defendant's briefs in this case relating to the motions pending before the stay. In the case before Sr. Judge Futey, PSEG had argued that such a stay was mandatory under Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3 (2000) ("FAA"), which requires stays where the court is "satisfied that the issue is referable to arbitration."

A strong federal policy favors arbitration, Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), and, under the FAA, trial courts generally are obligated to grant a stay where "'satisfied' that the issue involved in the case [is] referable to arbitration," Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1372 (Fed. Cir. 2006). However, the United States is not a party to the arbitration agreements that formed the basis of PSEG's demand for dispute resolution and binding arbitration, which are contained in the PAs between PSEG and plaintiffs. Therefore, section 3 of the FAA did not apply in this case, and a stay was not absolutely mandated. See, e.g. Adams v. Ga. Gulf Corp., 237 F.3d 538, 541-42 (5th Cir. 2001) ("The denial of the benefit of the mandatory stay provision to non-signatories has been grounded in the recognition that the non-signatory's litigation with an arbitrating party cannot be referred to arbitration"); Nederlandse Erts-Tankersmaatschappij, N.F. v. Isbrandtsen Co., 339 F.2d 440, 441 (2d Cir. 1964) (granting of stay not justified under FAA where defendants are not parties to arbitration agreement).

As the United States Supreme Court has stated, the power to stay cases "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for the litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936) (citations omitted). Ultimately, neither plaintiffs nor defendant were able to show cause as to why the action should not be stayed. The court's stay of the cases on April 12, 2007, issued because the arbitration between plaintiffs and PSEG appeared, in its judgment, likely to determine issues between the parties relevant to plaintiffs' pending litigation in the instant case, not because the FAA mandated a stay.

The binding arbitration continued, and the arbitral panel issued its opinion on June 20, 2007. PSEG Power, LLC & PSEG Nuclear, LLC v. Pepco Holdings, Inc., Atl. City Elec. Co. & Delmarva Power & Light Co., Atl. City Electric Co. & Delmarva Power & Light Co. v. PSEG Power, LLC & PSEG Nuclear, LLC (Arb. Jun. 20, 2007) (Mukasey, Loftus, & Aldock, Arbs.). The panel held that the issues were arbitrable, id. at 10; that PSEG did not waive its claims by delay, laches, waiver, or estoppel, id. at 10-17; and that plaintiffs assigned whatever takings claims they might have had to PSEG through the PAs. Id. at 17-24. But see id. at 25-26 (separate opinion of John Aldock dissenting from majority, suggesting that PSEG forfeited its claim to arbitration through litigation conduct and laches, and that Court of Federal Claims should have decided such waiver issues). On June 22, 2007, PSEG filed its request with the Superior Court of New Jersey Chancery Division, Mercer County, to confirm the arbitration panel award. PSEG Power, LLC & PSEG Nuclear, LLC v. Atl. City Elec. Co. & Delmarva Power & Light Co., No. C-59-07 (N.J. Super. Ct. Ch. Div. June 22, 2007).

On July 2, 2007, plaintiffs moved this court to vacate the arbitration ruling, alleging that the question of waiver was for the court to decide, not the arbitral panel, and again arguing that PSEG waived its right to seek arbitration. Plaintiffs' argument relied primarily on the opinion of the United States Court of Appeals for the Third Circuit in Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207 (3d Cir. 2007), issued on April 6, 2007, three months after PSEG's Notice of Dispute, one day after PSEG's arbitration demand, and just days before this court's April 12, 2007 order to show cause. On July 19, 2007, the court granted PSEG's motion to intervene in these cases for the limited purpose of opposing plaintiffs' motion to vacate the arbitration.

During argument on the motion and following briefing, the court asked defendant to take a position, for the record, with regard to the assignments of rights that plaintiffs provided to PSEG and to Exelon. On August 22, 2007, defendant filed a notice stating that the Government "accepted the assignments of those claims that the plaintiffs purported to make to PSEG Nuclear, to the extent that we have been made aware of those claims through the plaintiffs' complaint in this action and through the assignment provisions in the purchase and sale agreements that have been included in the appendices to some of the briefing in this case." Def.'s Notice filed Aug. 22, 2007, at 3. Following defendant's express acceptance of the assignments in question, the court requested supplemental briefing with responses to the following six questions:

1. If the PAs transferred all extant claims as of September 27, 1999, were plaintiffs' takings claims in existence at the effective date of transfer?

2. What effect does defendant's notice formally accepting plaintiffs' assignment of claims to PSEG have on plaintiffs' maintenance of a suit under a theory of retained takings claims?

3. Can an independent takings claim be maintained concurrently with a breach of contract claim pursuant to the Standard Contract? If not, how can a takings claim be maintained separately by bifurcating the claims through an assignment of the contract claims to a third-party?

4. If the court enters an order ruling that plaintiffs have no takings claims because the source of their claims was a viable contract at the time that the putative takings claim arose, see Detroit Edison v. United States, 56 Fed. Cl. 299, 302 (2003), can any takings claims survive?

5. If the source of the takings claims is independent from the Standard Contract and/or arises from a statute or regulation, see Boston Edison, 64 Fed. Cl. 167, 187 (2005), what precisely is that source? Can the source of the right be resolved as a matter of law? If such an independent source exists, on what date did each takings claim arise?

6. If the court cannot resolve plaintiffs' takings claims at this juncture, should plaintiffs's case be consolidated with PSEG's earlier-filed case? See Vt. Yankee Nuclear Power Corp. v. United States, 73 Fed. Cl. 236, 242 (2006).

Order entered Aug. 30, 2007. The court also asked defendant to "state for the record whether it renews its motion to dismiss filed May 12, 2004, for purposes of the court's final ruling." Id. at 5. In its response dated September 12, 2007, defendant did so, renewing with respect to both cases its motion to dismiss or, in the alternative, its motion for summary judgment, originally filed April 28, 2005, as supplemented by subsequent briefing.

## DISCUSSION

### I. The motion to vacate the arbitration ruling

#### 1. Determining waiver in an arbitration context and plaintiff's assertion of Ehleiter

A strong presumption favors finding a matter to be arbitrable. In Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), the Supreme Court examined the role of judges in resolving issues related to arbitration. The Court held that gateway questions of arbitrability are presumptively for the court to decide. These gateway questions, however,

are limited to disputes that the "contracting parties would likely have expected a court to have decided . . . where they are not likely to have thought that they had agreed that an arbitrator would do so," id. at 83-84, which is to say, "whether the parties are bound by a given arbitration clause" and whether such a clause "applies to a particular type of controversy." Id. By contrast, "procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." Id. at 84. These procedural questions include traditional allegations of "waiver, delay, or a like defense to arbitrability." Id. The Supreme Court affirmed this division of labor between the courts and arbitrators in Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444 (2003).

In Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207 (3d Cir. 2007), however, the Third Circuit observed that it had "long decided questions of waiver *based on litigation conduct* instead of referring the issue to an arbitrator." Id. at 217 (emphasis added). The Third Circuit, in recounting the only other post-Howsam and Green Tree case in which a federal court of appeals considered this division of labor between the courts and arbitrators, noted that the language of the FAA only required courts to issue a stay in an action pending arbitration if "'the applicant for the stay is not in *default* in proceeding with such arbitration.'" Ehleiter, 482 F.3d at 218 (quoting 9 U.S.C. § 3). The Third Circuit understood this to be a statutory mandate that, at least "in cases where a stay is sought," courts should themselves "decide the waiver issue" presented by litigation conduct. Id. The court also considered "comparative expertise considerations" informing the Supreme Court's resolution of who should decide issues of waiver by litigation conduct. Id. Litigation conduct necessarily implicates "judicial procedures," and the Third Circuit recognized that courts, not arbitrators, are best situated to determine whether litigative conduct constitutes an abuse of judicial proceedings. Id. For that reason the court in Ehleiter held emphatically that "waiver of the right to arbitrate based on litigation conduct remains presumptively an issue for the court to decide." Id. at 221.

Plaintiffs argue in their motion to vacate the arbitration proceeding that this court, not the arbitral panel, should have decided whether PSEG waived its right to seek arbitration under the PAs. Plaintiffs note that PSEG's "arbitration demand came 40 months after Plaintiffs' representatives met with PSEG's representatives in September 2003 to discuss Plaintiffs' intention to file takings claims against DOE" and "22 months after" plaintiffs filed suit in the instant action. Pls.' Br. filed Jul. 2, 2007 at 11. Further, plaintiffs charge that PSEG was "not only aware of, but actively participated in, this litigation" by opposing a motion to compel production of certain documents, by later producing those documents and presenting witnesses at depositions, and responding to the court's March 27, 2007 order to show cause. Id. at 12.

It is important to note that plaintiffs do not assert that the court should vacate the arbitration ruling under the terms of the FAA. Under the FAA district courts may vacate an arbitration award where one of the following is present: (1) fraud in procuring the award; (2) partiality on the part of the arbitrators; (3) gross misconduct by the arbitrators; or (4) failure of the arbitrators to render a mutual, final, and definite decision. 9 U.S.C. § 10; see Flex-Foot, Inc. v. CRP, Inc., 238 F.3d 1362, 1365, 1367 (Fed. Cir. 2001). Plaintiffs do not contend that any of these four grounds is applicable. Instead, plaintiffs base their objection on Ehleiter's holding that, in the circumstances presented by the cases at bar, the court, not the arbitral panel, should have decided whether PSEG's litigation conduct constituted a waiver of its right to seek arbitration and contend that PSEG's conduct so constituted a waiver. Plaintiffs' understanding of the reasoning employed by the Third Circuit in Ehleiter is substantially correct: when two parties have engaged in litigation before a particular court, that court is best situated to resolve the question of waiver by litigation conduct, because such a question necessarily involves understanding the conduct that has been before the court and implicates judicial procedures. Unfortunately for plaintiffs, while the reasoning in Ehleiter is sound, it does not apply to the facts of this case.

It is important to note that the "comparative expertise considerations" that militate having a court and not the arbitrators decide questions of waiver of arbitrability by litigation conduct that the court in Ehleiter discussed assume a situation in which the two litigants have been engaging in litigative conduct before the court on an ongoing and involved basis as opposing parties to the dispute. Plaintiffs filed suit against the United States as a defendant, not PSEG. Any consideration of a court's "comparative expertise" is necessarily limited to its percipient understanding of the litigative conduct as between the parties to the litigation that occurred in motions and arguments before the court. These cases have not been consolidated with the earlier case of PSEG Nuclear L.L.C., No. 01-551C (Fed. Cl. filed Sept. 26, 2001), which is currently pending before Sr. Judge Futey. Nor has PSEG been allowed to intervene generally; it is an intervenor-defendant only for the purposes of this motion to vacate the arbitration ruling. Plaintiffs take the position that PSEG became an active litigant in these cases by opposing a motion to compel production of certain documents, by later producing those documents and presenting witnesses at depositions, and by responding to the court's March 27, 2007 order to show cause. Pls.' Br. filed July 2, 2007, at 12. To characterize such actions as voluntary and ongoing involvement in this dispute between plaintiffs and defendant is strained. Instead, these actions are responsive in nature and do not represent an attempt by PSEG to appear before the court as a litigative forum in the context of this particular controversy between plaintiffs and the Government. 5/ Ultimately, however,

---

5/ The arbitral panel's majority opinion describes PSEG's conduct in a similar (continued...)

the court must deny plaintiffs' motion to vacate the arbitration ruling because the court lacks jurisdiction over disputes between private parties.

2. Whether the United States Court of Federal Claims has jurisdiction over private arbitration between plaintiffs and PSEG

The Court of Federal Claims, like all federal courts, is a court of limited jurisdiction. The court's jurisdiction is set forth primarily in the Tucker Act, codified as 28 U.S.C. § 1491. It grants the court "jurisdiction to render judgment upon *any claim against the United States* founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000) (emphasis added). This grant of jurisdiction constitutes a waiver of sovereign immunity by the United States. "It long has been established, of course, that the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" United States v. Testan, 424 U.S. 392, 399 (1976) (alteration in original) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)). Thus, the Court of Federal Claims has no jurisdiction over a cause of action except to the extent that Congress has waived sovereign immunity. Id. Moreover, "in a Court of Claims context, . . . a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" Id. (quoting United States v. King, 395 U.S. 1, 4 (1969)). Given this construction, the jurisdiction of the Court of Federal Claims extends as far, but only as far, as the United States has consented to suits against it. "The jurisdiction of the Court of Federal Claims is prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1461 (Fed. Cir. 1998).

The Court of Federal Claims and its predecessor courts have never possessed jurisdiction to adjudicate disputes between private parties. See Sherwood, 312 U.S. at 588-89 ("We think it plain that the present suit could not have been maintained in the Court of Claims because the court is without jurisdiction of any suit brought against private parties . . . ."); see also Nat. City Bank of Evansville v. United States, 143 Ct. Cl. 154, 163 F. Supp. 846, 852 (1958) ("It is well established that the jurisdiction of this court extends

---

5/(...continued)
manner. See PSEG Power, LLC & PSEG Nuclear, LLC v. Pepco Holdings, Inc., Atlantic City Elec. Co. & Delmarva Power & Light Co., Atlantic City Electric Co. & Delmarva Power & Light Co. v. PSEG Power, LLC & PSEG Nuclear, LLC, at 13-17 (Arb. Jun. 20, 2007) (Mukasey, Loftus, & Aldock, Arbs.).

only to claims against the United States, and obviously a controversy between private parties could not be entertained."). The Court of Federal Claims was established to provide a forum for the vindication of public rights, *i.e.*, to provide a mechanism for holding government accountable to suits by private citizens. The court lacks jurisdiction over private rights implicated in a dispute between private parties. See Fisherman's Harvest, Inc. v. PBS&J, 490 F.3d 1371, 1376-78 (Fed. Cir. 2007).

The arbitration ruling in question is the product of private agreements between plaintiffs and PSEG. The genesis of the right to arbitrate lies in the PAs between private parties, not any agreement involving the Government or implicating the sovereign. Regardless of the merits of plaintiffs' argument that PSEG's conduct – whether in the course of litigation or otherwise – constitutes a waiver of its right to seek arbitration, this court does not possess the power to disturb an arbitration created by an agreement between private parties and involving only those private parties. For this reason plaintiffs' motion to vacate the arbitration ruling is denied.

II. Defendant's renewed motion for summary judgment

In its order entered on August 30, 2007, the court asked defendant to "state for the record whether it renews its motion to dismiss filed May 12, 2004, for purposes of the court's final ruling." Order entered Aug. 30, 2007, at 5. In its response dated September 12, 2007, defendant did so, renewing for both cases its motion to dismiss or, in the alternative, its motion for summary judgment, originally filed April 28, 2005, as supplemented by subsequent briefing. Defendant's original May 12, 2004 motion to dismiss in Delmarva Power & Light, filed pursuant to RCFC 12(b)(6), alleged that plaintiffs failed to state a claim for which relief could be granted. Broadly speaking, in that motion to dismiss, defendant argued that plaintiffs did not identify any cognizable claim for a taking of any property. 6/ Defendant's original April 28, 2005 motion for summary judgment, pursuant to RCFC 56, argued: that plaintiffs purported to assign all of their claims through the PAs, whether those claims arose under a takings or a contracts theory; that, in any event, plaintiffs' requests for diminished value and restitution damages were not proper remedies under a contract claim; that plaintiffs had not identified a cognizable claim for a taking of property; and, that plaintiffs' payment of fees to the SNF fund did not constitute a taking.

---

6/ Defendant's May 12, 2004 motion to dismiss was in response to plaintiffs' original complaints. The original complaints included only takings claims; the so-called "protective" claims for partial breach of contract and breach of the implied covenant of good faith and fair dealing were raised by plaintiffs only in their amended complaints.

1. Standard of review

1) Summary judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The legal issues before the court may be resolved on summary judgment. Long Island Sav. Bank, FSB v. United States, No. 2006-5029, ___ F.3d ____, 2007 WL 2685640, at *7 (Fed. Cir. Sept. 13, 2007).

2) Takings claims and cognizable property interests

The Federal Circuit has held that determining "[w]hether a compensable taking has occurred is a question of law based on factual underpinnings." Members of Peanut Quota Holders Ass'n, Inc. v. United States, 421 F.3d 1323, 1329 (Fed. Cir. 2005); see Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001). In evaluating whether a governmental action effects a taking of private property without just compensation, the court must first determine whether the claimant has established a cognizable property interest, *i.e.*, one protected by the Fifth Amendment. Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002). If a property right has been established, the court then must determine whether the Government has taken it in part or in whole. The traditional concept of a taking posits a physical appropriation or physical invasion of private property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 427 (1982). The Supreme Court nonetheless long has accepted that a taking can occur when the Government regulates use of property, even in the absence of a physical taking or invasion. Regulatory takings jurisprudence recognizes that if "a regulation goes too far it will be recognized as a taking." Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922).

3) Assignments of contracts with and claims against the Government

Two statutes apply to restrict the manner in which contracts with the Government and claims against the Government can be assigned voluntarily: 41 U.S.C. § 15 and 31 U.S.C. § 3727 (2000). 7/ They are often referred to as the "Assignment of Claims Act" or the "Anti-

---

7/ The second of these statutes was formerly codified at 31 U.S.C. § 203. In 1982 title 31 of the U.S. Code was substantially reorganized. Pub. L. No. 97-258, 96 Stat 877 (1982).
(continued...)

Assignment Act," collectively. See United Bonding Ins. Co. v. Catalytic Constr. Co. , 533 F.2d 469, 471 (9th Cir. 1976) ("The Assignment of Claims Act . . . provides that . . . ."). The relevant portion of the first of these statutes, 41 U.S.C. § 15, reads:

> No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

41 U.S.C. § 15(a) (2000). This statute serves to restrict generally the assignment of any interest in a contract with the United States to any other party, with a few exceptions pertaining largely to the assignment of moneys due under a contract with the United States to a bank or similar financial institution. See 41 U.S.C. § 15(b). Any purported assignment of a contract with the United States not only is invalid, but it causes the annulment of the contract "so far as the United States is concerned." 41 U.S.C. § 15(a).

The second statute, 31 U.S.C. § 3727, applies more generally to "a claim against the United States . . . ." 31 U.S.C. § 3727(a)(1) (2000). The relevant portion of the statute restricts generally the assignment of claims against the United States outside of a restricted procedure.

> An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727(b). The statute thus establishes that assignments of claims against the Government are void unless they comply with the restrictions of 31 U.S.C. § 3727(b). By the terms of the statute, claims that have not yet been pursued in court to final judgment

---

7/(...continued)
This statute was recodified at 31 U.S.C. § 3727 without substantive change. See id. The recitation of case law that follows in this section involves cases adjudicated before 1982, so those courts referred to 31 U.S.C. § 203, not § 3727.

necessarily are precluded from assignment. The two statutes often are referred to collectively because together they serve to preclude generally the voluntary assignment of legal rights as against the Government to third parties and because they embody similar principles. It is helpful, however, to understand the "conceptual difference between the statutes," which is that 31 U.S.C. § 3727 "pertains to claims for work already done," while 41 U.S.C. § 15, "involving executory contracts, is more concerned with continuing obligations." Tuftco Corp. v. United States, 614 F.2d 740, 744 n.4 (Ct. Cl. 1980). This explains why assignments of claims are void *ab initio* pursuant to 31 U.S.C. § 3727, but, pursuant to 41 U.S.C. § 15, assignments of executory contracts are both void and annul the contract and its concomitant obligations "so far as the United States is concerned." 41 U.S.C. § 15(a).

The Supreme Court has held on more than one occasion that "primary purpose" of these statutes "was undoubtedly to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government." United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 373 (1949). Two other important goals of the Assignment of Claims Act were

> (1) to insure that the United States may avoid involvement in any litigation as to the existence or extent of subrogation or other assignment of such claims; and (2) to insure that the suits and any judgments against the United States will be in the names of the original claimants so that the United States will be able to avail itself of its statutory rights in respect of venue, and of counterclaim and offset on account of any cross-claims it may have against the original claimants.

Id. at 371; see e.g., United States v. Shannon, 342 U.S. 288, 283 (1952) (noting similar purpose for enactment). The Government is the only party that can properly invoke the Assignment of Claims Act, because "provisions of the statute making void an assignment or power of attorney by a Government contractor *are for the protection of the Government*." Aetna, 338 U.S. at 371 (emphasis added). Because the general prohibition on assignment of contracts and claims is intended for the protection of the Government, courts also have held that the Government may, by word or deed, recognize and accept an assignment, even where such an assignment otherwise did not comply with the terms of the Assignment of Claims Act. See, e.g., Tuftco Corp. v. United States, 614 F.2d 740, 746 (Ct. Cl. 1980) ("Consistent with the situations in which [the Act] has been deemed inapplicable stands the long-recognized principle that . . . the Government, if it chooses to do so, may recognize an assignment."); United Pac. Ins. Co. v. United States, 358 F.2d 966, 970 (Ct. Cl. 1966) ("[D]efendant has now withdrawn any objection it might have had to the validity of the assignment. . . . In the absence of any attack upon the assignment by defendant, we feel

bound, following the dictates of equitable policy and sound precedent, to recognize the assignment and treat it as valid and binding between the parties."). 8/

2. Plaintiffs assigned all claims with respect to and arising out of the SNF to PSEG

Defendant and PSEG contend that plaintiffs cannot assert their takings and contracts claims, whatever the merits of those claims, because plaintiffs assigned whatever claims they had regarding DOE's failure to dispose of SNF to the buyers of the nuclear plants, PSEG and PECO (now Exelon), by the terms of the PAs. Plaintiffs respond that the assignments of their contract claims were invalid *ab initio* by operation of the Assignment of Claims Act and, as a consequence, that they retain the right to pursue their claims against the Government. Plaintiffs also contend that the language of the PAs did not include an assignment of their takings claims. In the alternative, plaintiffs posit that, in any case, the Assignment of Claims Act precludes the assignment of their takings claims and that any such purported assignment would be invalid *ab initio*.

1) The Government's acceptance of the assignments

The Assignment of Claims Act operates for the benefit of the Government; its provisions are intended to protect the Government from voluntary assignments of contracts or claims to parties where it has not consented to or recognized the assignment. The Government's recognition and acceptance of such an assignment makes it a valid assignment. See supra Part II.1.3); see also Maffia v. United States, 163 F. Supp. 859, 862 (Ct. Cl. 1958) ("Despite the bar of the [Assignment of Claims Act], the Government, if it chooses to do so, may recognize an assignment."). During argument on the motion to vacate and following briefing, the court asked defendant to take a position, for the record, with regard to the assignments of rights that plaintiffs provided to PSEG and to Exelon. On August 22, 2007, defendant filed a notice "exercising its sole discretion to accept the assignments of those claims that the plaintiffs purported to make to PSEG Nuclear, to the extent that we have been

8/ Plaintiffs have asserted that takings claims may never be assigned. See Pls.' Br. filed Sep. 12, 2007, at 14-16. They rely primarily on misreadings of the relevant Supreme Court precedent. Shannon stood only for the principle that an otherwise unrecognized voluntary assignment of claims remains invalid, even when the assignor joins as a party the assignee. Shannon, 342 U.S. at 284-85. Plaintiffs' contend that United States v. Dow, 357 U.S. 17 (1958), also stands for the proposition that the assignment of takings claims is prohibited as a general proposition. The holding in Dow concerned primarily establishing when a taking occurs, not whether the assignment of takings claims is permissible. Id. at 20-23.

made aware of those claims through the plaintiffs' complaint in this action and through the assignment provisions in the purchase and sale agreements that have been included in the appendices to some of the briefing in this case." Def.'s Notice filed Aug. 22, 2007, at 3. This express acceptance of the assignments serves to vitiate the provisions of the Assignment of Claims Act that otherwise would preclude the assignment of contracts with, or claims against, the United States. For this reason all assignments of such contracts and claims that plaintiffs made in the PAs are valid. 9/

2) The subject matter assigned in the PAs

Section 2.1 of the PAs described those assets that the sellers (plaintiffs) would transfer to purchasers (PSEG and PECO) in the course of the sale of the nuclear plants. Determining what purportedly was assigned by plaintiffs in the PAs requires interpreting the relevant provisions of the PAs. Contract interpretation "begins with the plain language of the written agreement." Hercules, Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed.Cir.2002); see also Sanchez and Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed.Cir.1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.").

Subsection 2.1(*l*), the relevant portion of the PAs, includes as one of the "Purchased Assets"

> All claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract (including all claims for failure by the Department of Energy to take Spent Nuclear Fuel) accrued prior to, on or after the Closing Date, whether relating to periods prior to, on or after the Closing date, and all other claims of Seller against the Department of Energy with respect to, arising out of or in connection with the Purchased Assets, other than the claims described in Section 2.2(*l*) . . . . 10/

---

9/ This notice accepting assignments resolves any previous ambiguity or inconsistency in the Government's position on the validity of these assignments.

10/ Section 2.2(*l*) excludes from the Purchased Assets only certain "Department of Energy Decommissioning and Decontamination Fees" that are not the subject of this dispute.

PAs § 2.1(*l*). No dispute can be marshaled that the plain language of this provision expressly assigns the right to pursue breach of contract claims against DOE for its failure to take SNF. 11/

Plaintiffs nonetheless assert that "[t]here is no reasonable interpretation that Plaintiffs' takings claims are in any way included within the scope of this section . . . . Plaintiffs' takings claims are not based on the Standard Contract and do not emanate from that Contract. Rather, Plaintiffs' takings claims are based on its rights under the U.S. Constitution and are separate and apart from the Standard Contract with DOE." Pls.' Br. filed Sept. 12, 2007, at 5. Indeed, plaintiffs take pains to note:

> The three PAs are each approximately eighty-three pages long, single spaced, before including exhibits, attachments, and schedules. The parties expressly retained sophisticated counsel to advise them and to draft these extremely detailed documents. There is no claim by any party to these proceedings that these PAs are in any way ambiguous on these issues or require the use of parol evidence to make sense of them. Yet, nowhere in these PAs do the parties express any intent or desire to transfer claims grounded on the U.S. Constitution or arising under the Constitution. Had the parties desired to do so, it would have been a relatively easy matter to include a separate clause providing that all Plaintiffs' claims arising under or grounded on the U.S. Constitution were transferred to PSEG and/or that those claims were no longer the property of Plaintiffs.

Id. Plaintiffs' contentions, however, do not flow from the plain language of the written agreement. Section 2.1(*l*) of the PAs transferred to buyers not only "[a]ll claims of Seller relating to or pertaining to the Department of Energy's defaults under the Department of Energy Standard Contract," but also "*all other claims* of Seller against the Department of

---

11/ Plaintiffs have admitted that they raised the claims for partial breach of contract in their amended complaints as a "protective" measure, after expressing concern that the Government would take inconsistent positions as to its acceptance of the assignment of the Standard Contract and any rights to pursue an action for partial breach of the Standard Contract. Transcript of Proceedings, Atl. City Elec. Co. v. United States, No. 04-36C, at 31 (Fed. Cl. Dec. 3, 2004). Plaintiffs have also admitted, in their opposition to defendant's original motion for summary judgment of April 28, 2005, that, "[t]o the extent that the government is willing to [accept the transfer of the relevant breach of contract claims], Delmarva and Atlantic would be willing to dismiss the breach claims in the amended complaints." Pls.' Br. filed May 25, 2005, at 9.

Energy with respect to, arising out of or in connection with the Purchased Assets . . ." PAs § 2.1(*l*) (emphasis added). The SNF was one of these Purchased Assets, see PAs §§ 2.1(b)-2.1(d), and plaintiffs' takings claims, whatever their merits, are "claims of the Seller against the Department of Energy with respect to, arising out of, or in connection with" that SNF. 12/

3) No genuine issue of material fact

Summary judgment is appropriate when there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); see also Anderson, 477 U.S. at 247-48. It is particularly important to note that a "critical factor in a motion for summary judgment" is "the determination by the court that there is no *genuine* issue of *material* fact." Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 835 (Fed. Cir. 1984). Attorney argument asserting a genuine issue of material fact is insufficient to oppose successfully a motion for summary judgment. "The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient." Id. at 836. Plaintiffs have failed to point to any such evidentiary conflict at all; the only disputed issues before the court are matters of law. Because plaintiffs assigned all of their claims against the Government pertaining to disposal of the SNF to PSEG and PECO, the court must grant defendant's motion for summary judgment.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted. and the Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.

s/ Christine O.C. Miller

__________________________________

**Christine Odell Cook Miller**
Judge

---

12/ Because plaintiffs have assigned all their claims related to the SNF to PSEG and PECO, including whatever takings claims they might have otherwise pursued, the court declines to comment on the merits of such takings claims.